# Exhibit 1

# Superior Court Docket and Documents

## 2020 CA 003889 B JOHNSON, Sergeant JANNEASE Vs. DISTRICT OF COLUMBIA et al FLRS

- Case Type:
- Civil II
- Case Status:
- Open
- File Date:
- 09/03/2020
- Action:
- Complaint for Whistleblower
- Status Date:
- 09/03/2020
- Next Event:
- 12/11/2020

| All Information | Party | Event | Docket | Receipt | Disposition |
|---|---|---|---|---|---|

### Party Information

**JOHNSON, SGT JANNEASE**
- Plaintiff

- Disposition
- Disp Date

| Alias |
|---|

| Party Attorney |
|---|
| Attorney |
| HANNON, JR, JOSEPH M |

**DISTRICT OF COLUMBIA**
- Defendant

- Disposition
- Disp Date

| Alias | |
|---|---|
| CO | VAUGHAN, LAUREN C. |

| Party Attorney |
|---|
| Attorney |
| SEEMAN, KATRINA M |

**BOOTH, Director, DEACON QUINCY**
- Defendant

- Disposition
- Disp Date

| Alias |
|---|

| Party Attorney |
|---|

**PATTEN, WANDA**
- Defendant

- Disposition
- Disp Date

| Alias |
|---|

| Party Attorney |
|---|

### Events

| Date/Time | Location | Type | Result | Event Judge |
|---|---|---|---|---|
| 09/10/2020 02:00 PM | Courtroom 400 | Hearing on Temporary Restraining Order | Temporary Restraining Order Hearing Held | WILLIAMS, YVONNE |
| 09/23/2020 10:30 AM | Courtroom 100 | Status Hearing on Preliminary Injunction | Status Hearing Held | WILLIAMS, YVONNE |
| 09/30/2020 11:00 AM | Courtroom 100 | Status Hearing | Event Cancelled | WILLIAMS, YVONNE |

| Date/Time | Location | Type | Result | Event Judge |
|---|---|---|---|---|
| 12/11/2020 09:30 AM | Courtroom 100 | Initial Scheduling Conference-60 | | WILLIAMS, YVONNE |

## Docket Information

| Date | Docket Text | Image Avail. |
|---|---|---|
| 09/03/2020 | eComplaint Filed. submitted 09/03/2020 19:48. TB<br>(SUMMONS ONLY SUBMITTED FOR DEFENDANT DISTRICT OF COLUMBIA)<br>Attorney: HANNON JR, Mr JOSEPH M (352526)<br>Sergeant JANNEASE JOHNSON (Plaintiff); | Image |
| 09/04/2020 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 12/11/2020    Time: 9:30 am<br>Judge: SADDLER, FERN FLANAGAN    Location: Courtroom 100 | |
| 09/04/2020 | Issue Date:  09/04/2020<br>Service:  Summons Issued<br>Method:  Service Issued<br>Cost Per:  $<br><br>DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue, NW<br>WASHINGTON, DC   20004<br>Tracking No: 5000229741<br><br>DISTRICT OF COLUMBIA<br>441 4th Street, NW<br>Suite 630 South<br>WASHINGTON, DC   20001<br>Tracking No: 5000229742 | |
| 09/04/2020 | Complaint Package eServed to Filer | Image |
| 09/04/2020 | Application for an emergency temporary restraining  Order Filed. Submitted 09/04/2020 23:11pm.  ae<br>Attorney: HANNON JR, Mr JOSEPH M (352526)  Receipt: 460449  Date: 09/08/2020 | Image |
| 09/04/2020 | Additional eFiling Document to Application for an emergency temporary restraining  Order Filed. Submitted 09/04/2020 23:11pm.  ae<br>Attorney: HANNON JR, Mr JOSEPH M (352526) | Image |
| 09/08/2020 | Praecipe Filed. Submitted 09/08/2020 20:58. ajm<br>Attorney: HANNON JR, Mr JOSEPH M (352526)<br>Sergeant JANNEASE JOHNSON (Plaintiff); | Image |
| 09/08/2020 | Additional eFiling Document to Praecipe Filed. Submitted 09/08/2020 20:58. ajm<br>Attorney: HANNON JR, Mr JOSEPH M (352526) | Image |
| 09/09/2020 | Event Scheduled<br>Event: Hearing on Temporary Restraining Order<br>Date: 09/10/2020    Time: 2:00 pm<br>Judge: JUDGE-IN-CHAMBERS    Location: Courtroom 400 | |
| 09/10/2020 | Praecipe Filed. Submitted 09/10/2020 11:44. ajm<br>Attorney: HANNON JR, Mr JOSEPH M (352526)<br>Sergeant JANNEASE JOHNSON (Plaintiff); | Image |
| 09/10/2020 | Additional eFiling Document to Praecipe submitted 09/10/2020 11:44. ajm<br>Attorney: HANNON JR, Mr JOSEPH M (352526) | Image |
| 09/10/2020 | Event Scheduled<br>Event: Status Hearing on Preliminary Injunction<br>Date: 09/23/2020    Time: 10:30 am<br>Judge: SADDLER, FERN FLANAGAN    Location: Courtroom 100 | |

| Date | Docket Text | Image Avail. |
|---|---|---|
| 09/10/2020 | Event Resulted: HEARING HELD<br>The following event: Hearing on Temporary Restraining Order scheduled for 09/10/2020 at 2:00 pm has been resulted as follows:<br><br>Plaintiff, Plaintiff's Counsel Hannon, Defendant's Counsel Seeman, and Counsel Cokereke appeared for the scheduled hearing via Webex. After hearing from the present parties, the Court grants the Motion for Temporary Restraining Order. The parties shall next appear before Judge Saddler for a Status Hearing on the Motion for Preliminary Injunction on 9/23/2020 at 10:30 am. Copies of the Order will be sent to the parties.<br><br>Result: Temporary Restraining Order Hearing Held<br>Judge: WILLIAMS, YVONNE    Location: Courtroom 400<br>Sergeant JANNEASE JOHNSON (Plaintiff); DISTRICT OF COLUMBIA (Defendant); ; Mr JOSEPH M HANNON JR (Attorney) on behalf of Sergeant JANNEASE JOHNSON (Plaintiff); Judge YVONNE WILLIAMS on behalf of Judge FERN FLANAGAN SADDLER | |
| 09/10/2020 | Order Granting Motion for Temporary Restraining Order Entered on the Docket. Signed by Judge Yvonne Williams in chambers on 9/10/20. E-filed. Parties notified via CaseFileXpress on 9/10/20. NA | |
| 09/10/2020 | Order Granting Motion for Temporary Restraining Order signed by Judge Williams submitted 09/10/2020 16:30:38. kc. | Image |
| 09/22/2020 | Praecipe to Enter Appearance Filed. submitted 09/22/2020 18:45. NB<br>Attorney: SEEMAN, KATRINA M (1671729)<br>DISTRICT OF COLUMBIA (Defendant); | Image |
| 09/22/2020 | Motion To Vacate The Temporary Restraining Order Filed. submitted 09/22/2020 18:50. NB<br>Attorney: SEEMAN, KATRINA M (1671729)<br>DISTRICT OF COLUMBIA (Defendant); | Image |
| 09/22/2020 | Additional eFiling Document to Motion To Vacate The Temporary Restraining Order Filed. submitted 09/22/2020 18:50. NB<br>Attorney: SEEMAN, KATRINA M (1671729)<br>DISTRICT OF COLUMBIA (Defendant); | Image |
| 09/23/2020 | Event Scheduled<br>Event: Status Hearing<br>Date: 09/30/2020    Time: 11:00 am<br>Judge: SADDLER, FERN FLANAGAN    Location: Courtroom 100 | |
| 09/23/2020 | Event Resulted:<br>The following event: Status Hearing on Preliminary Injunction scheduled for 09/23/2020 at 10:30 am has been resulted as follows:<br><br>Result: Status Hearing Held. Remote Courtroom 100 (Courtsmart). Plaintiff Atty's Hannon and Burke present and Defendant Atty Semen present. Court gave procedural background of the case. Plaintiff's Atty represents that September 30th will be the last day for Plaintiff's participation in office, so the TRO is now a moot issue. Defendant's Atty Seemen represents that Defendants Booth and Patton has not been served. Once they are served, she represents that she will also represent them. Plaintiff's Atty Burke represents that service was rendered through certified mail. Atty Seemen represents that she just filed a motion last night to vacate the TRO. The Court continued this hearing to allow Plaintiff's Atty Hannon to file a written response. Status Hearing set for September 30, 2020 at 11:00am. By close of business on this date, the court will vacate the Defendant's Motion for Temporary Restraining Order at the request of the parties. Parties were given verbal notice of the next court date. sd/jfs<br><br>Judge: SADDLER, FERN FLANAGAN    Location: Courtroom 100 | |
| 09/28/2020 | Joint Praecipe Regarding Plaintiff's Consent to The District's Motion to Vacate the September 10, 2020 Temporary Restraining Order Filed. Submitted 09/28/2020 12:47. TB<br>Attorney: HANNON JR, Mr JOSEPH M (352526)<br>Attorney: OKEREKE, CHRISTINA (219272)<br>Attorney: SEEMAN, KATRINA M (1671729) | Image |
| 09/28/2020 | Joint Motion to Vacate the September 30, 2020 Status Hearing Filed. submitted 09/28/2020 12:49 TB<br>Attorney: HANNON JR, Mr JOSEPH M (352526)<br>Attorney: OKEREKE, CHRISTINA (219272)<br>Attorney: SEEMAN, KATRINA M (1671729) | Image |
| 09/29/2020 | Order Granting Motion to Vacate Tempororay Restraining Order and Status Hearing Entered on the Docket. Signed in Chambers by Judge Fern Flanagan Saddler on September 29, 2020. Copies sent to parties. Submitted on September 29, 2020. GM | |
| 09/29/2020 | Event Resulted:<br>The following event: Status Hearing scheduled for 09/30/2020 at 11:00 am has been resulted as follows:<br><br>Result: Event Cancelled<br>Judge: SADDLER, FERN FLANAGAN    Location: Courtroom 100 | |
| 09/29/2020 | Order Granting Joint Motion to Vacate the September 30, 2020 Status Hearing signed by J/Saddler on 09/29/2020. Submitted on 09/29/2020 15:29. KT | Image |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 10/05/2020 | Affidavit of Service Filed. Submitted 10/05/2020 14:13. TB | Image |
| | (UNABLE TO RESULT SERVICE; GREEN CARD NOT ATTACHED) WANDA PATTEN (Defendant); | |

### Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|----------------|--------------|---------------|----------------|
| 460319 | 09/04/2020 | HANNON JR, Mr JOSEPH M, Attorney | $120.00 |
| 460449 | 09/08/2020 | HANNON JR, Mr JOSEPH M, Attorney | $20.00 |
| Total | Total | Total | Total $140.00 |

### Case Disposition

| Disposition | Date | Case Judge |
|-------------|------|------------|
| Undisposed | | |

**Filed**
**D.C. Superior Court**
**09/03/2020 19:48PM**
**Clerk of the Court**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| SGT.  JANNEASE JOHNSON | : |
| 12807 Waterfowl Way | : |
| Upper Marlboro, MD 20774 | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Civil Action No._____ |
| | : |
| DISTRICT OF COLUMBIA, | :   **Jury Trial Demanded** |
| a Municipal Corporation | : |
| **Serve**: Mayor Muriel Bowser | : |
| c/o Lauren C.  Vaughan | : |
| Office of the Secretary for the | : |
| Mayor of the District of Columbia | : |
| John A. Wilson Building, Suite 419 | : |
| 1350 Pennsylvania Avenue, NW | : |
| Washington, DC 20004 | : |
| | : |
| **Serve**: Karl A.  Racine | : |
| Attorney General for the | : |
| District of Columbia | : |
| 441 4th Street, NW | : |
| Suite 630 South | : |
| Washington, DC 20001, | : |
| | : |
| and, | : |
| | : |
| QUINCY BOOTH, Director | : |
| District of Columbia Department | : |
| Of Corrections | : |
| 2000 14th Street, NW | : |
| Washington, DC 20009, | : |
| | : |
| and, | : |
| | : |
| WANDA PATTEN, Deputy | : |
| Director of Operations | : |
| District of Columbia Department of | : |
| Corrections | : |
| 2000 14th Street, NW | : |
| Washington, DC 20009. | : |
| Defendants. | : |

## VERIFIED COMPLAINT

SGT. JANNEASE JOHNSON sues Defendants for their engagement in Prohibited Personnel Practices in violation of The District of Columbia Whistleblower Reinforcement Act of 1998, D.C. Code §§ 1-615.53, *et seq.* and in violation of United State Constitution, First Amendment, U.S. Const. amend. I, as applied by The Public Health and Welfare Act of 1996, 42 USCA § 1983, *et seq.*: to wit, Defendants demoted and then fired SGT. JOHNSON on account of her disclosures to attorneys for her Union of information related to the failure of Defendants to protect correctional officers, staff, and inmates at the D.C. Jail, and by extension the public at large, from sickness and death caused by COVID-19.

## JURISDICTION

This Court has Jurisdiction over The District of Columbia Whistleblower Reinforcement Act claim pursuant to D.C. Code § 1-615.54(a)(1).

This Court has Jurisdiction over the United State Constitution, First Amendment Freedom of Speech claim pursuant to Title 42 USC § 1983.  *See Martinez v. State of Cal.* 444 U.S. 277 (1980).

## PARTIES AND RELATED AGENCIES

1.      SGT. JOHNSON prior to the conduct which gives rise to this Verified Complaint was a Sergeant with the D.C. Department of Corrections (DOC), having served for almost three decades with distinction.  In addition, SGT. JOHNSON was serving as the Executive Secretary of the elected Labor Committee of the Fraternal Order of Police (FOP) for the D.C. Jail employees (hereafter "Unit Members").

2.      Defendant District of Columbia ("D.C.") is a municipal corporation.

2

3.      Defendant Quincy Booth is the Director of the D.C. Department of Corrections and is sued in his official and personal capacities.

4.      Defendant Wanda Patten is the Deputy Director of the D.C. Department of Corrections and is also sued in her official and personal capacities.

## FACTUAL ALLEGATIONS

5.      Sgt. Johnson repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

### COVID-19 Poses a Heightened Danger to Correctional Facilities

6.      COVID-19 is the disease caused by the SARS-CoV-2 virus and is currently a global pandemic.[1]

7.      There is no vaccine or cure for COVID-19.[2]

8.      Like nursing homes, cruise ships, and college dormitories, correctional facilities are environments that enable, and in fact facilitate, the spread of COVID-19.

9.      Because staff, residents, contractors, community members, and others constantly cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring the virus into the facility or take it home from the facility.

10.     Once COVID-19 enters a correctional facility there is a high risk of rapid person-to-person transmission of the virus because of cramped conditions that place residents and staff in close proximity to each other.[3]

[1] See WORLD HEALTH ORG., Coronavirus disease (CO VID-19) Pandemic (last visited March 30, 2020, 11:00 AM), https://www.who.intlemergencies/diseases/novel-coronavirus-2019.
[2] CTRS. DISEASE CONTROL & PREVENTION, WHAT YOU NEED TO KNOW ABOUT CORONAVIRUS DISEASE 2019 (COVID-19) (2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[3] Neeltje van Doremalen et al., Correspondence, Aerosol and Surface Stability ofSARS-CoV-2 as Compared with SARS-CoV-1, NEW ENGLAND l MEDICINE, March 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

3

11.     History also bears out that prisons and jails become breeding grounds for epidemics that eventually spread out to broader communities.

12.     Public health research shows that an "influenza epidemic in San Quentin prison" spread to 26 percent of prisoners and became "one of the primary foci" of the 1918 flu epidemic.[4]  The outbreak in San Quentin was started by the introduction of a "newly received prisoner" who had influenza.[5]

13.     More recently, during the N1H1 epidemic in 2009, jails and prisons were also epicenters for transmission.[6]

14.     Empirical evidence shows how outbreaks in correctional institutions quickly reflect back into the greater community: in 1997, near the height of the HIV epidemic, 20 percent of all HIV-infected Americans had been in a correctional facility at least once during the year.[7]

15.     This epidemiological history was known or should have been known to the District of Columbia, the DOC, and Defendants Booth and Patten.

**COVID-19 Threatens the Jail Population, Employees, and the Community**

16.     On January 21, 2020, the first confirmed COVID-19 case was diagnosed in the United State.[8]

17.     On February 25, the CDC "Warned of an almost certain outbreak" in the United States.[9]

---

[4] Niyi Awofeso, Prison Show Prophylaxis for Close Contacts May Indeed Help in Next Flu Pandemic, 329 BMJ 173, 173 (2004).
[5] Stuart A. Kinner et al., Comment, Prisons and Custodial Settings Are Part of a Comprehensive Response to COVID-19, LANCET, March 17, 2020.
[6] Nicole Westman, Prisons and Jails are Vulnerable to COVID-19 Owbreaks, VERGE, March 12, 2020.
[7] Anne C. Spaulding et al., HIV/AJDS Among Inmates of and Re/easeesfrom US Correctional Facilities, 2006: Declining Share of Epidemic but Persis/ell/ Public Health Opportunity, 4 PLoS ONE 7558 (2009).
[8] Derrick Bryson Taylor, A Timeline of the Coronavirus, N.Y. TIMES, March, 2020 https://www.nytimes.comlarticle/coronavirus-timeline.html (last visited March 24, 2020).
[9] Id.

18.    On February 28, the United States saw its first Covid-19 death.[10]

19.    On February 28, Mayor Bowser ordered the activation of the District's Emergency Operations Center to coordinate responses to COVID-19, requiring Defendants to "remind their staff and constituencies" of "basic infection practices," including to "[w]ash hands with soap and water" or an "alcohol-based hand sanitizer," to "[a]void close contact with people who are sick," and to "[c]lean and disinfect frequently touched objects and surfaces."[11]  The Executive Order specifically requires that "[a]ll relevant District agencies shall review their copy of the District Response Plan to evaluate the potential impacts of COVID-19 on emergency roles and responsibilities and take necessary steps to ensure continued performance."[12]

20.    On March 7, the D.C. Department of Health announced the District's first confirmed, laboratory-tested, case of COVID-19.  The same week there were as many as ten sick inmates in section SE2 of the Jail; however, due to the inaction of the Defendants, it is unknown whether these inmates were infected with COVID-19.

21.    On March 9, over a week from Mayor Bowser's executive order, there were at least five sick inmates.  Two of the inmates had been removed from the general population but were soon returned.  It is likely that these inmates contaminated other inmates, Unit Members, and other parts of the Jail.

22.    On March 13, President Trump declared a national emergency.[13]

23.    As of March 13, DOC leadership had not taken any significant steps to protect Unit Members, inmates, or the public at large.  In response HANNON LAW GROUP – attorneys

---

[10] *Id.*
[11] D.C. Mayor's Order 2020-035, § IO(a).
[12] Id. § 3(a).
[13] President Donald j. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, March 13, 2020.

for the FOP Union – began meeting daily with the Union's Labor Committee for an ongoing review of DOC's response to the emergency.

24.     These daily meetings included SGT. JOHNSON in her role as Executive Secretary for the Labor Committee.  From these meetings a plan to protect Unit Members was formed.  This plan included obtaining information regarding D.C. Jail operations and sharing that information with Union attorneys to assess the danger of COVID-19 to Unit Members, inmates and the public.  The FOP was entitled to communicate regularly with Director Quincy Booth and to negotiate over necessary changes that affected the terms and conditions of employment

25.     As part of good operational practice (and in conjunction with requirements in the CBA), the FOP expected the DOC to conduct a labor/management meeting on a monthly basis. Instead, in the midst of the COVID-19 crisis Director Booth canceled these meetings for January, February and March 2020.  As alleged further below, the DOC leadership and Mayor Bowser consistently refused to communicate with the Labor Committee or their counsel during this crisis.  The goal of the Mayor and the DOC was to keep Unit Members uninformed of the dangers associated with exposure to COVID-19 in the Jail so as not to impair operations of the Jail.

26.     On March 19, HANNON LAW GROUP, FOP's counsel, sent a "Request for Information on Potentially Dangerous Conditions at the DOC Facilities" to DOC's General Counsel Eric Glover and to its Labor Liaison.  The next morning, DOC's General Counsel responded: "DOC is preparing a response to your inquiries and will contact you as soon as possible."  The FOP did not receive a response until fifteen days later, which simply mirrored the public information then on the DOC website; it was not, in fact, what the DOC was doing.

27.     Also, on March 19, HANNON LAW GROUP sent an email to DOC on behalf of the FOP regarding the quarantine of 65 inmates who came in contact with an infected U.S. Marshal at Superior Court, requesting immediate provision of Personal Protective Equipment (PPE) for its members.  DOC did not respond.

28.     By March 20, it was clear to the FOP Labor Committee that management was incapable of preventing the spread of the virus.  A unanimous vote of no confidence in Director Booth and Deputy Director Patten, among others, was passed by the FOP Labor Committee. Management then began providing masks – but expressly for inmates only.  This is despite Unit Members facing a greater risk than inmates since correctional officers – and especially case managers – interact with many more inmates than any individual inmate.

29.     On March 23, instead of communicating with the Union as requested on March 19, Director Booth issued a notice announced at every roll call, falsely stating: "It has come to the agency's attention that employees of the DOC intend to engage in either a walkout and/or protest on the grounds of the DOC."  Rather than communicating honestly with the Union on these critical conditions of work, Director Booth threatened the correctional officers with discipline.  This action was clearly in retaliation for the Union presenting legitimate concerns about DOC's failure to implement protections for inmates and Unit Members.

30.     On March 24, Director Booth summoned the FOP Labor Committee Chairman Cpl. Benjamin Olubasusi to his office at the Reeves Center.  Without notice to HANNON LAW GROUP, the Director then put Deputy Mayor Kevin Donahue and Mayor Bowser on speaker phone.  The Mayor then falsely warned Cpl. Olubasusi that it is a "crime" for D.C. correctional officers "to walk out of the Jail."  Mayor Bowser asked Cpl. Olubasusi, "What do you want?"

31.     Also, on March 24, HANNON LAW GROUP, as part of its work with the Union's Labor Committee, participated in a national conference call sponsored by the National Fraternal Order of Police on COVID-19.  Speakers on the call included high-ranking experts from the Department of Homeland Security, Federal Emergency Management Agency and the White House, as well as FOP State Representatives from all 50 states.  The call was to implement preexisting protocols for law enforcement officers and correctional officers nationwide.

32.     On March 25, 2020, the Mayor announced the number of positive COVID-19 infected persons in the District of Columbia increased by 46 new cases to a total of 183. Notably, of the new cases 13 were in their 20s, 12 were in their 30s, and only 7 were over the age of 60.  The Mayor's daily update promised residents, including correctional officers, that the District would conduct "tracing" pursuant to CDC Guidance in order to identify individuals who might be infected from close contact with an infected individual:

> With ongoing community transmission, contact tracing is focused on positive cases associated with childcare facilities, schools and universities, healthcare facilities, senior care facilities, *correctional and detention centers*, and facilities serving individuals who are experiencing homelessness.  Guidance will be published for healthcare providers, employers and the public to provide information on what to do if you have been diagnosed with or are a contact of someone who has COVID19.

(Emphasis supplied).  In truth, the DOC would never employ effective "contact tracing" in the D.C. Jail.

33.     Also on March 25, in response to Mayor Bowser's question to Cpl. Olubasusi "What do you want?", HANNON LAW GROUP sent a letter to Director Booth outlining conditions at the Jail and listing those actions urgently requested by the FOP.  The letter reported the current conditions at the Jail, as reported by SGT. JOHNSON and other Unit Members working in the Jail:

8

- There is no Communication and Coordination between DOC leaders and the FOP Labor Committee. Labor/Management meetings are repeatedly cancelled, including one meeting scheduled during this critical time period.

- Inmates coming into the Jail are not screened for symptoms of COVID-19.

- Correctional officers receiving and discharging inmates have no PPE; however, they must have direct contact with these inmates.

- Inmates continue to move within the Jail. Those inmates in the four restricted housing units must be escorted by hand by correctional officers without any PPE. Inmates in non-restricted housing units travel alone through the Jail as required for appointments. At latest count, there were 1,149 inmates in the Central Detention Facility and 509 in the Correctional Treatment Facility.

- The correctional officers assigned to housing units have no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units. In each unit, one corrections officer is required to be out among the inmates at all times, without any protection.

- Inmates are not required to engage in any of the behaviors which the Mayor recommends for the general population, such as "social distancing", repeated hand-washing, and health monitoring.

- Case workers must meet with inmates in small offices with no PPE or other distancing measures.

- Inmates continue to engage in recreation in a common yard, also without social distancing or other protections from the spread of COVID-19.

- Correctional officers enter the Jail three shifts a day. There is no distancing at entrances, no distancing at roll calls, no attempt to obtain or record health concerns of each officer.

- When the D.C. Jail was forced to quarantine 65 inmates who were at risk to exposure to COVID-19 when they were at court, an Emergency Response Team (ERT) was designated to remove them from the general population to a "quarantine" housing unit. The ERT members refused the assignment without provision of gowns and other appropriate PPE protection were ordered to remove the inmates with only masks and gloves. During the extraction, one of the members was spit upon by an inmate. Sgt. Alexander and Sgt. Graham were then removed from the ERT team and assigned to posts at the CCB.

- These inmates were not "quarantined" in any meaningful manner. They were housed two to a cell, and the correctional officers on the unit were not provided with any PPE or other means for protection against infections.

9

34.     The letter, yet again, detailed FOP's repeated requests to implement effective

procedures to protect Unit Members from infection, illness and death:

- A Daily Meeting among the Labor Committee, its Shop Stewards, its counsel and the DOC Director, Deputy Director, and its counsel to discuss conditions and responses to COVID-19;

- A COVID-19 Protocol for officers and inmates including the following:

- Restricted movement of inmates;

- Distancing among inmates/inmates, officers/officers, and officers/inmates

- Incident Reporting of officers and inmates' symptoms of illness;

- Regular Disinfection of the CDF and CTF;

- Priority for PPE for officers;

- Discontinuation of inmate transport for court appearances;

- 14-day Quarantine for new inmates;

- Establish a quarantine unit;

- Establish an on-site testing unit for those meeting CDC test criteria, including persons living in the household of a corrections officer;

- Treat COVID-19 among officers as duty-connected.

35.     The same day, March 25, SGT. JOHNSON would report to HANNON LAW

GROUP that at least two inmates had tested positive for COVID-19.  A third inmate

presumptively tested positive as well.

36.     On March 28, having still received no response from management, the Labor

Committee established Protocols for its membership based on CDC Guidance, and delivered

them to DOC for implementation and distribution.  Once again, no response was received from

DOC.  Although the Labor Committee urged members to refuse to comply with an order that

violated these Protocols, members consistently relented when ordered, having to put their own lives at risk by assisting inmates without PPE.

37.     By March 28, the Jail had only reported two positive inmates via its internal mailing list.  But later that day, two additional inmates tested positive, bringing the total known inmate cases to four.  The next day it was at five.

38.     On March 29, the Labor Committee learned that the 50-year-old wife of one of the elected members of the Labor Committee, a 29-year veteran, was infected with COVID-19. She was hospitalized in serious condition and returned home on April 1, still in a serious state. Her husband learned on April 1 that he too was positive for COVID-19.

39.     The Labor Committee also learned of the ineffectiveness of the DOC's "contact tracing" of infected inmates.  The Labor Committee learned that at least six of the inmates most recently testing positive at the Jail for COVID-19 were among the 65 inmates who were quarantined after exposure to a COVID-19 positive U.S. Marshal at Superior Court.  That quarantine lasted for only two days, when DOC's Public Information Officer Keena Blackmon announced that the quarantine was being lifted without any of those inmates being tested.  The reason given by Dr. Blackmon follows:

> After sending out yesterday's Open Letter we learned through the Department of Justice (DOJ) and the DC Department of Health (DC Health) full investigation into the U.S. Marshal's contact tracing that none of the DOC residents were in contact with the individual. The quarantine has been lifted.

40.     The Labor Committee's conclusion from this was that whoever is conducting the "tracing" and "investigations" was not doing so in a professional, effective, or reliable manner.

41.     The Labor Committee also learned that the Public Defender Service for the District of Columbia and the ACLU intended to file suit in federal court against the DOC on behalf of incarcerated inmates, alleging that failure to protect inmates from COVID-19 violates

11

the Fifth and Eighth Amendments of the Constitution of the United States. *Banks v. Booth*, No. 1:20-cv-849 (CKK) (D.D.C., filed March 30, 2020).

42.     Thereafter the Labor Committee issued a Press Release which announced that they had decided the Public Defender Service was correct and that DOC was not following the "Guidance on Management of COVID-19 at Correctional and Detention Facilities", issued and updated regularly by the CDC.  PPE recommended by CDC was not present at the Jail for correctional officers or was in short supply and hoarded by supervisors under lock and key. Cleaning and disinfection of the housing units was inadequately performed by inmates, and the Department of Health had not conducted inspections of the housing units.

43.     More importantly, the DOC was not addressing the obvious: the rate of quarantine of correctional officers working in the Central Treatment Facility was 25% of the force on March 27, to increase significantly after the announcement of two infected inmates in the Central Treatment Facility (CTF) wing of the Jail.  Officers assigned to the Central Detention Facility (CDF) wing were being reassigned to CTF due to the number of CTF officers in quarantine. This decline in officers is why the Mayor, Director Booth, and their agents had sought to mislead Unit Members about their own exposure and risk.

44.     On March 31, the FOP Labor Committee in conjunction with HANNON LAW GROUP announced a Press Conference to be held the next morning, April 1, 2020, in front of the D.C. Jail.  The announcement was widely shared and sent to 29 journalists as part of the Labor Committee's plan to raise public alarm.

45.     One of the purposes of the Press Conference was to announce that the FOP, on behalf of its members working in the D.C. Jail, had authorized HANNON LAW GROUP to seek status in the PDS/ACLU lawsuit as a "friend of the court" in support of the inmates.

46.     Regarding the press conference and under the CBA, HANNON LAW GROUP notified the DOC Public Information Officer:

> Due to the high number of media inquiries re: COVID-19 at the Jail, the FOP/DOC Labor Committee and its Stewards will be giving an open press conference to the media.  This notice is sent pursuant to the Collective Bargaining Agreement, and none will violate the guidance and requirements of the agency stated therein.

47.     At 10:45 p.m. that evening, Eric Glover, General Counsel for the DOC, sent an email to HANNON LAW GROUP, stating:

> Per my previous email to you, per DOC's media policy, "[e]mployees approached by the media for an interview that has any bearing on DOC shall notify the PIO for appropriate review and authorization."  As no review has taken place by the agency's PIO, DOC does not authorize the below referenced media event. Thank you.

HANNON LAW GROUP responded:

> There is nothing to review, and the CBA does not require authorization from the DOC. Thank you.

48.     Shortly before the Press Conference ended, the Deputy Warden Kathleen Landerkin called the Protective Service Division Police in an attempt to break up the press conference.  The PSD officers took no action.

**Sergeant Johnson Acted to Raise Public Awareness of Serious Danger**

49.     On April 1, with DOC leadership's refusal to protect Unit Members or engage with the Union, and as part of the Labor Committee and HANNON LAW GROUPS's plan to raise awareness of the life-threatening conditions, the press conference was live-streamed from outside the D.C. Jail.  The press conference had five speakers; J. Michael Hannon, Managing Partner of the HANNON LAW GROUP; Corporal Benjamin Olubasusi, Chairman of the FOP Labor Committee; SGT. JANNEASE JOHNSON, Executive Secretary for the FOP Labor Committee; Cpl. Cherlo Mballow, Steward for the FOP; and, the President of the D.C. FOP Lodge #1.  Highlights of the press conference included:

a) Mr. Hannon spoke about the history of the Labor Committees relationship with DOC leadership and the breakdown in communication that had occurred under Director Booth.  He also discussed their intent, on behalf of the Labor Committee and its officers, to submit an authorized Amicus Brief supporting the PDS/ACLU lawsuit.

b) Cpl. Olubasusi explained that only three members of the Labor Committee were present because one member was already ill awaiting his own test results.  He explained how Unit Members where going without PPE and or social distancing all while DOC rejected requests for help.  Instead, DOC responded with threats of legal action.  He believed that DOC was "leaving [them] to die."

c) SGT. JOHNSON spoke passionately about the failure of DOC to respond to COVID-19 in the Jail.  She gave specific examples where leadership was falling short including not testing, not doing contact tracing, and not reporting/tracking the number of employees who test positive.  As would become clear later what was most troubling to DOC leadership was SGT. JOHNSON pointing out that while most of the Jail is not cleaned regularly, the administrative wing is cleaned extensively every day.  And that despite this heightened cleaning program SGT. JOHNSON reported that Director Booth would still not visit the Jail from his office at the Reeves Center in Northwest.

50.     On April 7, even the "official" Jail count, which still was not tracking employee cases, was reaching crisis level when it was confirmed that twenty-eight inmates had tested positive.  The next day that count increased to thirty-seven.  Inmates who were quarantined still managed to mix with other inmates.  An unknown number of inmates and officers, many of whom still did not have PPE, were being exposed because of this.

51.     On April 9, the District Court in *Banks v. Booth* appointed Ms. Grace Lopes and Mr. Mark Jordan as *amici curiae* to investigate conditions at the Jail and report to the Court. Two days later, on the morning of April 11, for the 7:30 a.m. shift, DOC supervisors for the first time offered surgical masks to correctional officers at roll call.  During the shift, a Major circulated through the Jail telling correctional officers to put on their masks because "the inspectors are coming", passing out surgical masks to those who needed them.  Other

administrative staff were seen around the Jail posting various notices about COVID-19 which had not been in place earlier.

52.     On April 11, the Labor Committee met with Ms. Lopez and Mr. Jordan via conference call.  In attendance were Labor Committee officers, including SGT. JOHNSON, and attorneys with HANNON LAW GROUP.  Thanks to the efforts by SGT. JOHNSON and other Labor Committee officers sharing up-to-date information with their attorneys, the Labor Committee shared specific and documented issues at the Jail.  This information and supporting documents obtained by SGT. JOHNSON and others would later be sent to Ms. Lopes and Mr. Jordan by HANNON LAW GROUP, including email circulated by management to SGT. JOHNSON and other correctional officers.

53.     On April 13, the first inmate death occurred.  Many of the Unit Members assigned to guard this inmate, many without proper PPE, were still on duty throughout the Jail in the days and weeks to come.

54.     On April 14, HANNON LAW GROUP on behalf of Cpl. Olubasusi and the Labor Committee filed a class action lawsuit in the Superior Court, along with an Application for an Emergency Temporary Restraining Order.  The lawsuit alleged that the District and the DOC violated the D.C. OSHA statute by failing to protect Unit Members from the COVID-19 pandemic.  SGT. JOHNSON provided a declaration in support of that lawsuit.

55.     SGT. JOHNSON's declaration, much of which is restated here, was drawn from her personal experiences in the Jail, and from the experiences of other Unit Members who, because she was a Union Officer, turned to her to report their concerns.

56.    On April 15, Ms. Lopes and Mr. Jordan provided an oral report to the Honorable

Colleen Kollar-Kotelly in the inmate's case.  In their oral report, *amici curiae* reported to the

Court, in part, the following:

    a.    DOC had just received a delivery of PPE on April 20, 2020;

    b.    the Jail's complement of correctional officers is understaffed due to quarantine of
          correctional officers and other administrative absences;

    c.    inmates are not engaging in distancing, and the insufficiency of staff contributes
          to an inability to enforce distancing;

    d.    medical records reviewed to date do not report symptoms of inmates;

    e.    inmates in isolation units are not permitted to leave their cells, do not have
          sufficient cleaning materials, are not receiving sufficient towels or disinfectant,
          their clothes are not cleaned for as much as 10-days, they are not allowed phone
          calls to attorneys or family; and, they are visited twice daily by medical staff;

    f.    inmates report a reluctance to share health concerns for fear of being placed in
          isolation;

    g.    neither staff nor inmates are sufficiently educated regarding the risk of infection
          from COVID-19, proper use of PPE, and use of sanitation equipment;

    h.    both staff and inmates in quarantine units were observed with old, dirty,
          misshapen or unconventional masks, and few staff are seen with gloves;

    i.    mold was observed in many common area showers, and many common sinks and
          toilets in CTF are not functioning; and,

    j.    very few inmates are afforded legal calls, and those which take place are on
          telephones which are monitored by DOC.

57.    On April 22, three more Unit Members had tested positive for COVID-19, and the

chaos in the Jail was becoming more evident.  That evening, inmates rioted in one of the housing

units of the Jail.  Many of these inmates had not been allowed recreation time for four days.

Others had not been able to shower in as many days.  Deputy Warden Landerkin authorized

correctional officers to use force to quell the riot.

16

58.     On April 23, 2020, an email reporting the incident was sent through the DOC Incident Notification Mailing List under the title "Planned Use of Force."   The email contained no medical information and was not marked confidential.

59.     SGT. JOHNSON still genuinely concerned about the health and safety of the inmates, Unit Members and as part of her ongoing work with the Labor Committee to collect information, forwarded this email to the HANNON LAW GROUP.

60.     J. Michael Hannon of HANNON LAW GROUP, as part of the ongoing plan to raise public awareness of the state of the Jail, shared the "Planned Use of Force" email with Nathan Baca of WUSA 9 News.   Neither SGT. JOHNSON nor any other Labor Committee member was aware of Mr. Hannon's sending the email to Mr. Baca.

61.     Mr. Baca contacted Dr. Keena Blackmon, the Director of Strategic Communications/Public Information Officer for DOC, about the conditions in the Jail.   He specifically referenced the "Planned use of force" email indicating the Jail was in chaos.   Dr. Blackmon notified DOC leadership, and an investigation was immediately launched, not into the conditions which resulted in the need for force but into SGT. JOHNSON's conduct in emailing to Mr. Hannon.

62.     April 25, while resources where being used to investigate SGT. JOHNSON transmission of email to HANNON LAW GROUP, Unit Members increasingly were not being relieved after 12-hour shifts: six officers each worked twenty-four hours straight, and another two officers each nineteen hours.   Officers becoming sick could not go on administrative leave. Human Resources stopped responding to officer requests for sick leave.   The effect of this was that officers were forced to take their personal leave or simply risk being AWOL.

17

63.     The Union was shut out from conversations with management, and the Mayor could not be reached.  The Union is forbidden by law from going on strike.  To date only orders from Judge Kollar-Kotelly in the *Banks v. Booth* had garnered management's attention.

64.     On April 27, as part of the ongoing Labor Committee efforts to raise public awareness of the danger at the Jail, SGT. JOHNSON provided an interview to Nathan Baca of WUSA 9 News.  She was not the only member of the Labor Committee to provide interviews to the Press.  Since almost nothing had improved since the April 1 press conference or the April 11 meeting with Ms. Lopez and Mr. Jordan, SGT. JOHNSON's interview included largely the same concerns, with the sad, but notable, update that an FOP member had now died due to COVID-19.  DOC was notified in advance of the interview.

65.     Immediately thereafter, and in response to SGT. JOHNSON's effectiveness at raising public concern, Major Antoinnette Miles removed SGT. JOHNSON from her post (Adjustment Board OIC) and reassigned her to housing units on the A Card, a significant demotion.  The stated reason was that "there is a pending investigation into misconduct by you wherein you allegedly released privileged information."  Major Miles did not describe the "privileged information."

66.     SGT. JOHNSON's demotion would not be the last humiliation she suffered.  Her re-assignment began a painful process that would humiliate her in front of her co-works, cause financial hardship, and a significant mental and emotional stress.  This only added to the significant stress of working as a correctional officer in a Jail being mismanaged through the largest global pandemic in a lifetime.

67.     On May 1, Mr. Baca of WUSA 9 authored an article with testimonials from SGT. JOHNSON, current inmates, and their families.  In it SGT. JOHNSON recounted how Unit

Members were "becoming sick and left on post for more than 26 hours." One of SGT.

JOHNSON's co-workers died of COVID-19 on April 5 after being exposed to these conditions.

The article went on to report from inmates. One inmate saying "this is not (a) jail. This is a

cemetery. We're just waiting to die."

68.    On May 4, the "official" Jail count had fifty-five inmates testing positive.

69.    On May 9, the Labor Committee, again including SGT. JOHNSON, and attorneys

with HANNON LAW GROUP, met again with Ms. Lopez and Mr. Jordan via conference call as

part of their ongoing review of the Jail as ordered by Judge Kollar-Kotelly Court. During and

after the meeting, the Labor Committee shared additional documentation of the ongoing issues at

the Jail. Among the documents shared with Ms. Lopez and Mr. Jordan was the April 23 email

regarding the riot and use of force. In their subsequent report to Judge Kollar-Kotelly, Ms.

Lopez and Mr. Jordan noted the following:

> The effectiveness of the DOC's response continues to depend on the efforts of staff
> working in the facilities each day. The correctional workforce is currently diminished
> due to large numbers of staff being unavailable for duty and many housing units operate
> short staffed. Members of the correctional staff have consistently told *amici* that they are
> exhausted from working long hours under very stressful working conditions, which may
> include exposure to the novel coronavirus and in some instances the need to wear full
> PPE for extended time periods.

70.    On May 12, during a bargaining session between the FOP Union and DOC, the

institutional hostility of DOC leadership to the Union strategy boiled to the surface. DOC

Deputy Director Gitanna Stewart-Ponder stated "how can we move forward when we have

people going to media."

71.    Also, on May 14, the DOC Office of Investigative Services completed a report on

SGT. JOHNSON's supposed misconduct which had been referred to it after the inquiry to the

DOC by reporter Nathan Baca. The report states it was compiled after an investigation of SGT.

JOHNSON, initiated after Mr. Baca contacted the Jail for information related to the April 23

"Planned Use of Force" email.  The report cited emails which SGT. JOHNSON had shared with

attorneys at HANNON LAW GROUP, which she did as part of her work with the Labor

Committee.  The report alleged that transmission of these email violated DOC policies and

procedures, the most notable of which was violation of the Health Insurance Portability and

Accountability Act (HIPAA).  The report did not reference or consider whether these emails

were appropriately marked "confidential" in conformity to DOC policies and procedures on

HIPAA.

72.     On May 22, the HANNON LAW GROUP submitted their Amicus Brief in

support of the PDS/ACLU in their lawsuit.  The brief outlined many of the same failings outlined

here, garnered through the assistance of SGT. JOHNSON and other Labor Committee members.

This important information would not have been available without the essential sharing of

information made by SGT. JOHNSON and others at the Jail.

**SGT. JOHNSON is Fired.**

73.     On May 29, after working to help raise awareness of the deplorable situation at

the Jail, SGT. JOHNSON was proposed by Defendant Wanda Patten for removal from her

position.  The stated basis for the proposal was SGT. JOHNSON's forwarding certain email(s) to

attorneys for the Union.  Director Patten intentionally failed to note that the offending emails

were NOT marked confidential, under DOC policy or federal HIPAA regulations.  Nor did she

note that federal HIPAA regulations permit a Unit Member to forward otherwise confidential

documents to an attorney under whistleblower law.  Director Patten's distortion of the facts

represents a reckless disregard for the rights of SGT. JOHNSON and the law.

74.     In conformity with the Collective Bargaining Agreement between the Union and the DOC, an attorney with the D.C. Office of the State Superintendent of Education Ms. Hillary Hoffman-Peak was appointed as the "hearing officer" to review Defendant Patten's proposed termination of SGT. JOHNSON.  HANNON LAW GROUP on behalf of the Union presented a written response and accompanied SGT. JOHNSON in a video presentation to Ms.  Hoffman-Peak.  Also presenting evidence were Labor Committee Chairman Olubasusi and Vice Chairman Cpl. Arnold Hudson, Sr.  During the oral presentation, Mr. Hannon told Ms. Hoffman-Peak that SGT. JOHNSON had no knowledge of his having sent the April 23 email to Nathan Baca.

75.     On June 30, Ms. Hoffman-Paek submitted her recommendation that SGT. JOHNSON not be disciplined.  She found that;

- DOC had failed to meet the burden of preponderance of the evidence that SGT. JOHNSON's conduct was prohibited; and,

- that SGT. JOHNSON's disclosures to Union attorneys were protected under the District of Columbia Whistleblower Reinforcement Act of 1998 specifically referencing the ongoing class action of *Booth v. Banks* that she was assisting in as part of the Labor Committee.

76.     On July 20, following Defendant's failed attempt to terminate SGT. JOHNSON, Defendant Booth wrote a lengthy letter, which included new legal arguments not present in DOC's original submission, to Ms. Hoffman-Peak and "remanded" the case to her for reconsideration.  In this letter, Defendant Booth responded to Ms. Hoffman-Peak's conclusions with counter arguments and new arguments, leaning heavily on federal HIPAA laws in supporting his insistence that SGT. JOHNSON be removed.  Notoriously absent from this letter was any indication that the emails were marked confidential under DOC policies or HIPAA regulations.  Director Booth – as did Deputy Director Patten – intentionally withheld this critical information in reckless disregard for the rights of SGT. JOHNSON and the law.

77.     HANNON LAW GROUP requested an opportunity to respond to Director Booth's letter in writing and, if necessary, another oral presentation.  Ms. Hoffman-Peak, after seeking advice from The D.C. Office of Labor Relations and Collective Bargaining, an agency responsible for representing DOC, choose not to allow SGT. JOHNSON the opportunity to respond to the updated arguments for her dismissal.

78.     On July 31, HANNON LAW GROUP via email pointed out to Ms. Hoffman-Peak the conflict of interest the D.C. Office of Labor Relations and Collective Bargaining had as the agency responsible for representing DOC, the opposing side in the present case.  HANNON LAW GROUP provided other arguments for allowing a response, stating that it would provide its written response by COB Monday, August 4.  Ms. Hoffman-Peak still declined to take additional argument on behalf of SGT. JOHNSON.

79.     On August 4, before receiving HANNON LAW GROUP's promised written response, Ms. Hoffman-Peak submitted her new findings.  This time she adopted almost in its entirety Director Booth's updated arguments.  She found – even if the email were confidential – that SGT. JOHNSON's disclosure of DOC email to attorneys for the Union *was expressly permitted under the whistleblower safe harbor provision in 45 C.F.R. § 164.502 (j).*  However, her decision then went off the rails.  She concluded:

> However, the Hearing Officer finds that Sgt. Johnson's actions of forwarding the email through her attorneys to the media was not protected under the Whistleblower Protection Act.  Sgt. Johnson is bound by the actions of the attorneys because there is no question the attorneys in question were representing the Union, and there is also no question that Sgt. Johnson was acting in her Union capacity with regards to the conduct in question.

This conclusion has three fatal defects: first, the April 23rd "Planned Use of Force" email sent to Nathan Baca by Mr. Hannon contains no medical information protected by HIPAA, it merely reports the riot and its aftermath; second, the April 23 email – perforce – contained no HIPAA

22

confidentiality notice or any other confidential marking as required by DOC policy; and third, there is no basis for firing SGT. JOHSON on some theory of vicarious liability for the independent actions of the Union's attorney.

80.     On August 13, SGT. JOHNSON received notice of her dismissal, dated August 12, by Defendant Quincy Booth adopting the recommendation of Ms. Hoffman-Peak.

81.     On August 21, after working on behalf of the Labor Committee to bring public attention to the dangerous conditions at the Jail, after not having a full opportunity to respond to the updated allegation against her, and after the contradictory findings by the hearing officer, SGT. JOHNSON's spotless nearly thirty-year career with DOC was unceremoniously ended.

82.     Defendants' actions were taken with actual malice and in malicious, wanton, reckless, or willful and wanton disregard for the rights of SGT. JOHNSON.

### COUNT I—CLAIM FOR ENGAGING IN PROHIBITED PERSONNEL PRACTICES IN VIOLATION OF THE DISTRICT OF COLUMBIA WHISTLEBLOWER REINFORCEMENT ACT OF 1998

83.     SGT. JOHNSON repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

84.     Through her work on behalf of the FOP Labor Committee, SGT. JOHNSON has engaged in protected disclosures to attorneys for the FOP Labor Committee for the specific purpose of bringing litigation to remedy the egregious failure of the Defendants to protect SGT. JOHNSON, other Unit Members, and the general public from sickness and death.

85.     Through her participation in the matter of *Banks v. Booth* before the U.S. District Court for the District of Columbia (No. 1:20-cv-849), SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest. One such protected disclosure includes the Amicus Brief of the Fraternal Order of Police DOC Labor Committee in Support of

23

Plaintiffs' Motion for a Temporary Restraining Order in *Banks v. Booth* (Docket No. 23) and the Supplemental Declaration of J. Michael Hannon, Esq. in *Banks v. Booth* (Docket No. 29).

86.     Through her participation in the class action complaint in the matter of Benjamin *Olubasusi et al. v. District of Columbia*, *et al.* before the Superior Court of the District of Columbia (No. 2020 CA 002256 B), SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest.

87.     Through her participation in the unfair labor practice complaint in the matter of *FOP/DOC Labor Committee v. Bowser*, *et al.* (No. 20-U-24) before the District Public Employee Relations Board, SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest.

88.     Through her participation in sixteen separate, group grievances pursuant to the Collective Bargaining Agreement, SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest.

89.     Each of SGT. JOHNSON's disclosures, including those that have been summarized throughout this Complaint, were made in the ordinary course of her duties to attorneys for the FOP, to supervisors or to a public body. The disclosures evidence gross mismanagement; gross misuse or waste of public resources or funds; abuse of authority in connection with the administration of a public program or the execution of a public contract; a violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or a substantial and specific danger to the public health and safety pursuant to D.C. Code Section 1-615.52(a)(6).

90.     As a direct result of her participation in the aforementioned matters, Defendants removed SGT. JOHNSON from her post, reassigned her, and then altogether fired her on August 12, effective August 21.  Each of these actions constitutes a prohibited personnel action in violation of D.C. Code Section 1-615.53(a).

91.     Defendants' conduct towards SGT. JOHNSON is in contravention of stated law and policy that public employees are free to report waste, fraud, abuse of authority, violations of law, and threats to public health or safety without fear of retaliation.  SGT. JOHNSON's right to report such violations entitles her to legal protection, relief, and damages as the law permits.

## COUNT II— CLAIM FOR RETALIATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

92.     SGT. JOHNSON repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

93.     SGT. JOHNSON under the First Amendment has a constitutionally protected right to speech.  This right extends to speech undertaken "in pursuit of a wide variety of political, social, economic, education, religious, and cultural ends."  *Roberts v. U.S. Jaycees,* 468 U.S. 609, 622 (1984).

94.     In the instant case the speech was both the sharing of emails with Union attorneys and sharing her experiences and beliefs with the press regarding the COVID-19 pandemic in the Jail.  This speech was undertaken as part of her personal responsibilities as Executive Secretary for the Union Labor Committee in their efforts to bring public scrutiny on the deplorable and dangerously poor response to COVID-19 by DOC.

95.     When a public employee, like SGT. JOHNSON, speaks her "employer may not discharge …[them] on a basis that infringes that employee's constitutionally protected interest in

freedom of speech." *Lefande v. District of Columbia,* 613 F.3d 115, 1158 (D.C. Cir. 2010). In firing SGT. JOHNSON in retaliation for her first amendment protected disclosures, DOC has violated her constitutionally protected rights extended specifically to public employees through Title 42 of The Public Health and Welfare Act of 1996, Title 42 USC § 1983.

96.     SGT. JOHNSON spoke as a citizen on a matter of public concern. Her right of free speech in a matter of public concern outweighs the government's interest in promoting efficiency. SGT, JOHNSON's speech was either a substantial or motivating factor in the punitive action taken against her by Defendants. And, there is no basis for removal of SGT. JOHNSON other than her exercise of protected speech.

97.     SGT. JOHNSON is therefore entitled to legal protection, relief, and damages as the law permits.

## COUNT III— CLAIM for CIVIL CONSPIRACY

98.     SGT. JOHNSON repeats all allegations contained in the proceeding paragraphs and incorporates the same herein.

99.     The Defendants entered into an agreement, amongst themselves and with others, to retaliate against SGT. JOHNSON on account of her disclosures on behalf of the Labor Committee to bring public attention to the dangerous conditions at the Jail.

100.    The defendants, amongst themselves and with others, engaged in overt acts in furtherance of their conspiracy, the direct and proximate results of which was injury to SGT. JOHNSON, who was demoted and thereafter fired.

## COUNT IV— CLAIM FOR INJUNCTIVE RELIEF

101.    SGT. JOHNSON repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

26

102.    Based on Defendants' violations of the District of Columbus Whistleblower Reinforcement Act of 1998, SGT. JOHNSON prays she be awarded injunctive relief, to wit: equitable relief, reinstatement, restoration of lost benefits, back pay and interest on back pay, compensatory damages, and payment of costs and attorneys' fees associated with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jannease Johnson prays that she be awarded equitable relief, compensatory damages, and punitive damages against the individual defendants in an amount to be determined by a jury, and payment of costs and attorneys' fees associated with this action.

## DEMAND FOR JURY TRIAL

SGT. JOHNSON hereby demands a trial by jury of all Counts triable by jury and of all factual allegations required for the determination of this Complaint.

Dated:                                      Respectfully submitted,

                                            HANNON LAW GROUP, LLP

                                            /s/ J. Michael Hannon
                                            J.  Michael Hannon, #352526
                                            333 8th Street NE
                                            Washington, DC 20002
                                            (202) 232-1907
                                            Fax: (202) 232-3704
                                            jhannon@hannonlawgroup.com

                                            *Attorneys for Jannease Johnson*

## VERIFICATION

I solemnly affirm under the penalties of perjury of the United States of America that the

contents of the forgoing paper are true to the best of my knowledge, information, and belief.

_____9/3/2020_____                          _____
Date                                                      Jannease Johnson



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

SGT. JANNEASE JOHNSON
_____
                                    Plaintiff

vs.                                                        Case Number _____

DISTRICT OF COLUMBIA, et al.
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Michael Hannon
_____                    _Clerk of the Court_
Name of Plaintiff's Attorney

333 8th Street NE
_____          By _____
Address                                                                Deputy Clerk
Washington, DC 20002
_____

202-232-1907
_____          Date _____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                        Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

     Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

     A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____

_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
                               Subsecretario

Fecha _____

如需翻译,请打电话 (202) 879-4828　　Veuillez appeler au (202) 879-4828 pour une traduction　　Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 통역을 원하시면 (202) 879-4828 로 전화해 주십시오.　　 የአማርኛ ትርጉም ለማግኘት፦ (202) 879-4828 ይደውሉ

     IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

     Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

SGT. JANNEASE JOHNSON
_____
Plaintiff

vs.                                                                Case Number _____

DISTRICT OF COLUMBIA, et al.
_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Michael Hannon
_____                          _Clerk of the Court_
Name of Plaintiff's Attorney

333 8th Street NE
_____          By _____
Address                                                                      Deputy Clerk
Washington, DC 20002

202-232-1907
_____          Date _____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화해주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                          Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____

Demandante

contra

Número de Caso: _____

_____

Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

_____     Por: _____
Dirección                                                                        Subsecretario

_____

Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

만약에 번역을 원하시면 (202) 879-4828 로 전화 주십시오.     የምትርጉም ፡ አግልግሎት ፡ ከፈለጉ ፡ (202) 879-4828 ፡ ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

SGT. JANNEASE JOHNSON
_____
                                    Plaintiff

vs.                                                          Case Number _____

DISTRICT OF COLUMBIA, et al.
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Michael Hannon
_____              _Clerk of the Court_
Name of Plaintiff's Attorney

333 8th Street NE
_____              By _____
Address                                                              Deputy Clerk
Washington, DC 20002

202-232-1907
_____              Date _____
Telephone

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828를 전화로 주실세요    የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

---

Demandante

contra

Número de Caso: _____

---

Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

---

Nombre del abogado del Demandante

---

Dirección

Por: _____

Subsecretario

---

Fecha _____

Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오     ያማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                          Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

JANNEASE JOHNSON

Case Number: _____

vs

Date: _____09/03/2020_____

DISTRICT OF COLUMBIA, et al.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*   J. Michael Hannon | Relationship to Lawsuit |
| Firm Name:   Hannon Law Group, LLP | ☒ Attorney for Plaintiff |
| Telephone No.:           Six digit Unified Bar No.:<br> 202-232-1907            352526 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury          ☒ 6 Person Jury            ☐ 12 Person Jury

Demand: $ _____            Other: **For the Jury** _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____  Judge: _____  Calendar #:_____

Case No.:_____  Judge: _____  Calendar#:_____

---

NATURE OF SUIT:     *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent | Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent | Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☒ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
s/ J. Michael Hannon

Attorney's Signature

_____
09/03/2020

Date

CV-496/ June 2015

Filed
D.C. Superior Court
09/02/2020 19:28PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| SGT.  JANNEASE JOHNSON | : |
| 12807 Waterfowl Way | : |
| Upper Marlboro, MD 20774 | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  Civil Action No.  **2020 CA 003889 B** |
| | : |
| DISTRICT OF COLUMBIA, | :  **Jury Trial Demanded** |
| a Municipal Corporation | : |
| **Serve**: Mayor Muriel Bowser | : |
| c/o Lauren C.  Vaughan | : |
| Office of the Secretary for the | : |
| Mayor of the District of Columbia | : |
| John A. Wilson Building, Suite 419 | : |
| 1350 Pennsylvania Avenue, NW | : |
| Washington, DC 20004 | : |
| | : |
| **Serve**: Karl A.  Racine | : |
| Attorney General for the | : |
| District of Columbia | : |
| 441 4th Street, NW | : |
| Suite 630 South | : |
| Washington, DC 20001, | : |
| | : |
| and, | : |
| | : |
| QUINCY BOOTH, Director | : |
| District of Columbia Department | : |
| Of Corrections | : |
| 2000 14th Street, NW | : |
| Washington, DC 20009, | : |
| | : |
| and, | : |
| | : |
| WANDA PATTEN, Deputy | : |
| Director of Operations | : |
| District of Columbia Department of | : |
| Corrections | : |
| 2000 14th Street, NW | : |
| Washington, DC 20009. | : |
| Defendants. | : |

## VERIFIED COMPLAINT

SGT. JANNEASE JOHNSON sues Defendants for their engagement in Prohibited Personnel Practices in violation of The District of Columbia Whistleblower Reinforcement Act of 1998, D.C. Code §§ 1-615.53, *et seq.* and in violation of United State Constitution, First Amendment, U.S. Const. amend. I, as applied by The Public Health and Welfare Act of 1996, 42 USCA § 1983, *et seq.*: to wit, Defendants demoted and then fired SGT. JOHNSON on account of her disclosures to attorneys for her Union of information related to the failure of Defendants to protect correctional officers, staff, and inmates at the D.C. Jail, and by extension the public at large, from sickness and death caused by COVID-19.

## JURISDICTION

This Court has Jurisdiction over The District of Columbia Whistleblower Reinforcement Act claim pursuant to D.C. Code § 1-615.54(a)(1).

This Court has Jurisdiction over the United State Constitution, First Amendment Freedom of Speech claim pursuant to Title 42 USC § 1983. *See Martinez v. State of Cal.* 444 U.S. 277 (1980).

## PARTIES AND RELATED AGENCIES

1.      SGT. JOHNSON prior to the conduct which gives rise to this Verified Complaint was a Sergeant with the D.C. Department of Corrections (DOC), having served for almost three decades with distinction.  In addition, SGT. JOHNSON was serving as the Executive Secretary of the elected Labor Committee of the Fraternal Order of Police (FOP) for the D.C. Jail employees (hereafter "Unit Members").

2.      Defendant District of Columbia ("D.C.") is a municipal corporation.

3.      Defendant Quincy Booth is the Director of the D.C. Department of Corrections and is sued in his official and personal capacities.

4.      Defendant Wanda Patten is the Deputy Director of the D.C. Department of Corrections and is also sued in her official and personal capacities.

## FACTUAL ALLEGATIONS

5.      Sgt.  Johnson repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

### COVID-19 Poses a Heightened Danger to Correctional Facilities

6.      COVID-19 is the disease caused by the SARS-CoV-2 virus and is currently a global pandemic.[1]

7.      There is no vaccine or cure for COVID-19.[2]

8.      Like nursing homes, cruise ships, and college dormitories, correctional facilities are environments that enable, and in fact facilitate, the spread of COVID-19.

9.      Because staff, residents, contractors, community members, and others constantly cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring the virus into the facility or take it home from the facility.

10.     Once COVID-19 enters a correctional facility there is a high risk of rapid person-to-person transmission of the virus because of cramped conditions that place residents and staff in close proximity to each other.[3]

---

[1] See WORLD HEALTH ORG., Coronavirus disease (CO VID-19) Pandemic (last visited March 30, 2020, 11:00 AM), https://www.who.intlemergencies/diseases/novel-coronavirus-20 I 9.

[2] CTRS. DISEASE CONTROL & PREVENTION, WHAT YOU NEED TO KNOW ABOUT CORONAVIRUS DISEASE 2019 (COVID-19) (2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

[3] Neeltje van Doremalen et al., Correspondence, Aerosol and Surface Stability ofSARS-CoV-2 as Compared with SARS-CoV-1, NEW ENGLAND I MEDICINE, March 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

11.     History also bears out that prisons and jails become breeding grounds for epidemics that eventually spread out to broader communities.

12.     Public health research shows that an "influenza epidemic in San Quentin prison" spread to 26 percent of prisoners and became "one of the primary foci" of the 1918 flu epidemic.[4]  The outbreak in San Quentin was started by the introduction of a "newly received prisoner" who had influenza.[5]

13.     More recently, during the N1H1 epidemic in 2009, jails and prisons were also epicenters for transmission.[6]

14.     Empirical evidence shows how outbreaks in correctional institutions quickly reflect back into the greater community: in 1997, near the height of the HIV epidemic, 20 percent of all HIV-infected Americans had been in a correctional facility at least once during the year.[7]

15.     This epidemiological history was known or should have been known to the District of Columbia, the DOC, and Defendants Booth and Patten.

**COVID-19 Threatens the Jail Population, Employees, and the Community**

16.     On January 21, 2020, the first confirmed COVID-19 case was diagnosed in the United State.[8]

17.     On February 25, the CDC "Warned of an almost certain outbreak" in the United States.[9]

---

[4] Niyi Awofeso, Prison Show Prophylaxis for Close Contacts May Indeed Help in Next Flu Pandemic, 329 BMJ 173, 173 (2004).
[5] Stuart A. Kinner et al., Comment, Prisons and Custodial Settings Are Part of a Comprehensive Response to COVID-19, LANCET, March 17, 2020.
[6] Nicole Westman, Prisons and Jails are Vulnerable to COVID-19 Owbreaks, VERGE, March 12, 2020.
[7] Anne C. Spaulding et al., HIV/AJDS Among Inmates of and Re/easeesfrom US Correctional Facilities, 2006: Declining Share of Epidemic but Persis/ell/ Public Health Opportunity, 4 PLoS ONE 7558 (2009).
[8] Derrick Bryson Taylor, A Timeline of the Coronavirus, N.Y. TIMES, March, 2020 https://www.nytimes.comlarticle/coronavirus-timeline.html (last visited March 24, 2020).
[9] Id.

18.     On February 28, the United States saw its first Covid-19 death.[10]

19.     On February 28, Mayor Bowser ordered the activation of the District's Emergency Operations Center to coordinate responses to COVID-19, requiring Defendants to "remind their staff and constituencies" of "basic infection practices," including to "[w]ash hands with soap and water" or an "alcohol-based hand sanitizer," to "[a]void close contact with people who are sick," and to "[c]lean and disinfect frequently touched objects and surfaces."[11]   The Executive Order specifically requires that "[a]ll relevant District agencies shall review their copy of the District Response Plan to evaluate the potential impacts of COVID-19 on emergency roles and responsibilities and take necessary steps to ensure continued performance."[12]

20.     On March 7, the D.C. Department of Health announced the District's first confirmed, laboratory-tested, case of COVID-19.  The same week there were as many as ten sick inmates in section SE2 of the Jail; however, due to the inaction of the Defendants, it is unknown whether these inmates were infected with COVID-19.

21.     On March 9, over a week from Mayor Bowser's executive order, there were at least five sick inmates.  Two of the inmates had been removed from the general population but were soon returned.  It is likely that these inmates contaminated other inmates, Unit Members, and other parts of the Jail.

22.     On March 13, President Trump declared a national emergency.[13]

23.     As of March 13, DOC leadership had not taken any significant steps to protect Unit Members, inmates, or the public at large.  In response HANNON LAW GROUP – attorneys

---

[10] Id.
[11] D.C. Mayor's Order 2020-035, § IO(a).
[12] Id. § 3(a).
[13] President Donald j. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, March 13, 2020.

for the FOP Union – began meeting daily with the Union's Labor Committee for an ongoing review of DOC's response to the emergency.

24.     These daily meetings included SGT. JOHNSON in her role as Executive Secretary for the Labor Committee.  From these meetings a plan to protect Unit Members was formed.  This plan included obtaining information regarding D.C. Jail operations and sharing that information with Union attorneys to assess the danger of COVID-19 to Unit Members, inmates and the public.  The FOP was entitled to communicate regularly with Director Quincy Booth and to negotiate over necessary changes that affected the terms and conditions of employment

25.     As part of good operational practice (and in conjunction with requirements in the CBA), the FOP expected the DOC to conduct a labor/management meeting on a monthly basis. Instead, in the midst of the COVID-19 crisis Director Booth canceled these meetings for January, February and March 2020.  As alleged further below, the DOC leadership and Mayor Bowser consistently refused to communicate with the Labor Committee or their counsel during this crisis.  The goal of the Mayor and the DOC was to keep Unit Members uninformed of the dangers associated with exposure to COVID-19 in the Jail so as not to impair operations of the Jail.

26.     On March 19, HANNON LAW GROUP, FOP's counsel, sent a "Request for Information on Potentially Dangerous Conditions at the DOC Facilities" to DOC's General Counsel Eric Glover and to its Labor Liaison.  The next morning, DOC's General Counsel responded: "DOC is preparing a response to your inquiries and will contact you as soon as possible."  The FOP did not receive a response until fifteen days later, which simply mirrored the public information then on the DOC website; it was not, in fact, what the DOC was doing.

6

27. Also, on March 19, HANNON LAW GROUP sent an email to DOC on behalf of the FOP regarding the quarantine of 65 inmates who came in contact with an infected U.S. Marshal at Superior Court, requesting immediate provision of Personal Protective Equipment (PPE) for its members. DOC did not respond.

28. By March 20, it was clear to the FOP Labor Committee that management was incapable of preventing the spread of the virus. A unanimous vote of no confidence in Director Booth and Deputy Director Patten, among others, was passed by the FOP Labor Committee. Management then began providing masks – but expressly for inmates only. This is despite Unit Members facing a greater risk than inmates since correctional officers – and especially case managers – interact with many more inmates than any individual inmate.

29. On March 23, instead of communicating with the Union as requested on March 19, Director Booth issued a notice announced at every roll call, falsely stating: "It has come to the agency's attention that employees of the DOC intend to engage in either a walkout and/or protest on the grounds of the DOC." Rather than communicating honestly with the Union on these critical conditions of work, Director Booth threatened the correctional officers with discipline. This action was clearly in retaliation for the Union presenting legitimate concerns about DOC's failure to implement protections for inmates and Unit Members.

30. On March 24, Director Booth summoned the FOP Labor Committee Chairman Cpl. Benjamin Olubasusi to his office at the Reeves Center. Without notice to HANNON LAW GROUP, the Director then put Deputy Mayor Kevin Donahue and Mayor Bowser on speaker phone. The Mayor then falsely warned Cpl. Olubasusi that it is a "crime" for D.C. correctional officers "to walk out of the Jail." Mayor Bowser asked Cpl. Olubasusi, "What do you want?"

31.     Also, on March 24, HANNON LAW GROUP, as part of its work with the Union's Labor Committee, participated in a national conference call sponsored by the National Fraternal Order of Police on COVID-19.  Speakers on the call included high-ranking experts from the Department of Homeland Security, Federal Emergency Management Agency and the White House, as well as FOP State Representatives from all 50 states.  The call was to implement preexisting protocols for law enforcement officers and correctional officers nationwide.

32.     On March 25, 2020, the Mayor announced the number of positive COVID-19 infected persons in the District of Columbia increased by 46 new cases to a total of 183. Notably, of the new cases 13 were in their 20s, 12 were in their 30s, and only 7 were over the age of 60.  The Mayor's daily update promised residents, including correctional officers, that the District would conduct "tracing" pursuant to CDC Guidance in order to identify individuals who might be infected from close contact with an infected individual:

> With ongoing community transmission, contact tracing is focused on positive cases associated with childcare facilities, schools and universities, healthcare facilities, senior care facilities, *correctional and detention centers*, and facilities serving individuals who are experiencing homelessness.  Guidance will be published for healthcare providers, employers and the public to provide information on what to do if you have been diagnosed with or are a contact of someone who has COVID19.

(Emphasis supplied).  In truth, the DOC would never employ effective "contact tracing" in the D.C. Jail.

33.     Also on March 25, in response to Mayor Bowser's question to Cpl. Olubasusi "What do you want?", HANNON LAW GROUP sent a letter to Director Booth outlining conditions at the Jail and listing those actions urgently requested by the FOP.  The letter reported the current conditions at the Jail, as reported by SGT. JOHNSON and other Unit Members working in the Jail:

- There is no Communication and Coordination between DOC leaders and the FOP Labor Committee.  Labor/Management meetings are repeatedly cancelled, including one meeting scheduled during this critical time period.

- Inmates coming into the Jail are not screened for symptoms of COVID-19.

- Correctional officers receiving and discharging inmates have no PPE; however, they must have direct contact with these inmates.

- Inmates continue to move within the Jail.  Those inmates in the four restricted housing units must be escorted by hand by correctional officers without any PPE.  Inmates in non-restricted housing units travel alone through the Jail as required for appointments.  At latest count, there were 1,149 inmates in the Central Detention Facility and 509 in the Correctional Treatment Facility.

- The correctional officers assigned to housing units have no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units.  In each unit, one corrections officer is required to be out among the inmates at all times, without any protection.

- Inmates are not required to engage in any of the behaviors which the Mayor recommends for the general population, such as "social distancing", repeated hand-washing, and health monitoring.

- Case workers must meet with inmates in small offices with no PPE or other distancing measures.

- Inmates continue to engage in recreation in a common yard, also without social distancing or other protections from the spread of COVID-19.

- Correctional officers enter the Jail three shifts a day.  There is no distancing at entrances, no distancing at roll calls, no attempt to obtain or record health concerns of each officer.

- When the D.C. Jail was forced to quarantine 65 inmates who were at risk to exposure to COVID-19 when they were at court, an Emergency Response Team (ERT) was designated to remove them from the general population to a "quarantine" housing unit.  The ERT members refused the assignment without provision of gowns and other appropriate PPE protection were ordered to remove the inmates with only masks and gloves. During the extraction, one of the members was spit upon by an inmate.  Sgt. Alexander and Sgt. Graham were then removed from the ERT team and assigned to posts at the CCB.

- These inmates were not "quarantined" in any meaningful manner.  They were housed two to a cell, and the correctional officers on the unit were not provided with any PPE or other means for protection against infections.

9

34.     The letter, yet again, detailed FOP's repeated requests to implement effective

procedures to protect Unit Members from infection, illness and death:

- A Daily Meeting among the Labor Committee, its Shop Stewards, its counsel and the DOC Director, Deputy Director, and its counsel to discuss conditions and responses to COVID-19;

- A COVID-19 Protocol for officers and inmates including the following:

- Restricted movement of inmates;

- Distancing among inmates/inmates, officers/officers, and officers/inmates

- Incident Reporting of officers and inmates' symptoms of illness;

- Regular Disinfection of the CDF and CTF;

- Priority for PPE for officers;

- Discontinuation of inmate transport for court appearances;

- 14-day Quarantine for new inmates;

- Establish a quarantine unit;

- Establish an on-site testing unit for those meeting CDC test criteria, including persons living in the household of a corrections officer;

- Treat COVID-19 among officers as duty-connected.

35.     The same day, March 25, SGT. JOHNSON would report to HANNON LAW

GROUP that at least two inmates had tested positive for COVID-19.  A third inmate

presumptively tested positive as well.

36.     On March 28, having still received no response from management, the Labor

Committee established Protocols for its membership based on CDC Guidance, and delivered

them to DOC for implementation and distribution.  Once again, no response was received from

DOC.  Although the Labor Committee urged members to refuse to comply with an order that

10

violated these Protocols, members consistently relented when ordered, having to put their own lives at risk by assisting inmates without PPE.

37.     By March 28, the Jail had only reported two positive inmates via its internal mailing list.  But later that day, two additional inmates tested positive, bringing the total known inmate cases to four.  The next day it was at five.

38.     On March 29, the Labor Committee learned that the 50-year-old wife of one of the elected members of the Labor Committee, a 29-year veteran, was infected with COVID-19. She was hospitalized in serious condition and returned home on April 1, still in a serious state. Her husband learned on April 1 that he too was positive for COVID-19.

39.     The Labor Committee also learned of the ineffectiveness of the DOC's "contact tracing" of infected inmates.  The Labor Committee learned that at least six of the inmates most recently testing positive at the Jail for COVID-19 were among the 65 inmates who were quarantined after exposure to a COVID-19 positive U.S. Marshal at Superior Court.  That quarantine lasted for only two days, when DOC's Public Information Officer Keena Blackmon announced that the quarantine was being lifted without any of those inmates being tested.  The reason given by Dr. Blackmon follows:

> After sending out yesterday's Open Letter we learned through the Department of Justice (DOJ) and the DC Department of Health (DC Health) full investigation into the U.S. Marshal's contact tracing that none of the DOC residents were in contact with the individual. The quarantine has been lifted.

40.     The Labor Committee's conclusion from this was that whoever is conducting the "tracing" and "investigations" was not doing so in a professional, effective, or reliable manner.

41.     The Labor Committee also learned that the Public Defender Service for the District of Columbia and the ACLU intended to file suit in federal court against the DOC on behalf of incarcerated inmates, alleging that failure to protect inmates from COVID-19 violates

11

the Fifth and Eighth Amendments of the Constitution of the United States.  *Banks v. Booth*, No.
1:20-cv-849 (CKK) (D.D.C., filed March 30, 2020).

42.      Thereafter the Labor Committee issued a Press Release which announced that
they had decided the Public Defender Service was correct and that DOC was not following the
"Guidance on Management of COVID-19 at Correctional and Detention Facilities", issued and
updated regularly by the CDC.  PPE recommended by CDC was not present at the Jail for
correctional officers or was in short supply and hoarded by supervisors under lock and key.
Cleaning and disinfection of the housing units was inadequately performed by inmates, and the
Department of Health had not conducted inspections of the housing units.

43.      More importantly, the DOC was not addressing the obvious: the rate of quarantine
of correctional officers working in the Central Treatment Facility was 25% of the force on March
27, to increase significantly after the announcement of two infected inmates in the Central
Treatment Facility (CTF) wing of the Jail.  Officers assigned to the Central Detention Facility
(CDF) wing were being reassigned to CTF due to the number of CTF officers in quarantine.
This decline in officers is why the Mayor, Director Booth, and their agents had sought to mislead
Unit Members about their own exposure and risk.

44.      On March 31, the FOP Labor Committee in conjunction with HANNON LAW
GROUP announced a Press Conference to be held the next morning, April 1, 2020, in front of
the D.C. Jail.  The announcement was widely shared and sent to 29 journalists as part of the
Labor Committee's plan to raise public alarm.

45.      One of the purposes of the Press Conference was to announce that the FOP, on
behalf of its members working in the D.C. Jail, had authorized HANNON LAW GROUP to seek
status in the PDS/ACLU lawsuit as a "friend of the court" in support of the inmates.

46.     Regarding the press conference and under the CBA, HANNON LAW GROUP notified the DOC Public Information Officer:

> Due to the high number of media inquiries re: COVID-19 at the Jail, the FOP/DOC Labor Committee and its Stewards will be giving an open press conference to the media.  This notice is sent pursuant to the Collective Bargaining Agreement, and none will violate the guidance and requirements of the agency stated therein.

47.     At 10:45 p.m. that evening, Eric Glover, General Counsel for the DOC, sent an email to HANNON LAW GROUP, stating:

> Per my previous email to you, per DOC's media policy, "[e]mployees approached by the media for an interview that has any bearing on DOC shall notify the PIO for appropriate review and authorization."  As no review has taken place by the agency's PIO, DOC does not authorize the below referenced media event. Thank you.

HANNON LAW GROUP responded:

> There is nothing to review, and the CBA does not require authorization from the DOC. Thank you.

48.     Shortly before the Press Conference ended, the Deputy Warden Kathleen Landerkin called the Protective Service Division Police in an attempt to break up the press conference.  The PSD officers took no action.

**Sergeant Johnson Acted to Raise Public Awareness of Serious Danger**

49.     On April 1, with DOC leadership's refusal to protect Unit Members or engage with the Union, and as part of the Labor Committee and HANNON LAW GROUPS's plan to raise awareness of the life-threatening conditions, the press conference was live-streamed from outside the D.C. Jail.  The press conference had five speakers; J. Michael Hannon, Managing Partner of the HANNON LAW GROUP; Corporal Benjamin Olubasusi, Chairman of the FOP Labor Committee; SGT. JANNEASE JOHNSON, Executive Secretary for the FOP Labor Committee; Cpl. Cherlo Mballow, Steward for the FOP; and, the President of the D.C. FOP Lodge #1.  Highlights of the press conference included:

a) Mr. Hannon spoke about the history of the Labor Committees relationship with DOC leadership and the breakdown in communication that had occurred under Director Booth. He also discussed their intent, on behalf of the Labor Committee and its officers, to submit an authorized Amicus Brief supporting the PDS/ACLU lawsuit.

b) Cpl. Olubasusi explained that only three members of the Labor Committee were present because one member was already ill awaiting his own test results. He explained how Unit Members where going without PPE and or social distancing all while DOC rejected requests for help. Instead, DOC responded with threats of legal action. He believed that DOC was "leaving [them] to die."

c) SGT. JOHNSON spoke passionately about the failure of DOC to respond to COVID-19 in the Jail. She gave specific examples where leadership was falling short including not testing, not doing contact tracing, and not reporting/tracking the number of employees who test positive. As would become clear later what was most troubling to DOC leadership was SGT. JOHNSON pointing out that while most of the Jail is not cleaned regularly, the administrative wing is cleaned extensively every day. And that despite this heightened cleaning program SGT. JOHNSON reported that Director Booth would still not visit the Jail from his office at the Reeves Center in Northwest.

50.    On April 7, even the "official" Jail count, which still was not tracking employee cases, was reaching crisis level when it was confirmed that twenty-eight inmates had tested positive. The next day that count increased to thirty-seven. Inmates who were quarantined still managed to mix with other inmates. An unknown number of inmates and officers, many of whom still did not have PPE, were being exposed because of this.

51.    On April 9, the District Court in *Banks v. Booth* appointed Ms. Grace Lopes and Mr. Mark Jordan as *amici curiae* to investigate conditions at the Jail and report to the Court. Two days later, on the morning of April 11, for the 7:30 a.m. shift, DOC supervisors for the first time offered surgical masks to correctional officers at roll call. During the shift, a Major circulated through the Jail telling correctional officers to put on their masks because "the inspectors are coming", passing out surgical masks to those who needed them. Other

administrative staff were seen around the Jail posting various notices about COVID-19 which had not been in place earlier.

52.    On April 11, the Labor Committee met with Ms. Lopez and Mr. Jordan via conference call.  In attendance were Labor Committee officers, including SGT. JOHNSON, and attorneys with HANNON LAW GROUP.  Thanks to the efforts by SGT. JOHNSON and other Labor Committee officers sharing up-to-date information with their attorneys, the Labor Committee shared specific and documented issues at the Jail.  This information and supporting documents obtained by SGT. JOHNSON and others would later be sent to Ms. Lopes and Mr. Jordan by HANNON LAW GROUP, including email circulated by management to SGT. JOHNSON and other correctional officers.

53.    On April 13, the first inmate death occurred.  Many of the Unit Members assigned to guard this inmate, many without proper PPE, were still on duty throughout the Jail in the days and weeks to come.

54.    On April 14, HANNON LAW GROUP on behalf of Cpl. Olubasusi and the Labor Committee filed a class action lawsuit in the Superior Court, along with an Application for an Emergency Temporary Restraining Order.  The lawsuit alleged that the District and the DOC violated the D.C. OSHA statute by failing to protect Unit Members from the COVID-19 pandemic.  SGT. JOHNSON provided a declaration in support of that lawsuit.

55.    SGT. JOHNSON's declaration, much of which is restated here, was drawn from her personal experiences in the Jail, and from the experiences of other Unit Members who, because she was a Union Officer, turned to her to report their concerns.

56.     On April 15, Ms. Lopes and Mr. Jordan provided an oral report to the Honorable

Colleen Kollar-Kotelly in the inmate's case.  In their oral report, *amici curiae* reported to the

Court, in part, the following:

   a.  DOC had just received a delivery of PPE on April 20, 2020;

   b.  the Jail's complement of correctional officers is understaffed due to quarantine of
       correctional officers and other administrative absences;

   c.  inmates are not engaging in distancing, and the insufficiency of staff contributes
       to an inability to enforce distancing;

   d.  medical records reviewed to date do not report symptoms of inmates;

   e.  inmates in isolation units are not permitted to leave their cells, do not have
       sufficient cleaning materials, are not receiving sufficient towels or disinfectant,
       their clothes are not cleaned for as much as 10-days, they are not allowed phone
       calls to attorneys or family; and, they are visited twice daily by medical staff;

   f.  inmates report a reluctance to share health concerns for fear of being placed in
       isolation;

   g.  neither staff nor inmates are sufficiently educated regarding the risk of infection
       from COVID-19, proper use of PPE, and use of sanitation equipment;

   h.  both staff and inmates in quarantine units were observed with old, dirty,
       misshapen or unconventional masks, and few staff are seen with gloves;

   i.  mold was observed in many common area showers, and many common sinks and
       toilets in CTF are not functioning; and,

   j.  very few inmates are afforded legal calls, and those which take place are on
       telephones which are monitored by DOC.

57.     On April 22, three more Unit Members had tested positive for COVID-19, and the

chaos in the Jail was becoming more evident.  That evening, inmates rioted in one of the housing

units of the Jail.  Many of these inmates had not been allowed recreation time for four days.

Others had not been able to shower in as many days.  Deputy Warden Landerkin authorized

correctional officers to use force to quell the riot.

16

58.     On April 23, 2020, an email reporting the incident was sent through the DOC Incident Notification Mailing List under the title "Planned Use of Force."  The email contained no medical information and was not marked confidential.

59.     SGT. JOHNSON still genuinely concerned about the health and safety of the inmates, Unit Members and as part of her ongoing work with the Labor Committee to collect information, forwarded this email to the HANNON LAW GROUP.

60.     J. Michael Hannon of HANNON LAW GROUP, as part of the ongoing plan to raise public awareness of the state of the Jail, shared the "Planned Use of Force" email with Nathan Baca of WUSA 9 News.  Neither SGT. JOHNSON nor any other Labor Committee member was aware of Mr. Hannon's sending the email to Mr. Baca.

61.     Mr. Baca contacted Dr. Keena Blackmon, the Director of Strategic Communications/Public Information Officer for DOC, about the conditions in the Jail.  He specifically referenced the "Planned use of force" email indicating the Jail was in chaos.  Dr. Blackmon notified DOC leadership, and an investigation was immediately launched, not into the conditions which resulted in the need for force but into SGT. JOHNSON's conduct in emailing to Mr. Hannon.

62.     April 25, while resources where being used to investigate SGT. JOHNSON transmission of email to HANNON LAW GROUP, Unit Members increasingly were not being relieved after 12-hour shifts: six officers each worked twenty-four hours straight, and another two officers each nineteen hours.  Officers becoming sick could not go on administrative leave. Human Resources stopped responding to officer requests for sick leave.  The effect of this was that officers were forced to take their personal leave or simply risk being AWOL.

17

63.     The Union was shut out from conversations with management, and the Mayor could not be reached.  The Union is forbidden by law from going on strike.  To date only orders from Judge Kollar-Kotelly in the *Banks v. Booth* had garnered management's attention.

64.     On April 27, as part of the ongoing Labor Committee efforts to raise public awareness of the danger at the Jail, SGT. JOHNSON provided an interview to Nathan Baca of WUSA 9 News.  She was not the only member of the Labor Committee to provide interviews to the Press.  Since almost nothing had improved since the April 1 press conference or the April 11 meeting with Ms. Lopez and Mr. Jordan, SGT. JOHNSON's interview included largely the same concerns, with the sad, but notable, update that an FOP member had now died due to COVID-19.  DOC was notified in advance of the interview.

65.     Immediately thereafter, and in response to SGT. JOHNSON's effectiveness at raising public concern, Major Antoinnette Miles removed SGT. JOHNSON from her post (Adjustment Board OIC) and reassigned her to housing units on the A Card, a significant demotion.  The stated reason was that "there is a pending investigation into misconduct by you wherein you allegedly released privileged information."  Major Miles did not describe the "privileged information."

66.     SGT. JOHNSON's demotion would not be the last humiliation she suffered.  Her re-assignment began a painful process that would humiliate her in front of her co-works, cause financial hardship, and a significant mental and emotional stress.  This only added to the significant stress of working as a correctional officer in a Jail being mismanaged through the largest global pandemic in a lifetime.

67.     On May 1, Mr. Baca of WUSA 9 authored an article with testimonials from SGT. JOHNSON, current inmates, and their families.  In it SGT. JOHNSON recounted how Unit

Members were "becoming sick and left on post for more than 26 hours." One of SGT.

JOHNSON's co-workers died of COVID-19 on April 5 after being exposed to these conditions.

The article went on to report from inmates. One inmate saying "this is not (a) jail. This is a

cemetery. We're just waiting to die."

68.     On May 4, the "official" Jail count had fifty-five inmates testing positive.

69.     On May 9, the Labor Committee, again including SGT. JOHNSON, and attorneys

with HANNON LAW GROUP, met again with Ms. Lopez and Mr. Jordan via conference call as

part of their ongoing review of the Jail as ordered by Judge Kollar-Kotelly Court. During and

after the meeting, the Labor Committee shared additional documentation of the ongoing issues at

the Jail. Among the documents shared with Ms. Lopez and Mr. Jordan was the April 23 email

regarding the riot and use of force. In their subsequent report to Judge Kollar-Kotelly, Ms.

Lopez and Mr. Jordan noted the following:

> The effectiveness of the DOC's response continues to depend on the efforts of staff
> working in the facilities each day. The correctional workforce is currently diminished
> due to large numbers of staff being unavailable for duty and many housing units operate
> short staffed. Members of the correctional staff have consistently told *amici* that they are
> exhausted from working long hours under very stressful working conditions, which may
> include exposure to the novel coronavirus and in some instances the need to wear full
> PPE for extended time periods.

70.     On May 12, during a bargaining session between the FOP Union and DOC, the

institutional hostility of DOC leadership to the Union strategy boiled to the surface. DOC

Deputy Director Gitanna Stewart-Ponder stated "how can we move forward when we have

people going to media."

71.     Also, on May 14, the DOC Office of Investigative Services completed a report on

SGT. JOHNSON's supposed misconduct which had been referred to it after the inquiry to the

DOC by reporter Nathan Baca. The report states it was compiled after an investigation of SGT.

JOHNSON, initiated after Mr. Baca contacted the Jail for information related to the April 23 "Planned Use of Force" email. The report cited emails which SGT. JOHNSON had shared with attorneys at HANNON LAW GROUP, which she did as part of her work with the Labor Committee. The report alleged that transmission of these email violated DOC policies and procedures, the most notable of which was violation of the Health Insurance Portability and Accountability Act (HIPAA). The report did not reference or consider whether these emails were appropriately marked "confidential" in conformity to DOC policies and procedures on HIPAA.

72.     On May 22, the HANNON LAW GROUP submitted their Amicus Brief in support of the PDS/ACLU in their lawsuit. The brief outlined many of the same failings outlined here, garnered through the assistance of SGT. JOHNSON and other Labor Committee members. This important information would not have been available without the essential sharing of information made by SGT. JOHNSON and others at the Jail.

                    **SGT. JOHNSON is Fired.**

73.     On May 29, after working to help raise awareness of the deplorable situation at the Jail, SGT. JOHNSON was proposed by Defendant Wanda Patten for removal from her position. The stated basis for the proposal was SGT. JOHNSON's forwarding certain email(s) to attorneys for the Union. Director Patten intentionally failed to note that the offending emails were NOT marked confidential, under DOC policy or federal HIPAA regulations. Nor did she note that federal HIPAA regulations permit a Unit Member to forward otherwise confidential documents to an attorney under whistleblower law. Director Patten's distortion of the facts represents a reckless disregard for the rights of SGT. JOHNSON and the law.

74.     In conformity with the Collective Bargaining Agreement between the Union and the DOC, an attorney with the D.C. Office of the State Superintendent of Education Ms. Hillary Hoffman-Peak was appointed as the "hearing officer" to review Defendant Patten's proposed termination of SGT. JOHNSON.  HANNON LAW GROUP on behalf of the Union presented a written response and accompanied SGT. JOHNSON in a video presentation to Ms.  Hoffman-Peak.  Also presenting evidence were Labor Committee Chairman Olubasusi and Vice Chairman Cpl. Arnold Hudson, Sr.  During the oral presentation, Mr. Hannon told Ms. Hoffman-Peak that SGT. JOHNSON had no knowledge of his having sent the April 23 email to Nathan Baca.

75.     On June 30, Ms. Hoffman-Paek submitted her recommendation that SGT. JOHNSON not be disciplined.  She found that;

- DOC had failed to meet the burden of preponderance of the evidence that SGT. JOHNSON's conduct was prohibited; and,

- that SGT. JOHNSON's disclosures to Union attorneys were protected under the District of Columbia Whistleblower Reinforcement Act of 1998 specifically referencing the ongoing class action of *Booth v. Banks* that she was assisting in as part of the Labor Committee.

76.     On July 20, following Defendant's failed attempt to terminate SGT. JOHNSON, Defendant Booth wrote a lengthy letter, which included new legal arguments not present in DOC's original submission, to Ms.  Hoffman-Peak and "remanded" the case to her for reconsideration.  In this letter, Defendant Booth responded to Ms. Hoffman-Peak's conclusions with counter arguments and new arguments, leaning heavily on federal HIPAA laws in supporting his insistence that SGT. JOHNSON be removed.  Notoriously absent from this letter was any indication that the emails were marked confidential under DOC policies or HIPAA regulations.  Director Booth – as did Deputy Director Patten – intentionally withheld this critical information in reckless disregard for the rights of SGT. JOHNSON and the law.

21

77.     HANNON LAW GROUP requested an opportunity to respond to Director Booth's letter in writing and, if necessary, another oral presentation.  Ms. Hoffman-Peak, after seeking advice from The D.C. Office of Labor Relations and Collective Bargaining, an agency responsible for representing DOC, choose not to allow SGT. JOHNSON the opportunity to respond to the updated arguments for her dismissal.

78.     On July 31, HANNON LAW GROUP via email pointed out to Ms. Hoffman-Peak the conflict of interest the D.C. Office of Labor Relations and Collective Bargaining had as the agency responsible for representing DOC, the opposing side in the present case.  HANNON LAW GROUP provided other arguments for allowing a response, stating that it would provide its written response by COB Monday, August 4.  Ms. Hoffman-Peak still declined to take additional argument on behalf of SGT. JOHNSON.

79.     On August 4, before receiving HANNON LAW GROUP's promised written response, Ms. Hoffman-Peak submitted her new findings.  This time she adopted almost in its entirety Director Booth's updated arguments.  She found – even if the email were confidential – that SGT. JOHNSON's disclosure of DOC email to attorneys for the Union *was expressly permitted under the whistleblower safe harbor provision in 45 C.F.R. § 164.502 (j).*  However, her decision then went off the rails.  She concluded:

> However, the Hearing Officer finds that Sgt. Johnson's actions of forwarding the email through her attorneys to the media was not protected under the Whistleblower Protection Act.  Sgt. Johnson is bound by the actions of the attorneys because there is no question the attorneys in question were representing the Union, and there is also no question that Sgt. Johnson was acting in her Union capacity with regards to the conduct in question.

This conclusion has three fatal defects: first, the April 23rd "Planned Use of Force" email sent to Nathan Baca by Mr. Hannon contains no medical information protected by HIPAA, it merely reports the riot and its aftermath; second, the April 23 email – perforce – contained no HIPAA

confidentiality notice or any other confidential marking as required by DOC policy; and third, there is no basis for firing SGT. JOHSON on some theory of vicarious liability for the independent actions of the Union's attorney.

80.     On August 13, SGT. JOHNSON received notice of her dismissal, dated August 12, by Defendant Quincy Booth adopting the recommendation of Ms. Hoffman-Peak.

81.     On August 21, after working on behalf of the Labor Committee to bring public attention to the dangerous conditions at the Jail, after not having a full opportunity to respond to the updated allegation against her, and after the contradictory findings by the hearing officer, SGT. JOHNSON's spotless nearly thirty-year career with DOC was unceremoniously ended.

82.     Defendants' actions were taken with actual malice and in malicious, wanton, reckless, or willful and wanton disregard for the rights of SGT. JOHNSON.

### COUNT I—CLAIM FOR ENGAGING IN PROHIBITED PERSONNEL PRACTICES IN VIOLATION OF THE DISTRICT OF COLUMBIA WHISTLEBLOWER REINFORCEMENT ACT OF 1998

83.     SGT. JOHNSON repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

84.     Through her work on behalf of the FOP Labor Committee, SGT. JOHNSON has engaged in protected disclosures to attorneys for the FOP Labor Committee for the specific purpose of bringing litigation to remedy the egregious failure of the Defendants to protect SGT. JOHNSON, other Unit Members, and the general public from sickness and death.

85.     Through her participation in the matter of *Banks v. Booth* before the U.S. District Court for the District of Columbia (No. 1:20-cv-849), SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest. One such protected disclosure includes the Amicus Brief of the Fraternal Order of Police DOC Labor Committee in Support of

Plaintiffs' Motion for a Temporary Restraining Order in *Banks v. Booth* (Docket No. 23) and the Supplemental Declaration of J. Michael Hannon, Esq. in *Banks v. Booth* (Docket No. 29).

86.     Through her participation in the class action complaint in the matter of Benjamin *Olubasusi et al. v. District of Columbia*, *et al.* before the Superior Court of the District of Columbia (No. 2020 CA 002256 B), SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest.

87.     Through her participation in the unfair labor practice complaint in the matter of *FOP/DOC Labor Committee v. Bowser*, *et al.* (No. 20-U-24) before the District Public Employee Relations Board, SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest.

88.     Through her participation in sixteen separate, group grievances pursuant to the Collective Bargaining Agreement, SGT. JOHNSON has made, and continues to make, protected disclosures that serve the public interest.

89.     Each of SGT. JOHNSON's disclosures, including those that have been summarized throughout this Complaint, were made in the ordinary course of her duties to attorneys for the FOP, to supervisors or to a public body.  The disclosures evidence gross mismanagement; gross misuse or waste of public resources or funds; abuse of authority in connection with the administration of a public program or the execution of a public contract; a violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or a substantial and specific danger to the public health and safety pursuant to D.C. Code Section 1-615.52(a)(6).

90.     As a direct result of her participation in the aforementioned matters, Defendants removed SGT. JOHNSON from her post, reassigned her, and then altogether fired her on August 12, effective August 21.  Each of these actions constitutes a prohibited personnel action in violation of D.C. Code Section 1-615.53(a).

91.     Defendants' conduct towards SGT. JOHNSON is in contravention of stated law and policy that public employees are free to report waste, fraud, abuse of authority, violations of law, and threats to public health or safety without fear of retaliation.  SGT. JOHNSON's right to report such violations entitles her to legal protection, relief, and damages as the law permits.

### COUNT II— CLAIM FOR RETALIATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

92.     SGT. JOHNSON repeats the allegations contained in the preceding paragraphs and incorporates the same herein.

93.     SGT. JOHNSON under the First Amendment has a constitutionally protected right to speech.  This right extends to speech undertaken "in pursuit of a wide variety of political, social, economic, education, religious, and cultural ends."  *Roberts v. U.S. Jaycees,* 468 U.S. 609, 622 (1984).

94.     In the instant case the speech was both the sharing of emails with Union attorneys and sharing her experiences and beliefs with the press regarding the COVID-19 pandemic in the Jail.  This speech was undertaken as part of her personal responsibilities as Executive Secretary for the Union Labor Committee in their efforts to bring public scrutiny on the deplorable and dangerously poor response to COVID-19 by DOC.

95.     When a public employee, like SGT. JOHNSON, speaks her "employer may not discharge …[them] on a basis that infringes that employee's constitutionally protected interest in

freedom of speech." *Lefande v. District of Columbia,* 613 F.3d 115, 1158 (D.C. Cir. 2010).  In

firing SGT. JOHNSON in retaliation for her first amendment protected disclosures, DOC has

violated her constitutionally protected rights extended specifically to public employees through

Title 42 of The Public Health and Welfare Act of 1996, Title 42 USC § 1983.

96.     SGT. JOHNSON spoke as a citizen on a matter of public concern.  Her right of

free speech in a matter of public concern outweighs the government's interest in promoting

efficiency.  SGT, JOHNSON's speech was either a substantial or motivating factor in the

punitive action taken against her by Defendants.  And, there is no basis for removal of SGT.

JOHNSON other than her exercise of protected speech.

97.     SGT. JOHNSON is therefore entitled to legal protection, relief, and damages as

the law permits.

### COUNT III— CLAIM for CIVIL CONSPIRACY

98.     SGT. JOHNSON repeats all allegations contained in the proceeding paragraphs

and incorporates the same herein.

99.     The Defendants entered into an agreement, amongst themselves and with others,

to retaliate against SGT. JOHNSON on account of her disclosures on behalf of the Labor

Committee to bring public attention to the dangerous conditions at the Jail.

100.    The defendants, amongst themselves and with others, engaged in overt acts in

furtherance of their conspiracy, the direct and proximate results of which was injury to SGT.

JOHNSON, who was demoted and thereafter fired.

### COUNT IV— CLAIM FOR INJUNCTIVE RELIEF

101.    SGT. JOHNSON repeats the allegations contained in the preceding paragraphs

and incorporates the same herein.

102.     Based on Defendants' violations of the District of Columbus Whistleblower Reinforcement Act of 1998, SGT. JOHNSON prays she be awarded injunctive relief, to wit: equitable relief, reinstatement, restoration of lost benefits, back pay and interest on back pay, compensatory damages, and payment of costs and attorneys' fees associated with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jannease Johnson prays that she be awarded equitable relief, compensatory damages, and punitive damages against the individual defendants in an amount to be determined by a jury, and payment of costs and attorneys' fees associated with this action.

## DEMAND FOR JURY TRIAL

SGT. JOHNSON hereby demands a trial by jury of all Counts triable by jury and of all factual allegations required for the determination of this Complaint.

Dated:                                        Respectfully submitted,

HANNON LAW GROUP, LLP

*/s/ J. Michael Hannon*
J.  Michael Hannon, #352526
333 8th Street NE
Washington, DC 20002
(202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Jannease Johnson*

**VERIFICATION**

I solemnly affirm under the penalties of perjury of the United States of America that the

contents of the forgoing paper are true to the best of my knowledge, information, and belief.

_____9/3/2020_____                    _____
Date                                       Jannease Johnson

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

SGT. JANNEASE JOHNSON
_____
                                  Plaintiff

vs.

                                                          Case Number   **2020 CA 003889 B**

DISTRICT OF COLUMBIA, et al.
_____
                                  Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Michael Hannon
_____
Name of Plaintiff's Attorney

333 8th Street NE
_____
Address
Washington, DC 20002

202-232-1907
_____
Telephone

如需翻译，请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주시기 바랍니다         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

_Clerk of the Court_

By _____
                                  Deputy Clerk

Date _____**09/04/2020**_____

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                                    Super. Ct. Civ. R. 4



# TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
## DIVISIÓN CIVIL
### Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                    Demandante
contra

                                                    Número de Caso: _____

_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

_____            Por: _____
Dirección                                                         Subsecretario

_____

_____            Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 도움을 원하시면 (202) 879-4828로 전화하십시오.         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                        Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

SGT. JANNEASE JOHNSON
_____
                                    Plaintiff

vs.                                                              Case Number  _____

DISTRICT OF COLUMBIA, et al.
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Michael Hannon
_____                    _Clerk of the Court_
Name of Plaintiff's Attorney

333 8th Street NE
_____    By _____
Address                                                              Deputy Clerk
Washington, DC 20002
_____

202-232-1907
_____    Date _____
Telephone
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828를 전화로 주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov



_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____                  *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____      Por: _____
Dirección                                              Subsecretario

_____
                                                    Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 통역을 원하시면(202) 879-4828로 전화주십시오    የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

SGT. JANNEASE JOHNSON
_____
                                                        Plaintiff

vs.                                                                                    Case Number _____

DISTRICT OF COLUMBIA, et al.
_____
                                                        Defendant

**SUMMONS**

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Michael Hannon
_____          *Clerk of the Court*
Name of Plaintiff's Attorney

333 8th Street NE
_____          By _____
Address                                                                                    Deputy Clerk
Washington, DC 20002

202-232-1907
_____          Date _____
Telephone

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____          Por: _____
Dirección                                                        Subsecretario

_____

                                                       Fecha _____
Teléfono
如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828
만약에 번역을 원하시면 (202) 879-4828 로 전화 하십시오.           የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                        Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

JANNEASE JOHNSON

Case Number: **2020 CA 003889 B**

vs

Date: 09/03/2020

DISTRICT OF COLUMBIA, et al.

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)*   J. Michael Hannon | Relationship to Lawsuit |
|---|---|
| Firm Name:   Hannon Law Group, LLP | ☒ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.:   Six digit Unified Bar No.:<br>202-232-1907        352526 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury      ☒ 6 Person Jury          ☐ 12 Person Jury

Demand: $_____          Other: For the Jury

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar#:_____

---

NATURE OF SUIT:     *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent | Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent | Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☒ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
s/ J. Michael Hannon

Attorney's Signature

_____
09/03/2020

Date



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

Sergeant JANNEASE JOHNSON
    Vs.                         C.A. No.      2020 CA 003889 B
DISTRICT OF COLUMBIA et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                Chief Judge Robert E. Morin

Case Assigned to: Judge FERN FLANAGAN SADDLER
Date:  September 4, 2020
Initial Conference: 9:30 am, Friday, December 11, 2020
Location:  Courtroom 100
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch.  The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

# EXHIBIT 1

## Declaration of Dr. Jaimie Meyer

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

### I.  Background and Qualifications

1.  I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine. I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2.  I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut. In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility. Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. In 2017-2018, I volunteered to run monthly AIDS awareness programming at Danbury FCI and FSL federal prisons for women in Danbury, Connecticut. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole). I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others. I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3.  I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4.  My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5.  I am being paid $200 per hour for my time reviewing materials and preparing this report.

6. I have not testified as an expert at trial or by deposition in the past four years.

7. I have been asked by the Public Defender Service for the District of Columbia to review and comment on materials in connection with a case to be filed on behalf of certain incarcerated individuals who are at an increased risk of contracting and developing complications from exposure to COVID-19. I was specifically asked to comment on jail conditions during and preparedness for the COVID-19 pandemic.

8. In addition to my knowledge, training, education, and experience in the field of prison healthcare and infectious diseases, and the resources relied upon by experts in infectious diseases and prison health, I also reviewed specifically the Centers for Disease Control and Prevention (CDC) guidance on management of COVID-19 in correctional facilities (available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html), the Bureau of Prisons (BOP) modified operations plan (available at https://www.bop.gov/coronavirus/covid19_status.jsp), the National Commission on Correctional Health Care (NCCHC) materials on COVID-19 (available at https://www.ncchc.org/COVID-Resources), and the World Health Organization interim guidance on Preparedness, prevention and control of COVID-19 in prisons and other places of detention (available at http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1).

## II.    Heightened Risk of Epidemics in Jails and Prisons

9. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

10. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

11. Reduced prevention opportunities. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through

droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

12. <u>Disciplinary segregation or solitary confinement facilities is not an effective disease containment strategy.</u> Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff. Because incarcerated people may perceive quarantine as punitive, or as a living arrangement that allows fewer privileges than their regular housing, incarcerated people may be deterred from self-reporting symptoms to medical staff. As a result, they may remain in congregate settings while infected, potentially transmitting infections to others.

13. <u>Reduced prevention opportunities.</u> During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

14. <u>Reduced prevention opportunities.</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

15. <u>Increased susceptibility.</u> People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

16. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease</u>

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

<u>outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

17. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

18. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

19. <u>Health safety.</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

20. <u>Safety and security.</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

21. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

## III.    Profile of COVID-19 as an Infectious Disease[4]

22. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to nor developed protective responses against this virus. A vaccine is currently in development but will likely not be available for at least another year to the general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for use in clinical trials. People in prison and jail will likely have even less access to these novel health strategies as they become available.

23. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6] Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially

---

[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.

[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*. The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext

when they have not received the influenza vaccine or the pneumonia vaccine.

24. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

25. COVID-19 prevention strategies include containment and mitigation. Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Jails and prisons are totally under-resourced to meet the demand for any of these strategies. As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease. Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

26. The time to act is now. Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19. To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in place. Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV. Risk of COVID-19 in the D.C. Department of Corrections' ("D.C. DOC") Correctional Treatment Facility and Central Detention Facility ("D.C. jails")

27. In making my assessment of the danger of COVID-19 in the District of Columbia jails, I have reviewed the following reports and declarations:
   i. Reports published following local government inspections of the DC jails:
   - District of Columbia Corrections Information Council, "DC Department of Corrections Inspection Report" (published May 21, 2019);
   - Office of the District of Columbia Auditor, "Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks" (published February 28, 2019)

---

[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

  **ii.** Report resulting from a non-profit agency inspection of the DC jails:
- Washington Lawyers' Committee for Civil Rights and Urban Affairs, "D.C. Prisoners: Conditions of Confinement in the District of Columbia" (published June 11, 2015)

  **iii.** Declarations from those living and working within the DC jails:
- CTF inmates Keon Jackson and Eric Smith
- CDF inmates D'Angelo Phillips and Edward Banks
- Public Defender Service staff who entered the jail facilities to meet with clients and who have conducted phone interviews with clients regarding conditions within the jails:
  - Division Chief Jonathan Anderson;
  - Supervising Attorney Joseph Wong;
  - Supervising Attorney Ieshaah Murphy;
  - Staff Attorney Daniel Pond;
  - Staff Attorney Rachel Cicurel;
  - Staff Attorney Ronald Resetarits;
  - Staff Attorney Kavya Naini;
  - Investigative Intern Eileen Johnson;
  - Investigative Intern Katherine Kuenzle;
  - Investigative Intern Samuel Cyphers;
  - March 25, 2020 Fraternal Order of Police Department of Corrections Labor Committee Letter to Quincy L. Booth

28. Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. In addition, the practices and resources of CDF and CTF with regard to sanitation and other policies, as reflected in the declarations of CDF and CTF inmates who have resided in these facilities in March 2020 and the declarations of the PDS attorneys who have visited these facilities in March 2020, lead me to conclude, in my professional judgment, that the inmates, visitors, and employees of these facilities are at imminent risk of contracting COVID-19. Further, based on these same declarations, it is my professional judgment that, now that there is at least one positive case of COVID-19 within the CDF and CTF facilities, the chances are extremely high that most or all of the other inmates of, visitors to, and employees at that facility will contract it as well. Finally, it is my professional judgment that, because of the high likelihood that inmates, visitors, and employees of CDF and CTF will contract COVID-19, combined with the state of limited medical care for inmates at these facilities, any inmate of these facilities who contracts COVID-19 faces a serious and substantial risk of death from COVID-19. The reasons for this conclusion are detailed as follows.[8]

---

[8]  In the below section, summaries of CDC guidance and general clinic recommendations

### a. General Prevention Practices

i. **Cleaning and Disinfecting Practices:** Because the SARS-CoV-2 virus (that causes COVID-19 disease) can survive on inanimate objects, high-touch surfaces (including doorknobs, light switches, countertops) should be regularly disinfected with bleach. The CDC recommends cleaning and disinfecting, several times per day, surfaces that are not ordinarily cleaned daily, including doorknobs, light switches, countertops, sink handles, recreation equipment, telephones, kiosks. At least several times per day, staff should clean and disinfect shared equipment, including radios, service weapons, keys, and handcuffs.

*Even before the COVID-19 pandemic, CDF and CTF facilities were described, in a mix of government reports, audits and declarations, as being unsanitary and unhygienic with crumbling physical infrastructure. These conditions will contribute to the rapid spread of COVID-19 within the facility, in the absence of adequate cleaning and disinfecting protocols. Declarations from people incarcerated at CDF and CTF facilities reflect that inmates are provided with rare bottles of Windex to clear their cells, which contains 4% isopropyl alcohol, as compared to the 70% alcohol-containing products or bleach needed to disinfect, per CDC recommendations. In fact, since Windex contains 28% ammonia, it could actually be harmful if mixed with bleach because the reaction generates chlorine gas that irritates the respiratory tract, eyes, and skin.*

ii. **Hygiene:** Prevention of COVID-19 requires that people have access to soap, private sinks, and clean water for handwashing or alcohol-based hand sanitizers.

*Failure to provide CDF and CTF inmates with a consistent and free supply of hygienic products (including soap and hand sanitizer) will increase the rate at which COVID-19 spreads around these facilities, because hand washing is one of the most effective ways to prevent spread of the virus. Yet declarations from people currently incarcerated in these facilities reflect no access to alcohol-based sanitizers and completely inadequate provision of no-cost soap.*

iii. **Personal protective equipment (PPE):** CDC recommends that "all staff and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained correctly to don, doff, and dispose of PPE." In this case, PPE includes gowns, gloves, face masks, respirators, and eye shields or goggles. N95 respirators require special fit testing and people with facial hair need special accommodations because they cannot achieve a tight enough seal with N95 respirators. Inmates involved in cleaning, laundry, and meal service also need to be trained in how to don and doff personal protective equipment.

---

are followed by a discussion in *italics* of how these guidelines apply to the District of Columbia Department of Corrections.

*The lack of personal protective equipment ("PPE") for both D.C. DOC staff and inmates, as described in the declarations of inmates and attorneys, will result in increased risk of COVID-19 infection. Even if PPE is accessible for CDF and CTF staff, it does not appear from PDS staff declarations that staff have been using PPE. This is also likely to increase the spread of the virus, as even asymptomatic people can transmit the virus. Of particular concern is the lack of PPE for staff who interact with the many visitors that cycle in and out of the facilities.*

*Inmates assigned to cleaning duties are also not provided appropriate PPE, resulting in high risk of contracting COVID-19. The DOC Labor Committee Letter reflects that Correctional Officers who requested PPE to extract inmates who are possible COVID-19 infected and bring them to isolation or quarantine were removed from duty. This is completely unacceptable and will undoubtedly result in COVID-19 infections in the facility and harm to inmates and staff. Absent from the documents I reviewed is any mention of planning for shortages for PPE or training staff on how to use PPE. This is critical because, without training, staff risk exposing themselves and inmates to COVID-19 infection when donning and doffing equipment.*

**b. Screening:** COVID-19 is a virus that spreads easily, primarily from person-to-person through respiratory droplets. It is therefore imperative that people entering closed confinement settings like prisons are properly screened to ensure that they do not bring the virus into the facility. Research suggests that people who are ill with COVID-19 and experiencing symptoms are most likely to transmit the virus to others. The virus can be transmitted very efficiently from person to person within 6 feet, putting staff and inmates at risk of becoming infected unless proper infection prevention and control strategies are implemented.

**i. Screening Inmates:** Current CDC guidance suggests screening should consist of two questions: "1) Today or in the past 24 hours, have you had any of the following symptoms: fever/felt feverish/had chills; cough; difficulty breathing; 2) In the past 14 days have you had contact with a person known to be infected with COVID-19?"

*There is no description in any of the documents I reviewed, that inmates are being screened for COVID-19 on intake. After completing screening, people without symptoms or temperature but who have been exposed to COVID-19, should be quarantined for 14 days to monitor for signs and symptoms of infection. Declarations from inmates suggest quarantining after exposure is occurring but for only 1 week. This premature release from quarantine will likely result in people with COVID-19 infection entering the general population in the facility and infecting others. Given that the average person with COVID-19 infection transmits the disease to 2-3 others (in the best of circumstances in the community*

*where social distancing is possible), this will likely result in the disease spreading through the facility like wildfire.*

ii.   **Screening Staff:** CDC recommends verbally screening all staff daily on entry into the facility for COVID-19 symptoms and close contact with cases, and temperature checks.

*It is unclear from the documents I reviewed whether this is occurring, if at all. Per the DOC Labor Committee Letter, there has been no attempt to reassign staff who are at high-risk for COVID-19 themselves, putting staff at high risk of contracting the disease and transmitting to other staff and inmates residing inside the facility.*

iii.   **Screening Visitors/Vendors/Contractors:** According to the CDC, visitors and volunteers should also complete verbal screening procedures and temperature checks on entry into the facility.

*The screening procedures described in the PDS staff declarations are insufficient to mitigate the risk that the virus will enter. Of particular concern is the lack of PPE for staff who interact with the many visitors that cycle in and out of the facilities delay; the inadequacy of the visitor screening program to identify asymptomatic carriers and the use of faulty equipment to recognize even symptomatic visitors will all but guarantee that someone infected with COVID-19 will enter the facilities. While some attempts have been clearly made to introduce a screening questionnaire, the questions used are outdated because they still focus on travel screening which has become a moot point in light of widespread community outbreaks, and thus do not align with CDC recommendations. The vast deficits in the screening process is especially important in DC jails, where medical care providers and contractors. If a medical care provider is infected with COVID-19, there is still the high likelihood that they will be able to enter the facility and can infect inmates with whom they have direct patient care contact.*

c. **Social distancing:** When containment strategies become overwhelmed, mitigation strategies require people to practice social distancing. CDC recommends the following strategies: Meals can be staggered, and seating be rearranged in dining halls and common areas (like waiting areas) to enable social distancing, such as removing every other seat. Alternatively, meals could be provided in housing units. Mitigation strategies must be in place for other highly congregate settings, such as recreation, group activities, educational classes, vocational training, and religious services.

*The lack of ability to practice social distancing in the CDF and CTF is also concerning and will the increase rate of spread of the virus. Continuing programming in groups of 30, as one inmate described in his declaration, will inevitably result in increased spread of the virus. The description by another inmate about inmates dipping their hands and cups into a communal cooler of juice also suggests that D.C. DOC is not enforcing even basic social distancing protocols. This is compounded by congregate housing units, in*

*which 40-50 men are sleeping in a single unit, many of whom have respiratory symptoms that are consistent with COVID-19 infection. CDF and CTF facilities are described, in a mix of government reports, audits and declarations as poorly ventilated with overwhelmingly communal shared spaces that are poorly ventilated. This scenario makes social distancing practices impossible, contributing to the rapid spread of COVID-19 once it enters a facility. The ventilation conditions described in the District of Columbia's Auditor's report is also concerning and will increase the rate of spread of the virus. The Department of Corrections' response to the Auditor's report includes D.C. DOC's own conclusion that the "current HVAC system has significant design problems that inhibit proper airflow." Because the virus can spread in an airborne state, ventilation is an important mitigator for the spread of the virus.*

**d. Management of the disease in the facility:** People who have been diagnosed with COVID-19 (either because they exhibit consistent symptoms or because they obtained a positive test), need to be medically isolated to prevent the virus from being transmitted to other people in the facility population. Importantly, medical isolation differs from disciplinary segregation. It should be used as a public health measure that also attends to the medical needs of the individual; not used to deprive them of all freedom of movement. Ideally, people with COVID-19 will be medically isolated near medical units where they can receive clinical care and attention. In people who are older (>65) and with underlying medical conditions, the disease can progress extremely rapidly, so medical attention is critical.

*The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected. The descriptions by inmates that there are day-long delays to see medical staff is highly concerning and will increase the risk of infection-related morbidity and mortality. The District of Columbia's Auditor's observation that the Department of Health does not conduct any inspections of the CTF is troubling, as regular compliance checks are essential to determining whether medical care is adequate.*

    **i. Sufficiency of isolation spaces**: Prisons are built to contain people, not diseases. Given how COVID-19 outbreaks have overwhelmed even the most sophisticated hospital systems nationwide, it is unlikely that the D.C. DOC will be adequately equipped or supported once someone in the facility becomes ill with COVID-19. Even mild disease requires close monitoring and that caregivers and/or healthcare personnel have personal protective equipment (PPE), including gloves, gowns, eye shields, and masks, that are not usually available in the D.C. DOC or are potentially in limited supply. Airborne isolation rooms are specially equipped with negative pressure to allow air flow from outside the room to inside. These negative pressure rooms should be used for people with diagnosed or suspected COVID-19 who have more severe disease or are at high risk of aerosolizing droplets (e.g. they are coughing frequently).

A COVID-19 outbreak poses particular risk to people with underlying chronic health conditions, including heart disease, lung disease, liver disease, pregnancy, diabetes, and suppressed immune systems. They have higher risk of becoming infected with COVID-19 if exposed and higher risk of complications and death if infected. People also need continuous access to treatment for their other underlying health conditions, which are at risk during a COVID-19 pandemic in the context of healthcare understaffing and reduced access to medications (if supply chains are interrupted).

*The 2019 D.C. Auditor report suggests there is a single medical isolation space in CTF with negative pressure capacity, located in the Medical 82 unit. The same report noted that, at the time of the audit, the remainder of the 40 beds were nearly entirely filled (at 73% capacity), which would leave few beds available for COVID-19 patients. To say this is unacceptable is an understatement. Given that, as of March 27, 2020 there are around 1600 individuals in D.C. DOC custody, that means approximately 1600 individuals would rely on that single isolation room if they became infected with COVID-19. Clearly demand would outpace need. Individuals who could not be isolated in single spaces could be isolated in cohorts, but only if testing were widely available in the facility, which does not appear to be the case. These issues will culminate in people with COVID-19 infection: 1) remaining in communal settings to easily transmit to everyone in their housing unit or 2) requiring transfer to area hospitals, which will likely also be limited in the context of a community-wide outbreak. Limited bed space may also mean that inmates and staff will be deterred from reporting their symptoms, potentially delaying medical attention and resulting in preventable complications and possibly death.*

ii.   **Medical care for other health conditions:** Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention. Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes. Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

*The commonplace neglect of, and delay in providing treatment to, individuals with acute pain and serious health needs under ordinary circumstances is also*

*strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under- prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic. The statement by two inmates that it can take "days" to receive medical attention is strong evidence that D.C. DOC is seriously ill-equipped and under-prepared, as the COVID-19 outbreak will require D.C. DOC to provide medical attention to a large number of people at once.*

29. The above examples illustrate that the D.C. DOC remains unprepared to address the current COVID-19 pandemic. As the CDC acknowledges, even a prison operating precisely under its guidelines would be a far more dangerous environment than the community, given the mayor's directive to remain at home and business and school closures in place.

30. D.C. DOC's inability to adequately contain and treat COVID-19 is especially concerning for higher risk individuals, such as older adults and people with chronic illnesses such as diabetes, liver disease, pregnancy, heart disease, and lung disease. People with these particular characteristics are most susceptible to becoming seriously ill or even dying should they become infected with COVID-19.

31. There is true urgency to act on these facts now. Data from the US during other infectious disease outbreaks (e.g. influenza) and data from other countries during COVID-19 show that when prison systems are unprepared for pandemics, people in prison experience much higher rates of morbidity and mortality than even affected communities. Such crises within prisons endanger communities as a whole by increasing the overall number of cases and increasing pressure on hospitals. There is no current approved vaccine or antiviral medication treatment for COVID-19 so public health preparedness is the only tool we have.

32. Inadequate screening and testing procedures in facilities, including failing to test inmates who have demonstrated symptoms of COVID-19, increase the widespread COVID-19 transmission.

**V.  Conclusion and Recommendations**

33. **The declarations provided by people currently incarcerated in CDF and CTF are alarming and make clear that conditions in the DC jails during this pandemic are dangerous.** It is my professional judgment that individuals placed in these jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These significantly higher risks include an elevated risk of serious illness (pneumonia and sepsis) and death.  DC jails are ill-equipped to prevent COVID-19 from entering its facilities and woefully unprepared to prevent its spread within the facility.

34. Reducing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large.

35. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in DC jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

36. This is especially important for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 65. Nonetheless, it remains the case, given the conditions in the DC jails, that everyone in the CDF and CTF is right now at serious risk of contracting COVID-19 and, if that occurs, of dying from it.

37. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for rapid and severe COVID-19 spread in these facilities is a matter of hours not days. Once a case of COVID-19 is identified in a facility, it is only a matter of time until there is a widespread outbreak. In the past several days, first one, then two, and now four, inmates in D.C. DOC custody have tested positive for COVID-19 with many inmates reportedly in quarantine. More cases are sure to follow because of under-resourced, under-staffed, or minimally implemented infection prevention and control measures.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Dr. Jaimie Meyer

March 29, 2020
Wilton, Connecticut

# EXHIBIT A

# CURRICULUM VITAE

| | |
|---|---|
| Date of Revision: | November 20, 2019 |
| Name: | Jaimie Meyer, MD, MS, FACP |
| School: | Yale School of Medicine |

## Education:
BA, Dartmouth College Anthropology 2000
MD, University of Connecticut School of Medicine 2005
MS, Yale School of Public Health Biostatistics and Epidemiology 2014

## Career/Academic Appointments:
| | |
|---|---|
| 2005 - 2008 | Residency, Internal Medicine, NY Presbyterian Hospital at Columbia, New York, NY |
| 2008 - 2011 | Fellowship, Infectious Diseases, Yale University School of Medicine, New Haven, CT |
| 2008 - 2012 | Clinical Fellow, Infectious Diseases, Yale School of Medicine, New Haven, CT |
| 2010 - 2012 | Fellowship, Interdisciplinary HIV Prevention, Center for Interdisciplinary Research on AIDS, New Haven, CT |
| 2012 - 2014 | Instructor, AIDS, Yale School of Medicine, New Haven, CT |
| 2014 - present | Assistant Professor, AIDS, Yale School of Medicine, New Haven, CT |
| 2015 - 2018 | Assistant Clinical Professor, Nursing, Yale School of Medicine, New Haven, CT |

## Board Certification:
AB of Internal Medicine, Internal Medicine, 08-2008, 01-2019
AB of Internal Medicine, Infectious Disease, 10-2010
AB of Preventive Medicine, Addiction Medicine, 01-2018

## Professional Honors & Recognition:
### International/National/Regional
| | |
|---|---|
| 2018 | NIH Center for Scientific Review, Selected as Early Career Reviewer |
| 2017 | Doris Duke Charitable Foundation, Doris Duke Charitable Foundation Scholar |
| 2016 | American College of Physicians, Fellow |
| 2016 | NIH Health Disparities, Loan Repayment Award Competitive Renewal |
| 2016 | AAMC, Early Career Women Faculty Professional Development Seminar |
| 2014 | NIH Health Disparities, Loan Repayment Program Award |
| 2014 | NIDA, Women & Sex/Gender Differences Junior Investigator Travel Award |
| 2014 | International Women's/Children's Health & Gender Working Group, Travel Award |
| 2014 | Patterson Trust, Awards Program in Clinical Research |
| 2013 | Connecticut Infectious Disease Society, Thornton Award for Clinical Research |
| 2011 | Bristol Myers-Squibb, Virology Fellows Award |

| 2006 | NY Columbia Presbyterian, John N. Loeb Intern Award |
| 2005 | American Medical Women's Association, Medical Student Citation |
| 2005 | Connecticut State Medical Society, Medical Student Award |
| 2000 | Dartmouth College, Hannah Croasdale Senior Award |
| 2000 | Dartmouth College, Palaeopitus Senior Leadership Society Inductee |

## Yale University

| 2014 | Women's Faculty Forum, Public Voices Thought Leadership Program Fellow |

## Grants/Clinical Trials History:

### Current Grants

| | |
|---|---|
| Agency: | Center for Interdisciplinary Research on AIDS (CIRA) |
| I.D.#: | 2019-20 Pilot Project Awards |
| Title: | Optimizing PrEP's Potential in Non-Clinical Settings: Development and Evaluation of a PrEP Decision Aid for Women Seeking Domestic Violence Services |
| P.I.: | Tiara Willie |
| Role: | Principal Investigator |
| Percent effort: | 2% |
| Direct costs per year: | $29,993.00 |
| Total costs for project period: | $29,993.00 |
| Project period: | 7/11/2019 - 7/10/2020 |

| | |
|---|---|
| Agency: | SAMHSA |
| I.D.#: | H79 TI080561 |
| Title: | CHANGE: Comprehensive Housing and Addiction Management Network for Greater New Haven |
| Role: | Principal Investigator |
| Percent effort: | 20% |
| Direct costs per year: | $389,054.00 |
| Total costs for project period: | $1,933,368.00 |
| Project period: | 11/30/2018 - 11/29/2023 |

| | |
|---|---|
| Agency: | Gilead Sciences, Inc. |
| I.D.#: | Investigator Sponsored Award, CO-US-276-D136 |
| Title: | Delivering HIV Pre-Exposure Prophylaxis to Networks of Justice-Involved Women |
| Role: | Principal Investigator |
| Percent effort: | 8% |
| Direct costs per year: | $81,151.00 |
| Total costs for project | |

| | |
|---|---|
| period: | $306,199.00 |
| Project period: | 6/19/2018 - 1/31/2020 |

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | R21 DA042702 |
| Title: | Prisons, Drug Injection and the HIV Risk Environment |
| Role: | Principal Investigator |
| Percent effort: | 22% |
| Direct costs per year: | $129,673.00 |
| Total costs for project period: | $358,276.00 |
| Project period: | 8/1/2017 - 7/31/2020 |

| | |
|---|---|
| Agency: | Doris Duke Charitable Foundation |
| I.D.#: | Clinical Scientist Development Award |
| Title: | Developing and Testing the Effect of a Patient-Centered HIV Prevention Decision Aid on PrEP uptake for Women with Substance Use in Treatment Settings |
| Role: | Principal Investigator |
| Percent effort: | 27% |
| Direct costs per year: | $149,959.00 |
| Total costs for project period: | $493,965.00 |
| Project period: | 7/1/2017 - 6/30/2020 |

## Past Grants

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | K23 DA033858 |
| Title: | Evaluating and Improving HIV Outcomes in Community-based Women who Interface with the Criminal Justice System |
| Role: | Principal Investigator |
| Percent effort: | 75% |
| Direct costs per year: | $149,509.00 |
| Total costs for project period: | $821,147.00 |
| Project period: | 7/1/2012 - 11/30/2017 |

| | |
|---|---|
| Agency: | Robert Leet & Clara Guthrie Patterson Trust |
| I.D.#: | R12225, Award in Clinical Research |
| Title: | Disentangling the Effect of Gender on HIV Treatment and Criminal Justice Outcomes |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $75,000.00 |

| Total costs for project period: | $75,000.00 |
|---|---|
| Project period: | 1/31/2014 - 10/31/2015 |

| Agency: | Bristol-Myers Squibb |
|---|---|
| I.D.#: | HIV Virology Fellowship Award |
| Title: | Effect of newer antiretroviral regimens on HIV biological outcomes in HIV-infected prisoners: a 13 year retrospective evaluation |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $34,390.00 |
| Total costs for project period: | $34,390.00 |
| Project period: | 12/1/2011 - 11/30/2012 |

## Pending Grants

| Agency: | NIMH |
|---|---|
| I.D.#: | R01 MH121991 |
| Title: | Identifying Modifiable Risk and Protective Processes at the Day-Level that Predict HIV Care Outcomes among Women Exposed to Partner Violence |
| P.I.: | Sullivan, Tami |
| Role: | Principal Investigator |
| Percent effort: | 30% |
| Direct costs per year: | $499,755.00 |
| Total costs for project period: | $4,148,823.00 |
| Project period: | 1/1/2020 - 12/31/2024 |

## Invited Speaking Engagements, Presentations, Symposia & Workshops Not Affiliated With Yale:

### International/National

2019: CME Outfitters, Washington, DC. "A Grassroots Approach to Weed out HIV and HCV in Special OUD Populations"

2019: US Commission on Civil Rights, Washington, DC. "An Analysis of Women's Health, Personal Dignity and Sexual Abuse in the US Prison System"

2018: College of Problems on Drug Dependence, College of Problems on Drug Dependence, San Diego, CA. "Research on Women who Use Drugs: Knowledge and Implementation Gaps and A Proposed Research Agenda"

2018: Clinical Care Options, Washington, DC. "Intersection of the HIV and Opioid Epidemics"

2016: Dartmouth Geisel School of Medicine, Hanover, NH. "Incarceration as Opportunity: Prisoner Health and Health Interventions"

2010: Rhode Island Chapter of the Association of Nurses in AIDS Care, Providence, RI. "HIV and Addiction"

## Regional

2018:  Clinical Directors Network, New York, NY. "PrEP Awareness among Special Populations of Women and People who Use Drugs"

2018:  Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "HIV prevention for justice-involved women"

2017:  Clinical Directors Network, New York, NY. "Optimizing the HIV Care Continuum for People who use Drugs"

2016:  Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "Topics in Infectious Diseases"

2016:  Connecticut Advanced Practice Registered Nurse Society, Wethersfield, CT. "Trends in HIV Prevention: Integration of Biomedical and Behavioral Approaches"

## Peer-Reviewed Presentations & Symposia Given at Meetings Not Affiliated With Yale:

### International/National

2019:  CPDD 81st Annual Scientific Meeting, CPDD, San Antonio, TX. "Punitive approaches to pregnant women with opioid use disorder: Impact on health care utilization, outcomes and ethical implications"

2019:  14th International Conference on HIV Treatment and Prevention Adherence, IAPAC Adherence, Miami, FL. "Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP Contextually Relevant?"

2019:  2019 NIDA International Forum, NIDA, San Antonio, TX. "Diphenhydramine Injection in Kyrgyz Prisons: A Qualitative Study Of A High-Risk Behavior With Implications For Harm Reduction"

2019:  11th International Women's and Children's Health and Gender (InWomen's) Group, InWomen's Group, San Antonio, TX. "Uniquely successful implementation of methadone treatment in a women's prison in Kyrgyzstan"

2019:  Harm Reduction International, Porto, Porto District, Portugal. "How does methadone treatment travel? On the 'becoming-methadone-body' of Kyrgyzstan prisons"

2019:  APA Collaborative Perspectives on Addiction Annual Meeting, APA Collaborative Perspectives on Addiction Annual Meeting, Providence, RI. "Impact of Trauma and Substance Abuse on HIV PrEP Outcomes among Women in Criminal Justice Systems. Symposium: "Partner Violence: Intersected with or Predictive of Substance Use and Health Problems among Women.""

2019:  Society for Academic Emergency Medicine (SAEM), Worcester, MA. "Effects of a Multisite Medical Home Intervention on Emergency Department Use among Unstably Housed People with Human Immunodeficiency Virus"

2019:  Conference on Retroviruses and Opportunistic Infections (CROI), IAS, Seattle, WA. "Released to Die: Elevated Mortality in People with HIV after Incarceration"

2019:  12th Academic and Health Policy on Conference on Correctional Health, 12th Academic and Health Policy on Conference on Correctional Health, Las Vegas, NV. "PrEP Eligibility and HIV Risk Perception for Women across the Criminal Justice Continuum in Connecticut"

2019:  Association for Justice-Involved Female Organizations (AJFO), Atlanta, GA. "Treatment of Women's Substance Use Disorders and HIV Prevention During and Following Incarceration"

2018:   American Public Health Association (APHA) Annual Meeting, American Public Health Association (APHA) Annual Meeting, San Diego, CA. "New Haven Syringe Service Program: A model of integrated harm reduction and health care services"

2018:   12th National Harm Reduction Conference, 12th National Harm Reduction Conference, New Orleans, LA. "Service needs and access to care among participants in the New Haven Syringe Services Program"

2018:   22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "HIV risk perceptions and risk reduction strategies among prisoners in Kyrgyzstan: a qualitative study"

2018:   22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "Methadone Maintenance Therapy Uptake, Retention, and Linkage for People who Inject Drugs Transitioning From Prison to the Community in Kyrgyzstan: Evaluation of a National Program"

2018:   NIDA International Forum, NIDA, San Diego, CA. "HIV and Drug Use among Women in Prison in Azerbaijan, Kyrgyzstan and Ukraine"

2018:   2018 Conference on Retroviruses and Opportunistic Infections (CROI), CROI, Boston, MA. "From prison's gate to death's door: Survival analysis of released prisoners with HIV"

2018:   11th Academic and Health Policy on Conference on Correctional Health, Academic Consortium on Criminal Justice Health, Houston, TX. "Assessing Concurrent Validity of Criminogenic and Health Risk Instruments among Women on Probation in Connecticut"

2017:   IDWeek: Annual Meeting of Infectious Diseases Society of America, Infectious Diseases Society of America, San Diego, CA. "Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons (Oral presentation)"

2017:   International AIDS Society (IAS) Meeting, International AIDS Society, Paris, Île-de-France, France. "Late breaker: Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons"

2017:   NIDA International Forum, NIDA, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "Assessing Receptiveness to and Eligibility for PrEP in Criminal Justice-Involved Women"

2017:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:   Annual Meeting of the Society for Applied Anthropology, Society for Applied Anthropology, Santa Fe, NM. "Where rubbers meet the road: HIV risk reduction for women on probation (Oral presentation)"

2016:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Palm Springs, CA. "An Event-level Examination of Successful Condom Negotiation Strategies among College Women"

2015:   CDC National HIV Prevention Conference, CDC, Atlanta, GA. "Beyond the Syndemic: Condom Negotiation and Use among Women Experiencing Partner Violence (Oral presentation)"

Jaimie Meyer, MD, MS, FACP

2015: International Harm Reduction Conference, International Harm Reduction, Kuala Lumpur, Federal Territory of Kuala Lumpur, Malaysia. "Evidence-Based Interventions to Enhance Assessment, Treatment, and Adherence in the Chronic Hepatitis C Care Continuum"

2015: International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Phoenix, AZ. "Violence, Substance Use, and Sexual Risk among College Women"

2014: International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice Outcomes"

2014: College on Problems in Drug Dependence (CPDD), College on Problems in Drug Dependence (CPDD), San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice Outcomes"

2014: Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses and Opportunistic Infections (CROI), Boston, MA. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration"

2013: HIV Intervention and Implementation Science Meeting, HIV Intervention and Implementation Science Meeting, Bethesda, MD. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2013: Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses and Opportunistic Infections (CROI), Atlanta, GA. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2012: IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of America, San Diego, CA. "Correlates of Retention in HIV Care after Release from Jail: Results from a Multi-site Study"

2012: IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of America, San Diego, CA. "Frequent Emergency Department Use among Released Prisoners with HIV: Characterization Including a Novel Multimorbidity Index"

2012: 5th Academic and Health Policy Conference on Correctional Health, 5th Academic and Health Policy Conference on Correctional Health, Atlanta, GA. "Effects of Intimate Partner Violence on HIV and Substance Abuse in Released Jail Detainees"

2011: IAPAC HIV Treatment and Adherence Conference, IAPAC, Miami, FL. "Adherence to HIV treatment and care among previously homeless jail detainees"


## Regional

2019: Connecticut Infectious Disease Society, New Haven, CT. "Preliminary Findings from a Novel PrEP Demonstration Project for Women Involved in Criminal Justice Systems and Members of their Risk Networks"

2017: Connecticut Public Health Association Annual Conference, Connecticut Public Health Association, Farmington, CT. "The New Haven syringe services program"

2014: Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration"

2013:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2011:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Emergency Department Use by Released Prisoners with HIV"

## Professional Service:

## Peer Review Groups/Grant Study Sections

2019 - present   Reviewer, NIDA, NIH Reviewer: RFA-DA-19-025: HEAL Initiative: Justice Community Opioid Innovation Network (JCOIN) Clinical Research Centers

2019 - present   Reviewer, Yale DCFAR Pilot Projects

2018 - present   Reviewer, Center for Interdisciplinary Research on AIDS (CIRA)

2015 - present   Reviewer, University of Wisconsin-Milwaukee Research Growth Initiative

## Advisory Boards

2017   Advisor, HIV Prevention and Treatment in Cis-Gendered Women, Gilead Sciences, Inc.

## Journal Service

### Editor/Associate Editor

2019 - present   Associate Editor, Journal of the International Association of Providers of AIDS Care (JIAPAC), Section Editor: Sex and Gender Issues

### Reviewer

2019 - present   Reviewer, JAIDS

2012 - present   Reviewer, Addiction Sci and Clin Pract

2012 - present   Reviewer, Addictive Behav Reports

2012 - present   Reviewer, AIDS Care

2012 - present   Reviewer, Social Science and Medicine

2012 - present   Reviewer, SpringerPlus

2012 - present   Reviewer, Substance Abuse Treatment Prevention and Policy

2012 - present   Reviewer, Women's Health Issues

2012 - present   Reviewer, Yale Journal of Biology and Medicine

2012 - present   Reviewer, AIMS Public Health

2012 - present   Reviewer, American Journal on Addictions

2012 - present   Reviewer, American Journal of Epidemiology

2012 - present   Reviewer, American Journal of Public Health

2012 - present   Reviewer, Annals Internal Medicine

2012 - present   Reviewer, BMC Emergency Medicine

2012 - present   Reviewer, BMC Infectious Diseases

2012 - present   Reviewer, BMC Public Health

2012 - present   Reviewer, BMC Women's Health

| | |
|---|---|
| 2012 - present | Reviewer, Clinical Infectious Diseases |
| 2012 - present | Reviewer, Critical Public Health |
| 2012 - present | Reviewer, Drug and Alcohol Dependence |
| 2012 - present | Reviewer, Drug and Alcohol Review |
| 2012 - present | Reviewer, Epidemiologic Reviews |
| 2012 - present | Reviewer, Eurosurveillance |
| 2012 - present | Reviewer, Health and Justice (Springer Open) |
| 2012 - present | Reviewer, International Journal of Drug Policy |
| 2012 - present | Reviewer, International Journal of Prisoner Health |
| 2012 - present | Reviewer, International Journal of STDs and AIDS |
| 2012 - present | Reviewer, International Journal of Women's Health |
| 2012 - present | Reviewer, JAMA Internal Medicine |
| 2012 - present | Reviewer, Journal of Family Violence |
| 2012 - present | Reviewer, Journal of General Internal Medicine |
| 2012 - present | Reviewer, Journal of Immigrant and Minority Health |
| 2012 - present | Reviewer, Journal of International AIDS Society |
| 2012 - present | Reviewer, Journal of Psychoactive Drugs |
| 2012 - present | Reviewer, Journal of Urban Health |
| 2012 - present | Reviewer, Journal of Women's Health |
| 2012 - present | Reviewer, Open Forum Infectious Diseases |
| 2012 - present | Reviewer, PLoS ONE |
| 2012 - present | Reviewer, Public Health Reports |

## Professional Service for Professional Organizations

### *AAMC Group on Women in Medicine and Science (GWIMS)*
2016 - present    Member, AAMC Group on Women in Medicine and Science (GWIMS)

### *American College of Physicians*
2016 - present    Fellow, American College of Physicians
2013 - 2016       Member, American College of Physicians

### *American Medical Association*
2005 - present    Member, American Medical Association

### *American Medical Women's Association*
2011 - present    Member, American Medical Women's Association

### *American Society of Addiction Medicine*
2009 - present    Member, American Society of Addiction Medicine

Jaimie Meyer, MD, MS, FACP

*Connecticut Infectious Disease Society*

2011 - present    Member, Connecticut Infectious Disease Society

*Infectious Disease Society of America*

2008 - present    Member, Infectious Disease Society of America

*InWomen's Network, NIDA International Program*

2013 - present    Member, InWomen's Network, NIDA International Program

*New York State Medical Society*

2005 - 2008    Member, New York State Medical Society

## Yale University Service

*University Committees*

2016 - 2018    Council Member, Leadership Council, Women's Faculty Forum

*Medical School Committees*

2015 - 2016    Committee Member, US Health and Justice Course, Yale School of Medicine
2014 - present    Committee Member, Yale Internal Medicine Traditional Residency Intern Selection Committee

## Public Service

2019 - present    Faculty Member, Yale University Program in Addiction Medicine
2017 - present    Faculty Member, Arthur Liman Center for Public Interest Law, Yale Law School
2013 - present    Mentor, Women in Medicine at Yale Mentoring Program
2012 - present    Faculty Member, Yale Center for Interdisciplinary Research on AIDS
2009 - 2011    Instructor, Preclinical Clerkship Tutor, Yale School of Medicine
2002    Fellow, Soros Open Society Institute
1998 - 1999    Fellow, Costa Rican Humanitarian Foundation

## Bibliography:

### Peer-Reviewed Original Research

1.  **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Emergency department use by released prisoners with HIV: an observational longitudinal study. PloS One 2012, 7:e42416.
2.  Chen NE, **Meyer JP**, Bollinger R, Page KR. HIV testing behaviors among Latinos in Baltimore City. Journal Of Immigrant And Minority Health / Center For Minority Public Health 2012, 14:540-51.
3.  Chitsaz E, **Meyer JP**, Krishnan A, Springer SA, Marcus R, Zaller N, Jordan AO, Lincoln T, Flanigan TP, Porterfield J, Altice FL. Contribution of substance use disorders on HIV treatment outcomes and antiretroviral medication adherence among HIV-infected persons entering jail. AIDS And Behavior 2013, 17 Suppl 2:S118-27.

4. Chen NE, **Meyer JP**, Avery AK, Draine J, Flanigan TP, Lincoln T, Spaulding AC, Springer SA, Altice FL. Adherence to HIV treatment and care among previously homeless jail detainees. AIDS And Behavior 2013, 17:2654-66.
5. Althoff AL, Zelenev A, **Meyer JP**, Fu J, Brown SE, Vagenas P, Avery AK, Cruzado-Quiñones J, Spaulding AC, Altice FL. Correlates of retention in HIV care after release from jail: results from a multi-site study. AIDS And Behavior 2013, 17 Suppl 2:S156-70.
6. Williams CT, Kim S, **Meyer J**, Spaulding A, Teixeira P, Avery A, Moore K, Altice F, Murphy-Swallow D, Simon D, Wickersham J, Ouellet LJ. Gender differences in baseline health, needs at release, and predictors of care engagement among HIV-positive clients leaving jail. AIDS And Behavior 2013, 17 Suppl 2:S195-202.
7. **Meyer JP**, Wickersham JA, Fu JJ, Brown SE, Sullivan TP, Springer SA, Altice FL. Partner violence and health among HIV-infected jail detainees. International Journal Of Prisoner Health 2013, 9:124-41.
8. **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Frequent emergency department use among released prisoners with human immunodeficiency virus: characterization including a novel multimorbidity index. Academic Emergency Medicine : Official Journal Of The Society For Academic Emergency Medicine 2013, 20:79-88.
9. **Meyer JP**, Cepeda J, Springer SA, Wu J, Trestman RL, Altice FL. HIV in people reincarcerated in Connecticut prisons and jails: an observational cohort study. The Lancet. HIV 2014, 1:e77-e84.
10. **Meyer JP**, Zelenev A, Wickersham JA, Williams CT, Teixeira PA, Altice FL. Gender disparities in HIV treatment outcomes following release from jail: results from a multicenter study. American Journal Of Public Health 2014, 104:434-41.
11. **Meyer JP**, Cepeda J, Wu J, Trestman RL, Altice FL, Springer SA. Optimization of human immunodeficiency virus treatment during incarceration: viral suppression at the prison gate. JAMA Internal Medicine 2014, 174:721-9.
12. **Meyer JP**, Cepeda J, Taxman FS, Altice FL. Sex-Related Disparities in Criminal Justice and HIV Treatment Outcomes: A Retrospective Cohort Study of HIV-Infected Inmates. American Journal Of Public Health 2015, 105:1901-10.
13. Boyd AT, Song DL, **Meyer JP**, Altice FL. Emergency department use among HIV-infected released jail detainees. Journal Of Urban Health : Bulletin Of The New York Academy Of Medicine 2015, 92:108-35.
14. Shrestha R, Karki P, Altice FL, Huedo-Medina TB, **Meyer JP**, Madden L, Copenhaver M. Correlates of willingness to initiate pre-exposure prophylaxis and anticipation of practicing safer drug- and sex-related behaviors among high-risk drug users on methadone treatment. Drug And Alcohol Dependence 2017, 173:107-116.
15. Peasant C, Sullivan TP, Weiss NH, Martinez I, **Meyer JP**. Beyond the syndemic: condom negotiation and use among women experiencing partner violence. AIDS Care 2017, 29:516-523.
16. Wickersham JA, Gibson BA, Bazazi AR, Pillai V, Pedersen CJ, **Meyer JP**, El-Bassel N, Mayer KH, Kamarulzaman A, Altice FL. Prevalence of Human Immunodeficiency Virus and Sexually Transmitted Infections Among Cisgender and Transgender Women Sex Workers in Greater Kuala Lumpur, Malaysia: Results From a Respondent-Driven Sampling Study. Sexually Transmitted Diseases 2017, 44:663-670.
17. Hoff E, Marcus R, Bojko MJ, Makarenko I, Mazhnaya A, Altice FL, **Meyer JP**. The effects of opioid-agonist treatments on HIV risk and social stability: A mixed methods study of women with opioid use disorder in Ukraine. Journal Of Substance Abuse Treatment 2017, 83:36-44.

18. Rutledge R, Madden L, Ogbuagu O, **Meyer JP**. HIV Risk perception and eligibility for pre-exposure prophylaxis in women involved in the criminal justice system. AIDS Care 2018, 30:1282-1289.

19. Peasant C, Sullivan TP, Ritchwood TD, Parra GR, Weiss NH, **Meyer JP**, Murphy JG. Words can hurt: The effects of physical and psychological partner violence on condom negotiation and condom use among young women. Women & Health 2018, 58:483-497.

20. Loeliger KB, Altice FL, Desai MM, Ciarleglio MM, Gallagher C, **Meyer JP**. Predictors of linkage to HIV care and viral suppression after release from jails and prisons: a retrospective cohort study. The Lancet. HIV 2018, 5:e96-e106.

21. Odio CD, Carroll M, Glass S, Bauman A, Taxman FS, **Meyer JP**. Evaluating concurrent validity of criminal justice and clinical assessments among women on probation. Health & Justice 2018, 6:7.

22. Loeliger KB, Altice FL, Ciarleglio MM, Rich KM, Chandra DK, Gallagher C, Desai MM, **Meyer JP**. All-cause mortality among people with HIV released from an integrated system of jails and prisons in Connecticut, USA, 2007-14: a retrospective observational cohort study. The Lancet. HIV 2018, 5:e617-e628.

23. Loeliger KB, **Meyer JP**, Desai MM, Ciarleglio MM, Gallagher C, Altice FL. Retention in HIV care during the 3 years following release from incarceration: A cohort study. PLoS Medicine 2018, 15:e1002667.

24. Azbel L, Wegman MP, Polonsky M, Bachireddy C, **Meyer J**, Shumskaya N, Kurmanalieva A, Dvoryak S, Altice FL. Drug injection within prison in Kyrgyzstan: elevated HIV risk and implications for scaling up opioid agonist treatments. International Journal Of Prisoner Health 2018, 14:175-187.

25. Peasant C, Montanaro EA, Kershaw TS, Parra GR, Weiss NH, **Meyer JP**, Murphy JG, Ritchwood TD, Sullivan TP. An event-level examination of successful condom negotiation strategies among young women. Journal Of Health Psychology 2019, 24:898-908.

26. Ranjit YS, Azbel L, Krishnan A, Altice FL, **Meyer JP**. Evaluation of HIV risk and outcomes in a nationally representative sample of incarcerated women in Azerbaijan, Kyrgyzstan, and Ukraine. AIDS Care 2019, 31:793-797.

27. Rhodes T, Azbel L, Lancaster K, **Meyer J**. The becoming-methadone-body: on the onto-politics of health intervention translations. Sociology Of Health & Illness 2019, 41:1618-1636.

28. Olson B, Vincent W, **Meyer JP**, Kershaw T, Sikkema KJ, Heckman TG, Hansen NB. Depressive symptoms, physical symptoms, and health-related quality of life among older adults with HIV. Quality Of Life Research : An International Journal Of Quality Of Life Aspects Of Treatment, Care And Rehabilitation 2019.

## Chapters, Books, and Reviews

29. Azar MM, Springer SA, **Meyer JP**, Altice FL. A systematic review of the impact of alcohol use disorders on HIV treatment outcomes, adherence to antiretroviral therapy and health care utilization. Drug And Alcohol Dependence 2010, 112:178-93.

30. **Meyer JP**, Springer SA, Altice FL. Substance abuse, violence, and HIV in women: a literature review of the syndemic. Journal Of Women's Health (2002) 2011, 20:991-1006.

31. **Meyer JP**, Chen NE, Springer SA. HIV Treatment in the Criminal Justice System: Critical Knowledge and Intervention Gaps. AIDS Research And Treatment 2011, 2011:680617.

32. Springer SA, Spaulding AC, **Meyer JP**, Altice FL. Public health implications for adequate transitional care for HIV-infected prisoners: five essential components. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2011, 53:469-79.

Jaimie Meyer, MD, MS, FACP

33. Chen NE, **Meyer JP**, Springer SA. Advances in the prevention of heterosexual transmission of HIV/AIDS among women in the United States. Infectious Disease Reports 2011, 3.

34. **Meyer J**, Altice F. HIV in Injection and Other Drug Users. Somesh Gupta, Bhushan Kumar, eds. Sexually Transmitted Infections 2nd ed. New Delhi, India: Elsevier, 2012: 1061-80. ISBN 978-81-312-2809-8.

35. **Meyer JP**, Althoff AL, Altice FL. Optimizing care for HIV-infected people who use drugs: evidence-based approaches to overcoming healthcare disparities. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2013, 57:1309-17.

36. **Meyer J**, Altice F. Chapter 47, Treatment of Addictions: Transition to the Community. Robert L. Trestman, Kenneth L. Appelbaum, Jeffrey L. Metzner, eds. Oxford Textbook of Correctional Psychiatry (Winner of the 2016 Guttmacher Award). Oxford University Press 2015. ISBN 9780199360574.

37. **Meyer JP**, Moghimi Y, Marcus R, Lim JK, Litwin AH, Altice FL. Evidence-based interventions to enhance assessment, treatment, and adherence in the chronic Hepatitis C care continuum. The International Journal On Drug Policy 2015, 26:922-35.

38. Mohareb A, Tiberio P, Mandimika C, Muthulingam D, **Meyer J**. Infectious Diseases in Underserved Populations. Onyema Ogbuagu, Gerald Friedland, Merceditas Villanueva, Marjorie Golden, eds. Current Diagnosis and Treatment- Infectious Diseases. McGraw-Hill Medical 2016.

39. **Meyer JP**, Womack JA, Gibson B. Beyond the Pap Smear: Gender-responsive HIV Care for Women. The Yale Journal Of Biology And Medicine 2016, 89:193-203.

40. **Meyer JP**, Muthulingam D, El-Bassel N, Altice FL. Leveraging the U.S. Criminal Justice System to Access Women for HIV Interventions. AIDS And Behavior 2017, 21:3527-3548.

41. Shrestha R, McCoy-Redd B, **Meyer J**. Pre-Exposure Prophylaxis (PrEP) for People Who Inject Drugs (PWID). Brianna Norton, Ed. The Opioid Epidemic and Infectious Diseases. Elsevier 2019.

42. **Meyer JP**, Isaacs K, El-Shahawy O, Burlew AK, Wechsberg W. Research on women with substance use disorders: Reviewing progress and developing a research and implementation roadmap. Drug And Alcohol Dependence 2019, 197:158-163.

## Peer-Reviewed Educational Materials

43. The Fortune Society Reentry Education Project Detailing Kit. New York City Department of Health and Mental Hygiene. October 2014

44. United Nations Office on Drugs and Crime. Vienna, Austria

## Invited Editorials and Commentaries

45. **Meyer JP**. Capsule Commentary on Pyra et al., sexual minority status and violence among HIV infected and at-risk women. Journal Of General Internal Medicine 2014, 29:1164.

46. Brinkley-Rubinstein L, Dauria E, Tolou-Shams M, Christopoulos K, Chan PA, Beckwith CG, Parker S, **Meyer J**. The Path to Implementation of HIV Pre-exposure Prophylaxis for People Involved in Criminal Justice Systems. Current HIV/AIDS Reports 2018, 15:93-95.

47. **Meyer JP**. The Sustained Harmful Health Effects of Incarceration for Women Living with HIV. Journal Of Women's Health (2002) 2019, 28:1017-1018.

## Case Reports, Technical Notes, Letters

48. **Paul J**. Bullous pemphigoid in a patient with psoriasis and possible drug reaction: a case report. Connecticut Medicine 2004, 68:611-5.

49. How J, Azar MM, **Meyer JP**. Are Nectarines to Blame? A Case Report and Literature Review of Spontaneous Bacterial Peritonitis Due to Listeria monocytogenes. Connecticut Medicine 2015, 79:31-6.

50. Vazquez Guillamet LJ, Malinis MF, **Meyer JP**. Emerging role of Actinomyces meyeri in brain abscesses: A case report and literature review. IDCases 2017, 10:26-29.

51. Harada K, Heaton H, Chen J, Vazquez M, **Meyer J**. Zoster vaccine-associated primary varicella infection in an immunocompetent host. BMJ Case Reports 2017, 2017.

52. Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Answer to December 2017 Photo Quiz. Journal Of Clinical Microbiology 2017, 55:3568.

53. Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Photo Quiz: Peripheral Blood Smear in a Ugandan Refugee. Journal Of Clinical Microbiology 2017, 55:3313-3314.

## Scholarship In Press

54. Hoff E, Adams Z, Dasgupta A, Goddard D, Sheth S, **Meyer J**.  Reproductive Health Justice and Autonomy: A systematic review of pregnancy planning intentions, needs, and interventions among women involved in US criminal justice systems.  J Women's Health

# EXHIBIT B

J. MICHAEL HANNON *
DANIEL S. CROWLEY *†‡
PARTNERS

————————————

ANN-KATHRYN SO §
TALON R. HURST *§
ERIK H. FAWCETT ‖
DAVIS C. RAJTIK †
ASSOCIATES

**HANNON LAW GROUP, LLP**
COUNSELORS AND ATTORNEYS AT LAW
333 8TH STREET NE
WASHINGTON, DC 20002
EST. MARCH 17, 2006

————————————

T (202) 232-1907 | F (202) 232-3704
www.hannonlawgroup.com

March 25, 2020

WILLIAM CLAYTON BATCHELOR *†
OF COUNSEL

————————————

* ALSO ADMITTED IN MARYLAND
† ALSO ADMITTED IN VIRGINIA
‡ ALSO ADMITTED IN MASSACHUSETTS
§ALSO ADMITTED IN NEW JERSEY
‖ ADMITTED IN MARYLAND ONLY;
UNDER SUPERVISION OF J. MICHAEL
HANNON

**VIA ELECTRONIC TRANSMISSION ONLY**

Quincy L. Booth
Office of the Director
D.C. Department of Corrections

### IMPLEMENTATION OF MAYOR'S ORDERS ON COVID-19

We present this letter on behalf of the bargaining unit for all D.C. Jail corrections officers, the Fraternal Order of Police Department of Corrections Labor Committee.

### INTRODUCTION

Today the Mayor announced the number of positive COVID-19 infected persons in the District of Columbia increased by 46 new cases to a total of 183. Notably, of the new cases 13 are in their 20s, 12 are in their 30s, and only 7 are over the age of 60. The Mayor's update also reports the following:

> With ongoing community transmission, contact tracing is focused on positive cases associated with childcare facilities, schools and universities, healthcare facilities, senior care facilities, *correctional and detention centers*, and facilities serving individuals who are experiencing homelessness. Guidance will be published for healthcare providers, employers and the public to provide information on what to do if you have been diagnosed with or are a contact of someone who has COVID-19.

On March 19, our office sent an email to DOC regarding the quarantine of 50 inmates who came in contact with an infected U.S. Marshal at the Courthouse. (Attachment A). We received no response.

On the same date March 19, we sent a "Request for Information on Potentially Dangerous Conditions at the DOC Facilities" to DOC's General Counsel and to its HR Director. (Attachment B). The next morning, DOC's General Counsel responded: "DOC is preparing a response to your inquires and will contact you as soon as possible." We have received no response.

On March 23, 2020, the FOP/DOC Labor Committee delivered to the DOC leadership and posted throughout the D.C. Jail an Announcement regarding critical actions to be addressed

Page **2** of **5**
March 25, 2020
Booth, Quincy L.

by the Labor Committee regarding COVID-19, as well as the failure to prosecute an inmate for the brutal beating of a corrections officer. (Attachment C).

    Instead of communicating with the Union as requested on March 19, 2020, you issued a notice on the same date of March 23, announced at every roll call, falsely stating: "It has come to the agency's attention that employees of the DOC intend to engage in either a walkout and/or protest on the grounds of the DOC." Rather than communicating honestly with the Union on these critical conditions of work, you threatened the corrections officers with discipline. This action was clearly in retaliation for the Union presenting legitimate concerns about your failure to implement protections for inmates and corrections officers. This is not only an unfair labor practice and a prohibited personnel practice, but also a violation of the District of Columbia Whistleblower Reinforcement Act of 1998.

    In the afternoon of yesterday, March 24, you summoned the FOP/DOC Labor Committee President Cpl. Benjamin Olubasusi to your office at the Reeves Center. Without notice to HANNON LAW GROUP, you put Deputy Mayor Kevin Donahue and Mayor Bowser on your speaker phone. The Mayor then falsely warned Cpl. Olubasusi that it is a "crime" for D.C. corrections officers "to walk out of the Jail." You asked Cpl. Olubasusi what the Union wants, as if our communications over the past 5 days were never read.

    Also yesterday afternoon, HANNON LAW GROUP participated in a National Conference Call sponsored by the National Fraternal Order of Police on COVID-19. Speakers on the call included high-ranking experts from the Department of Homeland Security, FEMA, and the White House, as well as FOP State Representatives from all 50 states. The purpose of the call is to implement protocols for law enforcement officers and corrections officers nationwide. Highlights from the call are the following:

    Increasing infections will reduce the number of officers on duty.

    Loss of officers on duty will increase the work load on the uninfected officers.

    The resultant lack of officers will lead to additional crime and risk in the corrections system.

    PPE equipment is not being provided to officers nationwide.

    Because "social distancing" is impossible in law enforcement, the infection rate among officers will be higher than the general population.

    Coordination and Communication between and among political leaders and officers is the most important criteria to meet this challenge.

    State health departments, which are in control of the distribution of PPE, must make law enforcement and corrections officers a priority group for receipt of PPE and education.

Page **3** of **5**
March 25, 2020
Booth, Quincy L.

## CONDITIONS AT THE D.C. JAIL

The FOP/DOC Labor Committee, its Shop Stewards, and its members walk the line in the D.C. Jail 24/7. You, Director Booth, are miles away at the Reeves Center, and your administrative staff remain behind glass walls and doors in the administrative section of the D.C. Jail, all in splendid isolation from the inmate population, with regular disinfection teams in gowns, gloves and masks. Here is the report of our members on conditions at the Jail:

1.      There is no Communication and Coordination between DOC leaders and the FOP/DOC Labor Committee. Labor/Management meetings are repeatedly cancelled, including one meeting scheduled during this critical time period.

2.      Inmates coming into the Jail are not screened for symptoms of COVID-19.

3.      Corrections Officers receiving and discharging inmates have no PPE; however, they must have direct contact with these inmates.

4.      Inmates continue to move within the Jail. Those inmates in the four restricted housing units must be escorted by hand by corrections officers without any PPE. Inmates in non-restricted housing units travel alone through the Jail as required for appointments. At latest count, there were 1,149 inmates in the Central Detention Facility and 509 in the Correctional Treatment Facility.

5.      The corrections officers assigned to housing units have no masks, insufficient gloves, no gowns, no disinfectants, and no comprehensive cleaning occurs on a regular basis in these units. In each unit, one corrections officer is required to be out among the inmates at all times, without any protection.

6.      Inmates are not required to engage in any of the behaviors which the Mayor recommends for the general population, such as "social distancing", repeated hand-washing, and health monitoring.

7.      Case workers must meet with inmates in small offices with no PPE or other distancing measures.

8.      Inmates continue to engage in recreation in a common yard, also without social distancing or other protections from the spread of COVID-19.

9.      Corrections officers enter the Jail three shifts a day. There is no distancing at entrances, no distancing at roll calls, no attempt to obtain or record health concerns of each officer.

10.     When the D.C. Jail was forced to quarantine 65 inmates who were at risk to exposure to COVID-19 when they were at court, an ERT was designated to remove them from the general population to a "quarantine" housing unit. The

ERT members refused the assignment without provision of gowns and other appropriate PPE protection. They were ordered to remove the inmates with only masks and gloves. During the extraction, one of the members was spit upon by an inmate. Sgt. Alexander and Sgt. Graham were then removed from the ERT team and assigned to another post outside the Jail.

11. These inmates were not "quarantined" in any meaningful manner. They were housed two to a cell, and the corrections officers on the unit were not provided with any PPE or other means for protection against infections.

### WHAT DO WE WANT?

Both you and the Mayor asked Cpl. Olubasusi "What do you want?" While this crisis should not be a time of legal technicalities, we choose to view this as a willingness by management to bargain over the terms and conditions of employment of our officers. The following is an enumeration of our requests. This list, as we all know, is subject to change as the pandemic changes.

1. A Daily Meeting among the Labor Committee, its Shop Stewards, its counsel and the DOC Director, Deputy Director, and its counsel to discuss conditions and responses to COVID-19;

2. A COVID-19 Protocol for officers and inmates including the following:

   Restricted movement of inmates

   Distancing among inmates/inmates, officers/officers, and officers/inmates

   Incident Reporting of officers and inmates' symptoms of illness

3. Regular Disinfection of the CDF and CTF

4. Priority for PPE for officers

5. Discontinuation of inmate transport for court appearances

6. 14-day Quarantine for new inmates

7. Establish a quarantine unit

8. Establish an on-site testing unit for those meeting CDC test criteria, including persons living in the household of a corrections officer

9. Treat COVID-19 among officers as duty-connected

Page **5** of **5**
March 25, 2020
Booth, Quincy L.

In addition, we require production of all videotape and investigative reports of the assault on Officer Sulaimon T. Abiola so that we may investigate the assault and present it to the U.S. Attorney's Office for prosecution. Corporal Ayodeji Falade, Officer Olumide Popoola, Officer John Lewis, Officer Rahsard Roberts, Officer Abdou Alaguitouni and Corporal Damian Barnes and any other suspended officers must be returned to work pending your investigation into the assault.

### CONCLUSION

We agree with Mayor Bowser's sentiment that these are difficult times, and we should all be pulling on the same rope. However, cooperation is a two-way street. We note with a great deal of concern that at today's news conference, the Mayor stated that corrections officers do not require PPE because they do not provide medical care.

The District of Columbia cannot treat its corrections officers as chattel. Already, the life expectancy among corrections officers nationwide is among the lowest in law enforcement.

Thank you for your courtesies.

Sincerely,

*s/ J. Michael Hannon*

J. Michael Hannon

# ATTACHMENT A



**J. Michael Hannon <jhannon@hannonlawgroup.com>**

# Critical Incident at the DC Jail - March 19, 2020

1 message

**Ann-Kathryn So** <akso@hannonlawgroup.com>                 Thu, Mar 19, 2020 at 5:52 PM
To: Quincy.Booth@dc.gov, lennard.johnson@dc.gov, Eric.Glover@dc.gov,
paulette.johnson@dc.gov
Cc: kevin.donahue@dc.gov, lindsey.maxwell@dc.gov, "J. Michael Hannon"
<jhannon@hannonlawgroup.com>, "Olubasusi, Benjamin R. (DOC)"
<benjamin.olubasusi@dc.gov>

Good afternoon,

Today, March 19, 2020, at 0545, the Squad Leader (Sgt. Joseph Alexander) and the
Team Leader (Sgt. Donald Graham) of the DOC's Emergency Response Team (ERT)
were called in, and informed that a US Marshal at D.C. Superior Court tested positive for
COVID-19. The two Sergeants were handed a list of 50 inmates who possibly came in
contact with the US Marshal. They were ordered to extract the 50 inmates, and
quarantine them in an empty cell block. They were ordered to do so using only face
masks and gloves. Both Sergeants requested full body coverage (face shield, clothing
coverage, etc.) as personal protective equipment (PPE), and were refused. Sgt.
Alexander has personal knowledge that the items requested are in the Agency's
inventory. Both Sergeants indicated they were uncomfortable performing the inmate
extraction without proper PPE. The DOC Management representative, Deputy Warden
for Operations, Kathleen Jo Landerkin, again refused to provide the equipment, and
asked who on the ERT was also uncomfortable conducting the extraction with only face
masks and gloves. Every member of the ERT responded positively. The ERT was
ordered to conduct the extraction anyway. All did as they were told. At the time of the
extraction, all 50 inmates were housed in general population, with other inmates. Sgt.
Alexander asked if inmates with whom the 50 were housed should be quarantined,
management told him only the 50 inmates were to be moved into the empty cell block.
Those cellmates are still in general population. During the extraction, approximately half
of the 50 inmates resisted being moved. All but one moved eventually without incident;
however, one inmate spit in the face of one of the ERT officers, who was only protected
by the face mask. The 50 at-risk inmates are being housed two to a cell in "quarantine"
in an isolated cell block. The officer who was spit on, Hakeem Smith, has gone home.
Immediately after the extraction, the two Sergeants were reassigned to a different unit
(central cell block) and different shift (night) and their department phones have been
taken away. In addition, they were removed from the ERT. They were told by Major
Carlos Bivens that this was not a disciplinary action.

The DOC management has created an unconscionable public health crisis, and almost
certainly guaranteed and accelerated the rampant spread of COVID-19 within the DOC
facilities and the communities in which the staff live. Ms. Landerkin directly put the lives
of the officers on the ERT in imminent danger. She did so without regard for their
personal safety or that of the inmate population. In addition to being callous and
reprehensible, her actions are in obvious violation of several provisions of the Collective
Bargaining Agreement and are arguably illegal. The Agency is following absolutely no
appropriate guidelines with regard to the safe handling and treatment of the front line
staff or inmate population. The 50 at-risk inmates are housed two to a cell in
"quarantine" status. They were extracted from cell blocks where they were housed more
than one to a cell, and required to participate in recreation and other group activities. All
of this is in violation of the Mayor's Order 2020-048: Prohibition on Mass Gatherings
During Public Health Emergency - Coronavirus (COVID-19). In addition, when asked by
the ERT officers if the inmates with whom the 50 at-risk inmates were housed originally
also should be quarantined, DOC management refused. Management's response was
that if they were not on the list, they were to be left in their unit.

As if this public health crisis created by Ms. Landerkin was not enough, DOC management clearly retaliated against Sgts. Alexander and Graham for their request for PPE. At the time of the order reassigning them, they were told it was not a disciplinary action. Management can call it whatever they choose; however, it is clearly retaliatory. The DOC ordered staff into a life-threatening situation without the proper equipment, and retaliated against them for asking for the proper PPE. The PPE requested was not unreasonable; it was exactly what is being recommended throughout the industry and the nation for handling of infectious individuals. There is absolutely no justification for not providing this equipment, especially upon request and in light of the fact that it was on hand. This treatment will not be tolerated.

I indicated in my email Request for Information sent earlier today to Eric Glover and Paulette Johnson that the Union's priority was to protect the health and safety of the staff. We will take immediate and decisive action to do so in the face of the deliberate and dangerous actions taken by DOC management today. One such action is to file a group grievance for multiple violations of the Collective Bargaining Agreement. A detailed email will follow with the exact provisions that have been violated. Please consider this official notice.

V/R,

Ann-Kathryn So

--



**Ann-Kathryn So**
HANNON LAW GROUP, LLP
333 8th Street, N.E.
Washington, DC 20002
(202) 745-6888, Direct
(202) 232-3704, Facsimile

The information contained in this e-mail is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is **PRIVILEGED AND CONFIDENTIAL**. If the reader of this message is not the intended recipient, you are hereby notified that you have received this message in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

The information contained in this e-mail is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is **PRIVILEGED AND CONFIDENTIAL**. If the reader of this message is not the intended recipient, you are hereby notified that you have received this message in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

# ATTACHMENT B



J. Michael Hannon <jhannon@hannonlawgroup.com>

# Fwd: Request for Information on Potentially Dangerous Conditions at the DOC Facilities

1 message

---

**Ann-Kathryn So** <akso@hannonlawgroup.com>　　　　　Mon, Mar 23, 2020 at 3:53 PM
To: "J. Michael Hannon" <jhannon@hannonlawgroup.com>

Here is his response to my first email.  I have heard nothing about the second.

---------- Forwarded message ----------
From: **Glover, Eric (DOC)** <eric.glover@dc.gov>
Date: Fri, Mar 20, 2020 at 11:16 AM
Subject: RE: Request for Information on Potentially Dangerous Conditions at the DOC Facilities
To: Ann-Kathryn So <akso@hannonlawgroup.com>, Johnson, Paulette (DOC) <paulette.johnson@dc.gov>
Cc: Olubasusi, Benjamin R. (DOC) <benjamin.olubasusi@dc.gov>


Ms. So:


Thank you for contacting the District of Columbia Department of Corrections. DOC is preparing a response to your inquires and will contact you as soon as possible.


Regards,


Eric S. Glover

General Counsel

District of Columbia

Department of Corrections

2000 14th Street, N.W.

Seventh Floor

Washington, D.C. 20009

Phone: (202) 671-0088

Office Cell: (202) 286-8736

Fax: (202) 671-2514



**Confidentiality Notice:** This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential, or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of the message.

**Metadata:** This email transmission and any accompanying material may contain embedded metadata. Any included metadata is confidential or privileged information and is not intended to be viewed by a non-client recipient.

---

**From:** Ann-Kathryn So [mailto:akso@hannonlawgroup.com]
**Sent:** Thursday, March 19, 2020 11:00 AM
**To:** Glover, Eric (DOC) <eric.glover@dc.gov>; Johnson, Paule e (DOC) <paulette.johnson@dc.gov>
**Cc:** Olubasusi, Benjamin R. (DOC) <benjamin.olubasusi@dc.gov>
**Subject:** Request for Informa on on Poten ally Dangerous Condi ons at the DOC Facili es

CAUTION: This email originated from outside of the DC Government. Do not click on links or open a achments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for addi onal analysis by OCTO Security Opera ons Center (SOC).

Good morning,

In light of the ever-changing landscape with respect to the pandemic, we would like to ensure that the Agency is doing everything it can to keep the staff, residents, and visitors as safe as possible from COVID-19. Swift effective action is critical as the numbers of suspected and confirmed cases rise exponentially. This is especially true for DOC staff members, who have regular contact with the inmate population. They must be protected!

The DOC has publicized a number of measures it has or will be taking. Please confirm the following DOC efforts:

- Have all in-person visits, programming and volunteer activities at all Agency facilities in fact been suspended?

- Have DOC officials established Incident Command Team? Who is on that team? Are any members of the Union on that team?

- Is the Medical Staff meeting with each housing unit and officer roll call? Please provide details as to time, place and frequency of the meetings that the Medical Staff is holding.

- What is the Agency's strategic communications plan with regard to COVID-19, and how has it been communicated to the staff? Is it updated and communicated regularly as this situation evolves? The last update on the DOC web page is dated March 14, 2020.

- What does "enhanced cleaning efforts" mean? Have those "enhanced cleaning efforts" been implemented, especially within common areas? How often is this level of cleaning being done?

- The Agency promised to order additional cleaning and sanitation supplies, including protective gloves, masks and clothing for staff. No information was provided about dispensing these items. Have these items been received and distributed? Are there any supplies you need that you do not have? Have sanitizing wipes been provided by the Agency? Is the staff permitted to bring personal sanitation material, other than wipes? Are inmates being provided safety materials that the staff is not?

- Was there a two-hour cleaning of the entire facility? How many times has this happened? Is this occurring daily/regularly?

- Please describe the Agency's efforts in partnering and/or sharing information with criminal justice partners?

* Are daily updates continuing to be sent via emails to the staff regarding COVID-19? Can you please make those available?

Most notable in the Agency's public response to COVID-19 is that there is nothing that addresses the procedures for the screening, quarantine and/or treatment of staff, inmates and/or anyone who comes into contact with either or both. Can you provide detailed information as to what those procedures are? Specifically:

* Have the DOC employees (officers and medical staff) been provided appropriate protective devices/material/training? Are staff members knowledgeable on and adequately equipped to prevent transmission, minimize spread and protect themselves and the inmate population from contacting COVID-19?

* Is the DOC working in close connection with the DC Department of Health? What medical support does the Agency have specifically for the virus?

* Are all incoming inmates, staff and other individuals with access to the DOC facilities questioned as to their level of risk?

* What is the procedure for processing all new inmates to the facilities?

* What is the procedure for assessing the risk to existing inmates?

* What testing is being offered to confirm a diagnosis of COVID-19?

* What procedures are in place if an inmate is symptomatic?

* What procedures are in place if an inmate tests positive?

* What procedures are in place for quarantines?

* Are there any of the following:

* Asymptomatic inmates currently housed at any of the facilities who are at high-risk for contracting COVID-19?

* Symptomatic inmates currently housed at any of the facilities? If so, what actions are being taken with regard to those individuals?

* Inmates currently housed at any of the facilities who have tested positive for COVID-19?

* What is being done to track any inmates, visitors, staff, or other individuals with access to any of the facilities who have been at any DOC facility within the

past two weeks, including any individuals who were held and released or
transferred?

- What is the impact of the Agency's response to the Mayor's Order 2020-
048: Prohibition on Mass Gatherings During Public Health Emergency -
Coronavirus (COVID-19)?

**Of a most critical nature, it has come to our attention that there may be one or
more inmates currently housed within DOC facilities who are either symptomatic
and/or tested positive for COVID-19.** Please confirm if the Agency is aware of anyone
housed at or with access to any of their facilities who either is symptomatic or has tested
positive for COVID-19, and, if so, what actions have been taken and will be taken in
response. Is the Agency following the CDC's Guideline for Isolation Precautions:
Preventing Transmission of Infectious Agents in Healthcare Settings or similar
guidelines? Please provide the Union's Executive Management with your detailed
emergency action plan.

Without question, this pandemic is a health and safety crisis. The District of Columbia
has been in the forefront of a proactive response, and that must extend to the DOC. The
entire DOC population is at higher risk than the general public, and every precaution and
safety measure must be taken. It is the Union's priority to protect the staff, and it will
take actions necessary to do so.

I look forward to hearing from you.

Thank you.

V/R,

Ann

--

Ann-Kathryn So
HANNON LAW GROUP, LLP
333 8th Street, N.E.
Washington, DC 20002
(202) 745-8888, Direct
(202) 232-3704, Facsimile

*The informaon c  ontained in this e-mail is intended only for the personal and confidenal use of the recipien  t(s) named above. This message may be an a  orney-client communicaon and as such is  **PRIVILEGED AND CONFIDENTIAL**. If the reader of this message is not the intended recipient, you are hereby nofied that you have rec  eived this message in error, and that any review, disseminaon, dis  tribuon, or c  opying of this message is strictly prohibited. If you have received this communicaon in error  , please nof  y us immediately by e-mail and delete the original message.*

*The informaon c  ontained in this e-mail is intended only for the personal and confidenal use of the recipien  t(s) named above. This message may be an a  orney-client communicaon and as such is  **PRIVILEGED AND CONFIDENTIAL**. If the reader of this message is not the intended recipient, you are hereby nofied that you have rec  eived this message in error, and that any review, disseminaon, dis  tribuon, or c  opying of this message is strictly prohibited. If you have received this communicaon in error  , please nof  y us immediately by e-mail and delete the original message.*

**For the latest information on the District Government's response to COVID-19 (Coronavirus), please visit** coronavirus.dc.gov.

--



**Ann-Kathryn So**
HANNON LAW GROUP, LLP
333 8th Street, N.E.
Washington, DC 20002
(202) 745-6888, Direct
(202) 232-3704, Facsimile

*The informaon c  ontained in this e-mail is intended only for the personal and confidenal use of the recipien  t(s) named above. This message may be an a  orney-client communicaon and as such is  **PRIVILEGED AND CONFIDENTIAL**. If the reader of this message is not the intended recipient, you are hereby nofied that you have rec  eived this message in error, and that any review, disseminaon, dis  tribuon, or c  opying of this message is strictly prohibited. If you have received this communicaon in error  , please nof  y us immediately by e-mail and delete the original message.*

*The informaon c  ontained in this e-mail is intended only for the personal and confidenal use of the recipien  t(s) named above. This message*

Facilities may be an attorney-client communication and as such is *PRIVILEGED AND CONFIDENTIAL*. If the reader of this message is not the intended recipient, you are hereby notified that you have received this message in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

# ATTACHMENT C



# Fraternal Order of Police

### Department of Corrections Labor Committee

711 4TH Street, Northwest
Washington, DC 20001

## ANNOUNCEMENT TO DOC/FOP MEMBERS
## MARCH 23, 2020

These are grave times at the District of Columbia Department of Corrections (DOC). There is no question that dire threats face our workforce. The Executive Board of the Fraternal Order of Police/Department of Corrections Labor Committee's (FOP/DOC LC) is committed to supporting and protecting the Union's membership, and is doing all that it can to do so. We all know we face serious threats both inside and outside of the DOC facilities. There is no question that each one of us puts our lives and our livelihoods on the line every time we report to work and man our post or take our seat at our desk.

***We know your health and safety is at risk every day, and we want you to know it is our TOP priority to tackle the critical issues we all face with speed and effectiveness!!***

In keeping with our priorities, this serves as official notice of three crucial actions the FOP DOC LC's Executive Board is taking to protect the membership.

**COVID-19**—DOC has not provided its employees a valid action plan in response to COVID-19. We hear more every day about the virus, yet the DOC has done very little to support the frontline officers and staff against COVID-19. The DOC's public website about COVID-19 has not been updated since at least March 14, 2020. Our attorneys sent a Request for Information on March 19, 2020, asking if the DOC had done what it promised to protect our members, and what future steps would be taken. No answer has been received as of March 23, 2020. DOC management has canceled our labor/management meetings at this critical time. Our attorneys also made the DOC aware of several violations they committed in the "quarantine" order DOC Management issued and had executed on March 19, 2020. This action led to a "No Confidence" vote by the Board. The DOC is up against its deadline to respond to that letter. We continue to work on getting that information to hold DOC Management accountable.

**Officer Assault**—One of our officers was viciously assaulted on March 13, 2020 by an inmate. DOC Management's response to this was to issue disciplinary action against two fellow officers, who responded as they should have to save the life of the assaulted officer. Due to DOC Management's incompetent presentation of the case to the U.S. Attorney's Office, no charges were made against the inmate for the unprovoked attack on our officer!!

We have instructed the HANNON LAW GROUP to investigate the incident, and we are confident they will do so fully.  We anticipate that as a result of their efforts, HANNON LAW GROUP will re-present the case to the U.S. Attorney's Office for proper prosecution of the inmate.  Mr. J. Michael Hannon is a former Assistant United States Attorney.

We are also contesting the removal of the officers who came to the aid of our colleague.

**National FOP**----We are working with the DC Lodge #1 Leadership and National Fraternal Order of Police (FOP) organization to advocate on YOUR behalf!  We have made them aware of the failure of the DOC Management team to:

- ensure that proper protocols are followed with both staff, inmates and visitors at all DOC facilities;
- work with the Union on solutions as the COVID-19 situation evolves, and
- provide a safe working environment; and
- offer the proper equipment to ensure that the staff, inmates and visitors are protected.

We expect to present to the DOC our own set of protocols based on national standards being followed by other correctional institutions.  If those protocols are not adopted, our members cannot work safely at the D.C. Jail.

We are prepared to take every action necessary to protect you and your family.  We are prepared to escalate these issues as far as they need to go to obtain the attention of our citizens, the Mayor, and the courts if necessary.

# EXHIBIT C

# Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks



February 28, 2019      A report by the Office of the District of Columbia Auditor



Office of the District of Columbia Auditor

**Audit Team**
**Ed Pound, Audit Supervisor**
**Matthew Separa, Auditor-in-Charge**
**Candace McCrae, Analyst**
**James Wright, Analyst**
**Lawrence Perry, Deputy Auditor and Audit Supervisor**

**Kathleen Patterson, District of Columbia Auditor**
**www.dcauditor.org**

# Executive Summary



Office of the District of Columbia Auditor

## What ODCA Found

The Department of Corrections (DOC) operates two correctional facilities in Southeast D.C. The Central Detention Facility (CDF), which opened in 1976 and is referred to as the D.C. Jail, houses male inmates. The Correctional Treatment Facility (CTF) houses female inmates and serves as the medical facility for all inmates.

ODCA conducted site observations at the D.C. Jail and CTF, examined Department of Health (DOH) inspection reports of the D.C. Jail, reviewed DOC's mental health services and reviewed budget requests and documents. Findings include the following:

- DOC was repeatedly cited by DOH for violations of industry standards related to environmental conditions, including water penetration through the walls from a leaking roof, mold growth on walls, damaged shower stalls and temperatures outside of allowable standards.

- Aramark, DOC's food service provider, was cited by DOH for repeated violations of District regulations related to public health and food service such as unsanitary conditions in food preparation areas.

- During our scope, FY 2014 through FY 2018, DOH conducted the required three inspections per year in only two years. DOH acknowledged this, noted three inspections were completed in 2017 and 2018, and stated that "The issues contributing to fewer inspections in prior years have been resolved."

- The Mayor and Council did not appropriate the full amounts in capital funding DOC requested to make necessary facility improvements. For example, in agency submissions for FY 2014 through FY 2018, DOC sought 1-year capital allocations totaling $62.4 million, or an average of $12.5 million each year. The Mayor and Council approved a total of $15.7 million, or an average in one-year allocations of $3.1 million.

## Why ODCA Did This Audit

1. To assist DOC in conjunction with any pending construction of a new correctional facility by identifying areas for improvement in facilities, programs, and policies that can be incorporated over time; and

2. To assess the adequacy of DOC's existing policies and facilities to provide high quality mental health treatment programs consistent with best practices identified by the American Correctional Association and the National Commission on Correctional Health Care.

## What ODCA Recommends

- DOC should take all steps necessary, including requesting additional funding if necessary, to achieve and maintain full compliance with all ACA and APHA requirements.

- The District should move forward with a new D.C. Jail.

- DOH should continue to comply with D.C. Code 7-731(a-1)(1) and conduct three inspections per year of the D.C. Jail to help ensure that environmental conditions meet required standards.

- DOC should conduct regular documented monitoring of Aramark's compliance with all requirements of its contract and District food safety laws and regulations and sanction the contractor appropriately if necessary.

- The Mayor and Council should provide a capital budget for DOC that considers the risk of failure to address health and safety hazards identified by the DOH including the risk to the safety of inmates and staff and the risk of additional litigation.

**For more information: 202-727-3660.**

# Contents:

Background ......................................................... 1

Objectives, Scope, and Methodology .................. 6

Audit Results........................................................ 7

Auditor Concerns ............................................... 16

Conclusion ......................................................... 17

Agency Comments............................................... 18

ODCA's Response to Agency Comments ............ 31

Summary of Report Recommendations............... 32

# Background

The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community reintegration.

DOC has five strategic objectives:

- Upgrade its workforce to better serve the District's public safety needs.
- Foster an environment that promotes safety for inmates, staff, visitors and the community at large.
- Improve inmate education, job skill levels, and facilitate successful community reintegration.
- Maintain and improve inmate physical and mental health to support successful community re-entry.
- Create and maintain a highly efficient, transparent and responsive District government.

DOC had an approved Fiscal Year (FY) 2017 operating budget of $146,923,266 and 1,162 full-time employees. DOC operates two correctional facilities on its campus in Southeast D.C. that house inmates: The Central Detention Facility (CDF) commonly referred to as the D.C. Jail, and the Correctional Treatment Facility (CTF) which serves as the medical facility for all inmates. DOC also has had contracts with three private and independently operated halfway houses: Extended House, Fairview, and Hope Village. The U.S. District Court for the District of Columbia and the Superior Court of D.C. may place eligible pretrial offenders and sentenced misdemeanants in halfway houses as an alternative to incarceration. The scope of this report focuses primarily on the D.C. Jail and CTF operations.

## The D.C. Jail and the CTF

The D.C. Jail, which opened in 1976, is in Southeast D.C., and houses only male inmates. Women are housed at the neighboring CTF. As of June 2018, the average daily population at the D.C. Jail was 1,346. Most inmates housed at the D.C. Jail are awaiting adjudication of cases or are serving a sentence for misdemeanor offenses. Some sentenced felons are housed in the D.C. Jail prior to being transferred to the Federal Bureau of Prisons.[1] According to DOC, it offers many programs to inmates, including HIV/AIDS prevention; education and intervention services; individual and group counseling services, literacy education and religious services.

As of June 2018, the nearby CTF, which opened in 1992, had an average daily population of 692. In addition to female inmates, the CTF houses minimum to medium custody male inmates and inmates requiring medical accommodation in the disabled and infirmary units. Prior to October 1, 2018 and the passage of D.C. Law 21-238, the Comprehensive Youth Justice Amendment Act of 2016, the CTF housed a small number of juveniles charged as adults in a separate unit who are now housed at the Department of Youth Rehabilitation Services. Between 1997 and 2017 control of the CTF was managed by a private corrections company, Corrections Corporation of America (CCA), as part of a sale-leaseback proposed and approved when the District was in severe financial distress. The District received an infusion of cash from CCA, then paid the corporation back until February 2017 when control of the property reverted to the District. Medical services for inmates housed at both the CTF and the D.C. Jail are provided at the CTF through a contract between the DOC and Unity Health Care, Inc. According to the contract, Unity Healthcare Care, Inc. is to provide a comprehensive medical, mental health, pharmacy, and dental health services program for D.C. inmates.

---

[1]. The National Capital Revitalization and Self-Government Improvement Act of 1997, Pub.L. 105-33, enacted by Congress, paved the way for major changes to the District's criminal justice system. One major change was the closure of Lorton Correctional Complex, which housed inmates convicted of D.C. Code felonies. These inmates were transferred to the federal Bureau of Prisons.

The figures below provide a demographic breakdown at the D.C. Jail and CTF, based upon the average daily population of 1,346 at the D.C. Jail and 692 at the CTF.[2]



**Figure 1: Inmate Population by Gender**

Women **6.3%**

Men **93.7%**



**Figure 2: Inmate Population by Race[3]**

Other **5%**

White **3%**

Hispanic **5%**

African American **87%**



**Figure 3: Inmate Population by Religious Affiliation[4]**

Other Faiths/Beliefs **7.4%**

Did Not Declare **5.1%**

Other Major Religions **11.4%**

Atheist/Denies **14.1%**

Christian Faith **36.6%**

Muslim **25.5%**



**Figure 4:  Age Distribution of Inmates**

2.   Source: DC Department of Corrections Facts and Figures, June 2018

3.   Per the DOC June 2018 report, "the category other includes Native American and those who have declared their race as Other or not declared a race. Blacks are overrepresented compared to the population which is 47.7% Black.Whites, Hispanics and Asians are under- represented compared to the DC population which is 44.6% White, 10.9% Hispanic, 4.1% Asian and 0.8% Other."

4.   Per the DOC June 2018 report, "all data is self-reported by inmates in DOC custody between October 1, 2016, and June 30, 2018.The category "Other Major Religions" includes other faiths such as Jewish, Buddhist, Hindu and Rastafarian which occur infrequently among inmates."

## A troubled past

For 30 years the D.C. Jail had a history of severe overcrowding, unsafe facilities, and unsanitary conditions. Two lawsuits were filed in 1971 and 1975, *Campbell v. McGruder and Inmates of D.C. Jail v. Jackson*, respectively, both of which alleged unconstitutional conditions at the D.C. Jail and are the oldest District prison reform cases. These cases were consolidated in a class action lawsuit[5] and challenged the totality of the conditions at the D.C. Jail. Ultimately, the U.S. District Court found that conditions violated the Eighth Amendment prohibition against cruel and unusual punishment. After years of District noncompliance with Court orders with regard to medical and mental health care services, the Court appointed a Receiver for medical care at the D.C. Jail in 1995. This receivership was terminated on September 18, 2000.

The U.S. District Court terminated the underlying cases in March 2003, after 32 years of court oversight of the D.C. Jail. The termination came in the wake of the Prison Litigation Reform Act[6] approved by Congress in 1996 which placed restrictions on the ability of prisoners to file lawsuits based on the conditions of confinement. The District government's final documents filed in the cases included this paragraph from the *District of Columbia's Reply to Plaintiffs Opposition to Defendants' Motion to Terminate* in 2003:

> Inmates at the D.C. Jail are not systematically subjected to inhumane conditions of confinement, and defendants are not deliberately indifferent to their health and safety, <u>both</u> of which are required to find a constitutional violation. To the contrary, defendants have committed approximately $30 million toward a capitol [sic] improvement program at the Jail, which is designed to remedy historic deficiencies and refurbish the HVAC, cold and hot water, plumbing and electrical systems. Moreover, in collaboration with plaintiffs and the Special Officer, defendants have developed and are implementing an environmental program designed to protect the health and safety of inmates and staff at the Jail, including a computerized inspection system to report, monitor, track and abate maintenance problems.

The federal law's higher bar and the commitment by the District to spend significant capital funds to improve conditions at the D.C. Jail were likely factors in the Court's decision to terminate the judicial oversight. According to a DOC press release at the time, "a number of significant improvements, initiated as a part of a six-year, $30 million capital improvement plan, were major contributing factors to finally ending court intervention in the daily operations of the facility."

Nevertheless, at the same time, a continuation of overcrowding at the D.C. Jail prompted significant local legislative reforms known as the Jail Improvement Amendment Act of 2003.[7] The Committee Report states that the Act was needed to improve "what are currently unsafe, unhealthy, overcrowded and inhumane conditions at the District of Columbia Central Detention Facility ("Jail") through inspections, monitoring, and reporting; initiate immediate changes in operating protocols including a classification system and housing plan; institute a population ceiling at the Jail; and the requirement that the facility obtain accreditation by a national professional correctional organization. These specific improvements are designed to result in a safer institution."[8]

A decade later, a rash of suicides led to the formation of a suicide prevention task force within the D.C. Jail in 2013. An October 14, 2013 Suicide Prevention Task Force Report identified the following four areas for improvement with respect to suicide prevention at DOC: (1) increasing the ability to identify high-risk inmates, (2) creating more suicide-

---

5. See Campbell v. McGruder (Case No. CA 1462-71) and Inmates of D.C. Jail v. Jackson Case No. 1:75-cv-01688-WBB), U.S. District Court for the District of Columbia.

6. See Pub.L. No. 104-134, 110 Stat. 1321, 42 U.S.C. § 1997e.

7. See B15-31 (Law 15-62), Effective January 30, 2004.

8. See Committee on the Judiciary, Committee Report, Bill 15-31, "District of Columbia Jail Improvement Act of 2003", May 22, 2003

resistant jail practices, (3) improving housing unit determination processes, and (4) strengthening DOC's culture of suicide prevention and on Aug. 9, 2017, DOC promulgated a new Suicide Prevention and Intervention Policy.[9]

In 2015 a report by the Washington Lawyers Committee for Civil Rights and Urban Affairs described conditions within the D.C. Jail and the CTF: "The D.C. Jail's physical condition is alarming. Inspection reports by the D.C. Department of Health (DOH) have identified numerous violations of established correctional and public health standards, as well as structural and mechanical problems that are serious to extremely serious."[10]

## Plans for a new D.C. Jail

Planning for the construction of a new jail has been discussed by prior mayoral administrations prompting numerous media articles. In a memorandum dated December 21, 2010, DOC requested $420 million in capital funding allotments for the six-year period of 2012 through 2017 for a project entitled, "New facility- per DC General and Mass Ave Proposed Master Plan." The project description/scope/justification stated that:

"The purpose of this project is to perform capital improvements and facility condition assessment to ensure DOC facilities remain in good condition, to support the cost-effective delivery of programs and services. Among the capital improvements required are roof replacements, window renovation/replacements, interior renovations, electrical, HVAC (heating and air-conditioning system) replacements. In addition, this project can be used for priority building improvement projects that arise that may not have been planned for as part of the condition assessment. Even with excellent planning there is often a need to address critical infrastructure needs."

Under former Mayor Vincent Gray, the District's Public Safety Master Plan (completed in 2015) recommended that the city build a criminal justice center at Blue Plains or Hill East.[11] The Bowser Administration's Office of Public-Private Partnerships' (OP3) has had a new corrections center under consideration. According to the post on the OP3 website, last updated October 2, 2017:

"The Department of Corrections will seek the design, build, finance, and maintenance (DBFM) of a new corrections center that consolidates existing Correctional Treatment Facility (CTF) and Central Detention Facility (CDF) located at 1901 D Street, SE. The new facility must be able to accommodate the current inmate population, with the flexibility to efficiently adjust for future populations during the lifetime of the facility. This secure environment must include various support services and inmate treatment-related programs and activities (e.g., counseling, substance abuse treatment, education, job training, recreation, religion, work assignments, health and dental care, food service and laundry, among others). The new facility could be located on the existing site or another property owned by the District government or a third party, but continuous availability during the transition between facilities is critical. The DOC's administrative offices, which are currently housed in the Reeves Center located at 2000 14th Street, NW, could also be consolidated into the new facility for more efficient operations to house approximately 80 staff in 20,000 square feet. Additionally, the District is considering the potential to house more inmates currently housed in out-of-state facilities managed by the Federal Bureau of Prisons."[12] The website also indicates that the DOC and the Department of General Services (DGS) will be the agencies involved and community engagement will be conducted, and feedback will be incorporated into the project requirements before OP3 begins procurement.

---

9.  See District of Columbia Department of Corrections Policy and Procedure, Subject: Suicide Prevention and Intervention, Number: 6080.2G (effective date August 9, 2017). Policy Number 6080.2G which was reviewed August 9, 2018 supersedes Policy Number 6080. 2F (effective date March 10, 2010).

10. See Washington Lawyers' Committee for Civil Rights & Urban Affairs report, "D.C. Prisoners:Conditions of Confinement in the District of Columbia", June 11,2015

11. http://www.dirgroup.com/work/district-of-columbia-public-safety-facilities-master-plan/

12. Office of Public-Private Partnerships' website https://op3.dc.gov/node/1195540

In an August 14, 2018, interview, Deputy Mayor for Public Safety and Justice Kevin Donahue said the planning for a new jail was placed on "pause," and indicated that $100,000 has been budgeted to conduct a study within fiscal year 2019 that looks at the needs for a new facility, including how many people it will be designed to house, programming space, and so on. He acknowledged the earliest that construction could start would be 2025, and it could take four to five years to finish. In October 2018 the Office of Victim Services and Justice Grants issued a Request for Applications, for a grant award of up to $150,000 to engage an organization to build stakeholder engagement and solicit feedback related to the design and construction of a new correctional facility in the District of Columbia.

# Objectives, Scope, and Methodology

## Objectives

Because of the ongoing challenges at DOC facilities and consistent with its mission to improve the effectiveness, efficiency, and accountability of the District government, the Office of the D.C. Auditor (ODCA) initiated this discretionary audit of conditions of confinement at the D.C. Jail. The audit focused on environmental conditions, incident reporting and tracking, and compliance with American Correctional Association, American Public Health Association, and National Commission on Correctional Health Care standards. The audit also reviewed the adequacy of jail inspections conducted by the Department of Health, and issues relating to planning for a new jail.

Specifically, the objectives of the audit were to:

- Assist DOC in conjunction with any pending construction of a new correctional facility by identifying areas for improvement in facilities, programs, and policies that can be incorporated over time.
- Assess the adequacy of DOC's existing policies and facilities to provide high quality mental health treatment programs consistent with best practices identified by the American Correctional Association and the National Commission on Correctional Health Care.

## Scope

The scope of this report focused on Fiscal Years 2014 through 2018, but we also reviewed data as far back as Fiscal Year 2007 for historical purposes and context.

## Methodology

To complete this review, we conducted site observations at the D.C. Jail and CTF and interviewed relevant employees. We reviewed D.C. Code provisions as well as standards established by the American Correctional Association, American Public Health Association, and National Commission on Correctional Health Care. We examined Department of Health (DOH) inspection reports of the D.C. Jail for calendar years 2007 through the present, as well as related documentation, including DOC's official responses to these inspections. Regarding incidents at the D.C. Jail, we reviewed DOC's incident tracking system and related incidents within the scope of our review. Lastly, ODCA reviewed DOC's mental health services, provided by Unity Health Care Corrections, for compliance with requirements issued by the American Correctional Association and the National Commission on Correctional Health Care (NCCHC).

This report was drafted, reviewed, and approved in accordance with the standards outlined in ODCA's Policy and Procedure Manual.

# Audit Results

**DOH has cited DOC for repeated and uncorrected violations of industry standards related to environmental conditions, including room temperatures, sanitary conditions, pests, broken fixtures, and inadequate lighting, among other issues. DOH also has cited both DOC and the food service provider Aramark[13] for repeated violations of District regulations related to public health and food service.**

As the federal court terminated its oversight of the D.C. Jail, which had included regular inspections, The Council of the District of Columbia (The Council) enacted the District of Columbia Jail Improvement Amendment Act of 2003[14] and required DOH to conduct inspections three times per year. For its inspections, the department's Health Regulation and Licensing Administration Health Care Facilities Division uses a standardized form at the D.C. Jail to document compliance with environmental standards as defined by the American Public Health Association (APHA) and the American Correctional Association (ACA). In each inspection, DOH examined 39 APHA standards and 24 ACA standards.

In March 2018, DOH found that DOC was out of compliance with 7 of 24 ACA standards (29%) and 6 of 39 APHA standards (15%). The DOH inspections found that DOC was not in compliance with standards designed to ensure that:

- Indoor heating, ventilation and air conditioning control systems were maintained within acceptable ranges.[15]

- Cellblocks and common areas were maintained in a clean and sanitary manner and in good repair.

- Clothing or bedding in disrepair is replaced or repaired, and that clothing bedding, mattresses, and pillows must be cleaned and sanitized before being reissued to a new user.

- Light levels in inmate cells/rooms were adequate in personal grooming areas and writing surfaces and that lighting throughout the facility was sufficient for the tasks performed.

- Inmates had access to operable showers with temperature controlled hot and cold running water.

Unfortunately, these issues are not new. In the health inspections between 2014 and March of 2018, DOH repeatedly cited DOC for the same or very similar issues of noncompliance in the reports. Some examples of repeated deficiencies cited include a leaking roof and subsequent water penetration through walls; unhealthy levels of dust; unsanitary conditions in food preparation areas; broken plumbing fixtures, especially inmate showers; large numbers of broken fluorescent lights in cells; and temperatures outside of allowable standard of at least 68 degrees Fahrenheit during the coldest months. Evidence suggests an increase in citations as the facility ages. For example, DOH cited DOC for 222 blown fluorescent tubes in inmate cells in March of 2018, an increase from just 28 cited in May of 2016.

---

13. DOC contracts with Aramark Correctional Services LLC to provide to operate and manage DOC's inmate food service programs at the Jail and CTF. Aramark is also to provide meals for purchase by staff in the Officer's Dining Room (ODR) at the Jail.

14. B15-31; Law 15-62. Effective January 30, 2004.

15. ACA standards require that: (1) the ventilation system supplies at least 15 cubic feet per minute of circulated air per occupant with a minimum of five cubic feet per minute of outside air.Toilet rooms and cells with toilets have no less than four air changes per hour unless state or local codes require a qualified independent source and are checked less than once per accreditation cycle. (2) Temperature and humidity are mechanically raised or lowered to acceptable comfort levels.(3) In hot and dry climates, exterior window shields, shutters, or awnings must be provided to exclude solar radiation. (4) In hot humid climates when the facility does not have mechanical chilled-air systems, adequate windows and wall openings should be provided and the location must provide cross-ventilation.Gyms and swimming pools require special temperature, humidity, and ventilation control. (5) The building design, insulation, and exterior surface and color minimize heat absorption.(6) Clothes, towels, sheets, draperies, posters, and other objects should not interfere with airflow in or out of living areas. (7) The control system should maintain an indoor air temperature of at least 68 degrees Fahrenheit during the coldest months.

ODCA accompanied a DOH health inspector during the September 2017 inspection of the D.C. Jail which encompassed five days. That on-site inspection revealed several significant deficiencies, including food preparation and handling issues, cleanliness issues in the cell blocks, including the shower areas, and safety issues. At an elevator bank, the inspector pointed out that wires and conduits that penetrated through the walls and ceilings had not been properly sealed with caulk. According to the inspector, if there was a fire, smoke could move through the walls and affect other areas of the building.

---

**DOH citations that have reoccurred:**

- Leaking damage or inoperable plumbing fixtures from 2014 through 2018
- Leaking roof from 2014 through 2018
- Peeling paint on metal desks, door frames, tables and bed frames from 2014 through 2018
- Water penetration through walls from 2014 through 2018
- Damaged janitor's closets from 2014 through 2016
- Damaged Formica tables from 2014 through 2018
- Damaged showers stalls from 2014 through 2018
- Bent seats/no seats from 2014 through 2018

---

In addition to the review of ACA and APHA standards, ODCA also examined DOH's inspections of DOC's culinary operations. DOC contracts with Aramark Correctional Services LLC to operate and manage DOC's inmate food service programs at the D.C. Jail and the CTF. Aramark is also the vendor selected to provide meals for purchase by staff in the Officer's Dining Room at the D.C. Jail.

ODCA found that DOH has cited both DOC and Aramark, for violations of Title 25-A of the District of Columbia Municipal Regulations (DCMR), which governs food operations. Specifically, DOC and Aramark have, according to several reports:

- Failed to keep food and non-food contact surfaces clean and sanitized.
- Received, stored, held, and/or served food at improper temperatures.
- Failed to keep kitchen equipment in good repair.
- Failed to control pests in the culinary area.

Notwithstanding these citations by DOH, the D.C. Jail has been accredited by the ACA since 2009[16]. To maintain its accreditation, DOC adheres to the ACA's "Expected Practices." For specific standards, DOC must meet 100% compliance and for other standards, DOC must meet 90% compliance to maintain accreditation. Reaccreditation occurs every three years with the D.C. Jail's last accreditation in 2015 and paperwork filed for accreditation in 2018.[17] As part of its 2015 accreditation, ACA told DOC that it had found the condition of the D.C. Jail to be in notably good repair *for its age* (emphasis added).

Although DOC has received ACA accreditation for the jail, some issues raised by DOH continue to reoccur without being successfully addressed. DOC has not consistently taken the steps necessary to correct the all of the issues identified by DOH's health inspectors.

In some cases, DOC does not respond to citations as needing corrective action. In some cases, DOC states that for ACA accreditation purposes, compliance is not possible due to the age of the structure and the limited resources DOC has on hand. In those instances when DOC agrees there is a problem, but the agency cannot correct the citation and

---

16. The Jail Improvement Amendment Act of 2003 required DOC to obtain ACA accreditation within four years of enactment. See B15-31; Law 15-62 §5(e). Effective January 30, 2004.

17. According to the 2015 ACA Accreditation report, dated January 25, 2016 the CTF has not yet been accredited since the facility has been under the management of DOC. The report indicates that the CTF initial accreditation will occur in 2018.

issues the same response, sometimes word for word, in its corrective action plans each time the violation is cited. Although DOC officials indicated that they have sufficient budget to meet their maintenance improvement needs, DOH's repeated findings of faulty or broken equipment and a decaying physical plant strongly suggest that additional investment may be needed.

Ensuring that DOC substantially complies with standards and regulations is necessary for the health of inmates and correctional officers. While there has been talk of a new jail, no real planning is in evidence and it is likely that a new facility will not be built for many years. It seems likely that the jail will serve as the principal incarceration facility in the District for years to come. The record of DOH's repeated findings over the last 11 years presents a liability risk to DOC and the District by presenting an opportunity for further lawsuits alleging a violation of inmate constitutional rights.

**Recommendations:**

1. DOC should take all steps necessary, including requesting additional funding if necessary, to achieve and maintain full compliance with all ACA and APHA requirements.

2. DOC should conduct regular documented monitoring of Aramark's compliance with all requirements of its contract and District food safety laws and regulations and sanction the contractor appropriately if necessary.

3. The District should move forward with a new D.C. Jail.

4. When considering a new correctional facility, DOC should analyze DOH violations to ensure that the design of the new facility minimizes the challenges of complying with standards and regulations that DOH frequently cited as having been violated.

**In past budget cycles DOC has requested but successive mayors have not proposed nor has the Council appropriated capital funding for DOC to fully address the agency's capital budget needs as indicated in the repeated DOH findings on conditions of confinement, putting at risk the health and safety of inmates and staff, adding to the risk of litigation, and leading to incorrect information in the District's CIP.**

In the 2003 *District of Columbia Reply to Plaintiffs' Opposition to Defendants' Motion to Terminate* in the pending cases[18], the District government stated its commitment to approximately $30 million toward capital improvements "designed to remedy historic deficiencies and refurbish the HVAC, cold and hot water, plumbing and electrical systems." In the intervening years the department has expended a total of $74.5 million in capital improvements (FY2004 through FY2018) of which $10.3 million has been spent on AMO-CR104C-HVAC. The description of the "AMO-CR104-HVAC Replacement for CDF" project, in DOC capital budget request documents is as follows.

"The heating, ventilation and air-conditioning system at the Central Detention Facility has been in disrepair for years. Additionally, the water supply to the facility has been extremely problematic. The main booster pumps are at the end of their useful life and no filters, softeners or strainers are installed on the system. All work that was part of the original contract has been completed. However, for the system to perform in accordance with the design parameters and deliver the requisite amount of air in the cellblocks, additional fine tuning is necessary; four large rooftop duct fittings need to be replaced, transitions from the large rooftop units need to be modified and final air and water balancing needs to be done for the system to work properly. Chiller, steam station and associated piping overhaul is also included."[19]

DOC has submitted capital budget requests that reflect the need to fund critical capital projects. It is clear from DOC budget requests over the last five completed budget cycles that the agency has sought significant capital funding

---

18. See Campbell v. McGruder (Case No. CA 1462-71) and Inmates of D.C. Jail v. Jackson Case No. 1:75-cv-01688-WBB), U.S. District Court for the District of Columbia.

19. DOC's FY 2015-20 Enhancements Budget Submission dated November 13, 2013.

that is has not received in the annual budget process. In agency submissions for FY2014 through FY2018, DOC sought 1-year capital allocations totaling $62.4 million, or an average of $12.5 million each year. The Mayor and Council approved a total of $15.7 million, or an average in one-year allocations of $3.1 million. In the CIP six-year funding requests for those five budget cycles, DOC sought a total of $329.4 million or an average of $65.9 million over the six-year cycle, but the CIP as proposed only allocated $31.3 million, or an average for the six-year cycle of just $6.3 million.

To be sure, in the District of Columbia the CIP budget is an imprecise spending plan at best. The ODCA audit reports on school modernization have made clear that simply being included in a capital budget plan does not indicate accuracy in the amount that will eventually be spent. But it is also the case in all the school spending audits to date, the capital expenditures have consistently gone over the original budget and not under. In allocating well under what was requested in order to maintain DOC facilities. the executive and legislative branches of the District government have risked a failure to meet real needs as reflected in the DOH inspection reports.

The DOH inspection reports have repeatedly found deficiencies within several areas of the D.C. Jail's infrastructure, including leaks in the roof and water penetration throughout the walls, HVAC issues (temperatures too hot or too cold), and nonfunctioning equipment, including showers, toilets, lights, etc.

DOC has recognized these issues and submitted capital budget requests since 2010 that include projects that would specifically address some of DOH's concerns. For instance, DOC identified the need for general renovations to the D.C. Jail, justifying the project by saying "the CDF is almost a 40 years (sic) old structure continuously used 24/7, 365 days a year that faces extreme wear and tear. Upkeep and maintenance of the CDF is critical to the mission of the agency because it is required to safely house over 2,000 inmates and provide operational support, while complying with applicable standards and regulations." DOC has similarly stated the need for significant projects related to HVAC replacement and roof refurbishment.

In an interview in August 2018 Deputy Mayor for Public Safety and Justice Kevin Donahue sought to minimize the obvious discrepancies between what DOC requested and what the Mayor and Council approved in DOC's capital budget. He explained that agency leaders are encouraged to "blue sky" their requests as if funding were no object, and that capital allocations are then pared down in an interative process. He said that the yearly allocations are more serious endeavors than the 6-year requests and reflect more closely what an agency actually needs.

Figure 5 below presents the capital budget request (in millions) since 2014 and the approved budgets.

**Figure 5: DOC Capital Budget Requests (In Millions)**

| Fiscal Year | Years Covered | DOC Year 1 Request | Year 1 Approved Per Budget Book | DOC 6-Year Total Request | 6-Year Approved Per Budget Book |
|---|---|---|---|---|---|
| 2014 | 2014-2019 | $15.3 | $11.2 | $62.7 | $14.5 |
| 2015 | 2015-2020 | $5.9 | $1.5 | $39.6 | $4.5 |
| 2016 | 2016-2021 | $4.8 | $1.0 | $26.7 | $2.3 |
| 2017 | 2017-2022 | $16.4 | $0 | $78.8 | $5.0 |
| 2018 | 2018-2023 | $20.0 | $2.0 | $121.6 | $5.0 |
| Totals | | $62.4 | $15.7 | $329.4 | $31.3 |

In DOC's FY 2018 capital budget request, the agency sought $21,974,188 for general renovations to the D.C. Jail, $12,000,000 for HVAC replacement, and $1,000,000 for roof refurbishment over the six-year period from FY 2018 through FY 2023. A significant portion of DOC's requested capital funding that year came in the final three years of the capital plan (FY 2021-2023), in which DOC requested a total of $70,574,188 across all projects (including those above). In the final year (FY 2023) alone, DOC requested $44,750,000 in capital funds, anticipating a need to replace boiler units at the CTF and the D.C. Jail.

The FY 2018 and FY 2019 CIPs proposed by the Mayor did not include any capital funding for DOC beyond fiscal year 2020. The FY 2018 capital plan provided DOC with $2 million in FY 2018, $2 million in FY 2019, and $1 million in FY 2020, but nothing in FYs 2021 through FY 2023.

In addition to the risk of harm and legal liability, the lack of support for recognized maintenance and repair needs expressed by the agency may be failing to meet CIP regulations. The purposes of the District's CIP are as follows (emphasis added):

"The CIP is used as the basis for formulating the District's annual capital budget. The Council and Congress adopt the budget as part of the District's overall six-year CIP. Inclusion of a project in a congressionally adopted capital budget and the approval of requisite financing gives the District the authority to spend funds for each project. **The remaining five years of the program show the official plan for making improvements to District-owned facilities in future years.**"[20]

"The text of the CIP is an important planning and management resource...The CIP is flexible, allowing project expenditure plans to be amended from one year to the next in order to reflect actual expenditures and revised expenditure plans. However, consistent with rigorous strategic planning, substantial changes in the program are discouraged."[21] The CIP is updated each year by adding a planning year and reflecting any necessary changes in projected expenditure schedules, proposed projects and District priorities.

"Under the program, projects should complement the planning of other District agencies and **must constitute a coordinated, long-term program to improve and effectively use the capital facilities and agency infrastructure.**"[22]

There are several effects that result from not accurately portraying DOC's capital needs in the six-year CIP:

- The plan distorts the true capital needs of the District, and other projects may need to be cut down the line to make room for emergency capital needs. Using DOC as an example, in this case, the agency will need some level of capital funding in FY 2021 through FY 2024.

- The public is not informed regarding the true level of capital investment needed at DOC to correct the deficiencies found by DOH and to adequately maintain the existing equipment and facilities at a suitable level.

While officials within the Executive Office of the Mayor (EOM) are aware of DOC's capital needs, the administration, like its immediate predecessors, has not made accurate projections for the agency's expected need for continued capital funding in future years in the CIP. EOM officials acknowledged that they expect the D.C. Jail will need significant capital investments in future years and that there is a need for better long-term planning. EOM officials further explained that the CIP is supposed to be a six-year plan, but in reality, is being used—as evidenced by DOC in this case—to make short term decisions about where money needs to be spent. EOM officials expressed concern that if DOC does have additional immediate needs in the near future capital funding will have to be pulled from other sources to address the need because EOM already allocated capital funding for the next six years.

---

20. See FY 2019 Proposed Budget and Financial Plan, Congressional Submission, Volume 5- FY2019 to FY2024, page 5-2.

21. See FY 2019 Proposed Budget and Financial Plan, Congressional Submission, Volume 5- FY2019 to FY2024, page 5-15.

22. See FY 2019 Proposed Budget and Financial Plan, Congressional Submission, Volume 5- FY2019 to FY2024, page 5-23.

Recommendations:

5. The Mayor and Council should provide a capital budget for DOC that considers the risk of failure to address health and safety hazards identified by the DOH including the risk to the safety of inmates and staff and the risk of additional litigation.

6. EOM should, working with the other members of the District's Capital Budget Team, develop policies and procedures for the capital budgeting process that ensure the plan accurately reflects the known capital needs of agencies, including DOC, over the entire six-year capital budgeting period.

**The Department of Health did not regularly conduct three inspections of the D.C. Jail each year as required by the D.C. Code.**

D.C. Code states that, "[t]he Department of Health shall conduct a minimum of 3 inspections per year of the environmental conditions at the Central Detention Facility. For the purposes of this subsection, the term "environmental conditions" shall include temperature control, ventilation, and sanitation." The Code requires that the Department of Health submit the report of each inspection to the Council and the Mayor within 30 days of the inspection.[23]

In a review of health inspections of the D.C. Jail between 2014 and 2018 we found that DOH conducted the required three inspections in only two of the five years. DOH acknowledges that it had not conducted the required inspections in prior years and by email July 12, 2018, indicated that the three inspections were conducted in 2017, and would be in 2018. "The issues contributing to fewer inspections in prior years have been resolved," DOH said. The agency recounted the email text in responding to our draft report and stated that the requirement was met in 2017 and 2018. Figure 6 on the following page presents an analysis of the number of inspections conducted per year. Health inspections conducted by DOH between 2007 and 2013 are included for historical purposes.

**Figure 6: DOH Inspections of the D.C. Jail**

| Calendar Year | Number of DOH Inspections | Compliancy with Required # of Inspections |
|---|---|---|
| 2007 | 3 | Yes |
| 2008 | 2 | No |
| 2009 | 2 | No |
| 2010 | 3 | Yes |
| 2011 | 1 | No |
| 2012 | 3 | Yes |
| 2013 | 2 | No |
| 2014 | 2 | No |
| 2015 | 2 | No |
| 2016 | 2 | No |
| 2017 | 3 | Yes |
| 2018 | 3 | Yes |

Source: Department of Health Inspection Reports

---

23. See § 7-731 (a-1).

DOH officials cited several reasons why the agency did not conduct the correct number of inspections required under D.C. Code in previous years:

- DOH was tasked with conducting the inspections but was not provided adequate funding to cover the costs of the inspections.
- During some years, a contractor was conducting inspections and there were contracting delays.
- DOH waited for the Department of Corrections to respond to the prior inspection before scheduling the next inspection.
- DOH must coordinate the inspections with the Department of Corrections as the surveyor must be accompanied on the inspections of the correctional facility.

The inspections are designed to ensure the health and well-being of correctional officers and inmates. If the inspections are not occurring as regularly scheduled, there is a potential risk to the health and safety of officers and inmates.

**Recommendation:**

7. DOH should continue to comply with D.C. Code 7-731(a-1)(1) and conduct three inspections per year of the D.C. Jail to help ensure that environmental conditions meet required standards.

**DOC's health services contractor, Unity Health Care Corrections, complies with basic industry accreditation requirements for mental health screenings and suicide prevention, but DOC and Unity should update and clarify some internal written policies and procedures to ensure screenings remain consistent with accreditation requirements.**

In reviewing Unity and DOC health care policies, ODCA examined accreditation requirements of the American Correctional Association (ACA) and the National Commission on Correctional Health Care (NCCHC).

Both ACA and NCCHC require that the *mental health* intake screenings contain certain components, including information on whether an inmate has ever had a history of seizures or head trauma, as well as information on an inmate's orientation to time and space and overall appearance.

ODCA's review of DOC's Office of Health Administration (OHSA) shows that DOC is capturing all medical information required by ACA and NCCHC. However, OHSA is relying on requirements and information contained within its initial medical assessment to fulfill ACA and NCCHC requirements that are supposed to be part of the initial mental health assessment.

ODCA reviewed three policies and practices, specifically:

- Intake mental health screening
- Comprehensive mental health screening
- Suicide prevention

While ODCA observed that the procedures followed by DOC and Unity covered all the elements required by ACA and NCCHC, both DOC and Unity's mental health policies do not explicitly contain some of the ACA and NCCHC requirements with respect to intake mental health screenings of inmates. For instance, both ACA and NCCHC require that the *mental health* intake screenings contain components, including information on whether an inmate has ever had a history of seizures or head trauma, as well as information on an inmate's orientation to time and space. These

items are not contained within DOC's mental health screening requirements because they are practiced as part of DOC's intake *medical* screenings, conducted and recorded at intake immediately before the mental health screening and thus not repeated.

ODCA also reviewed accreditation documents provided by DOC demonstrating that NCCHC considered the components of the intake medical screenings to fulfill some of the mental health screening components during the most recent accreditation process. This demonstrates that DOC is not at risk of losing its accreditation simply because its mental health exam policies do not repeat those items.

DOC and Unity have not specifically written their policies and procedures to match them against ACA and NCCHC requirements. Unity's contract requires that Unity comply with ACA and NCCHC requirements but does not state how the contractor should do so (for instance, by maintaining policies and procedures that are consistent with those requirements).

Because DOC and Unity's policies for intake mental health examinations do not explicitly address all aspects of the ACA and NCCHC requirements, there is a risk that if the current intake medical exam process changes, DOC may no longer be in compliance with these ACA and NCCHC requirements in performing its intake mental health screenings.

**Recommendation:**

8.  DOC should update their mental health intake screening policies and procedures to ensure they fully meet ACA and NCCHC accreditation requirements without having to rely on questions and procedures administered as part of the intake medical exam, ensure that the agency's health services contractor's (currently Unity) policies and procedures mirror those of DOC and are in full compliance with ACA and NCCHC accreditation requirements and see that OHSA's and contractors written policies remain consistent with the standards.

**DOC's Office of Heath Administration regular audits of Unity represent good internal control and monitoring practices that reduce the likelihood of noncompliance and the risk of negative outcomes.**

OHSA is a division within the DOC and is overseen by DOC's Deputy Director of Administration. Its primary responsibility is to oversee the effective implementation of the Agency's medical service contract with its current vendor, Unity Health Care, Incorporated (Unity). Since 2006, Unity has provided medical, dental, and mental health services to DOC's male, female, and juvenile population. In addition to assuring compliance with the contract, OHSA oversees the vendor's compliance with NCCHC and ACA standards to help assure re-accreditation every three years.

As previously stated, the CTF was not inspected as part of the 2015 ACA accreditation.[24] We understand from DOC's comments on our draft report that the ACA accreditation received in January 2019 included the CTF. We found, that OHSA had in place a system of audits to monitor Unity's performance in quality measures established by NCCHC, the ACA, Unity's contract, and District and federal laws and regulations. OHSA is scheduled to conduct 162 audits annually across 64 performance measures. Most of these audits are conducted two to three times per year, and DOC has developed a risk assessment process to determine how frequently audits should occur.

The audits themselves typically consist of reviewing a sample of electronic medical records of patients who have used specific programs and determining whether the records contain the required information or whether the patient has received the service indicated. DOC's OHSA compares the performance on these audits with the established performance benchmarks and issues corrective action plans if compliance is not met. OHSA then conducts a re-audit 60 days later to determine whether the Corrective Action Plan has been met.

---

24. According to the 2015 ACA Accreditation report, dated January 25, 2016 the CTF has not yet been accredited since the facility has been under the management of DOC. The report indicates that the CTF initial accreditation will occur in 2018.

OHSA's performance was measured against the United States Government Accountability Office (GAO) Standards for Internal Control in the Federal Government which state: "Management establishes activities to monitor performance measures and indicators. These may include comparisons and assessments relating to different sets of data to one another so that analyses of the relationships can be made, and appropriate actions taken. Management designs controls aimed at validating the propriety and integrity of both entity and individual performance measures and indicators."[25]

Additionally, GAO's principles for monitoring state, in part: "Corrective actions are a necessary complement to control activities to achieve objectives. Management should establish and operate monitoring activities to monitor the internal control system and evaluate the results. Management should remediate identified internal control deficiencies on a timely basis."[26]

Moreover, ODCA reviewed DOC's auditing practices in the context of DOC's policies, which state: "DOC will audit Contractors [sic] provision of quality health care consistent with ACA, NCCHC, Federal and District regulatory standards, as noted in the 'DOC Performance Improvement Tool. DOC may utilize this tool to conduct independent and/or joint audits with Contractor."[27]

In summary, the practices employed by OHSA provide reasonable assurance that Unity is complying with established performance benchmarks and that OHSA is taking appropriate steps to address issues requiring corrective action. It is important to note that the scope of ODCA's assessment was narrow. ODCA did not assess whether mental health services provided to inmates are adequate. ODCA assessed DOC's compliance with the ACA and NCCHC requirements related to three items—the intake mental health assessment, the comprehensive mental health assessment, and suicide prevention policies. ODCA concluded that DOC's audits of Unity reduce the risk that the contractor will not comply with contractual or accreditation requirements. OHSA should continue its monitoring of Unity's service performance, including annual evaluations of risk to determine audit frequency as well as issuing and following up on corrective action plans when necessary to ensure services provided to inmates meet all established benchmarks.

---

25. United States Government Accountability Office, Standards for Internal Control in the Federal Government, September 2014, Page 47.

26. United States Government Accountability Office, Standards for Internal Control in the Federal Government, September 2014, Page 64.

27. See Contract CW37196, dated October 1, 2015, section C.5.30.10

# Auditor's Concerns

**D.C. Code does not require the agency to inspect the Correctional Treatment Facility.**

Currently the Department of Health does not conduct inspections at the Correctional Treatment Facility because the D.C. Code does not require such inspections. Regular inspections should be conducted to ensure the health and well-being of correctional officers and inmates. If inspections are not occurring there is a potential risk to the health and safety of officers and inmates.

Although ODCA could not conclusively determine why the law does not require CTF inspections by DOH, one potential reason is that prior to January 30, 2017, the treatment facility was managed by a private, for profit company—the Corrections Corporation of America and the CTF was not a part of the federal court oversight. During receivership, the U.S. District Court required inspections and the provision in the Jail Improvement Amendment Act of 2003 may have been written to to ensure the monitoring requirements during court oversight were maintained.

**Recommendation:**
9. DOC and the Council should review this inspection requirement and make necessary adjustments to the Code in the best interest of inmates housed at the CTF.

**Video Visitation Policy**

In 2012, DOC began video visitation at the D.C. Jail after in- person visitation was terminated. Currently, this is the primary way inmates communicate with their visitors. In-person visitations for inmates, however, were reinstated in 2015 at the CTF and the D.C. Jail for those with good behavior. DOC officials stated that video visitation has resulted in more communication between inmates and their families and fewer cancellations of visits.

However, as a new technology, the long-term effects of video visitation are not well understood. There is some research that suggests it may lead to a breakdown in an inmate's communication with family and a higher likelihood of recidivism down the line.[28] Other research suggests this is not the case.

**Recommendation:**
10. DOC should closely study the effects of its video visitation systems and consider including sufficient space in the plans for the new jail for both in-person and video visitations for

---

28. See:Prison Visitation Policies:A Fifty State Survey, Chesa Boudin, Trevor Stutz, and Aaron Litman. Yale Law & Policy Review, Volume 321, Issue 1, Article 5. https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1654&context=ylpr

# Conclusion

The D.C. Jail is an aging and deteriorating 40-year-old facility that must be operational 24 hours per day, 7 days per week.  While age is a contributing factor, the conditions within the D.C. Jail could worsen if DOC is not able to address health and environmental citations issued by DOH.  We found that DOC made requests for capital funds over and above what was provided by the Mayor and Council to address facility improvements. The Mayor and the DC Council must work in concert to appropriate sufficient capital for DOC to make necessary repairs to the facility.  Not doing so would put the health and safety of inmates and DOC staff at risk and increase the risk of lawsuits against the District.

One of the goals of this audit was to identify areas for improvement in facilities and policies that could assist with planning for the construction of a new jail. By reviewing DOH's inspection reports, ODCA found that DOC was repeatedly cited by DOH for violations of industry standards related to environmental conditions.  Some of the citations that were repeated throughout the scope of this audit included water penetration through the walls due to a leaking roof, mold growth on walls, damaged shower stalls, temperatures outside of allowable standards and other issues clearly associated with an aging facility. Aramark, DOC's food service provider, was cited by DOH for repeated violations of District regulations related to public health and food service such as unsanitary conditions in food preparation areas.

The persistence and seriousness of facility citations clearly point to the need for a new jail.  According to Kevin Donahue, the Deputy Mayor for Public Safety and Justice, the earliest construction of a new facility could begin is 2025 and would likely take four to five years to complete the project. Further delay heightens the risks associated with the age and deterioration of the facility.

We are pleased to note that DOC accepted four of the six recommendations directed to them in our report.

# Agency Comments

On December 21, 2018, we sent a draft copy of this report to the Department of Corrections (DOC) and the Department of Health (DOH) for review and written comment. DOC responded with comments on January 30, 2019, and DOH responded with comments on January 18, 2019. The comments are appended in full to this report.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CORRECTIONS



**Office of the Director**

# D.C. DEPARTMENT OF CORRECTIONS' RESPONSE TO THE AUDIT OF D.C. JAIL CONDITIONS BY THE OFFICE OF THE D.C. AUDITOR

I.    **The District's Demonstrated Performance in Achieving Established Standards Regarding Conditions of Confinement at the D.C. Jail**

The Office of the D.C. Auditor (ODCA) goes back decades to set the stage of the Audit of the D.C. Jail, but does not acknowledge or recognize that a long look-back in fact demonstrates the progress the D.C. government has made and the full and repeated recognition it has received as being compliant with national correctional standards. While the District of Columbia Jail was under Court supervision and receivership in the distant past, after years of demonstrated dedication to systemic reform by District officials, that *court oversight was terminated 16 years ago in 2003*. The United States District Court determined that the conditions of confinement met constitutional standards and no longer required judicial intervention and oversight, a status that continues to date.

In 2003, the D.C. Council passed the Jail Improvement Amendment Act of 2003 (Law 15-62), which required inspections, monitoring, and reporting. It further required that the Department of Corrections (DOC) initiate immediate changes in operating protocols including a classification system and housing plan; institute a population ceiling at the Jail; and required that the facility obtain accreditation by a national professional correctional organization in order to provide a safer institution. DOC complied with the requirements with changes in classification and housing protocols. It implemented and has adhered to population levels below the cap of 2,164 promulgated by DOC in DCMR 28-532. This cap was based on the rated capacity of the facility as determined by independent expert consultants Pulitzer/Bogard Associates. Consistent with D.C. Code § 24-211.02(b)(2), DOC submits Quarterly Jail Improvement Act reports to the D.C. Council, as required by the Act, relating to living conditions in the Central Detention Facility (CDF), including inmate grievances, in a Crystal report (a Windows-based tool that allows aggregate reporting of data from diverse sources). In addition, DOC produces and submits to the D.C. Council a monthly report on the Priority One environmental problems and the time to repair, a monthly report of the Environmental Safety Office, a monthly report on temperature control and ventilation, and a monthly report on the jail population that includes the number of people waiting for transfer to the Federal Bureau of Prisons and the average number of days that inmates waited for transfer.

The Act also required DOC to achieve American Correctional Association (ACA) accreditation, which, through hard work, commitment, and the dedication of staff and resources, we did. In addition, DOC

also achieved National Conference on Correctional Health Care (NCCHC) accreditation. ACA and NCCHC accreditations are considered the gold standards in correctional operational and medical/mental health care respectively. In order to be accredited by ACA, the D.C. Jail has to be one hundred percent compliant with all "mandatory standards," and ninety percent compliant with all "non-mandatory standards." In order to achieve and maintain NCCHC accreditation, the D.C. Jail has to be one hundred percent compliant with all "essential" NCCHC standards and eighty-five percent compliant with all "important" NCCHC standards. The D.C. Jail achieved initial ACA accreditation in August 2009, reaccreditation in January 2015 and was reaccredited again on January 12, 2019. D.C. Jail Medical and Mental Health Services were initially accredited by NCCHC in October 2001, and most recently in April 2018. Moreover, the D.C. Jail was originally certified as in compliance with the Prison Rape Elimination Act (PREA) on December 9, 2014, and most recently on November 24, 2017. The Correctional Treatment Facility (CTF) was accredited by ACA while under the management operation of Corrections Corporation of America (CCA) from 1997 until 2016 and reaccredited under DOC management on January 12, 2019. CTF Medical and Mental Health Services were accredited by the National Commission on Correctional Health Care (NCCHC), the initial accreditation in October 2004, and most recently in April 2018. The CTF is certified as compliant with the Prison Rape Elimination Act as of July 29, 2016.

The Department of Health (DC Health) conducts inspections of the D.C. Jail, as referenced throughout the Auditor's report, using the Department's Health Regulation and Licensing Administration Health Care Facilities Division (HCFD) standardized form to document compliance with environmental standards as defined by the American Public Health Association (APHA) and the American Correctional Association (ACA). In conducting this inspection, DC Health applies the APHA standards for correctional facilities, although D.C. Official Code § 7-731 (a-1) does not set out what standard(s) should be applied when conducting the inspections. Because the APHA is not an accrediting agency, it is APHA's policy that correctional facilities should achieve accreditation with NCCHC as it is the gold standard in correctional health. According to the APHA, the NCCHC has established standards that align with APHA recommendations; therefore, achieving NCCHC accreditation is achieving substantial compliance with APHA standards. As mentioned above, the D.C. Jail was accredited by NCCHC in October 2001 and reaccredited in April 2018. Therefore, the Jail is in compliance with APHA Standards per the APHA.

For more than a decade, the DOC was well below the national average for suicides in correctional facilities. However, there was a sudden occurrence of a cluster of suicides in 2013, prompting the District to immediately bring in expert consultant Lindsay M. Hayes and establish a Suicide Prevention Task Force resulting in: (1) increasing the ability to identify high-risk inmates, (2) creating more suicide-resistant jail practices, (3) improving housing unit determination processes, and (4) strengthening DOC's culture of suicide prevention as reflected in the agency's implemented DOC Policy 6080.2G, Suicide Prevention and Intervention.[1] In addition to the Task Force, the DOC regularly trains our staff in the identification of behaviors that may indicate a risk of suicide, and the appropriate protocols for suicide prevention and intervention. This response to a cluster of suicides further demonstrates the agency's commitment and ability to identify and improve protections, services, and supports for inmate safety and well-being.

II.    **Official Action to Ensure that the Maintenance and Repair of the D.C. Jail Meet Industry and Constitutional Standards for Conditions of Confinement**

The mission of the D.C. Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording

---

[1] https://doc.dc.gov/publication/suicide-prevention-and-intervention

those in custody meaningful reha ilitative opportunities for successful community reintegration. ii s mission is articulated repeatedly to staff, and is carried out through the implementation of numerous programs [2]) In addition to providing an environment that promotes safety for inmates, staff, visitors and the community at large, the DOC facilities are a place here we provide programs and services to improve inmate education and job s ill levels, and facilitate successful community reintegration. DOC also provides inmate physical and mental health treatment through i ty Healthcare, a premiere and respected community healthcare provider, that includes daily access to sic call, 24/7 urgent care, in-house and outside specialty care, full pharmaceutical services and hospital services, dental care, and HIV/A DS prevention education. Mental health care includes psychiatric and psychological care, clinical social o re rs, group therapy and individual counseling, su stance a use programs, an n tensive Mental Health it, and a ep Don ental Health i t DOC provides education programs hi ch include adult asi c education, DD , college courses, and vocational programs, as e ll as job readiness services The Department also provides religious programs and accommodations for inmate religious el iefs including services, religious diets, clothing and other items for the practice of faith consistent i th the safety and security of the facility. n mates have recreation, out of cell activity, television, li rary cart reading materials, commissary, social visitation, 24/7 legal visitation, telephone services (social and legal calls), mail services (regular and legal), case management services, la library services, grooming services, and inmates may grieve any concerns or complaints through the n mate ri evance Procedures (medical and regular) Demonstrating our commitment to reintegrating the Jail's population with the larger community, the DOC's investment in college programming and facilitation of voting y inmates are recognized nationally as path-breai ng and progressive.

All of these services are provided in facilities here there was an average daily population of 1173 to 13 from 2015 to 2018. An average of te lve thousand (12,000) inmates come through the D.C Jail annually, resulting in the need for a robust preventative maintenance plan for the physical plant and a priority triaging system for maintenance repairs e population activity volume, high turnover, and 24 7 occupation of the D.C. Jail translates to a facility ho se physical plant is under constant usage and strain as reflected in the reoccurrence of faulty plumbing fit ures and other maintenance and repairs hi ch, once fixed, reoccur else here in the facility. The D.C. ail has a large and comple plumbing system that supports all aspects of the building, including the common areas of the housing units, such as shoe rs, as e ll as individually supporting 13 cells, each i th its on sin and toilet. This e tensive footage of plumbing and large nume r of fitur es is reflected in the proportionate ratio of plumbing repairs cited in DC Health inspections and the fact that similar problems reoccur in different cells after repair As such, the number of plumbing fit ures needing repair does not reflect a failure to repair them in a timely manner, u t rather that another need occurred in another cell in the facility, reu iring constant maintenance and upe ep and reoccurring maintenance citations.

Notal y, if the plumbing in a cell is not opera le, or if the roof leas into a cell, the cell is not occupied y an inmate until fixed; therefore, inmates are not su jected to any deprivations or harm hi le fixtures are inoperal e or there is a lea .

At the D.C. ai l, most of the 8 housing units have 8 showers, totaling 132 showers, similarly reflecting a proportional number of needed shoe r repairs at any given time er efore, on each unit, if a shoe r fitur e reu ires repair, inmates have up to 7 other shoe rs to use, thus meeting their needs Shoe r repairs are immediately prioritized y maintenance staff and repairs are targeted for completion i thin 24-hours (actual completion time of course depends upon the complei ty of the repair). There are some

---

[2] https://docd cov /pageo c-program-statements

showe aea s that sue om a numbe o st u tual and ehan ial ei i eni es, suh as ori inal plumbing s ste s that ae pei eni ng en -of-lie ai lues

The ur ent HVAC system has signii an t design p oblems that inhibit po pe airl ow and tempea tue o nt ols. In light o t he HVAC issues e pei ene i n the su me o 2 016, DOCii no nunti on with the D.C. epa tment o nea l Services (DGS), o mpleted a needs assess ent an easibilit study to epl ae and/or upgad e the e isting HVAC equipment an assoi ate mehani al s stems a e sult pi o to the summe o 2017tt he OC installe t wo new wate hi lles and epla e the root op lag e air supply duts . DOC was a le to ei n the process o moving the system r om a manual o nt ol to eal-time i gitize ont ol. OCii no nunti on with DGS, continues to wo towas HVAC impo vements to inease the l ow o air throughout the ai lit . Moe ove DOC monitos i ndoor te pe atu es dailyand when tempeatu es ae appo ah in an unae ptal e ae a DOC maintenane sta sts the tempeatue Pe the ACA Eett e Prati ce ALDF-1A-20, the tempeatu e at DOC ai lities is ai se o r lowee t o aee ptal e como t le els, thus the avea e daily tempeatu e in the Jail is within normal an ges.

Pe ACA pe te d Pac tie 4-ALDF-4A-02tt he food p epaati on a ea inl udes space and equipment o o ood p ep aration ase on population size type o f ood pep aati on, and ethods o meal service ee a e sanita y, tempe atu e-o nto lle a eas o r ood stoag e. Weel y meetings an ai ly inspeti ons ae o ndut e to ensue that l eanliness and sanitation ae maintaine i n the i then Culina⁹ sta has an assigne e nvironmental oii ce and envion mental etai ls on eah shift Some inmates even pati i pate in ul ina⁹ tai ning lea ing to nationally-re ognize e rtii ati on an ob- ea iness upon thei r release

Consistent with ACA Mandatory pp et e a ti ce 4-ALDF-4A-11, the e is ou mentation y an indepen ent souee , D.C. ealtht hat foo sev ie ai lities and equipment meet esta lishe goven mental health and saet odesW hen the e a e any ei i eni es coee ti ve ati on is tae n immei ately. DC al th utilizes the food seti on of the HCFD inspe tion report to inspet the culina⁹ aea and officers' dining room. All broken eu ipment is e paire within 8 hous e only eee ption is when eu ipment pat s ae una aila le an the maintenane ven o must el y on the manuatue to supply new pa ts.

DOC has a ve min an pest ont ol plan that inl udes monthly inspeti ons ⁹ a ualii e peso n an utilizes the food seti on of the D inspet ion e pot as a measu e to inspet the ulina⁹ aea an officers' dining room. DOC has an environmental detail dediate d e l usively to the ul ina⁹ tea on eah shi t daily. This team maintains l eanliness and sanitation. As an a del evel o p otti on, DOC has ha a contat with a pest ont ol ompany o s eveal yea s. In the past when a pest cont ol o mpany has been una le to obtain satisat ory e sults the aen cy has te minate that o ntat an instituted a new one with a i feent o mpany with a voab le esul ts.

In 2017, in e sponse to issues i te i n the DC al th repot related to oo d sev icett he DOC unde took a se eal weeks' long e novation o t he oo d sev ie a ea that inl ude the eplae ment of a o eu ipment and the implementation of a new pest conto l ven o, whih has i elde po sitive results

In 018, the DOC ompleted installation on ew ooi ng. Even with a ne w o of, howeve leas an an o occur, including those from soues othe than the o of. In 019, the DOC is woii ng with GS to o ntinue stutu al epais to a e ss water peneta tion into the ai lity ⁹ way o the aee an win ows. n tei or oof lea s ae repaied in a timely anne but ha e e ocur ed in different aeas o the ai lity ue to the a e o he building, despite ongoing i ligent aintenane. In eneal ,

superannuated u ildings sri ng more roof lea s than ne  u ildings; however  repairs are made ii  ckly, and an  effects of tt  er on the building str ctr e and the environment, sch  as the infre uent occrr ence of mold, are identified and a ated immediately.

### III.   Certified Accredited Medical and Mental Health Care Meet Correctional Standards of Excellence

DOC Medical and   ental   ealth Services are o th ACA and C  HC accredited.  oth accrediting agencies re   ire that the mental health intae  screenings contain certain components  including information on et  her an inmate has ever had a histor  of seizures or head tra maas  ell as information on an inmate's orientation to time and space and overall appearance. The information is collected [9]  the medical intae  process immediately ri  or to the mental health intae  process and is recorded in the patient chart for medical and mental health's reference and use.  ecas  e of thist he same information is not solicited in the mental health intake questions that immediately follow medical intake's requests and docm entation. i   le the A  dit se  cl ates that problems could arise in the hypothetical situati  on ere   in the medical intae  screening changessch  a scenario is purely secl ative and n  likely to occur given DOC's close oversight of healthcare services, as noted   the A  ditor, and due to the fact that the racti  ce has e  en reviewed and meets NCC  C and ACA standards. Noteworthy is that DOC a  tomatically screens all inmates at inta e for voluntar  HIV testingserving as one of the largest screeners  in the District  and ro  vides I  V/A Ds medical treatment as  ell as   V/A Ds counseling and ed  cation.

### IV.   Budgeting for a New Jail

The Ma  or  Deu ty   a or for Public Safety and u  stice  Director of DOC and the D.C. Council all have acno wledged that a ne   correctional facilit  is desirable. As the DC Auditor's report noted, the District is looi ng at all options of how to fn  d a ne   DC Jail, incl  ding the o  ssibility of a  ublic Private Partnership (P3  As  art of the FY  019 u  dget development r  ocessii t  as determined that a P3 proec t ss   not the most r  dent course of action. The Administration instead chose to fund a std  y that will doc ment the needs for a ne   facilityii ncluding: how many e  ople it will e desi  gned to house, programming sac e  and other building and ca acit  considerations. In addition  in October 2018, the Office of  ctim r  vices and u  stice an  ts (OVSJG) issued a  eu est for A  plicationsf or a grant a  ard of   to $150,000 to engage an organization to build stae holder engagement and solicit feed ac related to the design and constrcti on of a ne   correctional facilit  in the District of Columbia.

At the same timett he   ayor made it a fn ding ri ority to invest in improving and p  grading current s stems at the DC i  l - both as part of reg lar maintenance and in res onse to more ac te facilit  needs - ii  le the administration ii  ts for the resl ts of the std  y in order to develop a ro  per budget estimate for the Ca  ital mprovement Plan (CP ). In the C P s  mitted in  2019tt he   ayor's budget included $13.  million for improvements in the cr  rent fiscal year and  6 million for additional improvements in FY 2020. The  2019 -- FY 2020 fn  ds are for general renovationsoo wer s  stem p  grades e  terior strctr  al finishingand  V  AC replacement wor  at the CDF.

e  administration is committed to fn  ding maintenance needs at the DC i  l while the std  y is occr ing and the re  irements for a ne   correctional facility are developed  ith communit  rr eturning citizens and criminal sti  ce reform e  perts' input. As a resl  t the maintenance needs for DOC will be discssed and considered for additional f  nds in  020 and e  yondas  is done for all municia  l facilities as ar  t of the annual  udget r  ocess. From 2000 – 2020DDOC has een a  rded  a total of $1..  3 million for facilit  improvments in o  th the DOC and DGS u  dgets.

The desire to build a new jail has been reflected by DOC in their initial budget submission. Agencies are ecouraged to submit any and all ideas, regardless of fiscal constraints, so the administration has a full view of all ideas to improve programs and services. Agencies are given preliminary numbers, and then they make clear what is absolutely necessary to fulfill their statutory duties and meet priority goals. ey then engage in further rounds of discussion with the Office of ud get and erformance Management and other senior officals who must balance the needs and new requests across government against available resources. As the Deputy Mayor e plained in his interview with the Auditor, requests from agencies can sometimes be two to three times the amounts that they would ultimately receive. If all of these requests were fullfiled, the District would not be able to submit a balanced budget and financial plan, as required by law.

e Mayor transmits her budget to the D.C. Council, which in turn decides which programs and projects to fund, having the benefit of oversight hearings, budget hearings with Directors, Deputy ayors, and the City Administrator, numerous reports, as well as all the community input they receive as candidates and legislators. ogether, the Council and Mayor determined that funding for maintenance, rather than a new facility, was preferable at this time and legally sound. no respect should an initial, internal, "blue sky" request for deliberative consideration be equated with a final determination that a new facility is immediately necessary to protect the health of inmates or respect their legal rights.

### V. District Responses to ODCA Recommendations

**Recommendations:**

1. DOC should take all steps necessary, including requesting additional funding if necessary, to achieve and maintain full compliance with all ACA and A HA requirements.
   **Response:** DOC accepts this recommendation and will continue to take the steps necessary to remain in compliance with ACA and C HC accreditation requirements.

2. DOC should conduct regular documented monitoring of Aramark's compliance with all requirements of its contract and District food safety laws and regulations and sanction the contractor appropriately if necessary.
   **Response:** DOC accepts this recommendation and will continue to ensure the food vendor's daily compliance with the contract and District food safety laws and regulations.

3. en considering a new correctional facility, DOC should analy DO violations to ensure that the design of the new facility minimizes the challenges of complying with standards and regulations that DOfr equently cites as having been violated.
   **Response:** DOC accepts this recommendation and will analyze past DC al th citations for consideration in the design of a new facility.

4. e Mayor and Council should provide a capital budget for DOC that considers the risk of failure to address health and safety ha ards identified by the DO including the risk to the safety of inmates and staff and the risk of additional litigation.
   **Response:** ee Mayor and Council always consider risks when building both capital and operating budgets, and will continue to do so.

5. EOM should, working with other members of the District's Capital Budget Team, develop policies and procedures for the capital budgeting process that ensure the plan accurately rel ects the known capital needs o aen  cies  including   OC, over the entire six-year capital budgeting period.

   **Response:** e   capital budget is proec ted as accurately as possible over the si  year capital budget periodbas ed on available in ormation and a ainst available resources. ch y   eart he capital budget is revisited to ensure that new in ormation about the condition of our assets can be assessed and considered.  Funding is then allocated based on available resources, e isting commitments and the time it takes to repair and/or construct new assets

6. D sh   ould comply with D.   Code §7-731(a-1)(1) and conduct three inspections per year o t he D.C. Jail to help ensure that environmental conditions meet required standards.

   **Response:** DOC accepts this recommendation and will continue to comply with DC Health inspections as requested and scheduled by the aen  cy.

7. D s   hould update their mental health intake screening policies and procedures to ensure they fully meet ACA and NCCHC accreditation requirements without having to rely on questions and procedures administered as part o t he intake medical e am, ensure that the agency's health services contractor's (currently Unity) policies and procedures mirror those o DOand   are in u ll compliance with       and NCCHCaccre   ditation requirements and see that OHSA's and contractors' written policies remain consistent with the standards.

   **Response:** DOC accepts this recommendation, and we have conferred with Unity Healthcare rea rding it. We are currently in the process of updating those respective policies and procedures to rel ect the noted revisions  D    e pects to have these updates o rmally completed by April   , 019.

8. D and    the   ouncil should review this inspection requirement and make necessary adu stments to the Code in the best interest of inmates housed at the CTF.

   **Response**: DOC recognizes this recommendation and defers this to the Council's le islative powers

9. D s   hould closely study the ee  cts o i ts video visitation systems and consider including su i cient space in the plans o r the new ai l o r both in-person and video visitations  or all inmatesdepen  ding on which o rm o  visitation a milies pree r

   **Response:** DOC has taken this recommendation under advisement

January 30, 2019



January 18, 2019

*Via email: Kathy.Patterson@dc.gov*

Kathy Patterson
District of Columbia Auditor
Office of the District of Columbia Auditor
717 14th Street, NW, Suite 900
Washington, DC 20005

Re:   Department of Health's Comments on Draft Report entitled "District Fails to
       Address Poor Conditions at the D.C. Jail"

Dear Ms. Patterson:

Thank you for providing the opportunity to the District of Columbia Department of
Health (DC Health) to comment on the draft report prepared by the Office of the District
of Columbia Auditor (ODCA) concerning the D.C. Jail.

On behalf of DC Health and Director Nesbitt, I respectfully request that the draft report
be modified at pages 18-19 to fairly and accurately report the DC Health's current
compliance with its obligations pursuant to D.C. Code § 7-731(a-1)(1).

*Missing Paragraphs from DC Health's Response*

Two paragraphs of text from my July 12, 2018 email to Matthew Separa (ODCA's
Program Analyst) should be reflected in your final report.[1]

In the middle of page 19 of the draft report, ODCA included one paragraph of text from
my email but did not include the paragraph immediately above the included paragraph or
the paragraph immediately below the included paragraph. The absence of the two
paragraphs materially misrepresents the current facts. In the first missing paragraph, I
stated:

> I start by noting that DC Health is currently in compliance. DC Health did
> inspect three times in calendar year 2017. This indicates that the issues
> contributing to fewer inspections in prior years have been resolved. For
> calendar year 2018, one inspection has been completed, another inspection

---

[1] For your convenience, I have included a copy of the DC Health email to Mr. Separa dated July 12, 2018
as an attachment to this letter.



is in progress now, and a third inspection will soon be scheduled. This further indicates the issues have been resolved. Working collaboratively with the Department of Corrections, DC Health is committed to making sure the inspections for environmental conditions occurs three times a year.

The second missing paragraph stated:

> To comply with the statutory mandate, DC Health made a number of changes including:
>
> 1. DC Health absorbed the costs of the inspections into its operating budget.
> 2. DC Health hired the person conducting the inspections as a while actually employed (WAE) employee so that contracting delays are avoided and the person can start the inspections on time.
> 3. DC Health no longer waits for the Department of Corrections to respond to the prior inspection before scheduling the next inspection.
> 4. DC Health actively coordinates with the Department of Corrections to assure inspections occur three times per year.

Without the missing paragraphs, the draft report reports misrepresents that DC Health is continuing to violate the statutory mandate. However, DC Health did take action in calendar year 2017 to comply with the statutory mandate. Because of that action, DC Health is now compliant with the statutory mandate as evidenced by:

1. DC Health completed three inspections in calendar year 2017 as indicated in Figure 6 on page 19 in the draft report.

2. DC Health also completed three inspections in calendar year 2018 on March 19, 2018 to April 2, 2018, July 2, 2018 to July 17, 2018, and October 22, 2018 to November 2, 2018.

*Recommendation 6*

ODCA's Recommendation No. 6 on page 19 of the draft report implies that DC Health still needs to take action in calendar year 2019 to start its compliance. However, as explained above, DC Health already took action in calendar year 2017, moreover, DC Health demonstrated compliance in calendar years 2017 and 2018.

As such, Recommendation 6 should be amended to reflect that DC Health is currently in compliance and is expected to stay in compliance.



I am available to discuss  Please contact me at Phillip.Husband@dc.gov or (202) 442-5970 for any follow-up on these comments.

Sincerely,

Phillip L. Husband
General Counsel

Attachment

cc:   Lawrence Perry
      Betsy Cavendish
      LaQuandra S. Nesbitt
      Sharon Lewis

**Husband, Phillip (DOH)**

| | |
|---|---|
| **From:** | Husband, Phillip (DOH) |
| **Sent:** | Thursday, July 12, 2018 5:03 PM |
| **To:** | Separa, Matthew (ODCA) |
| **Cc:** | Nesbitt, LaQuandra S. (DOH); Cavendish, Betsy (EOM) |
| **Subject:** | Compliance with Section 2 of the District of Columbia Jail Improvement Amendment Act of 2003, effective January 30, 2004 (D.C. Law 15-62, D.C. Official Code § 7-731(a-1)) |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | Separa, Matthew (ODCA) | Delivered: 7/12/2018 5:03 PM | Read: 7/12/2018 5:02 PM |
| | Nesbitt, LaQuandra S. (DOH) | Delivered: 7/12/2018 5:03 PM | Read: 7/12/2018 5:49 PM |
| | Cavendish, Betsy (EOM) | Delivered: 7/12/2018 5:03 PM | |
| | Lewis, Sharon (DOH) | | |
| | sharon.lewis@dc.gov | Delivered: 7/12/2018 5:03 PM | |

Mr. Separa,

You asked that the Department of Health (DC Health) provide information on why it did not conduct the required number of inspections each year in seven of the ten years between 2007 and 2016.

I start by noting that DC Health is currently in compliance. DC Health did inspect three times in calendar year 2017. This indicates that the issues contributing to fewer inspections in prior years have been resolved. For calendar year 2018, one inspection has been completed, another inspection is in progress now, and a third inspection will soon be scheduled. This further indicates the issues have been resolved. Working collaboratively with the Department of Corrections, DC Health is committed to making sure the inspections for environmental conditions occurs three times a year.

DC Health recognizes that it was not fully complying with section 2 of the District of Columbia Jail Improvement Amendment Act of 2003, effective January 30, 2004 (D.C. Law 15-62, D.C. Official Code § 7-731(a-1)) for several reasons:

1. DC Health was tasked with conducting the inspections but was not provided additional funding to cover the costs of the inspections.
2. The person who conducted the inspections was previously engaged as a contractor where contracting delays occurred.
3. DC Health waited for the Department of Corrections to respond to the prior inspection before scheduling the next inspection.
4. DC Health must coordinate the inspections with the Department of Corrections as the surveyor must be accompanied on the inspections of the correctional facility.

To comply with the statutory mandate, DC Health made a number of changes including:

1. DC Health absorbed the costs of the inspections into its operating budget.
2. DC Health hired the person conducting the inspections as a while actually employed (WAE) employee so that contracting delays are avoided and the person can start the inspections on time.
3. DC Health no longer waits for the Department of Corrections to respond to the prior inspection before scheduling the next inspection.

4. DC Health actively coordinates with the Department of Corrections to assure inspections occur three times per year.

I remain available to discuss.

**Phillip L. Husband**
General Counsel
Office of the General Counsel (OGC)
O: 202-442-5970
M: 202-997-4043
899 North Capitol Street NE, 5th Fl, Washington, DC 20002
dchealth.dc.gov



# ODCA's Response to Agency Comments

We thank the Department of Corrections, the Department of Health, the Executive Office of the Mayor and the Office of the Chief Financial Officer for their cooperation and assistance during our audit. We are pleased that DOC and DOH concurred with most of our recommendations. We will follow-up with the agencies on the implementation status of these recommendations as part of our annual recommendation compliance monitoring process.

Based on the items discussed during the exit conference and comments received from the agencies, we made changes to the report where applicable. Most important, we made explicit our recommendation that the District should move forward with building a new jail to address the risks identified in the audit. With regard to the Department of Health, we revised our description of the inspection reports completed during the scope of the audit to acknowledge the completion of the three required inspections in 2018.

At the request of the Department of Corrections we added information from an interview with Deputy Mayor Kevin Donahue pertaining to the initial capital funding requests made as a part of annual budget deliberations.

We also note the extensive description provided in the DOC comments on the improvements made in the operations of the D.C. Jail in the years following the enactment of the Jail Improvement Act of 2003. Although the government's compliance with the terms of the legislation are in many respects outside the scope of this audit, we acknowledge that there have been improvements in the conditions of confinement from the severe overcrowding of the facility that occurred prior to the enactment of the law.

# Summary of Report Recommendations

Most of the recommendations in this report can be implemented without any additional costs to the agencies, have the potential to generate revenue and/or cost savings to the District, and/or help to advance or support the mission and/or the strategic objectives of the Department of Corrections (DOC), the Department of Health (DOH), as well as the Mayor and the Council.

| Recommendation | Is There a Cost to the Agency to Implement? | Potential to Generate Revenue or Savings for the District? | Specific Agency or District-Wide Goal Advanced by Recommendation |
|---|---|---|---|
| 1. DOC should take all steps necessary, including requesting additional funding if necessary, to achieve and maintain full compliance with all ACA and APHA requirements. | Yes | No | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration.<br><br>DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |
| 2. DOC should conduct regular documented monitoring of Aramark's compliance with all requirements of its contract and District food safety laws and regulations and sanction the contractor appropriately if necessary. | Yes, if this requires an additional FTE. | No | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration.<br><br>DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |
| 3. The District should move forward with a new D.C. Jail. | Yes | Yes | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration.<br><br>DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |

| Recommendation | Is There a Cost to the Agency to Implement? | Potential to Generate Revenue or Savings for the District? | Specific Agency or District-Wide Goal Advanced by Recommendation |
|---|---|---|---|
| 4.  When considering a new correctional facility, DOC should analyze DOH violations to ensure that the design of the new facility minimizes the challenges of complying with standards and regulations that DOH frequently cites as having been violated. | Yes | Yes – reducing health violations reduces the chance of a lawsuit and a potential settlement. | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration.<br><br>DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |
| 5.  The Mayor and Council should provide a capital budget for DOC that considers the risk of failure to address health and safety hazards identified by the DOH including the risk to the safety of inmates and staff and the risk of additional litigation. | Yes | Yes – reducing risks reduces the chances of a lawsuit and a potential settlement. | N/A |
| 6.  EOM should, working with the other members of the District's Capital Budget Team, develop policies and procedures for the capital budgeting process that ensure the plan accurately reflects the known capital needs of agencies, including DOC, over the entire six-year capital budgeting period. | No | No | N/A |
| 7.  DOH should continue to comply with D.C. Code 7-731(a-1)(1) and conduct three inspections per year of the D.C. Jail to help ensure that environmental conditions meet required standards. | No | No | DOH's mission to promote health, wellness and equity, across the District, and protect the safety of residents, visitors and those doing business in our nation's Capital. DOH's responsibilities include identifying health risks; educating the public; preventing and controlling diseases, injuries and exposure to environmental hazards; promoting effective community collaborations; and optimizing equitable access to community resources.[29] |

29.  Information about the Department of Health and a list of their responsibilities can be found here: https://dchealth.dc.gov/page/about-dc-health

| Recommendation | Is There a Cost to the Agency to Implement? | Potential to Generate Revenue or Savings for the District? | Specific Agency or District-Wide Goal Advanced by Recommendation |
|---|---|---|---|
| 8. DOC should update their mental health intake screening policies and procedures to ensure they fully meet ACA and NCCHC accreditation requirements without having to rely on questions and procedures administered as part of the intake medical exam, ensure that the agency's health services contractor's (currently Unity) policies and procedures mirror those of DOC and are in full compliance with ACA and NCCHC accreditation requirements and see that OHSA's and contractors written policies remain consistent with the standards. | No | No | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration. DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |
| 9. DOC and the Council should review this inspection requirement and make necessary adjustments to the Code in the best interest of inmates housed at the CTF. | No | No | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration. DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |
| 10. DOC should closely study the effects of its video visitation systems and consider including sufficient space in the plans for the new jail for both in-person and video visitations for all inmates, depending on which form of visitation families prefer. | Yes | No | DOC's Mission Statement: The mission of the Department of Corrections (DOC) is to provide a safe, secure, orderly, and humane environment for the confinement of pretrial detainees and sentenced inmates, while affording those in custody meaningful rehabilitative opportunities for successful community re-integration. DOC's Strategic Objective #2: Foster Environment That Promotes Safety for Inmates, Staff, Visitors and the Community at Large. |

**About ODCA**

The mission of the Office of the District of Columbia Auditor (ODCA) is to support the Council of the District of Columbia by making sound recommendations that improve the effectiveness, efficiency, and accountability of the District government.

To fulfill our mission, we conduct performance audits, non-audit reviews, and revenue certifications. The residents of the District of Columbia are one of our primary customers and we strive to keep the residents of the District of Columbia informed on how their government is operating and how their tax money is being spent.

**Office of the District of Columbia Auditor**
**717 14th Street N.W.**
**Suite 900**
**Washington, DC 20005**

**Call us:** 202-727-3600
**Email us:** odca.mail@dc.gov
**Tweet us:** https://twitter.com/ODCA_DC
**Visit us:** www.dcauditor.org



Office of the District of Columbia Auditor

Information presented here is the intellectual property of the Office of the District of Columbia Auditor and is copyright protected. We invite the sharing of this report, but ask that you credit ODCA with authorship when any information, findings, or recommendations are used. Thank you.

Case 1:20-cv-00849-CKK Document 1-2 Filed 03/30/20 Page 169 of 300



# EXHIBIT D

District of Columbia
Corrections Information Council



District of Columbia
# Department of Corrections

2018 Inspection Report




*Correctional Treatment Facility (CTF)*     *Central Detention Facility (CDF)*

May 21, 2019

 **District of Columbia Corrections Information Council**

Charles Thornton, Board Chair
Katharine A. Huffman, Board Member
Calvin Woodland Jr., Board Member
Nkechi Taifa, Board Member
Charlie Whitaker, Board Member

### *About the District of Columbia Corrections Information Council*

The District of Columbia Corrections Information Council (CIC) is an independent oversight body mandated by the United States Congress and the Council of the District of Columbia to inspect, monitor, and report on the conditions of confinement in correctional facilities where residents from the District of Columbia are incarcerated. This includes facilities operated by the Federal Bureau of Prisons (BOP), the District of Columbia Department of Corrections (DOC), and private contractors.

The CIC reports its observations and recommendations to the District of Columbia Representative in the United States Congress, the Mayor of the District of Columbia, the Council of the District of Columbia, the District of Columbia Deputy Mayor for Public Safety and Justice, the Director of the BOP, the Director of the DOC, and the community.

Although the CIC does not handle individual complaints or provide legal representation or advice, individuals are still encouraged to contact the CIC. Reports, concerns, and general information from incarcerated DC residents and the public are very important to the CIC, and they greatly inform our inspection schedule, recommendations, and reports. However, unless expressly permitted by the individuals or required by law, names and identifying information of residents, corrections staff not in leadership, and members of the general public will be kept anonymous and confidential.

**DC Corrections Information Council**
441 4th Street, NW
Suite 270N
Washington, DC 20001
Phone: (202) 478-9211
Email: dccic@dc.gov
Website: https://cic.dc.gov/

2

# Executive Summary

## Correctional Treatment Facility Profile

**Dates of Inspection**: September 20, 2018
**Location:** SE, Washington, DC
**Security Level:** Minimum, Medium

**Rated Capacity:** 1,400
**10/01/18 Population:** 685
**Resident-to-Staff Ratio:** 2.37:1

## Central Detention Facility Profile

**Dates of Inspection**: September 26, 2018
**Location:** SE, Washington, DC
**Security Level:** Minimum, Medium, Maximum

**Rated Capacity:** 2,164
**10/01/18 Population:** 1,348
**Resident-to-Staff Ratio:** 2.37:1

## DOC Population Profile (September 2018, Fiscal Year Totals)

**Women Daily Average Population:** 155 (CTF)
**Modal Age Range:** 31-40
**Average Length of Stay:** 44 days

**Men Daily Average Population:** 1,849 (CDF/CTF)
**Modal Age Range:** 21-30
**Average Length of Stay:** 79 days

## Key Findings

The CIC highlights the following programs and facility practices:

- The DOC made notable efforts to expand educational offerings to those in custody, particularly within the CTF facility, developing a model college and career readiness department.
- All of the juvenile offenders charged as adults who were in DOC custody were transferred to New Beginnings prior to October 1, 2018.
- The CIC received numerous reports that case managers were not regularly available on units at CDF.
- During the fiscal year there were reported incidents of possible miscalculations in custody scores and subsequent security level classifications that prompted the CIC to look into the DOC classification process.
- The CIC received complaints from at least 11 DOC residents regarding their medical care.
- In FY 2018 the DOC revised its policies on medical assisted treatment (MAT). It now continues suboxone treatments for individuals who were receiving treatment in the community, and identifies individuals to begin MAT while in custody.
- There is little to no programming outside of the GED unit for individuals who are housed at

3

the CDF, particularly those who are maximum security residents.
- Residents on the administrative housing unit raised concerns about the informal disciplinary process on that unit.
- The CIC received numerous reports throughout FY 2018 about conditions on the government witness unit regarding the lack of programming, extended investigations, and concerns about daily life.
- From September to October 2018, the CIC received concerns from residents on the Special Management Unit (SMU) of CTF, regarding changes in recreation practices on the unit.
- The CIC received frequent resident concerns regarding deficiencies in the DOC grievance process, mainly that residents seldom receive any response to grievances that they submit.
- The CIC received numerous comments from residents that they did not receive documentation of disciplinary incidents.
- The CIC received complaints about access to religious programs and services as well as religious diet trays, ongoing throughout the fiscal year.
- Throughout the fiscal year the CIC received numerous reports about recreation — including comments about not having outdoor recreation or opportunities for recreation in general.
- The DOC has two employees that are trained to provide ADA services to residents who are referred for services, via the DOC medical department.
- Many residents reported to the CIC that their personal property was never returned after they transferred units.
- Throughout the fiscal year, individuals in both the CTF and CDF reported concerns about the physical conditions of the facilities.

## Recommendations

Based on the inspection of the CTF and CDF, the CIC makes the following recommendations:

- The DOC should expand educational and vocational programming options generally to those housed at the CDF with a focus on safe and innovative provision of services and programming to maximum security residents, restrictive housing residents, and residents with a classification status other than general population.
- The DOC should ensure that case managers are in fact available on every unit on a daily basis; offer office hours or easily scheduled appointments; and effectively assist residents with their needs.
- The DOC should ensure that case managers are accurately distinguishing between types of convictions and the offense severity points that are assigned to each conviction. The DOC should assess data systems to verify that case managers are accurately interpreting other documents assessed in calculating the custody score. The DOC should provide training to address common errors.
- The DOC should clearly communicate medical decisions and care updates to residents and ensure all appropriate follow-up care is scheduled and completed in a timely manner.
- The DOC should ensure that unit officers are allowing residents to access approved medical accommodations.
- Mental health staff should ensure that daily evaluations of psychiatric status, cell amenities, and life activities are fully completed and documented every day.
- The DOC should ensure that restrictions are only being placed on residents after documentation of a legitimate violation of DOC policy and a fair hearing.
- The DOC should ensure that there is a clear policy that applies to decisions made regarding

4

individuals with a special handling status, and should clearly communicate the restrictions, reasons for them, and process for having the restrictions lifted.

- The DOC should ensure that residents are always provided with documentation stating why they are under investigation.
- The DOC should work to provide residents on the government witness unit with adequate programming opportunities and recreation time.
- The DOC should ensure that the government witness unit operates in a sanitary and safe manner, including the delivery of cleaning supplies and the proper sealing, labeling, and handling of meals.
- The DOC should ensure that correctional staff is appropriately equipped with schedules for resident's detail assignments in order to preserve safety while ensuring that residents can report for their duties.
- The DOC should provide residents timely answers to all filed grievances in a manner that comports with its stated policies and procedures.
- The DOC should provide residents with documentation of all filed disciplinary actions that are formally charged or result in sanctions.
- DOC staff should ensure that the process for reviewing and approving religious diet requests is timely and efficient.
- DOC staff should ensure that all individuals have access to adequate recreation time and opportunities.
- DOC staff should clearly communicate the process for transferring property when a resident transfers units, document and inform the resident of any property that has been confiscated and will not be returned, and communicate to residents a clear process for addressing missing property complaints.
- The DOC should ensure that the physical premises of both the CDF and CTF are clean and safe at all times.

# Table of Contents

Executive Summary ...................................................................................................................... 3

    Correctional Treatment Facility Profile ................................................................................. 3

    Central Detention Facility Profile ......................................................................................... 3

    DOC Population Profile (September 2018, Fiscal Year Totals) ........................................... 3

    Key Findings .......................................................................................................................... 3

    Recommendations ................................................................................................................. 4

Introduction ................................................................................................................................ 7

Facility Overviews ...................................................................................................................... 7

    CTF Inspection Summary ..................................................................................................... 7

    CDF Inspection Summary ................................................................................................... 10

DOC Operational Findings ....................................................................................................... 13

    I.       Educational Programming ....................................................................................... 13

    II.     Title 16 Transfer of Juvenile Offenders Charged as Adults ................................... 14

    III.    Case Management ................................................................................................... 14

    IV.    Classification .......................................................................................................... 15

    V.     Medical Concerns .................................................................................................. 16

    VI.    New Policies for Opioid MAT ............................................................................... 16

    VII.   Safe Cells and Suicide Watch and Precaution ....................................................... 17

    VIII.  Maximum Security Programming .......................................................................... 18

    IX.    CDF Administrative Housing / Special Management Unit ..................................... 19

    X.     Special Handling .................................................................................................... 19

    XI.    Government Witness Unit ....................................................................................... 20

    XII.   CTF Special Management Unit .............................................................................. 21

    XIII.  Grievances .............................................................................................................. 22

    XIV.  Disciplinary Process ............................................................................................... 23

    XV.   Religious Programming and Meals .......................................................................... 23

    XVI.  Recreation .............................................................................................................. 24

    XVII. ADA Specialists ..................................................................................................... 24

    XVIII. Property ................................................................................................................ 25

    XIX.  Facility Physical Conditions ................................................................................... 25

    XX.   Additional Concerns .............................................................................................. 26

APPENDIX A: Methodology ................................................................................................... 27

APPENDIX B: DOC Response ................................................................................................. 30

# Introduction

The DC Department of Corrections (hereinafter, DOC) operates two jail facilities: the Correctional Treatment Center (hereinafter, CTF), and the Central Detention Facility also known as the DC Jail (hereinafter, CDF). The facilities are adjacent to one another and are located in Southeast Washington, D.C.

The CTF complex typically houses residents who are minimum or medium security, including female and juvenile[1] DC residents, as well as male residents who have specialized confinement needs. The CDF houses male residents, a majority of whom are held pending adjudication of a criminal case or are sentenced to a period of incarceration following conviction for a misdemeanor offense.[2] Other CDF residents include those held on United States Parole Commission (USPC) warrants, those awaiting transfer to the Federal Bureau of Prisons (BOP), and those held due to a writ or hold typically awaiting transfer to another jurisdiction.

Throughout the 2018 fiscal year, CIC staff met with residents housed at the CTF and CDF in order to interview them about conditions and experiences in custody. The CIC conducted its onsite inspection of the CTF on September 20, 2018, and the CDF on September 26, 2018. Following the inspection of facility grounds, the CIC submitted a document request to DOC staff on October 9, 2018. For a complete explanation of the report methodology, see Appendix A: Methodology.

# Facility Overviews

As part of the DOC inspection, the CIC toured areas of both the CTF and CDF, including units about which the CIC received resident concerns; units or programs that the CIC had experienced change since the FY2017 CIC inspection; or that the DOC choose to include in the 2018 inspection. For a complete list of the units that the CIC requested to visit and the units that the DOC included as part of the tour, see Appendix A: Methodology. The names of the units toured, information about the population and staff on each unit, as well as a brief description of daily life on each unit can be found in the chart below.

## CTF Inspection Summary

| Medical 96 | |
| --- | --- |
| **Unit Capacity**: 36<br>**Population September 20**: 36<br>**Unit Population**: Residents who require close, but not constant, monitoring. Typically houses individuals in need of ambulatory accommodations.<br>**Unit Staff**: Corrections officers; case management rotation;[3] nurses | Medical 96 houses residents with ongoing medical needs. The unit does not have medical staff on the unit at all times; however, there is regular medication delivery and medical staff is available on call and during rounds. Dialysis occurs on the unit Monday, Wednesday, and Friday. The cells on this unit have hospital-type beds with wheels and safety rails. Residents on this unit have recreation for one hour per day in an area on the unit, and staff said that they are able to have outdoor recreation, weather permitting. Residents are also able to leave the unit to go to education, programs, barbering, and more. Staff explained that higher security residents have access to programming on the unit, although |

---

[1] See DOC Operational Highlights (II) for more information about the transfer of juvenile offenders from CTF to New Beginnings.

[2] See id.

[3] "Case management rotation" refers to case management staff being available on units at the CTF and CDF, but on a rotating basis. The CIC received resident reports throughout the 2018 fiscal year saying that case managers are not available on their units daily, with the exception of specific units. While many residents reported that case managers are infrequently available on the unit and the same case managers are not always staffing their units, during the 2018 CIC tour of the CTF and CDF, DOC staff said that case managers are available on each unit every day. See DOC Operational Highlights (III) for more information about case management.

7

| | |
|---|---|
| complete rounds 3x/day; physical therapy; and medical staff (on call 24/7). | most higher security residents are housed on Medical 82. |
| **Medical 82** | |
| **Unit Capacity**: 40<br><br>**Population September 20**: 29<br><br>**Unit Population**: Male and female residents with acute medical needs.<br><br>**Unit Staff**: Corrections officers; case manager rotation; two or more nurses at all times; and medical provider on call. | Medical 82 houses residents with acute medical needs. There are various cell layouts on the unit, including 25 single cells, three dorm cells (fitting up to four people), two female cells (one single, one dorm), three safe cells (two in operation), and one isolation cell (for residents with tuberculosis or other contagious diseases). Staff explained that dorm cells are used for intake before residents are classified but have a medical need, or general population security level residents can be housed in dorm cells if needed. Staff explained that medical status is taken into account in deciding whether a resident can be in a cell with others. Pregnant residents are housed on Medical 82 at eight months into their pregnancy, or sometimes at six months if there are specific issues. Residents are not free to leave their cells and walk around the unit because the residents are different genders and security levels. There are four stall showers, and a television room on the unit. Residents do not go to outdoor or off-unit recreation due to the level of their medical needs. |
| **Women's Mental Health Unit** | |
| **Unit Capacity**: 50 (Single cells; two safe cells)<br><br>**Population September 20**: 34<br><br>**Unit Population**: Women who have acute mental health needs, a special housing status, or women completing the intake process.<br><br>**Unit Staff**: Corrections officers; case manager; 24 hour nurse (Monday-Friday); medical staff (on call on weekends); and mental health clinician (9:00am-5:00pm). | Staff explained that when women come into the facility and report that they are taking psychotropic medication, DOC staff coordinates with DC Department of Behavioral Health (DBH) to obtain records of prescriptions, or -- if the woman was formerly in DOC custody -- look within DOC records for verification of prescriptions. Staff also explained that the DOC pharmacy is typically able to give individuals at least a generic version of their medication, but medication can be delayed if the facility pharmacy does not have the required medication. Women on the mental health unit meet with liaisons from the DBH when they are going through intake and are cross-matched for DBH services. If they are not already linked to DBH services, DBH liaisons will determine what their needs are so that they can be linked to community service providers. When women are approaching release from DOC custody, DBH liaisons are also able to schedule appointments for them prior to their release. In terms of daily life, women are out of their cells between 9:00am and 3:00pm for programming, therapy, treatment team meetings, group counseling, recreation on and off unit, and a therapeutic arts program (offered on Thursdays). Residents who are taking medication meet with a psychiatrist every 30 days. Once every week women have a treatment team meeting: the treatment team determines if women are stable on their medication, and can be transferred to a general population unit. |
| **Young Men Emerging Unit (YME)** | |
| **Unit Capacity**: 25<br><br>**Population September 20**: 23<br><br>**Unit Population**: Men 18-25 years old who have been screened into the program, based on mentor and staff interviews and evaluations, as well as a clear record of behavioral conduct.<br><br>**Unit Staff**: Corrections officers; case manager; program analyst; and mental health specialist (9:00am-5:00pm). | The Young Men Emerging Unit (YME) opened on June 30, 2018. The ideology behind the unit, as well as its structure, is based on science regarding the developing mind, and the average age at which the brain reaches maturity – typically at about 25 years old. The YME unit was created to positively influence young men and create a sense of community and partnership. Staff and residents described to the CIC that the goal is to create a community within the unit, and also with the larger DC area, with the idea that if one feels connected to a community, they will also contribute to that community. The unit consists of young residents as well as six older mentors. The mentors on the unit are men who were incarcerated between the ages of 18-25, who provide guidance for the younger men on the unit. At the time of the CIC inspection, all six mentors on the unit were enrolled in college programs. Daily life on |

8

the unit consists of a room inspection, community conversation, group session, lunch, educational programs, Street Law, and recreation. Community providers instruct different groups and programs on the unit. Programs include yoga, meditation, substance abuse groups, entrepreneurship, industrial banking, information sessions with MORCA, life skills, and parenting. Additionally, residents on the unit are able to earn spending money based on completion of special assignments and positive behavior. This money goes into YME bank accounts and can be spent on commissary or privileges such as use of a Bluetooth radio, air hockey, X-Box, etc.

## Work Readiness Unit

**Unit Capacity**: 25

**Population September 20**: 20

**Unit Population**: Minimum and medium security men within four to six weeks of release (either sentenced misdemeanants or individuals coming back from the BOP), who are DC residents, do not have pending charges or warrants, do not have any Class I disciplinary infractions, and who are otherwise screened into the program.

**Unit Staff**: Corrections officers, group facilitator, case manager, work force development specialist (employee of Department of Employment Services (DOES), and Information Technology instructor.

The Work Readiness programs consists of two components – the first takes place while participants are in DOC custody and spans five weeks, and the second takes place post release, so that participants can continue the program in the community, where there is subsidized participation for up to eight months. The goal of work readiness is for participants to be employed upon release, or shortly after. The unit moved from CDF to CTF in 2017, and opened in the CTF in October 2017.

In each of the five weeks of the program, the daily instruction has a different topical focus – including resume creation, mock interviews, answering questions about criminal records, attitude sessions, etc. There is also computer instruction in the evenings. Other programs that take place on the unit are yoga, substance abuse sessions with the Hope Foundation, informational sessions with representatives from the Department of Health (DOH), computer basics, and Inside Out.

While in the five-week CTF component, participants meet weekly with a work force development specialist, who assesses their work skills, any additional needs such as mental health, and resources that they may require during the community component. The specialist then creates recommendations for the community component, including but not limited to, additional education, GED attainment, additional training, subsidized work, and involvement in an entrepreneurship program. The work force development specialist also helps participants create resumes and forwards those resumes to prospective employers.

The day after each participant is released from DOC custody, the work force development specialist meets with them in the community to assist with the transition either into work or educational programs. Typical job placements post-release include: the Department of Health and Mary's Center, as well as positions in the fields of construction, entrepreneurship, food service, and IT.

Finally, the case manager on the unit assists participants with finding housing and clothing, and working through other barriers to employment. DOC staff explained that one such barrier can be the conditions of supervised release, and that while DOC case management does attempt to work with the Court Services and Offender Supervision Agency (CSOSA) prior to release in order to arrange a plan that will help participants meet supervision requirements, it can still be difficult for participants to work and meet supervision requirements -- particularly requirements that are scheduled during work hours.

## General Population Housing Unit

| | |
|---|---|
| **Unit Capacity**: 43<br>**Population September 20**: 42<br>**Unit Population**: Individuals involved in college programs (Georgetown, Ashland, UDC, and Howard).<br>**Unit Staff**: Corrections officers and case manager rotation. | Staff explained that this particular unit was in the process of becoming a programming unit, meaning that all or most of the male residents on the unit are supposed to be enrolled in an educational program. These educational programs include college courses through Ashland University, Georgetown University, Howard University, or the University of the District of Columbia. Individuals enrolled in Ashland University courses are instructed through tablets; the majority of residents enrolled in Ashland are housed on this unit so that the tablets can be kept in one secure area, but also remain accessible for use. See DOC Operational Highlights (I) for more information about educational programming. |

## CDF Inspection Summary

| Intake Reception Center (IRC) | |
|---|---|
| N/A | The Intake Reception Center (IRC) is the filter for processing people who are coming into DOC custody or returning to the CDF or CTF, and tracking those who are leaving the facility -- for court, transfer, or release. The intake reception center has separate admission areas for males and females, where people are searched, exchange clothes, store clothing and property, shower with delousing shampoo, are photographed and fingerprinted, and receive an identifying wristband. Incoming individuals also receive a "wing card," which tracks completion of the remaining steps of the intake process. In a common area (male and female), individuals wait to complete the intake process, which includes a series of intake questions; measuring of vitals; TB, HIV, and syphilis tests; an assessment of medical needs and medication; a mental health screening; completion of an emergency contact form; and completion of a Prison Rape Elimination Act of 2003 (PREA) questionnaire.<br><br>The mental health screening consists of 20 questions, and if those questions indicate a need for a full evaluation, a mental health clinician is able to complete a full evaluation later that day. Staff explained that certain people are flagged for full evaluations, including those who are incarcerated for the first time, have high-profile cases, have previously documented mental health needs, or are at risk of suicide. There are separate holding cells in the reception center for individuals who need to be kept away from the general population until they receive a full evaluation.<br><br>Residents then go to the transition center, a specialized housing unit, or the CTF. Residents leaving the facility for release or transfer also exit through the IRC. Individuals being released receive a DC ID, library card, a 30-day supply of medication if HIV positive, and for general medications a three-day supply plus a prescription for a 30-day refill. Individuals being transferred to BOP custody receive a seven-day supply of their medication. |
| **Transition Center** | |
| **Unit Capacity**: 140<br>**Population September 26**: 121<br>**Unit Population**: Residents who are going through the process of intake.<br>**Unit Staff**: Corrections officers and case manager rotation. | Following the IRC process, unless otherwise specified, male residents in the CDF go to the Transition Center where they wait to be classified (in terms of security level and permanent housing unit), have orientation, and complete an interest list of programs in which they would like to be involved while in custody. Orientation is offered on every Wednesday. Residents receive information about case management, accessing phones, visits, etc., and learn about different programs that are offered. Each individual fills out an "interest list" indicating the programs/services in which they would like to participate, in the event that they meet the |

custody and other criteria for those programs. The programs for which each person is eligible will depend on their security level; the facility in which they are housed; and other factors, such as eligibility for a Pell Grant, which is a prerequisite for taking college courses through Ashland University. Classification is typically completed within 72 hours (not counting weekends, holidays, or days that a resident spends at court).

| **Acute Mental Health Unit** | |
|---|---|
| **Unit Capacity**: 80<br><br>**Population September 26**: 37<br><br>**Unit Population**: People who are a threat to themselves, or do not take their medication and those who medical staff has determined need to be on suicide watch or precaution.<br><br>**Unit Staff**: Corrections officers, case manager, clinician (Monday-Friday, 8:00am-5:00pm hours); Psychologist (Monday-Sunday, evening hours); a psychiatric nurse (24/7), and nurse on call (24/7). | The Acute Mental Health Unit (Acute Unit) is split into two sides: the intake side and the general population side. When residents experiencing a mental health crisis first arrive on the unit they are housed on the intake side, typically for two weeks to one month. On the intake side, individuals are out of cell for two hours every day. The cell lights on the intake side also remain on 24/7, so that the officers are able to see into the cells at all times. The lights can only be dimmed if ordered by a mental health professional. Individuals are assessed daily, and depending on their progress, they can be stepped down to the general population side. On the general population side individuals are out of cell for five hours per day, have more opportunities to interact with other residents on the unit, can participate in yoga or art, and the lights in their cells are turned off at night. Nurses walk the unit every two hours, and officers make rounds every 15 minutes. There are six suicide safe cells on the unit (See Operational Highlights (VII) for more information on safe cells). If a resident is stable and on their medication after being on the intake and then general population side of the Acute Unit, they can either be stepped down to the Mental Health Step-Down Unit, or sent back to general population. |
| **Mental Health Step-Down Unit (MHSDU)** | |
| **Unit Capacity**: 25<br><br>**Population September 26**: 4<br><br>**Unit Population**: Minimum and medium custody residents with mental health needs.<br><br>**Unit Staff**: Corrections officers, case manager, and mental health staff. | The Mental Health Step Down Unit (MHSDU) incorporates a nine-week program, where participants progress through three program levels. If needed, people may stay on the unit for more than nine weeks. Residents are able to progress through the levels by attending and participating in weekly group sessions. With each level of progression comes increased "unstructured" time, as well as increased access to commissary. Groups offered on the unit include Men's Group (led by a DBH liaison), art therapy, anger management (led by a clinician three times per week), narcotics anonymous, trauma management, and yoga. Individuals on the unit are able to request to meet individually for therapy. All residents on the unit meet with a clinician once a month for medication adjustments. In addition to on-unit programming, those who are able may walk to other units in the facility in order to participate in programs that are off-unit, and go to outdoor recreation when it is offered. During "unstructured" time, residents can play games, watch TV, read, exercise, etc. Residents are able to move off the unit and back to a general population, programming, or other status unit if they are stable and compliant in taking their medications. |
| **GED Unit** | |
| **Unit Capacity**: 150<br><br>**Population September 26**: 47 (16 Ashland)<br><br>**Unit Population**: Medium or maximum custody residents who are also GED students, GED tutors, or those enrolled in college courses students. | The GED unit is a programming unit designed to house residents studying for the GED – in English or Spanish – and in 2018 expanded to include individuals taking college courses. Additionally, a number of ABE and vocational courses are offered. The unit schedule includes morning and afternoon academic periods and afternoon and evening groups. The GED test is offered the last full week of every month. When individuals pass the GED, they are often able to stay on the unit and continue their education by enrolling in college courses. Currently, for college courses, qualifying residents (qualification depends on Pell Grant |

11

| **Unit Staff**: Corrections officers, case manager, volunteer Spanish GED instructor, and seven to eight academic volunteers. | eligibility) are able to take courses through Ashland University. Ashland offers courses through tablet software, and the tablets are available to residents on the GED unit daily from 8:00am – 11:00pm. In addition to course information, the tablets allow residents to have access to Khan Academy, TED talks, and radio programs. See Operational Highlights (I) for more information about educational programming. |

### Administrative Housing Unit / Special Management Unit

| **Unit Capacity**: 40 (single cells)<br>**Population September 26**: 23<br>**Unit Population**: Maximum security residents who need to be segregated, have high profile cases, require total separation, are on administrative segregation, have a history of staff assault, are on disciplinary segregation, or have special handling status.<br><br>**Unit Staff**: Five Corrections officers per shift and case manager rotation. | The administrative housing/special management unit is the highest security unit in the CDF. There is limited movement and programming available to residents on the unit. Regular movement outside of cells includes recreation time, which is two hours long. In the two-hour time period, residents have recreation by themselves in a recreation cage, can take a shower, and use the phone to make social calls. Residents on the unit are escorted within and outside of the unit in full restraints: leg irons, handcuff box, and belly chains. |

### Restrictive Housing Unit

| **Unit Capacity**: 72<br>**Population September 26**: 43<br>**Unit Population**: Residents with a history of sexual misconduct, protective custody residents who have separations, those on administrative segregation, and those on disciplinary segregation.<br><br>**Unit Staff**: Corrections staff (five officers on shift during the day, three overnight) and case manager rotation. | The restrictive housing unit is broken into quadrants by tier, each housing residents with a specific status, including one tier for people with separations, one for administrative segregation, and one that acts as the sexual misconduct unit. Residents on this unit have limited movement, which typically includes only two hours for recreation. In the two-hour time period, residents can have recreation with another resident, take a shower, and use the phone for social calls. There are limited programs on the unit, and when the CIC asked unit officers about programming opportunities on the unit, one responded "there are no programs." Residents are, however, supposed to have access to the law library and mobile library, and in particular instances they are referred to counseling with a social worker. There is a classroom on the unit for students entitled to education under the Individuals with Disabilities Education Act (IDEA). While staff said that they would not necessarily describe the space as a classroom, there are four desks available for students to meet with DCPS teachers. Staff said that a DCPS teacher goes to the unit daily to meet with students, but it is a different teacher every day. |

12

# DOC Operational Findings

The following section highlights aspects of DOC operations, which may be department-wide or specific to the CTF or CDF. These findings relate to the daily operations and functions of the facility, with particular focus on the perception of residents and the treatment they receive. The information in this section was primarily gathered during interviews with residents throughout the 2018 fiscal year, discussions with DOC executive staff, discussions with facility staff during the tour, as well as information sent to the CIC from the DOC as part of an information request. The CIC interviewed roughly 40 individuals during the fiscal year. Their comments and concerns are noted in the following sections:

## I. Educational Programming

*The DOC made notable efforts to expand educational offerings to those in custody, particularly within the CTF facility, developing a model college and career readiness department.*

In 2017, the DOC began to revamp its educational programming in an effort to increase the number and types of educational programs that are available to residents. The revitalized department, now known as the Department of College and Career Readiness, offers courses in the areas of Career and Technical Education (CTE), academic education, post-secondary education, cognitive intervention courses, master classes, work readiness, and legislative theatre. See the list of courses offered in each area below:

Career and Technical Education (CTE)

- Network Cabling Copper-Based Systems
- Applied Systems Integration: Grounding and Bonding Copper Connectivity Systems
- Network Cabling Fiber Optic Systems
- Introduction to Telecommunications Technologies
- Introduction to Home Entertainment Audio/Video Systems
- Guest Services Professional
- Connecting to Business
- Reentry Ventures Entrepreneur Course
- Graphic Design/Journalism
- Commercial Cleaning
- Digital Literacy

Academic Courses

- Literacy Courses – Levels I, II, III
- GED™ Preparatory
- English as a Second Language (ESL) Literacy and GED™ Preparatory
- Individualized GED™ Preparatory Courses (supported by the Petey Greene Program)\
- Free Minds Book Club

Post-Secondary Courses

- For-credit courses leading to an Associate's or Bachelor's degree are offered by Ashland University
- Georgetown University Martin Tankleff Prison Scholars Program – for-credit college courses that lead to a Liberal Arts Associate's Degree and ultimately a Bachelor's Degree
- College level courses that do not result in college credit are offered by Georgetown University
- Music Production and the Carceral Soundscape (Georgetown University)
- Georgetown University Street Law

13

- Howard University -- college-level courses that do not result in college credit through the Inside Out Prison Exchange Program

Cognitive Intervention

- Thinking for a Change

The courses offered are widely available to qualifying residents[4] – both female and male – at the CTF, but only selectively available to those at the CDF, which also houses the GED unit. From those who are able to participate, the CIC has heard overwhelmingly positive feedback about the quality and value of the educational opportunities.  Throughout FY 2018, the CIC had the opportunity to attend a number of graduation ceremonies that the DOC arranged in order to congratulate participants for their accomplishments, while creating a space for peers to praise and encourage each other -- in addition to receiving support from family members, who are also invited to the graduation ceremonies.

Additionally, the CIC received feedback from individuals at the CDF, particularly those in maximum security general housing population units and restrictive housing (or status) units, expressing their desire to participate in educational programming. There are still very limited options for programming at the CDF, leaving those DOC residents who are higher security and in DOC custody for the longest durations of time with virtually no educational opportunities, outside of the GED unit.

### *CIC Recommendations*

- The DOC should expand educational and vocational programming options generally to those housed at the CDF with a focus on safe and innovative provision of services and programming to maximum security residents, and residents with a classification status other than general population.

## *II.   Title 16 Transfer of Juvenile Offenders Charged as Adults*

*All of the juvenile offenders charged as adults who were in DOC custody were transferred to New Beginnings prior to October 1, 2018.*

Pursuant to the *Comprehensive Youth Justice Amendment Act of 2016*, DC juveniles charged as adults were to move from the CTF adult facility to New Beginnings, which is operated by the Department of Youth Rehabilitation Services (DYRS), by October 1, 2018. Prior to the transfers of the juveniles, DOC staff along with staff from DYRS, held meet and greets with family members of the individuals, as well as town halls, Q&A sessions, and transition conferences. During the CIC's 2018 inspection, the DOC reported that the first individuals were transferred from CTF to New Beginnings on the weekend of September 15, 2018. On the second day of the inspection, September 26, 2018, the DOC reported that all the transfers would be completed that day.

## *III.   Case Management*

*The CIC received numerous reports throughout the fiscal year, the majority of which came from those housed in the CDF, that case managers were not regularly available on their units.*

During FY 2018, the CIC received at least seven complaints about lack of regular access to case managers. Multiple individuals explained that there was a shortage of case managers (a concern that was heard

---

[4] Most courses have a number of requirements that individuals must meet in order to enroll in the program. Example requirements include CASAS scores, literacy retirements (GED programs), GED/high school diploma (post-secondary courses), minimum stay to finish course work, and no Class1 or II disciplinary violations.

particularly from individuals on maximum security general population and status units at the CDF), so case managers had multiple units assigned to them. As a result, many units went for weeks at a time without being visited by a case manager. Additionally, when a case manager did go to the unit, it was typically for a short amount of time and only to meet with a few select individuals on the unit. According to some reports, case managers would go to the unit during a count when residents must remain in their cells, or they would simply log in and out of the log book without actually meeting with anyone.

When DOC staff was asked to address the shortage of case managers, they said that every unit has case manager, there is always a backup case manager, and case managers are available Monday-Friday on their assigned unit(s). Staff clarified that some case managers have multiple units in their purview. The staff vacancy list that the DOC sent to the CIC as part of the 2018 information request shows that as of September 20, 2018, there were nine vacant case management positions.

### CIC Recommendations

- The DOC should ensure that case managers are in fact available on every unit on a daily basis; offer office hours or easily scheduled appointments; and effectively assist residents with their needs.

## IV.  Classification

*During the fiscal year there were reported incidents of possible miscalculations in custody scores and subsequent security level classifications that prompted the CIC to look into the DOC classification process.*

The DOC system of classifying residents gives each resident a total custody score that corresponds to a specific security level. This score is based a number of factors that, at a basic level, account for the individual's current offense, prior convictions, institutional history, drug/alcohol history, age, education, and employment prior to arrest. Within each of these categories, individuals are given a number of points, corresponding to the level of severity or the degree of positive adjustment in that category. These points are added to create the total custody score. A custody score that is above 12 points corresponds to maximum custody; 5-11 points corresponds to medium; four points with additional restrictions corresponds to medium; and four points without additional restrictions corresponds to minimum.

Multiple residents in FY 2018, who felt that their total custody scores had been miscalculated from anywhere between four and six additional points, contacted the CIC. For example, if the original charge of a felony was erroneously counted, instead of the ultimate conviction for a lower misdemeanor offense, then that error would result in a higher sub-score. Even in situations where the correction of a presumed mistake would not necessarily lead to a lower classification score, it is still in a resident's best interest to assure accuracy and achieve the lowest possible point score, because the DOC warden has the discretion to make a custody override based on the particular circumstances of the individual.

When the CIC contacted executive staff at the DOC about particular cases and the classification process in general, the DOC was responsive. Staff reviewed the cases and met with CIC staff to provide information about the classification process.

During the 2018 inspection, the CIC asked for further clarification about the classification process, and whether residents may have their total custody scores reevaluated if they believe an error exists within their score calculation. DOC staff explained that case managers complete the initial classification form using the Prism system to conduct a case search. Staff said that each case should show the conviction, rather than the original charge. While each resident is to be reclassified 90 days after coming into DC custody, residents can ask their case managers to reassess their classifications. However, residents who do not have regular access to their case manager cannot reasonably request such a reclassification.

15

Case 1:20-cv-02944-CKK   Document 52   Filed 10/14/20   Page 186 of 300

*CIC Recommendations*

- The DOC should ensure that case managers are accurately distinguishing between types of convictions and the offense severity points that are assigned to each conviction. The DOC should assess data systems to verify that case managers are accurately interpreting other documents assessed in calculating the custody score. The DOC should provide training to address common errors.

## V.   *Medical Concerns*

*Throughout the fiscal year, the CIC received complaints from at least 11 DOC residents regarding their medical care.*

Multiple residents expressed the feeling that their medical needs were not seriously evaluated, and that the predominating determination of their medical care was based on DOC administration recommendations, not medical staff recommendations. Residents said they were told that they would receive a reference to either meet with a specialist or receive outside care, but they did not receive this additional treatment in a timely manner, and were not given clear updates about the status of their appointments or next steps. Also, there were reports of unit officers failing to accommodate the physical needs of residents which had been approved by medical staff, such as the use of canes, access to bottom bunks, and dietary requirements.

*CIC Recommendations*

- The DOC should clearly communicate medical decisions and care updates to residents and ensure all appropriate follow-up care is scheduled and completed in a timely manner.

- The DOC should ensure that unit officers are allowing residents to access approved medical accommodations.

## VI.   *New Policies for Opioid MAT*

*In FY 2018 the DOC revised its policies on medical assisted treatment (MAT). It now continues suboxone treatments for individuals who were receiving treatment in the community, and identifies individuals to begin MAT while in custody.*

DOC medical staff described FY 2018 changes to the practice of providing medication-assisted treatment (MAT) for opioid dependence. In January 2018, the DOC began a new initiative whereby individuals may commence suboxone treatment while in custody. Previously, all residents, except for pregnant females (who were able to continue on methadone or suboxone treatments), were tapered off of treatment after intake. The determination of whether to provide this treatment to a particular individual rests on multiple factors, including personal history, withdrawal symptoms, etc. As of September 26, 2018, the DOC had initiated treatment for 30 people.

While the policy has not changed as to pregnant women, the DOC now maintains treatment for people who are already receiving suboxone. However, if a non-pregnant person was receiving methadone treatments in the community prior to their entry into DOC custody, they will be tapered off of those treatments. Additionally, the DOC does not initiate treatment for individuals who are going to the BOP, because the BOP will not continue it. If an individual receiving suboxone treatment prior to entering the DOC is going to the BOP, the individual will be tapered off of treatment.

16

## VII.    Safe Cells and Suicide Watch and Precaution

*The CIC received concerns from incarcerated individuals and attorneys about the conditions of safe cells. The CIC spoke to DOC staff to gain clarification on the 2017 DOC policy on Suicide Prevention.*

Safe cells are cells designed to be suicide resistant. They have specific amenities, such as plastic beds, for individuals whom the DOC medical team places on suicide watch or precaution. In the CDF, there are safe cells on the medical unit and acute mental health unit.  Additionally, the administrative housing unit contains suicide-resistant cells, which means that there are no points from which someone could hang himself while inside of the cell. In the CTF, there are safe cells on the Medical 82 unit and the women's mental health unit.

Individuals may be held in a safe cell either when they are on suicide watch or precaution. Suicide watch consists of 24-hour observation of the individual, while suicide precaution involves frequent, staggered spot checks of the individual being evaluated. According to DOC staff, individuals on both suicide watch and precaution are assessed daily by a psychiatrist. Individuals on suicide watch, who are evaluated by a psychologist, may be stepped down to suicide precaution for at least 24 hours; however, the amount of time one spends on watch or precaution is a decision that is always made by a psychiatrist. One individual with whom the CIC spoke said that they had been living in a safe cell for four months, and DOC staff confirmed this time period.

According to DOC policy,[5] safe cells are equipped with certain amenities, and individuals on suicide watch or precaution have restricted access to the usual conveniences available to residents. Such amenities and conveniences include running water in cells, safe mattresses and blankets, dim lighting, use of phones, access to legal visits, access to personal property, etc.[6] DOC staff explained that there is a presumption that residents on suicide watch or precaution can have running water in their cells, unless the individual has a history of drowning attempts or using the water to destroy their cell.

DOC staff explained its policy that each individual on suicide watch or precaution *may* have access to the listed amenities and conveniences, and that access is to be evaluated by a psychiatrist every day. Restrictions for amenities and conveniences must be signed by the psychiatrist, and posted on the outside of the door to each resident's cell.

Throughout FY 2018, the CIC had the opportunity to speak with individuals who had been placed on suicide watch or precaution for varying periods of time. They described the daily evaluations by mental health staff as sporadic, and lasting for durations of less than one minute. They also described the evaluations as comprised of simple questions, such as "are you ok?", and "are you suicidal?" One individual with whom the CIC spoke detailed his amenity and convenience restrictions, which DOC policy states are discretionary. They included the following: no phone, no recreation, no visits, no eating utensils, no curtains over the window, no socks, and no shoes; additionally, he was allowed a mattress and blankets, a smock, continuous bright lights in his cell, showers every three days, and access to running water in cell. His access to running water depended on which corrections officers were on duty, because the officers control the water. Some would turn the water in his cell on and some would not.

During the September 26, 2018 inspection of the CDF, the CIC observed safe cells on the acute mental health unit. Two of the cells that were in use had signed lists stating relevant restrictions, which were signed and individually dated for September 21, 2018 and September 23, 2018. It appeared as though DOC mental health staff were not in compliance with the departmental policy requiring a daily review of

---

[5] *See* D.C. DEP'T OF CORR., SUICIDE PREVENTION AND PRECAUTION 6080.2G 5 (2017), available at https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PP%206080.2G%20Suicide%20Prevention%20 and%20Intervention%208-9-2017.pdf.
[6] *See id.* at 21-22.

restrictions; however, it is possible that those individuals were evaluated, regardless of the lack of updates to their lists.

As part of the CIC request for information, the DOC provided data that there were four resident deaths in FY 2018, two of which were medical in nature, and two of which were suicides by hanging. There were additionally 112 documented suicide attempts, the majority of which were attempted by tied sheet, swallowed pills, or swallowed batteries.

### *CIC Recommendations*

- Mental health staff should ensure that daily evaluations of psychiatric status, cell amenities, and life activities are fully completed and documented every day.

## VIII.  *Maximum Security Programming*

*There is little to no programming outside of the GED unit for individuals who are housed at the CDF, particularly those who are maximum security residents.*

The CIC received comments from at least five individuals about the about the lack of programming options at CDF, particularly on maximum security general population units and restrictive housing units. Throughout FY 2018, residents on maximum security and restrictive housing units continually expressed that they are unable to participate in programs. Some were also on units where the radios were removed around October 2017, and not returned.

One resident noted the impact of not having programming, saying that most issues between inmates occur on the maximum units because people are bored and have nothing to do, nothing to work for, and no privileges to maintain. He explained that the DOC classification system and levels "weren't built for long-term inmates," and that there are no benefits to staying out of trouble once you are at maximum security, because there is essentially no way to move down custody levels.

Some maximum security residents reported that they participate in counseling with DOC staff. DOC staff explained that a DOC employed counselor provides long-term counseling to residents mostly in restrictive housing units. The counselor works with residents on a variety of issues, including anger management.

There is also an informal DOC project called the CARE team, which consists of social workers and licensed therapists who work with residents, particularly on restrictive housing units, to identify ongoing needs and connect individuals with mentors when possible. The project is in the early stages, and selections for participation in the program are based on the individual therapy list.

DOC staff stated that it is more difficult to have programs at CDF, as compared to CTF, due to the layout of CDF. However, they explained that they try to be creative and still offer CDF residents programs by moving them to empty housing units for programming. Staff also said, when possible, they bring CDF residents over to CTF for job fairs and other events, and they can participate before CTF residents participate.

### *CIC Recommendations*

- The DOC should work to provide meaningful programming opportunities for residents at CDF, particularly for maximum security units and restrictive housing units.

## IX.  CDF Administrative Housing / Special Management Unit

*The CIC spoke with a number of people residing on the administrative housing unit, who raised concerns about its informal disciplinary process.*

During FY 2018, at least four residents contacted the CIC about conditions on the administrative housing unit. All reported no consistent case management services on the unit for months. Additionally, others reported instances where they were subject to restrictions that did not result from a disciplinary hearing.

One individual explained that after failing to get out of the shower when told to do so, he was sprayed with a chemical agent, and restrictions were imposed.  The CIC viewed the memorandum stating the restrictions, which was posted outside of his cell. It appears verbatim below:

> "The below steps are to be made in regards to (resident) and his out of cell movement:
> Effective immediately:
> 1. A supervisor will be present for all movement of (resident) until he is behind a secured door.
> 2. A cell door, officer doors, shower doors, closets and housing unit doors are to remain in the closed and locked position at all times. When opening any of these doors, they should be immediately closed upon inmate and/or staff entry or exit.
> 3. At the completion of the strip search each time inmate (resident) comes out of the cell, the hand wand will be used to scan him once on the tier.
> 4. A cell search is to be completed once inmate (resident) is secured for any out of cell activity. Any items such as bowls, cups, or anything that can be used to store substances is to be removed from his cell and documented as nuisance contraband and discarded.
> 5. All (resident's) activities will be conducted on shift #2, to include education, showers, recreation, case management, and medical when possible.
> 6. All (resident's) out of cell activity will be conducted in handcuffs and waist chain restraints, with the exception of a shower.
> 7. These steps are to remain in effect until further notice."

### CIC Recommendations

- The DOC should ensure that restrictions are only being placed on residents after documentation of a legitimate violation of DOC policy and a fair hearing.

## X.  Special Handling

*Special handling status is a high security status that places individualized, additional restrictions on particular residents.*

The special handling status is a security status that places specific restrictions on inmates who the DOC determines require security restrictions in addition to their residency inside of the restrictive housing unit. They may leave their cells for recreation, legal visits, medical emergencies, and other specialized needs. There are very few people with a special handling status, and all are housed in CDF on the administrative housing unit.

Special handling requires that any time a resident is moved out of cell, there must be at least one lieutenant present to escort them, and no other residents can be out of cell on the unit tiers. When a special handling resident leaves their unit, they are typically escorted by four officers. Staff was unable to provide a general explanation of the decision-making process for categorizing an individual as special handling; however, every decision made about a resident on special handling must be approved by the warden. Individuals with whom the CIC spoke stated that their interactions with the warden are few and infrequent. One resident estimated that he saw the warden two times across the span of one year.

19

According to DOC policy, there is to be a written memorandum designating each individual's specific restrictions. During the September inspection, DOC staff explained that the restrictions are determined on an individual basis. One resident explained that he knew that there was a memorandum detailing his restrictions because he could hear officers reference it; however, he never saw or received a copy of the memorandum.

### CIC Recommendations

- The DOC should ensure that there is a clear policy governing individuals with a special handling status; DOC should clearly communicate to such individuals any restrictions, the reasons for them, and the process for having the restrictions lifted.

## XI.  Government Witness Unit

*The CIC received reports throughout FY 2018 about the government witness unit regarding the lack of programming, extended investigations, and daily conditions.*

During FY 2018, the CIC spoke with seven individuals housed on the government witness unit.

- *Programming* – The general policy of the DOC is to keep government witness residents separate from general population residents in order to preserve the identity and safety of government witnesses. As a result, government witnesses spend most of their time in the unit, because the facility common areas need to be clear of other residents in order for the government witnesses to access them. This also prevents government witnesses from participating in programming with the general population residents.

  Government witnesses commented on the lack of programs that are offered on their unit. Programs offered include life skills, commercial cleaning, industrial banking, and a drug program, as well as opportunities to rent books from the mobile library and participate in on-unit chapel. However, residents are not allowed to participate in life skills if they already participate in commercial cleaning, and vice versa. It was also reported that no programs are offered for the Spanish speakers, and the programs offered in English are not translated.

  During an interview with the CIC, one individual communicated that unit residents would like to have access to GED classes; barbershop and cosmetology classes; parenting classes; abusive relationship classes; foreign language classes, particularly for Spanish speakers; and business classes.

- *Investigations* – Residents reported that they have been under investigations that last for over 90 days and suspend their social visits during that time. All of the residents subjected to these investigations reported that they never received any documentation regarding the investigation or its reason; they were only made aware of the suspended visits when families called to schedule in-person visits and were informed that the residents' visits were suspended.

  During FY 2018, the CIC contacted the case manager on the unit seeking insight regarding the origin and scope of the investigations, and subsequent restrictions; however, the case manager was unaware of the source and reasons for the investigations.

  During the September 2018 inspection, the CIC asked executive staff whether the investigations were internal to the DOC or coming from an outside agency. The CIC also inquired about residents' lack of notice and documentation regarding the investigations. In response, DOC staff members explained that they were not aware of any internal or outside investigations that are unaccompanied by documentation and suspend social visits for government witness unit residents.

20

According to staff, a resident only has visits suspended if he receives a disciplinary violation with loss of visits as part of the sanction, or if he is sent to the Secure Management Unit. If the suspension is due to a disciplinary violation, residents are informed by the Adjustment board and receive documentation of the process.

- *Recreation* – Residents reported that they do not have recreation regularly throughout the week. They reported that they have recreation once or twice a week, and sometimes not at all.

- *Unit* – Residents reported that the unit is not provided with adequate cleaning products, supplies, or tools. Residents have to ask officers to call and request that supplies, including toilet paper, be delivered. Residents have also said that they have requested remotes for the televisions on the unit. When they do not receive remotes, they change the channel with a broom or mop handle.

- *Detail* – Residents reported that some corrections officers say that there are too many people working detail. Reportedly, some officers do not want to let the people working detail out of their cells at the designated times for their shifts.

- *Visits* – The CIC received reports about visitors being turned away for various reasons, such as wearing a work uniform or smelling like marijuana.

- *Mail* – Residents reported incidents where they have not received mail that was sent to them. Also, family members have reported not receiving mail sent to them by residents.

- *Food* – Residents explained that they do not always eat food that is delivered to the unit, because there is a history of food tampering by individuals working the kitchen, who know that particular trays will be delivered to the government witness unit. Most said that residents on the unit never drink from juice or milk jugs; they only drink beverages delivered in sealed single servings, because some past jug deliveries contained urine.

- *Staff* – Residents reported insults and profanity from staff due to their status as government witnesses.

### CIC Recommendations

- The DOC should ensure that residents are always provided with documentation stating why they are under investigation and the basis of the investigation.
- The DOC should work to provide residents on the government witness unit with access to adequate programming opportunities and recreation time.
- The DOC should ensure that the government witness unit operates in a sanitary and safe manner, including the delivery of cleaning supplies and the proper sealing, labeling, and handling of meals.
- The DOC should ensure that correctional staff is appropriately equipped with schedules for resident's detail assignments in order to preserve safety while ensuring that residents can report for their duties.

## XII.   CTF Special Management Unit

*From September to October 2018, the CIC received concerns from residents on the Special Management Unit (SMU) of CTF, regarding changes in recreation practices on the unit.*

At least five residents of SMU contacted the CIC to discuss the change in recreation practices on the unit, which caused difficulty in communicating with family members. In mid-September the recreation time changed from starting at 8:00am and lasting until 12:00pm, to starting at 5:00am and lasting until 9:00pm.

21

Recreation is the only time that the phones are available for residents to make social calls. Each resident on the SMU is allowed to have recreation for two hours within the recreation time (i.e. a two-hour time slot between the hours of 5:00am and 9:00pm). Despite the extended hours, after the change, those with recreation at 5:00am could not reach their families because they were unlikely to be awake at that time. There were also reports that recreation no longer occurs on the weekends.

In September 2018, the CIC reached out to the DOC about these issues. The DOC responded that it would look into the unit issues, particularly the availability of recreation on the weekends.

## XIII.    Grievances

*The CIC received resident concerns regarding deficiencies in the DOC grievance process, mainly that residents seldom receive any response to grievances that they submit.*

Throughout FY 2018, the CIC received complaints from residents explaining that the DOC grievance process is inadequate. During interviews with individuals, at least nine individuals raised concerns about grievances. The most frequent concern is that residents do not receive responses to their written and submitted grievances.

As part of the information request made by the CIC to DOC, the DOC provided documentation about informal and formal grievances in FY 2018. Informal grievances are complaints communicated to the unit case manager. Formal grievances are complaints filed with the grievance coordinator.

- *Informal Grievances*: There were 810 informal grievance complaints filed in FY 2018, 727 of which were resolved in less than 30 days.
- *Formal Grievances*: There were 144 formal grievance complaints filed in FY 2018, 140 of which were resolved in less than 30 days.



During the 2018 inspection, the CIC asked DOC for clarification on the recently changed grievance process. Staff explained that residents can still ask their case managers to resolve an issue, but communication with a case manager is not part of the formal process. Instead, all grievances are now delivered to the grievance coordinator, who then sends the complaints to the corresponding department. Following an inquiry, the relevant department sends a response to the coordinator, and then the coordinator sends the grievance back to the resident.

22

- The DOC should provide residents timely answers to all filed grievances in a manner that comports with its stated policies and procedures.

## XIV. *Disciplinary Process*

*The CIC received numerous comments from residents that they did not receive documentation of disciplinary incidents.*

Throughout FY 2018, multiple DOC residents raised concerns regarding the lack of documentation for disciplinary incidents that resulted in sanctions. For example, one individual described being placed on a seven-day cell restriction, which prohibited showers, recreation, and any property in his cell. The individual reported that they requested written documentation on the fourth day of the seven-day restriction period, and were released from restricted status on the following day, but no explanation of why the restriction was issued or removed was ever provided.

In response to the CIC's request, DOC provided information about disciplinary actions in FY 2018. In total there were 1,402 violations, 1,387 of which were sanctioned. During the fiscal year, there was one "not guilty" finding during the disciplinary hearing process.



**Most Common Disciplinary Violations**

| | |
|---|---|
| lack of cooperation | 341 |
| fighting | 227 |
| indecent exposure | 147 |
| threatening conduct | 122 |
| out of bounds | 97 |
| major contraband | 84 |
| class II assault | 80 |
| disrespect | 80 |

- The DOC should provide residents with documentation of all filed disciplinary actions that are formally charged or result in sanctions.

## XV. *Religious Programming and Meals*

*The CIC received complaints about access to religious programs and services as well as religious diet trays, ongoing throughout the fiscal year.*

During FY 2018, the CIC received reports regarding residents' inability to access religious services and accommodations, such as prayer observance. Five individuals reported times when they were not allowed to come out of their cells to pray or when officers failed to take them to the chapel area to participate in religious services or programming.

23

Additionally, at least five individuals reported issues with accessing their religious meals. Some residents experienced weeks to months of delays in the process of being approved to receive a religious diet tray. Once individuals were approved for the diet, some reported that religious diet trays were not always brought to the units. Also, there are ongoing concerns about certain food items not being sealed or labeled. In particular, persons observing a kosher diet are not able to distinguish if the food is in fact kosher because it is not labeled.

In November 2018, the CIC received reports that the DOC had recently begun providing a Halal diet for Muslim individuals who had previously been given kosher trays. The Halal diet consists of one hot meal per day and lower quality than the kosher diet, which has two hot meals per day. Similar to the kosher trays, not all items are sealed or labeled, so residents are unable to determine if the items do in fact meet Halal standards.

### *CIC Recommendations*

- DOC staff should ensure that all residents have the opportunity to regularly attend religious services and programs in a manner that comports with its stated policies and procedures.
- DOC staff should ensure that the process for reviewing and approving religious diet requests is timely and efficient.
- DOC staff should ensure the proper sealing and labeling of specialized dietary trays in order to assure quality control.

## XVI.   *Recreation*

*Throughout FY 2018, the CIC received reports about recreation, including no outdoor recreation or opportunities for indoor recreation.*

The CIC received reports from residents on particular units that they do not have opportunities for indoor recreation, and other comments that the majority of residents do not have regular opportunities for outdoor recreation.

At the CTF, residents on the medical units and government witness reported issues with access to indoor recreation. Additionally, residents in one discrete CTF unit have weekly outdoor recreation, whereas other housing units in CTF reported that they have not received any outdoor recreation for at least the past 5-7 months. At least five individuals from CDF expressed that they do not have meaningful opportunities for recreation, both indoor and outdoor.

### *CIC Recommendations*

- DOC staff should ensure that all individuals have regular access to indoor recreation, and adequate access to outdoor recreation time that comports with stated policies and procedures.

## XVII.   *ADA Specialists*

*The DOC has two employees that are trained to provide Americans with Disabilities Act (ADA) services to residents who are referred by the DOC medical department.*

There are two DOC employees who have specialty training for providing services to residents under the Americans with Disabilities Act of 1990 (ADA). According to DOC staff, residents can be referred by the medical department to receive ADA services. If they are referred for services, one of the two trained DOC employees are able to meet with them according to individual service needs. The amount of time an individual spends with a specialist is dependent on the requirements of their services. At the time of the inspection, there were reportedly three residents who were utilizing ADA services.

24

## XVIII.   Property

*Many residents reported to the CIC that their personal property was never returned to them by DOC after they transferred units.*

Throughout FY 2018, the CIC received at least five complaints regarding lost property. Many of the reports involved residents who had to transfer units, whose their property was never delivered from the old unit to the new unit; or, residents who never received their property after temporary property restrictions were lifted.

During the 2018 inspection, the CIC asked DOC staff about the process for property transfer and retention while a resident transfers units or is subject to a property restriction. Staff explained that property is supposed to be sent with residents as they transfer units. DOC staff further explained the process for residents who go from general population to a status housing unit, and have their property restricted. Upon entry to a restrictive housing unit, a resident is placed in the holding cell at the entrance of the unit and strip-searched. Their personal property is also reduced to the limit allowed on the unit. Any property that is over the limit is sent to storage, and residents are supposed to receive it within 24 hours of release back to general population. Staff suggested that residents who spoke to the CIC about lost property and were transferred to a secure housing unit may have had property confiscated as part of an investigation by the DOC Office of Investigative Services (OIS). However, that possibility assumes there was an incident preceding their transfer that would have necessitated OIS involvement.

### CIC Recommendations

- Whenever a resident transfers units, DOC staff should clearly document a resident's property, and explain the process for moving, holding, storing, and returning property.
- DOC staff should clearly document property that has been confiscated and will not be returned.
- DOC staff should communicate to residents a clear resolution process if the resident has missing property.

## XIX.   Facility Physical Conditions

*Throughout the fiscal year, individuals in both the CTF and CDF reported concerns about the physical conditions of the facilities.*

During interviews throughout FY 2018, at least six individuals raised concerns about the physical conditions of the CTF and CDF. The concerns are listed below:

- *Temperature concerns:* There is no circulation of air in the summer and freezing conditions in the winter since heat does not reach individual cells.
- *Flooding and sewage on bottom tier of a unit:* The DOC responded to this concern during the year and commenced maintenance on a number of units.
- *Mold in units, closets, and showers:* Residents informed the CIC that mold was painted over in preparation for inspections.
- *Cleaning supplies:* Residents are not provided sufficient cleaning supplies.
- *Rusty cage bearings:* Cage bearings are not secure.

### CIC Recommendations

- The DOC should ensure that the physical premises of both the CDF and CTF are clean and safe at all times.

25

## XX.    *Additional Concerns*

*The following list of resident comments includes the areas in which additional issues were raised to the CIC throughout FY 2018:*

- Assaults by staff
- Unprofessional staff conduct
- Staff retaliation following a grievance or other report
- Reported inmate on inmate conflict (including physical altercations and stabbings)
- Issues with good time credits
- Not enough detail jobs for women
- Law librarian requests unanswered and little assistance

# Appendix A: Methodology

## CIC FY 2018 DOC Inspection: Methodology

In accordance with D.C. Code § 24-101.01(d)(1)(2019), the Corrections Information Council (CIC) sent a request to tour the Department of Corrections (DOC) facilities, the Correctional Treatment Facility (CTF), and the Central Detention Facility (CDF). The CIC conducted an onsite inspection of the CTF on September 20, 2018, and an onsite inspection of the CDF on September 26, 2018. The CIC representatives on the inspection include Board Chair Charles Thornton; Program Analysts Laura de las Casas, Rebekah Joab, Nicole Ukaegbu, and Chrisiant Bracken; Communications Specialist Mabel Tejada, and interns Samantha Kramer and Justin Penik.

On each respective day, the onsite inspection processes included opening sessions with DOC executive staff, tours of the facility grounds, and closing remarks with the DOC executive staff.

The inspection request itinerary included a tour of select units and program areas, which were the locality of comments, both positive and negative, made by DC residents throughout the fiscal year. The units toured, along with those that the CIC requested to visit, but was unable, are listed below:

CTF
- Medical 96
- Medical 82
- Women's Mental Health Unit
- Young Men Emerging Unit (YME)
- Work Readiness Unit
- General Population Housing Unit

Areas that the CIC requested to tour but was not able to:
- Government Witness Unit
- Special Management Unit

CDF

- Intake Reception Center (IRC)
- Transition Center
- Acute Mental Health Unit
- Mental Health Step-Down Unit (MHSDU)
- GED Unit
- Administrative Housing Unit / Special Management Unit
- Restrictive Housing Unit

Areas that the CIC requested to tour but was not able to:
- Maximum security general population housing unit

Prior to the onsite inspection, the CIC communicated with residents at the CTF and CDF about conditions. During those interviews the CIC met with residents to discuss their concerns and ongoing issues. The concerns and remarks made by residents throughout FY 2018 informed the

areas that the CIC toured during the 2018 inspection, and were also included as resident feedback in the body of the report. The CIC met with more than 40 individuals in the fiscal year.

On October 9, 2018, the CIC sent the DOC a request for documents, including:

- Roster of residents including commitment date, race, age, facility, classification, projected release date, and inmate status
- Breakdown of facility units
- List of staff vacancies as of September 20, 2018
- Summary of FY 2018 disciplinary actions and sanctions
- Summary of FY 2018 Informal Grievance Logs
- Summary of FY 2018 Formal Grievance Logs
- List of community partners for programming
- Complete list and explanation of courses offered through the department of College and Career Readiness
- Data on restrictive housing population in FY 2018
- Inmate deaths in FY 2018
- Inmate suicide attempts in FY 2018
- Summary of FY 2018 significant incidents
- Summary of FY 2018 use of force incidents
- Information on food services and commissary

The CIC provided the DOC with a draft version of this report for review of factual information and an opportunity to respond to any information contained in the report. The DOC response can be found as an attachment.

# Appendix B: DOC Response

# EXHIBIT E



# D.C. Prisoners: Conditions of Confinement in the District of Columbia

June 11, 2015

A report of the Washington Lawyers' Committee
for Civil Rights & Urban Affairs
11 Dupont Circle NW, Suite 400
Washington, DC 20036
www.washlaw.org

# D.C. Prisoners: Conditions of Confinement in the District of Columbia

# Table of Contents

PAGE(S)

Executive Summary .................................................................................. 2

I. **District Department of Corrections Facilities and Populations** ............ 4

    A.     Facilities .......................................................................................... 5
    B.     Policies Affecting Prisoner Population ......................................... 7
    C.     Demographics and Budget ........................................................... 11

II. **Recurring Issues and Problems Involving the D.C. Jail and CTF** ........ 12

    A.     Crumbling physical infrastructure .............................................. 13
    B.     Mental Health and Suicide Prevention Practices at the D.C. Jail ........... 20
    C.     Issues Confronting Youth ............................................................. 25

III. **Costs of Confinement & Contracted Services** ..................................... 33

    A.     The CTF & Corrections Corporation of America ........................ 33
    B.     Unity Health Care ........................................................................ 45
    C.     Halfway Houses ............................................................................ 46

IV. **Looking Forward** ................................................................................. 47

    A.     Recommendation 1: Close the D.C. Jail and the CTF and construct a new, safer, more effective facility ............................................. 48
    B.     Recommendation 2: Expand the Secure Residential Treatment Program ........................................................................................ 48
    C.     Recommendation 3: Correct deficiencies in suicide prevention and youth confinement ................................................................. 48
    D.     Recommendation 4: Conduct a review of training ..................... 49
    E.     Recommendation 5: Revise current policies restricting "Good Time Credits" ........................................................................................ 49
    F.     Recommendation 6: Return management of the CTF to District control .......................................................................................... 49
    G.     Recommendation 7: Increase public access to records .............. 51

Appendix A - **Demographics & Budget**

Appendix B - **D.C. Department of Corrections Response**

# Preface

The appalling conditions of confinement in D.C. prison facilities, especially in light of their disproportionate impact on African-Americans, are a key criminal justice and civil rights issue in Washington DC. This is the third in a series of reports focusing on criminal justice reform and civil rights issues by the Washington Lawyers' Committee for Civil Rights and Urban Affairs.

We want to express our appreciation for the invaluable assistance in researching and writing this report provided by a team of lawyers from Covington & Burling LLP: Kevin Glandon, Shelton Abramson, Brandon Myers, and Alan Pemberton, who were the principal authors of this report, as well as paralegals Kimberly Bickham and Eric Barros.

All these reports are dedicated to Judge Louis F. Oberdorfer, the distinguished jurist, who inspired the creation of the Washington Lawyers' Committee in 1968 while a partner at Wilmer, Cutler & Pickering. Judge Oberdorfer served on the Committee's Board of Trustees until his elevation to the bench in 1977. Throughout his long career, Judge Oberdorfer, who died in February of 2013, spoke eloquently in support of civil rights and criminal justice reform. In his memory, the Louis F. Oberdorfer Fund has been established to support the Committee's ongoing work on criminal justice reform and civil rights advocacy. We are pleased to note that one of the significant contributors to this report was Elliot Mincberg, who is serving as the Louis Oberdorfer Senior Counsel on the Washington Lawyers' Committee staff. A stipend to support his work is provided by the Oberdorfer Memorial Fund.

The Washington Lawyers' Committee would also like to acknowledge with particular gratitude the service of the following retired and senior Federal and District of Columbia Judges who composed the Advisory Committee assisting with this study:

*John M. Ferren*, Senior Judge, District of Columbia Court of Appeals

*Rufus G. King III*, Senior Judge, Superior Court of the District of Columbia

*James Robertson*, Retired Judge, United States District Court for the District of Columbia

*Ricardo M. Urbina*, Retired Judge, United States District Court for the District of Columbia

*Patricia M. Wald*, Retired Chief Judge, United States Court of Appeals for the District of Columbia Circuit

Roderic V.O. Boggs, Executive Director

June 11, 2015

Deborah M. Golden, Director, DC Prisoners' Rights Project

# EXECUTIVE SUMMARY

On average, the daily population of D.C. Department of Corrections (DCDOC) facilities exceeds 2,000 prisoners. About three-quarters of these individuals are detained at the Central Detention Facility, a nearly forty-year-old facility commonly referred to as the "D.C. Jail." Just under one quarter are detained at the privately-run Correctional Treatment Facility (CTF). The rest are located at one of the District's three halfway houses.

This report examines the conditions of confinement at the D.C. Jail and the CTF and discusses several recurring and serious problems that require the prompt attention of the DCDOC and District policymakers.

- **The D.C. Jail's physical condition is alarming.** Inspection reports by the D.C. Department of Health (DOH) have identified numerous violations of established correctional and public health standards, as well as structural and mechanical problems that are "serious to extremely serious." Some of the problems noted in recent inspections appear to be a matter of poor housekeeping and sanitation practices — e.g., an "active infestation of vermin/pests throughout the facility." Others indicate more fundamental degradation of the D.C. Jail's physical infrastructure. Inspectors found "openings in the wall" of several cells, "damaged concrete in several of the cell blocks," "water penetration through the walls," mold growth, and a leaking roof. In addition, inspectors have noted that "most of the plumbing fixtures were in different stages of disrepair."

- **Suicide prevention practices in the D.C. Jail are "in need of immediate corrective action."** An expert report (the "Hayes Report") arrived at this conclusion in 2013 after being commissioned to examine the D.C. Jail conditions and policies following a ten-month period during which four prisoners in the D.C. Jail committed suicide. The Hayes Report found that the D.C. Jail did not have enough suicide-resistant cells, and that prisoners under observation were subject to "overly restrictive and seemingly punitive" precautionary measures. The Hayes Report also criticized the infrequency of monitoring, which demonstrated "complete unconcern for inmate safety." In response to the Hayes Report, the DCDOC formed a Suicide Prevention Task Force, which took steps to correct some of the issues noted in the report. However, the Task Force has not published anything in more than one year, so it is difficult to assess whether all of the required remedial measures have been implemented.

- **Facilities for youth are inadequate and programming is insufficient.** A report conducted by an outside correctional consulting group (the "Ridley Report") identified significant problems with the conditions of confinement for youth housed at the CTF and found that boys at the CTF "have needs far greater than the services currently provided." The Ridley Report highlighted the

inadequacies of the juvenile facilities at the CTF, the excessive imposition of segregation and isolation, and the insufficient programming for boys held there. The report also notes that many boys may only visit with family members through video visitation, which can interfere with maintaining critical family bonds. The DCDOC reports that it has "worked diligently to implement the Ridley recommendations," but we recommend further actions, including reducing the use of isolation and segregation among youth prisoners, further increasing and improving youth programing, and expanding access to in-person visitation for all youths.

- **The District should not renew its contract with CCA, the for-profit corporation running the CTF.** Since 1997, the CTF has been operated under contract by the Corrections Corporation of America (CCA). It appears that the District's compensation to CCA was 31% higher than CCA's reported average, at least as of 2014. During that year, CCA reported an operating margin of 29.7%. CCA's contract is set to expire in 2017 and issues related to CCA operation of prisons around the country since the beginning of the contract indicate that it would not be in the District's interests to continue to contract out the operation of the CTF.

- **The Secure Residential Treatment Program needs expansion.** The Secure Residential Treatment Program, operated out of the CTF by the Court Services and Offender Supervision Agency and the U.S. Parole Commission, offers a helpful alternative to incarceration for those suffering from addiction, but is unavailable to women and to many men due to the location of the facility and its limited size.

- **"Good time credit" policies deny early release based on arbitrary distinctions.** District policies regarding the availability of "good time credit" for academic, vocational, and rehabilitation achievement contain arbitrary restrictions with respect to certain offenses. Federal policy governs good time credits for inmates who will be transferred to the custody of the Bureau of Prisons.

- **Correctional officers may not have been provided sufficient training.** A theme running throughout prior reports is that some of the District's correctional officers have not been provided modern, effective training.

- **Public records regarding the D.C. Jail and the CTF are difficult to obtain.** The process for obtaining public records regarding the District's correctional system is complex, time-consuming, occasionally befuddling, and sometimes fruitless.

We conclude by offering seven proposed recommendations to address recurring issues outlined in the report. They would not solve all the issues facing the District's correctional system, but we believe they would be important and tangible improvements.

Although we detail multiple areas of concern, it should be said at the outset that this report is not intended to find fault with any particular person, organization, or institution. Corrections officers face dangerous, even life-threatening, conditions on a regular basis. The job is stressful and can be thankless. Administrative staff who help run the Department of Corrections and its facilities and programs are often faced with competing safety, budgetary, time, practical, political, and legal pressures. None of this is to say that the District cannot make improvements in every area of concern. We can. But assigning blame is less productive than collaborating to advance practical, effective solutions.

# I. DISTRICT DEPARTMENT OF CORRECTIONS FACILITIES AND POPULATIONS

Individuals in the DCDOC system are generally subject to confinement at either of two facilities within the District, the D.C. Jail and the CTF,[1] or at one of the District's three contracted halfway houses. Prisoners convicted of a felony are transferred to a Federal Bureau of Prisons (BOP) facility and may become eligible for parole.

In FY14, the average daily population for all DCDOC facilities combined was 2,041.[2] Approximately three quarters (1,474) of those individuals were detained at the D.C. Jail. Twenty-four percent (489) of those in DCDOC custody were located at CTF, and the rest were in one of the contract halfway houses in the District.[3] While most youth charged with crimes in the District are held at Department of Youth Rehabilitation Services (DYRS) facilities, an average of sixteen boys were located at CTF (the only DCDOC facility that houses youth) in FY14.[4] Pursuant to the Revitalization Act of 1997, individuals convicted of felonies in D.C. are transferred to the custody of the BOP.

---

[1] D.C. Dep't of Corr., *FY 2013 Performance Accountability Report*, 1.

[2] *See* D.C. Dep't of Corr., *DC Department of Corrections Facts and Figures*, http://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DC%20Departmen t%20of%20Corrections%20Facts%20and%20Figures%20October%202014.pdf

[3] *See id.*

[4] This number represents juveniles that the District tried as adults. *See id.*

A. Facilities

1. D.C. Jail

The DCDOC operates the D.C. Jail.[5]  The D.C. Jail's population comprises solely adult men who:  (1) are awaiting trial or a parole revocation decision and are subject to pre-trial detention, (2) have been convicted of a misdemeanor, or (3) have been convicted of a felony and are awaiting a transfer to a BOP facility.[6]  The D.C. Jail houses all three categories (Low, Medium, and High) of the DCDOC's Inmate Classification System (ICS), which is used to categorize prisoners for housing purposes based on "a number of factors that include the nature of their current criminal charges, prior criminal history and prior incarceration history."[7]

We appreciate the willingness of the DCDOC to allow us to tour the D.C. Jail in February 2015.  The D.C. Jail cell blocks include eighteen housing units, one of which is currently being used as an inmate receiving center.  Each housing unit has eighty cells which, pursuant to current practices, hold up to two individuals each.  The facility has of late been housing fewer District prisoners than the capacity of the D.C. Jail would allow.  The tour was brief, we did not tour the entire facility, and we did not bring experts or otherwise attempt to audit the facility or assess shortcomings addressed in environmental inspection reports discussed in section III(A).  Nonetheless, the tour was informative.  The D.C. Jail is an aging facility and is visibly suffering from wear and tear.

2. Correctional Treatment Facility

Unlike the D.C. Jail, the CTF is operated for the District by a contractor, the Corrections Corporation of America (traded as CXW on the New York Stock Exchange), pursuant to a 20-year contract that runs through January 30, 2017.[8]  The CTF population comprises primarily adult men and women who:  (1) are awaiting trial or a parole revocation hearing and are subject to pre-trial detention, (2) have been convicted of a misdemeanor, or (3) have been convicted of a felony and are awaiting a transfer to a BOP facility.[9]  The CTF also houses youth of both sexes and some U.S. Marshals Service

---

[5] Located at 1901 D Street, SE, Washington, DC 20003; *see also* D.C. Dep't of Corr., *FY 2013 Performance Accountability Report*, 1.

[6] D.C. Dep't of Corr., *DOC Frequently Asked Questions*, http://doc.dc.gov/page/doc-frequently-asked-questions.

[7] D.C. Dep't of Corr., *DOC Frequently Asked Questions*, http://doc.dc.gov/page/doc-frequently-asked-questions.

[8] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America (effective Jan. 30, 1997, as modified); D.C. Dep't of Corr., *DOC Frequently Asked Questions*, http://doc.dc.gov/page/doc-frequently-asked-questions.

[9] D.C. Dep't of Corr., *DOC Frequently Asked Questions*, http://doc.dc.gov/page/doc-frequently-asked-questions.

prisoners, and is permitted to house up to 200 sentenced BOP prisoners.[10]  Unlike the
D.C. Jail, the CTF only houses prisoners with a "Low" or "Medium" ICS category.[11]  The
CTF's operating capacity is between 1,400 and 1,500.[12]

### 3.   Halfway Houses

Until recently, the DCDOC contracted with four separate, contractor-owned and
operated halfway houses in the District, which are "often used as alternatives to
incarceration":[13]  (1) Efforts From Ex-Convicts; (2) Extended House, Inc.; (3) Fairview;
and (4) Hope Village.[14]   The District no longer contracts with Efforts From Ex-
Convicts.[15]  Data from the first week in February 2015 indicate that the Fairview housed
about ten women, Extended House held about twenty-six men, and Hope Village housed
about thirty men.[16]  These figures are lower than the average daily populations for FY
2014, which were as follows:  Efforts From Ex-Convicts (15 individuals), Fairview (24),
Extended House (40), and Hope Village (43).[17]

---

[10] *Id.*; D.C. Dep't of Corr., *DOC Official Population Counts by Facility* (Feb. 6, 2015),
http://doc.dc.gov/node/307122; Operations and Management Agreement by and between The
District of Columbia and Corrections Corporation of America, Modification 10.  As of January 1,
2003, the District permitted the CCA to fill empty beds at the CTF with prisoners from other
jurisdictions, with the District receiving a per diem for any such prisoners.  *Id.* Modification 3.
As of November 4, 2008, the District's contract with the CCA was expressly modified to permit
the CCA to house USMS prisoners at the CTF.  *Id.* Modification 9.

[11] D.C. Dep't of Corr., *DOC Frequently Asked Questions*, http://doc.dc.gov/page/doc-frequently-
asked-questions.

[12] The District reports that the operating capacity is 1,400; CCA filings cite a 1,500 figure.
*Compare* D.C. Dep't of Corr., *DOC Official Population Counts by Facility* (Feb. 6, 2015),
http://doc.dc.gov/node/307122, *with* Corrections Corporation of America, *Annual Report
(Form 10-K)*, 14,
http://www.sec.gov/Archives/edgar/data/1070985/000119312514072723/d664216d10k.htm.

[13] D.C. Dep't of Corr., *FY 2015 Performance Plan*, 1,
http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC15.pdf.

[14] D.C. Dep't of Corr., *FY 2013 Performance Accountability Report*, 1,
http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC_FY13PAR.pdf

[15] *See* D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and
Financial Plan*, C-37,
http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume
_1_web.pdf; D.C. Dep't of Corr., *FY 2015 Performance Plan*,
http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC15.pdf.

[16] D.C. Dep't of Corr., *DOC Official Population Counts by Facility* (Feb. 6, 2015),
http://doc.dc.gov/node/307122.

[17] D.C. Dep't of Corr., *DC Department of Corrections Facts & Figures October 2014*,
http://doc.dc.gov/node/344892.

## B. Policies Affecting Prisoner Population

### 1. U.S. Bureau of Prisons

Unlike each of America's fifty states, management of the District of Columbia is vested in a Mayor and City Council, but subject to control and oversight by the United States Congress.[18]  One result of this control is that, pursuant to a federal law,[19] sentenced felons in the District have been required to be transferred to the BOP.[20] Before the enactment of the National Capital and Self-Government Act of 1997 (the "Revitalization Act"), many of those prisoners had been housed at the Lorton Correctional Complex[21] in Virginia; by December 31, 2001, the District had ceased operations at Lorton.[22]

Almost sixty percent of the District's prisoner population are accused or convicted of felonies:  Within that population, nearly fifty percent of all District prisoners are standing trial on a felony charge and 10% have been convicted and are awaiting transfer to the BOP.[23]  As a result, the District's prisoner population is highly transitory:  Those awaiting trial for felonies will generally be released after the trial if acquitted or sent to the BOP if convicted, and misdemeanants will not be confined for more than one year.

### 2. Reason for Incarceration

The majority of individuals in DCDOC custody are either awaiting trial or awaiting transfer to a BOP facility.  Forty-eight percent have a felony legal matter pending, and another 10% have been sentenced to felony time (presumably awaiting transfer to a BOP facility).  Seven percent have a misdemeanor legal matter pending and are held pre-trial.  Only 11% of DCDOC prisoners are sentenced misdemeanants— individuals, not awaiting a transfer, who are serving imposed sentences in a DCDOC

---

[18] The Constitution grants legislative authority over the District to Congress.  U.S. Const. art. I, § 8, cl. 17.

[19] National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, 111 Stat. 712.

[20] D.C. Dep't of Corr., *Correctional Facilities*, http://doc.dc.gov/page/correctional-facilities.

[21] The conditions at Lorton were examined through a series of interviews with staff and prisoners in a 1990 article authored by Professor Robert Blecker of New York Law School.  *See* Robert Blecker, *Haven or Hell? Inside Lorton Central Prison: Experiences of Punishment Justified*, 42 Stan. L. Rev. 1149 (1990).

[22] D.C. Dep't of Corr., *About DOC*, http://doc.dc.gov/page/about-doc.

[23] *See infra* D.C. Dep't of Corr., *D.C. Department of Corrections' PREA, Safety and Security Report 2014*, http://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DOCPREASafetyan dSecurityReport2014.pdf.

facility.[24]  The remaining 24% of the prisoners are incarcerated for violation of parole, being held pursuant to a writ or hold, or for "other" reasons.

Of the male DCDOC prisoners, about 19% are classified as "Federal Inmates," *i.e.*, prisoners accused of violating federal law who are temporarily held in a DCDOC facility. Sixteen percent of the men being held for a D.C. Code offense are incarcerated for assault or domestic violence, 13.6% are in for a parole violation, and 9.4% are incarcerated for a burglary/robbery/carjacking.   The remaining prisoners are incarcerated for various offenses including property crimes (8.2%), drug offenses (6.6%), weapons possession (6.4%), and homicide (4%). Approximately 32% of male DCDOC prisoners are incarcerated for "violent" or "dangerous" crimes ("dangerous crimes" includes possession with intent to distribute a controlled substance).

The top two reasons for incarceration of female DCDOC prisoners are (1) assault/domestic violence and (2) parole violations, with each of the two categories accounting for 20% of the DCDOC female population.  Of female DCDOC prisoners, 13.7% are federal inmates.  Other reasons for incarceration include property crimes (7.9%), failure to appear in court[25] (6.5%), and white collar crimes[26] (5.8%).  Twenty-six percent of female prisoners are incarcerated for violent or dangerous offenses.

3.     Length of Stay and "Good Time" Credits

The average length of stay in a DCDOC facility is 179 days for male prisoners, and 94 days for female prisoners.  Under District law, prisoners[27] may earn "Good Time Credits" for completion of academic and vocational programs or rehabilitation programs; for "exceptionally meritorious service"; or "performing duties of outstanding importance in connection with institutional operations"; and for "demonstrat[ing] successful participation in one or more rehabilitation programs, work details, or special projects.[28]

One credit is equal to one full day of reduction in a sentence.  Prisoners earn one credit for completing a "program, detail, or project" that lasts twenty days or less, two credits for completing a program that lasts between twenty and twenty-six days; and

---

[24] *See id.*

[25] "Failure to appear" generally refers to an individual's failure to appear before any court or judicial officer when ordered to do so.  *See, e.g.*, D.C. Code §23-1327.

[26] "White collar crime" generally refers to financially-motivated, nonviolent crime that is often committed by government and business professionals.  *See, e.g.*, DC Code §22-3225.02 (Insurance fraud).

[27] The District's good time credit laws apply only to pretrial and subsequently sentenced misdemeanants.  Inmates charged with felonies and sentenced to more than one year of incarceration will be transferred to BOP custody and can only earn good time credits in accordance with federal law and BOP policies.

[28] D.C. Code §§ 24-221.01 to 24-221.01c.

three credits if a program lasts twenty-six days or more.[29]  There are a few limitations on the use of this policy.  First, only prisoners serving sentences for misdemeanors are eligible (however, credits can begin to accrue pre-sentencing while the individual is incarcerated).[30]  Second, credits may not reduce a prisoner's sentence by more than 15% if the conviction was for a crime of violence, and credits may not reduce the minimum sentence at all for a specified list of crimes, including certain crimes under the Controlled Substances Act.[31]  There are limitations on how many credits a prisoner may earn per month.[32]

### 4.   Parole/Supervised Release

When a D.C. Code offender[33] has served his or her minimum felony sentence, s/he may be eligible for parole.[34]  In addition to the standard parole system, the District also provides for medical parole for permanently incapacitated or terminally ill prisoners, and for geriatric release for prisoners at least sixty-five years old who have a chronic illness.[35]

The U.S. Parole Commission is vested with the authority to grant or deny parole to D.C. Code felony offenders and to revoke parole and supervised release for those under its supervision.[36]  Before August 5, 1998, the D.C. Board of Parole was responsible for making parole decisions, but its authority was transferred by the Revitalization Act.[37]

Even though D.C. Code felony offenders are transferred into the federal BOP system, the Commission applies District (rather than federal) guidelines and procedures to all D.C. Code offenders.[38]  However, the Commission has the authority to amend the

---

[29] D.C. Dep't of Corr., Program Statement 4341.1, § 10(b) (Aug. 17, 2012) (Good Time Credits).

[30] *See id.* § 10(a)-(b).

[31] *Id.* § 13(a)-(b).

[32] *Id.* § 13(d).

[33] By "D.C. Code offender," we refer to an individual who has violated a section of the D.C. criminal code, as opposed to a District resident who violated a federal law.

[34] D.C. Code § 24-404(a).

[35] *See id.* §§ 24-464, 24-465.

[36] *See* U.S. Dep't of Justice, *FAQs*, http://www.justice.gov/uspc/frequently-asked-questions#q46.

[37] *See id.*  The D.C. Board of Parole retained the authority to *revoke* parole until August 5, 2000, when that authority was also transferred to the Commission and the Board was abolished.  *Id.*; D.C. Code § 24-131(a)(1).

[38] *See* Parole FAQs.  Specifically, D.C. Code offenders are addressed in Subpart C of the Commission's manual, which is available at http://www.justice.gov/uspc/documents/uspc-manual111507.pdf.

rules, and it did so in 2000, potentially requiring prisoners to serve time beyond when they become eligible for parole until they are deemed "suitable" for parole.[39] The Commission's guidelines have been subject to challenge. For example, a class action filed by D.C. Code offenders challenges the application of the Commission's rules, arguing that the Commission's rules unconstitutionally apply retroactively to extend the length of time before prisoners will receive parole.[40]

While D.C. Code offenders are on parole, they are subject to supervision by an independent federal agency, the Court Services and Offender Supervision Agency (CSOSA).[41] CSOSA also supervises pre-trial defendants who have been released to the community.

### 5. Secure Residential Treatment Program

The Secure Residential Treatment Program (SRTP) is a residential substance abuse treatment program for individuals who have violated the terms of their parole or supervised release and who have addiction needs.[42] The benefit of the SRTP is that the participants receive substance abuse counseling and earn street-time credit, meaning that they are still considered to be on supervised release for purposes of calculating the length of their supervised release. The SRTP started as "a joint collaboration of CSOSA, the DC Government, the United States Parole Commission, and the Bureau of Prisons (BOP)" to address the needs of "chronic substance abusing, and criminally-involved DC Code offenders" and "increase their chances of successful community reintegration."[43] According to the DCDOC, the SRTP is currently operated by CSOSA and the U.S. Parole Commission, which control eligibility requirements and the content of the program.[44]

---

[39] *Id.*; *Daniel v. Fulwood*, 766 F.3d 57, 59 (D.C. Cir. Sept. 12, 2014).

[40] *See Daniel v. Fulwood*, 766 F.3d 57; *see also* Spencer Hsu, *U.S. appeals court revives parole challenge by D.C. inmates imprisoned since 1985*, The Washington Post, Sept. 12, 2014, http://www.washingtonpost.com/local/crime/us-appeals-court-revives-parole-challenge-by-dc-inmates-imprisoned-since-1985/2014/09/12/5c4a78ce-3a97-11e4-bdfb-de4104544a37_story.html.

[41] Court Services and Offender Supervision Agency for the District of Columbia, *Mission and Goals*, http://www.csosa.gov/about/mission.aspx.

[42] *See* Court Services and Offender Supervision Agency for the District of Columbia, *FAQs: Supervision Programs and Initiatives* ("Describe CSOSA's planned participation in the [SRTP]"), http://www.csosa.gov/about/faqs/programs.aspx#faq19.

[43] *Id.*

[44] D.C. Department of Corrections Response to Washington Lawyers' Committee White Paper, May 5, 2015 (hereinafter "DCDOC Response"). A draft of this report was shared with the DCDOC and, on May 5, the DCDOC provided its comments. This draft incorporates DCDOC comments, along with analysis of those comments. The DCDOC Response is included as Appendix B to this report.

Participants in the SRTP are housed for up to 180 days in a special thirty-two-bed unit at the CTF. The SRTP is administered by Phoenix House, a third-party contractor.[45]

The SRTP makes a significant difference in the lives of many of its participants and can help reduce the rate of recidivism.[46] But currently, the number of individuals who could benefit from the program far exceeds the SRTP's capacity. The SRTP is available only to men, and its limited capacity means that many individuals who might benefit from the program are unable to participate.

Those who are unable to participate in the program are held in custody and can wait months to begin participating in the program. During that time, the individuals who are held for a violation of their supervised release but who are unable to participate in the SRTP do not receive street time credit. Also, because the SRTP is operated out of the CTF, it is not available to individuals with a "High" ICS rating. As a result, individuals with a High ICS rating are put in custody at the D.C. Jail instead of being able to participate in the SRTP and will likely have their parole or supervised release revoked. They may apply for a waiver, but those waivers can take months, if they are ever granted at all.[47]

### C.   Demographics and Budget

As District leadership and community stakeholders confront the challenges presented by the conditions of confinement in the District, it is vital to consider two additional aspects of the correctional system: The system's disproportionate impact on certain populations, and its cost. In addition to the discussion in this section,

---

[45] *See* Phoenix House, *Secure Residential Treatment Program*, http://www.phoenixhouse.org/locations/metro-dc/secure-residential-treatment-program/.

[46] *See generally* Press Release, *Norton Announces the Secure Residential Treatment Program for Non-Violent Offenders Will Continue*, Congresswoman Eleanor Holmes Norton, http://norton.house.gov/media-center/press-releases/norton-announces-the-secure-residential-treatment-program-for-non.

[47] The SRTP is distinct from the Residential Substance Abuse Treatment (RSAT) program, which is available to male and female inmates in DCDOC custody. *See* D.C. Department of Corrections, *Substance Abuse Treatment at DOC*, http://doc.dc.gov/page/substance-abuse-treatment-doc. According to the DCDOC, inmates may volunteer to participate in the RSAT, join via referral or self-report, or enroll if they "have violated the terms of their probation and otherwise meet the requirements of the program." *See* DCDOC Response. The RSAT is generally a 30- to 120-day program that includes services on relapse prevention, as well as "workshops on domestic violence, parenting, fatherhood, life skills, arts, behavior modification, vocational education and health education." *Id.*; D.C. Department of Corrections, *Substance Abuse Treatment at DOC*, http://doc.dc.gov/page/substance-abuse-treatment-doc. This curriculum has been "licensed by Addiction Prevention and Recovery Administration (APRA), the regulating body for policy for substance abuse, prevention, treatment, and recovery services." DCDOC Response. Individuals who successfully complete the RSAT program are reinstated to supervision and are generally placed in a 30- to 60-day aftercare program.

demographics and cost issues are addressed in more detail in the appendix to this report.

> **Slightly less than half (49.5%) of the District's total population, but 91% of the District's prisoner population, is Black.**

The District's prisoner population is disproportionately Black and male as compared to the District's total population.   Slightly less than half (49.5%) of the District's total population, but 91% of the District's prisoner population, is Black.   By contrast, 43.4% of the District's total population, but only a small fraction (3%) of the District's prisoner population, is White.

> **And, while 92% of the DCDOC population is male, only 47% of the District's total population is male.**

And, while 92% of the DCDOC population is male, only 47% of the District's total population is male. [48]   When it comes to youth, the racial and gender disparities are even starker.

Since 2007, the District's prisoner population has declined significantly, and may well decline further as a result of District policies relating to the decriminalization of marijuana.  A report studying the District's high incarceration rate identified a lack of affordable housing, high rates of homelessness, education deficiencies, lack of access to mental health and substance abuse treatment, and high unemployment as relevant factors.[49]

## II.   RECURRING ISSUES AND PROBLEMS INVOLVING THE D.C. JAIL AND CTF

Despite the tremendous investments that the D.C. government has made in its prison system, discussed in more detail in the Appendix, the D.C. Jail and CTF continue to face significant problems.  As the following sections explain:

- The D.C. Jail's physical infrastructure appears to be crumbling and multiple inspections have revealed unsanitary conditions and non-compliance with basic standards established by national correctional authorities;

---

[48] United States Census Bureau, *State & County QuickFacts*, http://quickfacts.census.gov/qfd/states/11000.html.

[49] Justice Policy Institute, *A Capitol Concern: The Disproportionate Impact of the Justice System on Low-Income Communities in D.C.*, http://www.justicepolicy.org/images/upload/10-07_EXS_CapitolConcern_AC-PS-RD-DC.pdf.

- An independent expert found that the suicide prevention program employed at the D.C. Jail has significant shortcomings despite the fact that four prisoners recently committed suicide in the span of less than one year; and

- The CTF is not adequately providing for the needs of juveniles who are incarcerated there.

- For nearly twenty years, the CTF has been operated under contract by CCA. Continued problems at the CTF, the fact that the District's compensation to CCA appears to be 34% higher than CCA's reported average, at least as of 2013, and CCA's operational track record around the country since the beginning of the contract all strongly indicate that it would not be in the District's interests to continue to contract out CTF operations when the CCA contract expires in 2017.

### A. Crumbling physical infrastructure

#### 1. Recent reports

The District's jail facilities are not new. The CTF was opened in 1992 and has now been in operation for over twenty years.[50] The D.C. Jail was opened in 1976 and has been in operation for nearly forty years.[51] Based on discussions with DCDOC staff, as well as testimony provided to the D.C. Council by DCDOC officials, maintenance and upkeep for the D.C. Jail will continue to consume resources and may require expensive upgrades.

Inspection reports prepared by the D.C. Department of Health (DOH) paint a troubling picture of the physical condition of the D.C. Jail. The two most recent inspection reports that are available account for a September 2013 to October 2013 inspection period (the "Fall 2013 Inspection") and a February 2014 to March 2014 inspection period (the "Spring 2014 Inspection").[52] A cover letter from the DOH to the Director of the DCDOC accompanies each of the inspection reports and explains that:

> *This inspection identified areas of non-compliance with environmental requirements as defined by the American Correctional Association Standards for Adult Local Detention Facilities and the American Public Health Association Standards for Health Services Correctional Institutions.*[53]

---

[50] D.C. Dep't of Corr., *Correctional Facilities*, http://doc.dc.gov/page/correctional-facilities.

[51] D.C. Dep't of Corr., *Correctional Facilities*, http://doc.dc.gov/page/correctional-facilities.

[52] Although additional inspections likely occurred since March 2015, prior requests to obtain access to any associated reports through the FOIA process were unsuccessful.

[53] Letter from Joxel Garcia, Director, D.C. Department of Health, to Thomas Faust, Director, D.C. Department of Corrections (May 20, 2014); Letter from Joxel Garcia, Acting Director, D.C. (continued…)

The inspection reports themselves raise grave concerns. Although some of the problems could conceivably be addressed through improvements in housekeeping and sanitation or maintenance practices, others speak to larger problems with the physical infrastructure of the D.C. Jail and indicate that the facility itself—which opened nearly forty years ago—may require significant renovations or need to be replaced.



In both the Fall 2013 Inspection and the Spring 2014 Inspection, the inspector found that "the cell blocks and several common areas were not maintained in a clean and sanitary manner and in good repair."[54]   In the reports accompanying each inspection, the inspector provided a list of more than 100 problems to support this conclusion.[55] Problems that pertain to sanitation failures and a lack of routine maintenance and that could possibly be corrected through significant improvements in housekeeping practices include, for example:

"There is an active infestation of vermin/pests throughout the facility"

- "There is an active infestation of vermin/pests throughout the facility;"[56]

- There were numerous sanitation issues in the kitchen, such as unsanitary equipment and improper temperature control for refrigerated foods;[57]

- "The showers throughout the housing units were not sanitarily maintained and in good working order;"[58]

-----

Department of Health, to Thomas Faust, Director, D.C. Department of Corrections (Dec. 4, 2013).

[54] *See generally* Ralph Spencer, *Central Detention Facility Inspection Report, February 18 to March 21, 2014* (Mar. 21, 2014) (hereinafter "Spring 2014 Inspection Report"); Ralph Spencer, *Central Detention Facility Re-Inspection Report, February 18 to March 21, 2014* (Mar. 21, 2014) (hereinafter "Spring 2014 Re-Inspection Report"); Ralph Spencer, *Central Detention Facility Inspection Report, September 17 to October 11, 2013* (Oct. 18, 2013) (hereinafter "Fall 2013 Inspection Report"); Ralph Spencer, *Central Detention Facility Re-Inspection Report, September 17 to October 11, 2013* (Oct. 18, 2013) (hereinafter "Fall 2013 Re-Inspection Report").

[55] *See* Spring 2014 Re-Inspection Report, 2 - 6; Spring 2014 Inspection Report, 2 - 6; Fall 2013 Inspection Report, 2 - 6; Fall 2013 Re-Inspection Report, 2 - 7.

[56] Memorandum from Ralph Spencer, Safety and Environmental Health Specialist, to Senior Deputy Director, Health Regulation and Licensing Administration, 6 (Feb. 18, 2014 to Mar. 21, 2014) (hereinafter "Spring 2014 Spencer Memorandum"); Memorandum from Ralph Spencer, Safety and Environmental Health Specialist, to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration (Sept. 17, 2013 to Oct. 11, 2013) (hereinafter "Fall 2013 Spencer Memorandum")

[57] Spring 2014 Spencer Memorandum, 6; Fall 2013 Spencer Memorandum, 4 - 5.

- Numerous parts of the medical facility were deemed "dirty" or "damaged" and there was "a sewer odor" in some of the rooms;[59] and

- "[T]he lighting was not functioning properly" in many of the cell blocks.[60]

> **Department of Health:**
>
> **"structural and mechanical deficiencies were more prominent than environmental deficiencies"**

By contrast, other problems cited in the reports could be remedied only through significant renovations to the facility or by replacing the D.C. Jail entirely. Indeed, the Department of Health noted in its Fall 2013 Inspection that "structural and mechanical deficiencies were more prominent than environmental deficiencies,"[61] and many of those issues remained uncorrected during the Spring 2014 Inspection.[62]   Structural or mechanical deficiencies observed during the inspections, included, for example:

- "There were openings in the wall" of several cells[63] and "damaged concrete in several of the cell blocks;"[64]

- "Most of the plumbing fixtures were in different stages of disrepair;[65]

- The roof was leaking;[66]

- There was "water penetration through the walls;"[67]

---

[58] Spring 2014 Spencer Memorandum, 7; Fall 2013 Spencer Memorandum, 6.

[59] Fall 2013 Inspection Report, 4 - 5; Fall 2013 Re-Inspection Report, 4 - 5; *see also* Spring 2014 Inspection Report, 4 - 6; Spring 2014 Re-Inspection Report, 4 - 5.

[60] Fall 2013 Re-Inspection Report, 11; *see also* Spring 2014 Inspection Report, 11 ("There were several blown fluorescent tubes throughout the cell blocks and in the stairwells.").

[61] Fall 2013 Spencer Memorandum, 2.

[62] Spring 2014 Spencer Memorandum, 2.

[63] Fall 2013 Re-Inspection Report, 8; Fall 2013 Inspection Report, 2; *see also* Spring 2014 Spencer Memorandum, 9 (identifying "Openings in the wall" as a general maintenance concern).

[64] Spring 2014 Re-Inspection Report, 2; Spring 2014 Inspection Report, 2; Fall 2013 Re-Inspection Report, 8; Fall 2013 Inspection Report, 2.

[65] Fall 2013 Re-Inspection Report, 4, 12.

[66] Spring 2014 Spencer Memorandum, 2; Fall 2013 Spencer Memorandum, 2.

[67] Spring 2014 Spencer Memorandum, 2; Fall 2013 Spencer Memorandum, 2.

- Mold was growing on many of the walls;[68]

- There was "concrete separating at the corners in the gym;"[69]

- The floors, walls, and ceilings in many rooms were "damaged;"[70]

- Floor tiles in many of the rooms were missing or damaged;[71]

- There were rusted areas in the ceiling and the wall;[72]

- There were damaged and rusted windows and "damaged and missing caulk from around the window in several of the cell blocks;"[73]

- There was "peeling paint on the walls throughout the facility;"[74] and

- There was damage to the "concrete walkway around the exterior premises."[75]

The DOH emphasized the seriousness of the water leakage in particular, which it blamed for mold growth and described as "a health and safety issue which can have serious effects."[76]

---

[68] Spring 2014 Spencer Memorandum, 2; Fall 2013 Spencer Memorandum, 2.

[69] Spring 2014 Inspection Report, 2; Fall 2013 Re-Inspection Report, 2.

[70] See generally Spring 2014 Inspection Report; Spring 2014 Re-Inspection Report; Fall 2013 Inspection Report; Fall 2013 Re-Inspection Report.

[71] See generally Spring 2014 Inspection Report; Spring 2014 Re-Inspection Report; Fall 2013 Inspection Report; Fall 2013 Re-Inspection Report.

[72] Spring 2014 Inspection Report, 12; Spring 2014 Re-Inspection Report, 12; Fall 2013 Inspection Report, 12; Fall 2013 Re-Inspection Report, 12.

[73] Spring 2014 Inspection Report, 3; Fall 2013 Re-Inspection Report, 2.

[74] Spring 2014 Spencer Memorandum, 8; Fall 2013 Spencer Memorandum, 7.

[75] Spring 2014 Spencer Memorandum, 2; Fall 2013 Spencer Memorandum, 2.

[76] Fall 2013 Spencer Memorandum, 3; see also 2014 Spencer Memorandum, 10.

## 2. Persistent problems

A review of reports from ten recent inspections indicates that many issues have not been adequately addressed after being noted in prior reports.[77]  For example, in the report accompanying the Spring 2014 Inspection, the inspector noted that "[s]everal of the structural and mechanical deficiencies observed in previous inspections . . . remained outstanding."[78]  These issues include: "leaking roof, water penetration through the walls, mold growth on the walls," and "leaking damaged and or inoperable plumbing fixtures."[79]  In past reports, the Department of Health described these problems as "serious to extremely serious" and explained that some of these problems "can have a negative impact on the health and safety of the inmates and staff if they are not addressed in a timely manner."[80]

> The Department of Health described these problems as "serious to extremely serious"

However, despite the seriousness of these and other concerns, many of the same problems persisted—and in some cases deteriorated—between reports.[81]  Thus, while it is helpful that the DOH inspects the D.C. Jail on a regular basis, it is not clear that these reports are being translated into actions that significantly improve the condition of the facility.

It is standard for periodic inspections to consist of an initial inspection and a follow-up inspection to determine compliance with corrective action plans submitted by

---

[77] The ten inspections were conducted in February 2014 - March 2014; September 2013 - October 2013; April 2013 - May 2013; November 2012; May 2012 - June 2012; January 2012 - February 2012; May 2011; May 2010 - June 2010; June 2009; January 2009.

[78] Spring 2014 Spencer Memorandum, p. 2.

[79] *Id.*

[80] *See, e.g.*, Memorandum from Milton Anderson and Ralph Spencer to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration, 6 (May 18, 2010 to June 2, 2010); Memorandum from Milton Anderson and Ralph Spencer to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration, 18 (June 8, 2009 to June 19, 2009); Memorandum from Milton Anderson and Ralph Spencer to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration, 17 (Jan. 12, 2009 to Jan. 30, 2009).

[81] *See, e.g.*, Memorandum from Milton Anderson and Ralph Spencer to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration, 6 (May 18, 2010 to June 2, 2010); Memorandum from Milton Anderson and Ralph Spencer to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration, 18 (June 8, 2009 to June 19, 2009); Memorandum from Milton Anderson and Ralph Spencer to Feseha Woldu, Senior Deputy Director, Health Regulation and Licensing Administration, 17 (Jan. 12, 2009 to Jan. 30, 2009).

the facility based on the initial inspection. The DCDOC states that it is "committed to performing preventative and day to day maintenance of the CDF and CTF facilities in order to provide a clean and safe environment," and, typically, the DCDOC will have addressed or fixed at least some of the problems identified in the initial inspection by the time the follow-up inspection occurs. The DCDOC did not dispute the findings from these past reports, but noted that DOH had recently cited "noticeable improvements in the facility," and observed that "areas that were in need of repair and in poor condition during the initial inspection have improved significantly."[82] Further, the DCDOC maintained that 87% of the items identified in a March 2015 inspection have already been "abated."[83] Nonetheless, as DCDOC acknowledged, some of the issues noted in DOH inspection reports are, "due to the age and deterioration of the physical structure," "outside of DOC's control."[84]

During our tour of the D.C. Jail, we did not attempt to re-evaluate the facility or verify the findings of the environmental inspection reports. Nonetheless, we did observe that, although many parts of the facility were painted and appeared to be maintained, in other areas of the facility, paint was peeling or scratched, metal frames and hinges were rusted, the ceiling was stained and missing ceiling tiles, and piping insulation was frayed or damaged. We observed flies in the culinary area, though not to such an extent that we would term it an "infestation." We also learned that mice posed an occasional problem in dry storage. We did not observe any mice during the tour.

> The DCDOC acknowledged that it has not been able to fix certain shortcomings "due to the age and deterioration of the physical structure."

### 3.   Addressing these structural deficiencies

These DOH reports underscore the urgent need for improvements to the D.C. Jail. Many of these issues may not be easily remedied. Indeed, the DCDOC acknowledged that it has not been able to fix certain shortcomings "due to the age and deterioration of the physical structure."[85] But if District prisoners are to be housed in a facility that is clean, sanitary, and up to the minimum standards that have been established by national correctional authorities, then they must be addressed. A full examination of the potential remedies—including physical plant issues such as the replacement of aging facilities with one or more new, modern facilities—is necessary. The status quo is unacceptable.

---

[82] DCDOC Response.

[83] *Id.*

[84] *Id.*

[85] DCDOC Response.

### 4.   Additional Concerns

In a recent hearing before the Committee on the Judiciary and Public Safety, Director Thomas Faust suggested that the D.C. Jail's lack of program space makes it difficult to provide significant programming.[86]   Director Faust also stated that the facility is well-worn and that it will continue to need significant repairs.

During our tour, we discussed a number of structural issues at the facility that appear to pose current risks and may require costly improvements.

First, the D.C. Jail has four electrical generators, three of which are as old as the D.C. Jail itself, and a fourth that was transferred from the Lorton facility and was likely not new when that facility closed in 2001. Although the generators are reportedly all functioning and able to provide emergency back-up power, the current generator system is unable to provide enough power to meet all of the facility's electricity needs.   In particular, the system would not be able to support full operation of the air chillers on a hot day.   There is no indication of a security risk, but the result could be an inability to maintain reasonable temperatures in the facility.   Additionally, due to the age of the generators, parts are increasingly unavailable on the market, driving up the cost of maintenance and repair.

Second, the air handlers that control air flow and help balance temperatures in the cells were moved nearly two decades ago in an effort to increase efficiency. Unfortunately, it appears that there were fairly severe problems in the implementation of the system redesign and the current system has not been able to maintain consistent temperatures in the cellblocks.   Moreover, the air handlers are reportedly nearing the end of their useful life and replacement and attendant redesign of the structure may cost millions.

Third, the D.C. Jail relies on the D.C. General steam plant for steam, which is used for heating.   When the steam plant goes offline, as it has in the past, the D.C. Jail does not have an alternate source of steam for heat and has no control over the repair of that facility.   This lack of a contingency is concerning, particularly if a failure results in an inability to adequately heat the facility in winter.

Fourth, the D.C. Jail contains a number of structural flaws that limit its utility and cost-effectiveness.   For example, during the tour, DCDOC staff noted that one of the elevators was designed to skip a floor in the facility.   Staff were uncertain as to the original intent behind the design, but the feature is apparently no longer necessary. Nevertheless, staff must contend with an elevator that does not stop at all floors. Additionally, the 1970s facility was not designed with energy efficiency in mind, a concept that would be expected to save costs in a modern facility.

---

[86] D.C. City Council, *Public Hearing, Committee on the Judiciary* (Feb. 19, 2015), http://208.58.1.36:8080/DCC/February2015/02_19_15_Judici.mp4 (video) (testimony of Director Faust).

Fifth, although the cell blocks we toured contained common areas, the D.C. Jail appeared to have limited space available for programming.

B.    Mental Health and Suicide Prevention Practices at the D.C. Jail

**Between November 2012 and August 2013, four prisoners at the D.C. Jail committed suicide, bringing the suicide rate to three times the national average.**

Prisoners at the D.C. Jail receive on-site mental health services from the D.C. Department of Mental Health,[87] and clinicians from Unity Health Care, an outside vendor that provides a range of health care services to prisoners in DCDOC facilities.[88]   In recent years, prisoner suicides at the D.C. Jail have highlighted potential shortcomings in this mental health system.[89] Between November 2012 and August 2013, four prisoners at the D.C. Jail committed suicide, bringing the suicide rate to three times the national average.[90] At the time, the DCDOC's contract with Unity Health Care provided for certain suicide-prevention measures, including safe cells, a suicide intake protocol, and periodic suicide screening.[91]

In the midst of the dramatic increase in suicides at the D.C. Jail, the DCDOC engaged an outside consultant in mid-2013 to draft a report on suicide prevention practices within the D.C. Jail.[92]   The DCDOC also formed a Suicide Prevention Task Force (the "Task Force"), whose membership includes representatives of the Department of Corrections, Unity Health Care, the Department of Mental Health, and the Corrections Corporation of America.[93]  The Task Force took steps to correct some of

---

[87] D.C. Dep't of Corr., *Mental Health Services at DOC*, http://doc.dc.gov/page/mental-health-services-doc. Mental health services may also be provided by "community service agencies." *See id.*

[88] *See* Lindsay M. Hayes, *Report on Suicide Prevention Practices within the District of Columbia, Department of Corrections' Central Detention Facility* (Sept. 13, 2013) (hereinafter "Hayes Report").

[89] Aaron C. Davis, *Report: Rash of suicides at D.C. Jail points to deep problem with inmates' mental health care*, The Washington Post, Nov. 7, 2013, http://www.washingtonpost.com/local/dc-politics/report-rash-of-suicides-at-dc-jail-points-to-deep-problem-with-inmates-mental-health-care/2013/11/07/caecf39c-47e5-11e3-b6f8-3782ff6cb769_story.html.

[90] *Id.*

[91] D.C. Contract, DCFL-2006-D-6001 & Modifications (Unity Health Care, Inc.), Contract §§ C.3.2.3, C.3.12; *id.* at Modification 8, §§ C.3.2.4, C.3.12.7.

[92] *See generally* Hayes Report.

[93] D.C. Dep't of Corr., Office of Health Administrations, *Suicide Prevention Task Force Report* (Oct. 14, 2013) (hereinafter "Task Force Report").

the issues noted in the Hayes Report, but,[94] after an initial report in October 2013, the Task Force has not published anything further in more than a year. Nevertheless, Director Faust characterized the Task Force as "very active" in a recent hearing before the Committee on the Judiciary and Public Safety.[95]

      1.     Hayes Report

The DCDOC engaged Lindsey Hayes, an expert in the area of suicide prevention in correctional facilities, to assess the policies and practices at the D.C. Jail and to issue a report summarizing his findings (the "Hayes Report").[96] The Hayes Report found that, while the DCDOC and Unity Health Care had policies that "more than adequately cover the required components of a suicide prevention program . . . the suicide prevention *practices* for many of these required components [were] lacking in varying degrees and in need of immediate corrective action."[97] The D.C. Jail was particularly lacking in the following areas:

- *Lack of Suicide-Resistant Cells.* Hayes found that the D.C. Jail included an inadequate number of suicide-resistant cells.[98] Such cells do not include protrusions that could serve as an anchoring device for a prisoner trying to commit suicide by hanging. At the time of the assessment, the D.C. Jail included only nine suicide-resistant cells, but "there were more than nine (9) inmates on observation status each day."[99] As a result, several prisoners who were under observation for potentially suicidal behavior were housed in non-suicide resistant cells that contained "dangerous anchoring devices."[100] In response, the Hayes Report "strongly recommended that DOC officials embark upon an inspection program to ensure that prisoners on suicide precautions are housed in 'suicide-resistant' cells."[101]

- *Punitive Conditions.* Hayes found that the "precautions" taken with respect to prisoners who were possibly suicidal were "overly restrictive and seemingly punitive."[102] When prisoners were designated for "behavioral observation," they

---

[94] *See id.*

[95] D.C. City Council, *Public Hearing, Committee on the Judiciary* (Feb. 19, 2015), http://208.58.1.36:8080/DCC/February2015/02_19_15_Judici.mp4 (video) (testimony of Director Faust).

[96] *See generally* Hayes Report.

[97] *Id.* at 6.

[98] *See id.* at 23.

[99] *Id.*

[100] *Id.*

[101] *Id.* at 26.

[102] *Id.* at 24.

were isolated and "stripped of all clothing and possessions, and given only a paper gown without undergarments."[103]   While under behavioral observation, prisoners were permitted to leave their cells only for showers and legal visits, and were prohibited from using the telephone or having family visits.[104]   Hayes noted that many of these measures were counterproductive:   "Confining a suicidal inmate to their cell for 24 hours a day only enhances isolation and is anti-therapeutic."[105]   The "seemingly punitive" conditions also decreased the chances that prisoners would honestly report suicidal ideations.[106] According to Hayes, it was "obvious" that the punitive measures were premised on "a misguided belief that most inmates who threaten suicide and/or engage in self-injurious behavior are simply manipulative" and that the overly "restrictive and punitive aspects of Behavioral Observation [are meant] to deter such behavior."[107]

- *Insufficient Supervision of Potentially Suicidal Prisoners.*   Hayes was most critical of the DCDOC's use of a monitoring protocol called "behavioral observation" for suicidal prisoners instead of "Suicide Watch" or "Suicide Prevention."   Hayes found it "incredibl[e]" that, "*there were not any inmates on either Suicide Watch or Suicide Prevention status" during the three-day on-site assessment.*[108]   This is significant because while prisoners who are on Suicide Watch or Suicide Prevention would be monitored continuously or once every fifteen minutes, respectively, prisoners placed on "behavioral observation" were monitored only once every *30 to 60 minutes.*[109]   Hayes even suggested that this irregular monitoring of suicidal prisoners showed "complete unconcern for inmate safety,"[110] and that it was "obvious" that behavioral observation was being used to by-pass more regular monitoring.[111]  The Hayes Report cites one case of a prisoner who had attempted suicide on several occasions in the previous two months but was nevertheless placed on behavioral observation where he might be monitored only once every sixty minutes.[112]

- *Inadequate Training.* Hayes found that "correctional officers that are assigned to the mental health unit do *not* receive any specialized mental health and/or

---

[103] *Id.* at 23.

[104] *Id.* at 24.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 33.

[108] *Id.* at 31.

[109] *Id.* at 30, 32.

[110] *Id.* at 33.

[111] *Id.*

[112] *Id.* at 34 - 35.

suicide prevention training."[113]  The suicide prevention training program for all employees was "a 39-slide PowerPoint presentation . . . encompassing only one hour of instruction."[114]  Overall, the report concluded that "the number of hours devoted to both pre-service and annual suicide prevention training for correctional, medical, and mental health staff is inadequate, and the content of the training curricula is in need of improvement."[115]

### 2.   Suicide Prevention Task Force

In response to the increase in prisoner suicides, the DCDOC formed the Suicide Prevention Task Force to review "custodial practices related to medical and mental health issues in DOC facilities."[116]  On October 14, 2013, the Task Force published a report summarizing a recent meeting and other steps taken by the Task Force to date.[117]  In the report, the Task Force noted that, as of the date of the report, the suicide rate for the DCDOC as a whole, when accounting for the average daily population of its facilities, was "more than 3 times the average" of local jails nationwide.[118]

The report also described positive steps that the Task Force had taken to address some of the concerns outlined in the Hayes Report.  For example, the following Task Force recommendations were implemented:

- Increase the frequency of "Segregation and Intake unit checks" to at least once every fifteen minutes.[119]

- Ensure that "NO ONE is placed in a single cell unless there's an overwhelmingly compelling reason to do so."[120]

- Include a dedicated booking supervisor at intake to "monitor all high-risk inmates . . . to determine if an expedited referral to a mental health clinician is warranted."[121]

- Implement a new "Razor plan" that prohibits prisoners from accessing razors.[122]

---

[113] *Id.* at 9.

[114] *Id.*

[115] *Id.* at 10.

[116] *See* Task Force Report, 2.

[117] *See generally id.*

[118] *Id.* at 4.

[119] *Id.* at 6.

[120] *Id.*

[121] *Id.* at 5.

[122] *Id.* at 6.

- Institute a more robust four-hour suicide prevention training curriculum.[123]

In its report, the Task Force also described a set of "long-term suicide prevention strategies undergoing consideration."[124]   For example, in order to improve suicide-resistance in prisoner cells, the "DOC's Facilities team" worked on and had "nearly completed a 'suicide-resistant' cell prototype."[125]

Although the Task Force report signaled some improvements in the DCDOC's suicide prevention program, more work needed to be done beyond what was described in the October 2013 report. The DCDOC has reported that, as of May 2015, it has taken the following additional steps to improve its suicide prevention practices.

- The DCDOC reports that, as of October 2014, "all 40 designated cells have been completed and retrofitted as follows: to decrease ligature points, handles have been removed from toilets and desks, vents are covered with anti-ligature grade mesh, pick-proof, penal-grade caulking has been used in the cells, and doors have been replaced to allow for 2 clear panels that provide enhanced vision into and out of the cells."[126]

- As of May 2015, the DCDOC "provides suicide-resistant smocks and blankets."[127] In addition, "more time out of cells and the provision of more family visits and telephone access is under review."[128]

- The DCDOC reports that it "immediately discontinued "Behavior Management" status...upon receipt of the Hayes Report."  As of May 2015, the DCDOC reports that there are "two categories of observation: Suicide Watch for inmates thought to be actively suicidal and Suicide Precaution for inmates who are at risk of suicide, but less acutely compared to inmates on Suicide Watch."[129] The DCDOC states that "Inmates on Suicide Watch are placed in a safe cell on 3rd floor medical and are provided one-to-one constant monitoring by a healthcare professional," whereas "Inmates on Suicide Precaution are monitored by officers every fifteen (15) minutes in staggered intervals."[130]

---

[123] *Id.*

[124] *Id.* at 7.

[125] *Id.* at 8.

[126] DCDOC Response.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

- The DCDOC also reports that "Suicide Prevention training has been significantly enhanced."[131]  As of May 2015, "[a]ll correctional officers, other DOC staff and healthcare vendor staff must undergo four (4) hours annually of Suicide Prevention training."[132]  The DCDOC also stated that it "brought in national expert Dr. Dean Aufderheide to conduct a full day of training on self-injurious behavior issues which involved inmates with mental health issues as well as those exhibiting 'bad behavior.'"[133]  That training was attended by "[c]orrectional officers on the mental health and segregation units, as well as mental health staff."[134]

The DCDOC reports that the recommendations of the Hayes Report "have been implemented."  However, the WLC was unable to verify that this is the case.  Based on the information provided, none of these improvements make clear how prisoners who were isolated for exhibiting suicidal behavior would be treated in a manner that is less restrictive or punitive than before.  Hayes had noted that these seemingly punitive conditions were based on false assumptions and that they were actually counterproductive.  Moreover, it is not clear that the 40 designated safe cells are being made available to inmates in all cases where there may be a need.  For example, although a new inmate processing center currently under construction at the D.C. Jail contains a suicide-resistant cell, or safe cell, the existing inmate processing center (a converted housing unit) does not.  It also is not clear whether a best-practices standard has been applied to confirm that safe cells are in fact adequately suicide-resistant.  On our tour, a cell at the D.C. Jail deemed to be a safe cell appeared to be little different from a regular cell and included potentially dangerous fixtures, such as bunk beds.

Even though the D.C. Jail's recent District inmate population is well below operating capacity, the DCDOC has a practice of double-celling, or holding two people in a single cell, for the general population.  This practice was described as a suicide prevention measure.  Individuals in the mental health unit, however, are generally housed one to a cell.

C.    Issues Confronting Youth

Significant problems with the conditions of confinement for youth who are housed at the CTF were identified in a 2013 report prepared by a criminal justice consulting firm (the "Ridley

> "Juveniles at CTF have needs far greater than the services currently provided."

---

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

Report").[135]  The DCDOC operates the Incarcerated Juvenile Program at CTF, which includes youth who "have been charged in the court system as adults and are awaiting trial or currently serving their sentence."[136]  According to the Ridley Report, approximately one girl and seventy boys are processed through CTF each year, and approximately 26% of these youth have mental health issues.[137]  At the time of the onsite assessments by the Ridley Group, the CTF was housing twenty-five youth, all but one of whom were boys.

The Ridley Report found that "juveniles at CTF have needs far greater than the services currently provided."[138]  The report highlights the inadequacies of the facilities at the CTF, the excessive imposition of segregation and isolation, and the insufficient programming for juveniles.  The report also notes that boys may only visit with family members through video visitation, which can interfere with maintaining critical family bonds.  As the following analysis suggests, many of these problems are exacerbated by the fact that the DCDOC is housing an average of twenty-five youth at a facility that also houses hundreds of adults.[139]

1.    Inadequate Facility

The Ridley Report concluded that the youth's "Unit Space is inadequate for the population served."[140]  Units for youth should include "sufficient space for adequate physical exercise; provision of regular, special, and vocational education; and therapeutic programming."[141]  However, the Ridley Report found that at the CTF, the on-site "school is cramped and the unit does not have dedicated programming or recreation space."[142]  Some of the issues appear to arise from the fact that the small number of youth must be separated from the adult prisoner

> The on-site "school is cramped and the unit does not have dedicated programming or recreation space."

---

[135] Walter B. Ridley, Francis Mendez, and Ghia Ridley Pearson, *The District of Columbia Department of Corrections Correctional Treatment Facility Juvenile Unit Assessment* (2013). Mr. Ridley is a former Director of the DCDOC.

[136] *Id.* at 6.

[137] *Id.*

[138] *Id.* at 47.

[139] D.C. Dep't of Corr., *DOC Official Population Counts by Facility*, http://doc.dc.gov/node/307122; D.C. Dep't of Corr., *Quarterly Population Statistics October 2014*, http://doc.dc.gov/node/344902.

[140] Walter B. Ridley, Francis Mendez, and Ghia Ridley Pearson, *The District of Columbia Department of Corrections Correctional Treatment Facility Juvenile Unit Assessment* (2013), 9.

[141] *Id.* at 13.

[142] *Id.* at 9.

population by both sight and sound.  For example, the juveniles are permitted to use the gym and outdoor recreation facilities only when the adults are not using those facilities. The Ridley Report recommended that the DCDOC "explore whether there are unused spaces in the complex that can be used for recreation activities and or to move the unit to a larger space."[143]

### 2.    Use of Segregation

The Ridley Report, which was released in 2013, suggests that the use of isolation and segregation for youth at CTF is excessive.  Generally, youth in D.C. are not supposed to be subject to isolation for more than five days, and a hearing of the housing board is required to extend the isolation of a juvenile beyond five days.[144]  However, the Ridley Group found that in some cases "segregation had been extended multiple times," causing the "juveniles to remain in segregation for longer periods of time."[145]  Indeed, "a few juveniles reported being placed in segregation for 2 months with 1 hour of recreation daily."[146]  In response, the Ridley Report recommended that DOC adopt a

> [W]ritten policy which reflects clearly the process and procedure which ensures (a) juveniles are returned to the general population within the mandated five days of segregation/the duration of the segregation is as short as possible to address the risk to the other juveniles or (b) clear guidelines are defined and followed for segregation extensions.[147]

In addition, the report recommended that "segregation should be revoked as soon as it is considered no longer reasonable and necessary for the purpose for which it was implemented."[148]  In March 2014, Daniel Okonkwo, the Executive Director of D.C. Lawyers for Youth testified before the D.C. City Council Committee on Public Safety and the Judiciary, asserting that, as of that time, the DCDOC had "still not established and published" a written policy "that defines the procedure and requirements for imposing solitary confinement."[149]  As a result, it appeared "that there [still] is no upper limit to how long a youth can be held in solitary."[150]

---

[143] *Id.* at 13.

[144] *Id.* at 36.

[145] *Id.* at 37.

[146] *Id.* at 15

[147] *Id.* at 37.

[148] *Id.*

[149] Testimony of R. Daniel Okonkwo, Executive Director, Committee on Public Safety & the Judiciary, Performance Oversight Hearing on the Department of Corrections (Mar. 19, 2014),http://www.dcly.org/cpsj_doc_2014#_ftn2.

[150] *Id.*

Excessive use of solitary confinement is troubling because of the effect that it can have on juveniles' development. A joint report by the American Civil Liberties Union and Human Rights Watch found that "solitary confinement of young people often seriously harms their mental and physical health, as well as their development," and called for the practice to be abolished.[151] Clinical studies of the use of solitary confinement have "shown that adult prisoners generally exhibit a variety of negative physiological and psychological reactions to conditions of solitary confinement,"[152] and the "American Academy of Child and Adolescent Psychiatry has concluded that, due to their 'developmental vulnerability,' adolescents are in particular danger of adverse reactions to prolonged isolation and solitary confinement."[153]

> "Solitary confinement of young people often seriously harms their mental and physical health, as well as their development"

While the inadequate facilities and excessive use of isolation are significant problems in their own right, the Ridley Report suggested that they may be linked. Inadequate space might require corrections staff to use isolation and segregation on youth more frequently than they would if they were housed in a more appropriate facility: "Based on the fact that all juveniles are housed on one unit, at CTF, it is difficult to separate them without the use of segregation."[154]

The DCDOC has provided information on the use of administrative segregation subsequent to the release of the Ridley Report. The following chart provided by DCDOC shows the number of juveniles who were segregated over the past year (either because they were "awaiting a disciplinary hearing or placed in administrative segregation"):

---

[151] Human Rights Watch and American Civil Liberties Union, *Growing Up Locked Down: Youth in Solitary Confinement in Jails and Prisons Across the United States*, https://www.aclu.org/files/assets/us1012webwcover.pdf.

[152] American Civil Liberties Union, *Alone and Afraid*, https://www.aclu.org/files/assets/Alone%20and%20Afraid%20COMPLETE%20FINAL.pdf.

[153] *Id.* (internal citations omitted).

[154] Ridley Report, 37.

| Month | Number of juveniles |
|---|---|
| May 2014 | Six (6) |
| June 2014 | Zero (0) |
| July 2014 | Three (3) |
| August 2014 | Three (3) |
| September 2014 | Two (2) |
| October 2014 | Six (6) |
| November 2014 | Two (2) |
| December 2014 | Zero (0) |
| January 2015 | Zero (0) |
| February 2015 | Zero (0) |
| March 2015 | Five (5) |
| April 2015 | Two (2) |
| May 2015 | Zero (0) |

Further, the DCDOC provided the following information about how, as of May 2015, it uses isolation and segregation with juveniles.

- Juveniles in administrative segregation are "housed in a separate cell on the lower tier within the juvenile unit."[155]

- According to the DCDOC, those juveniles are able to "attend school through DCPS and have access to legal services, programming, counseling services, and meaningful contact with the other juvenile inmates."[156]

- In addition, "[i]f a juvenile is placed in administrative segregation . . . officers are required to do a visual security check of the juvenile every fifteen (15) minutes," and the "juvenile receives individual recreation for two (2) hours per day."[157]

As of May 2015, the DCDOC reports that, over the past year, "the average stay in segregation" is "approximately two (2) days."[158] The DCDOC states that "[j]uveniles will not be placed in segregation for longer than five (5) days unless extenuating circumstances exist."[159] It is unclear what these extenuating circumstances are or how frequently they are deemed to exist.

### 3. Insufficient Programming and Staffing

Insufficient programming for youth is a significant problem. According to the Ridley Report, "programming at the Juvenile Unit is insufficient and needs to be

---

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Id.*

expanded."[160]   The lack of programming left youth "without structured activity for the majority of the weekend."   Feedback from youth cited in the Ridley Report indicated that there "is too much down time with nothing structured to do."[161]   In addition, youth who completed their GED or high school diploma did not have any academic programming provided and were instead "assigned to detail duty for extended periods of time."[162]   With regard to re-entry programming, the Ridley Report recommended that CTF "incorporate evidence-based reentry planning as early as possibly for all juveniles from the moment they are admitted."[163]   Such programming can be critical for helping to ensure that problems do not carry over into adulthood and that the youth are best equipped to succeed when they re-enter their communities.   While the Ridley Group acknowledged that the DCDOC had "significantly expanded programming" in recent months, it stated that "there is still an opportunity to increase programming even further."[164]   According to the DCDOC, it has further expanded the juvenile program since the Ridley Report.[165]   For example, the DCDOC expanded an after-school program so that it now operates Monday through Friday.[166]

The Ridley Report also raised concerns with the staffing of the juvenile unit for youth prisoners, finding that many of the corrections officers lacked proper training.   In response, the Ridley Group recommended that "Personnel on all shifts should be trained to work with juveniles."[167]   As a recent report by D.C. Lawyers for Youth and Youth Justice acknowledged, staffing issues were at least partially attributable to the fact that a small number of boys and girls are housed at an otherwise adult facility:   "Given that youth are such a small fraction of CTF's population, it is perhaps unsurprising that CTF does not have a separate position description for hiring corrections officers to the Juvenile Unit and that the Unit sometimes utilizes relief staff who normally work with adults."[168]   The DCDOC reports that, "[a]s of September 2014, all correctional officer recruits are trained in Positive Youth Development (PYD), as well as the operational and disciplinary procedures of the Juvenile Unit."[169]   The DCDOC states that its PYD training "emphasizes building skills and assets in youth in addition to preventing

---

[160] Ridley Report, 11.

[161] *Id.*

[162] *Id.* at 12.

[163] *Id.* at 21.

[164] *Id.* at 11.

[165] DCDOC Response.

[166] *Id.*

[167] Ridley Report, 14.

[168] Campaign for Youth Justice and D.C. Lawyers for Youth, *Capital City Correction: Reforming D.C.'s Use of Adult Incarceration Against Youth*, 18, http://www.campaignforyouthjustice.org/images/pdf/Capital_City_Correction.pdf.

[169] DCDOC Response.

negative outcomes."[170]  For existing correctional staff, this PYD training will be "phased into" annual training.[171]

### 4.    Shortcomings of Video Visitation

> Not surprisingly, boys said that the video visitations "make it hard for [them] to communicate with their family members."

Contrary to the American Bar Association's Standards for Treatment of Prisoners, youth housed at the CTF are generally restricted to video visitation in lieu of in-person visitation.  Although there may be benefits to the selective implementation of video visitation, the ABA has taken the position that video visitation should not be used as a replacement for in-person visitation.[172]  However, it appears that, for youth at the CTF, video visitation *has* replaced in-person visitation, even though CTF offers in-person visits to *adults*.  The use of video visitation is particularly problematic for youth because "[a] key part of working with juveniles is being able to engage the families and help to strengthen the relationship between the juveniles and their parent/guardian."[173]  Moreover, according to a report by the Campaign for Youth Justice and D.C. Lawyers for Youth, the "visitation monitors are located in a common space, so youth have no privacy while speaking with their family members."[174]  Not surprisingly, boys said that the video visitations "make it hard for [them] to communicate with their family members."[175]

In its Standards for Treatment of Prisoners, the American Bar Association states that video visitation should not be used as a replacement for in-person visitation.[176]  And while video visitation is sometimes cited as a means to reduce the introduction of contraband into a prison, a recent study in Texas found that, after a county replaced in-

---

[170] *Id.*

[171] *Id.*

[172] *ABA Standards for Criminal Justice, Treatment of Prisoners*, http://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.authcheckdam.pdf.

[173] Ridley Report, 45.

[174] Campaign for Youth Justice and D.C. Lawyers for Youth, *Capital City Correction: Reforming D.C.'s Use of Adult Incarceration Against Youth*, 18, http://www.campaignforyouthjustice.org/images/pdf/Capital_City_Correction.pdf.

[175] Ridley Report, 15.

[176] *ABA Standards for Criminal Justice, Treatment of Prisoners*, http://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.authcheckdam.pdf.

person visitation with video visitation, there was an increase in contraband and disciplinary infractions.[177]

The DCDOC began providing some limited in-person visitation for minors in March 2014, but it appears that this has been made available to fewer than 50% of youths.[178] While applauding this development, the Committee on the Judiciary and Public Safety has requested "that the Department consider providing in-person visits to all juveniles, given the unique nature of their confinement."[179] The DCDOC reports that, as of May 2015, "juveniles who have reached the Gold Tier in the Juvenile Unit are given contact visitation with their parent or guardian once per month."[180] Whether a youth is eligible for Gold Tier is "based on several factors such as behavior, program

> **The DCDOC reports that, as of May 2015, "juveniles who have reached the Gold Tier in the Juvenile Unit are given contact visitation with their parent or guardian once per month."**

participation, and educational factors."[181] As of May 5, 2015, the DCDOC reported that eight juveniles had attained "Gold Tier" status, and that two more were expected by May 7, 2015.[182] In addition, youth inmates "are given contact visits during the holiday season in December."[183]

The use of video visitation is not confined to youth at the CTF. Since 2012, in-person visitation for prisoners at the D.C. jail has been limited to visits with lawyers or with clergy, or with others in exceptional circumstances. By all indications, the availability of video visitation is not, in itself, a concern. Indeed, it appears to provide additional opportunities for adult prisoners at the D.C. Jail to communicate with family and friends. However, video visitation should not come at the cost of heavy restrictions on in-person visitation.

---

[177] Texas Criminal Justice Coalition & Grassroots Leadership, *Video Visitation: How Private Companies Push for Visits by Video and Families Pay the Price*, http://grassrootsleadership.org/sites/default/files/uploads/Video%20Visitation%20%28web%29.pdf.

[178] Report and Recommendations of the Committee on the Judiciary and Public Safety on the Fiscal Year 2015 Budget for Agencies Under Its Purview, May 14, 2014, http://dccouncil.us/files/performance_oversight/Committee_on_the_Judiciary_and_Public_Safety.pdf.

[179] *Id.*

[180] DCDOC Response.

[181] *Id.*

[182] *Id.*

[183] *Id.*

---

# III. COSTS OF CONFINEMENT & CONTRACTED SERVICES

Over the past decade, the DCDOC's budget has averaged $141.7 million. As discussed in more detail in the Appendix, a significant percentage of the Department of Corrections budget is devoted to payment for contractual services, including the DCDOC's contracts with CCA, with the private halfway houses, and for prisoner health care.

## A. The CTF & Corrections Corporation of America

Since January 30, 1997, the District has been paying CCA both a management fee to operate the CTF and a lease payment for the CTF facility. The management fee has varied over time pursuant to a twenty-year contract, which is set to expire in 2017, but appears to have been $14.4 million for 2014.[184] When the District entered into the operations contract with CCA, the District and CCA also entered into an agreement to sell the CTF facility to CCA for $52 million.[185] The CCA was required to make initial improvements to the facility and, over the duration of the operations contract, the District agreed to pay $2.8 million each year (and a lesser amount in the final year of the contract, 2017) in lease payments in addition to paying any real estate taxes imposed on CCA as a result of ownership of the CTF.[186] At the end of the operations contract, ownership of the CTF will revert to the District.[187]

---

[184] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America (effective Jan. 30, 1997, as modified). We were able to review a copy of the operations contract and fourteen modifications, as well as the lease agreement. We were initially unable to obtain other contract documents such as the lease agreement or any modifications after modification number nine. The DCDOC referred our request for contract documents to the Office of Contracting and Procurement (OCP), which initially failed to provide any documents. Under the District's freedom of information law, we appealed that non-response to the Mayor's office. After over nine weeks and a series of follow-up communications with the Mayor's General Counsel Office, and the Mayor's Office of Legal Counsel, OCP ultimately provided documents. It should not be so difficult to obtain public documents.

[185] Lease Agreement by and between Corrections Corporation of America as Lessor and The District of Columbia as Lessee; Stephanie Mencimer, *Let's Make a Deal*, Wash. City Paper (May 9, 1997), http://www.washingtoncitypaper.com/articles/12631/lets-make-a-deal.

[186] *See id.*

[187] *See id.*; Corrections Corporation of America, *2009 Letter to Shareholders*.

1.   The Contract

The term of CCA's contract with the District is significantly longer than what CCA describes as its typical contract duration, which is typically for a term of "up to five years," with additional renewals at the option of the government.[188]

The District pays CCA in a number of ways.  As drafted, CCA's contract provided that the District's primary expense associated with CCA operation of the CTF is based on a per-prisoner daily rate that is increased by 3% annually.   In 1997, the first year of the contract, the District was required to pay CCA $70.40 per prisoner per day.[189]  Due to contract modifications, the base rate (before annual increases are figured in) has been adjusted several times.  For example, during a period in 2003, the per diem rate was dropped as low as $51.40 as part of a settlement of claims the District "may have had against [CCA] related to the Management Contract and [CCA's] alleged non-compliance, known and documented by the Department of Corrections (DOC) as of January 1, 2003."[190]  Assuming standard annual increases since the last contractual modification of the per diem, the per diem rate the District is obligated to pay in 2015 is $85.95 per prisoner per day.[191]  Based on a calculated 2014 per diem rate of $83.45, and an average adult prisoner population at the CTF during 2014 of 473, the 2014 management fee would have been roughly $14.4 million.

By way of comparison, CCA reported that, nationally, its revenue per "compensated man-day" in calendar year 2014 was $63.54, an increase over the 2013 figure of $60.57.[192]  Assuming that CCA's SEC filings reported an average rate, a degree of variation between the per diem rates of various jurisdictions due to different economic conditions and different regulatory regimes is to be expected.

Whether such variation fully explains the rates in the District's contract, which were approximately 31% higher in 2014 than the average, is unclear.[193]  However, labor costs may play a role in explaining the variation.  CCA often markets its services as

---

[188] Corrections Corporation of America, *Annual Report (Form 10-K)*, 28, http://www.sec.gov/Archives/edgar/data/1070985/000119312514072723/d664216d10k.htm.

[189] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, ¶ 7.1.

[190] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, Modification 4.

[191] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, ¶ 7.1.2; Modification 6 (setting a per diem rate of $62.09 as of February 1, 2004, to be adjusted annually thereafter).

[192] Corrections Corporation of America, *Annual Report (Form 10-K)*, 56 (Feb. 25, 2015) http://www.sec.gov/Archives/edgar/data/1070985/000119312515061839/d853180d10k.htm.

[193] This assumes a 2014 per diem rate of $83.45, which was calculated based on annual increases since Modification 6 in 2004.

leading to cost-savings, in part based on savings in expenses for labor. In states where it can operate without unions, its employee pay floor may be set by the minimum wage. By contrast, the District's contract with CCA provides that CCA must recognize the right of employees to unionize[194] and District contracts are subject to the federal Service Contract Act, which sets wage floors for various occupation codes (e.g., "Accounting Clerk II," "Pharmacy Technician," etc.) that, depending on the type of service, may be significantly higher than the federal minimum wage.[195] According to the most recent U.S. Department of Labor wage determination, the hourly wage for the occupation of "Corrections Officer" is $22.80, not including fringe benefits.[196] By way of comparison, the District's minimum wage as of the date of this report was $9.50 per hour, and the "Living Wage" for 2015 that the District requires its major contractors to pay is $13.80 per hour.[197]

Nonetheless, one of the DCDOC's plans for FY13 was to seek to re-negotiate the CTF per-diem rates, though this initiative was "discontinued due to a change in priorities" and has not been proposed in the department's FY14 or FY15 plans.[198]

In addition to regular payments based on the per diem rate, the District has paid CCA lump sum amounts on multiple occasions over the years. For example, a September 2005 contract modification included an additional payment of $960,000 in connection with a dispute between the District and CCA over a Department of Labor wage determination applicable to correctional officers, and $26 million in FY06 for prisoner bed space and a lease payment.[199]

---

[194] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, ¶5.2.4

[195] *See* 41 U.S.C. §§ 6702-6703.

[196] U.S. Dep't of Labor, *WD 05-2103 (Rev. -14)*, http://www.wdol.gov/wdol/scafiles/std/05-2103.txt.

[197] *See* D.C. Dep't of Employment Servs., *Wage and Hour Compliance*, http://does.dc.gov/service/wage-and-hour-compliance; D.C. Dep't of Employment Servs., *Living Wage Act of 2006 Fact Sheet*, http://does.dc.gov/sites/default/files/dc/sites/does/page_content/attachments/Living%20Wage%20Act%20Fact%20Sheet%202015.pdf.

[198] *See* D.C. Dep't of Corr., *FY 2013 Performance Accountability Report*, http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC_FY13PAR.pdf; D.C. Dep't of Corr., *FY 2014 Performance Plan*, http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC14.pdf; D.C. Dep't of Corr., *FY 2015 Performance Plan*, http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC15.pdf.

[199] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, Modifications 7-8.

For calendar year 2014, CCA reported that its operating margin was 29.7%, slightly up from the 29.4% margin it achieved in 2013.[200]

One cost to the District is for a building and equipment lease between the District and CCA for the CTF. CCA reports that it expects to receive a minimum of $2.8 million each year in rental income for 2014-2016 and an additional $694,000 in 2017, the last year of its current contract.[201]

CCA has been involved in lawsuits and investigations over the years, including an agreement to pay the State of Idaho $1 million as a result of "contractual disputes related to staffing at the Idaho Correction Center."[202] CCA is also being investigated by the Federal Bureau of Investigation (FBI) in connection with its actions at the Idaho facility, which has reportedly been referred to by prisoners as "Gladiator School."[203] The FBI is investigating whether CCA violated federal law prohibiting fraud following CCA's apparent acknowledgment that it violated its contract with the state by understaffing the facility "by thousands of hours" and that CCA's employees "falsified reports to cover up the vacancies."[204]

CCA has acknowledged that, "[t]he operation of correctional and detention facilities by private entities has not achieved complete acceptance by either governments or the public," that "[t]he movement toward privatization of correctional and detention facilities has also encountered resistance from certain groups," and that "negative publicity about an escape, riot or other disturbance or perceived poor operational performance, contract compliance, or other conditions at a privately managed facility may result in adverse publicity to [CCA] and the private corrections industry in general," any of which may "make it more difficult for [CCA] to renew or maintain existing contracts or to obtain new contracts."[205]

---

[200] Corrections Corporation of America, *Annual Report (Form 10-K)*, 56, http://www.sec.gov/Archives/edgar/data/1070985/000119312515061839/d853180d10k.htm.

[201] Corrections Corporation of America, *Annual Report (Form 10-K)*, F-20, http://www.sec.gov/Archives/edgar/data/1070985/000119312514072723/d664216d10k.htm

[202] Corrections Corporation of America, *Annual Report (Form 10-Q)*, 18, http://www.sec.gov/Archives/edgar/data/1070985/000119312514300102/d755063d10q.htm.

[203] *See id.*; Rebecca Boone, *APNewsBreak: FBI investigates prison company*, Associated Press, March 7, 2014, http://bigstory.ap.org/article/apnewsbreak-fbi-investigates-prison-company-cca.

[204] Rebecca Boone, *APNewsBreak: FBI investigates prison company*, Associated Press, March 7, 2014, http://bigstory.ap.org/article/apnewsbreak-fbi-investigates-prison-company-cca.

[205] Corrections Corporation of America, *Annual Report (Form 10-K)*, 27-28, http://www.sec.gov/Archives/edgar/data/1070985/000119312514072723/d664216d10k.htm.

### 2. Profile of CCA and its relationship with the District

CCA, founded in 1983, is a publicly traded real estate investment trust, and is the oldest and largest private prison company in America.[206] Because CCA's contract is set to expire in 2017, it is appropriate to consider events involving CCA that have occurred since 1997, when the contract was signed. The DCDOC itself apparently planned to conduct a cost/benefit analysis of continuing a privatized model for the CTF or returning management to the District in FY12 and FY13, but this initiative was at first delayed due to "an incredible backlog of critical DOC procurements at [the Office of Contracting and Procurement]," and ultimately "discontinued due to a change in priorities."[207]

CCA "owns or controls 52 correctional and detention facilities and manages 13 additional facilities owned by [its] government partners, with a total design capacity of approximately 86,500 beds in 20 states and the District of Columbia."[208] In 2013, CCA reported revenue of approximately $1.69 billion.[209]



Source: "See CCA's Nationwide System of Correctional Centers,"
CCA.com, http://www.cca.com/locations.

---

[206] *See* Matt Stroud, *The Private Prison Racket*, POLITICO Magazine, Feb. 24, 2014, http://www.politico.com/magazine/story/2014/02/private-prison-racket-103893.html#.VCXP12ddV8E.

[207] *See* D.C. Dep't of Corr., *FY 2013 Performance Accountability Report*, http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC_FY13PAR.pdf ; D.C. Dep't of Corr., *FY 2012 Performance Accountability Report*, http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC_FY12PAR.pdf ; D.C. Dep't of Corr. *FY 2012 Performance Plan*, http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DOC12.pdf.

[208] Corrections Corporation of America, *CCA Announces 2014 First Quarter Financial Results*, News Release, May 7, 2014, http://ir.correctionscorp.com/phoenix.zhtml?c=117983&p=irol-newsArticle&ID=1928425&highlight=.

[209] Corrections Corporation of America Revenue & Earnings Per Share (EPS), NASDAQ, http://www.nasdaq.com/symbol/cxw/revenue-eps.

In 1997, CCA contracted with the District to "operate, maintain and manage the CTF" for a term of 20 years.[210]  In the event that CCA fails to comply with the provisions in its contract, federal or state and local requirements and laws, the District may terminate its contract with CCA after allowing a 30 day cure period.[211]  However, "if any action, or failure to act, by [CCA] results in any risk to the safety or welfare of the prisoners assigned to the CTF, the staff of the CTF or the general public, the District may immediately initiate the action it deems appropriate to eliminate or reduce such risk, including assumption of the operation of the CTF."[212]

> **In 1997, CCA contracted with the District to "operate, maintain and manage the CTF" for a term of 20 years.**

CCA, along with other private prison companies, has been the subject of much criticism.  Joshua Miller, a labor economist with the American Federation of State, County and Municipal Employees, asserted that the private corrections model was "structurally flawed" because "[t]he profit motive drastically changes the mission of corrections from public safety and rehabilitation to making a quick buck."[213]  Public criticisms of CCA generally fall into two categories:  (1) Allegations that CCA provides substandard services resulting in harm to both prisoners and prisoners, and (2) Allegations that CCA supports policy measures that have the effect of keeping more people in prison and for longer periods of time.

### a)    Allegations of substandard services

The first criticism stems, in part, from a number of instances where CCA employees reportedly exhibited misconduct.  For example, in 2006, a former CCA corrections officer admitted to "putting human waste in an inmate's drinking jug" after the company was sued by four prisoners alleging that they were forced to eat food contaminated with urine and feces.[214]  Reportedly, "[o]ne of many instances of prisoner sexual abuse" occurred in a Texas CCA facility where a CCA employee "was found guilty of sexually abusing at least eight female immigrant detainees while

> **In Idaho, the state's largest prison was given the nickname "Gladiator School" because of its violent reputation.**

---

[210] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America (1997).

[211] *Id.* at 9.1-9.3.

[212] *Id.* at 9.3

[213] Grassroots Leadership, *The Dirty Thirty: Nothing to Celebrate About 30 Years of Corrections Corporation of America*, 4, http://grassrootsleadership.org/sites/default/files/uploads/GRL_Dirty_Thirty_formatted_for_web.pdf.

[214] Kelli Kennedy, *Human Waste Put in Food, Ex-inmates Claim*, Associated Press, Mar. 12, 2006, http://www.highbeam.com/doc/1P1-119683145.html/.

transporting them in a van alone."[215]  In 2007, a Justice Department survey of local jails showed that a CCA facility in New Mexico had "the highest rate of sexual victimization (13.4 percent), more than four times the national average," and "the highest rate of staff-on-inmate sexual victimization — 7 percent, as compared with a national average of around 2 percent."[216]  Additionally, CCA facilities have seen numerous escapes, mistaken releases, and riots.[217]  In Idaho, the state's largest prison was given the nickname "Gladiator School" because of its violent reputation, allegedly caused by understaffing.[218] After multiple lawsuits and an Associated Press investigation revealing that records had been falsified in order to meet minimum staffing requirements, the Federal Bureau of Investigation announced that it was investigating CCA "and looking at whether various federal fraud statutes were violated and possibly other federal statutes connected with the fraud."[219]

At the District's CTF, there have been a series of instances where CCA corrections officers and guards allegedly accepted bribes to smuggle contraband (including cash, electronic items, cigarettes, and drugs) to prisoners.  In 2002, four guards were indicted on charges that they smuggled drugs, pagers and cash to prisoners in exchange for bribes.[220]  In 2010, another CCA correctional officer pled guilty to bribery for accepting

---

[215] Grassroots Leadership, *The Dirty Thirty: Nothing to Celebrate About 30 Years of Corrections Corporation of America*, 5, http://grassrootsleadership.org/sites/default/files/uploads/GRL_Dirty_Thirty_formatted_for_web.pdf.

[216] James Ridgeway, *Ex-Con Shareholder Goes After World's Biggest Prison Corporation*, Mother Jones, May 10, 2012, http://www.motherjones.com/politics/2012/05/ex-con-alex-friedmann-cca-private-prison-rape.

[217] Grassroots Leadership, *The Dirty Thirty: Nothing to Celebrate About 30 Years of Corrections Corporation of America*, 5-9, http://grassrootsleadership.org/sites/default/files/uploads/GRL_Dirty_Thirty_formatted_for_web.pdf.

[218] Rebecca Boone, *FBI investigates prison company*, Associated Press, Mar. 7, 2014, http://www.nydailynews.com/news/national/fbi-takes-investigation-idaho-gladiator-school-article-1.1714357.

[219] *Id.*

[220] Grassroots Leadership, *The Dirty Thirty: Nothing to Celebrate About 30 Years of Corrections Corporation of America*, 5, http://grassrootsleadership.org/sites/default/files/uploads/GRL_Dirty_Thirty_formatted_for_web.pdf.

money to smuggle an iPod and cigarettes to prisoners.[221]  More recently, in April 2014, two CCA corrections officers were arrested and charged on similar bribery charges.[222]

Also, in 2010, two former CTF prisoners sued the District of Columbia and CCA for civil rights violations alleging that CCA employees "preyed on them sexually and banished them to solitary lockdown when they complained."[223]  One of the female prisoners alleged that a CCA officer paid her "sugar daddy," who was on the outside, and then demanded sex from the prisoner.

### b)  CCA lobbying efforts and political contributions

In its Annual Report filed with the Securities and Exchange Commission, CCA includes the following which it classifies as a "forward-looking statement":

*Our ability to secure new contracts to develop and manage correctional and detention facilities depends on many factors outside our control. Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. This possible growth depends on a number of factors we cannot control, including crime rates and sentencing patterns in various jurisdictions, governmental budgetary constraints, and governmental and public acceptance of privatization. The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them. Immigration reform laws are currently a focus for legislators and politicians at the federal, state, and local level. Legislation has also been proposed in numerous jurisdictions that could lower minimum sentences for some non-violent crimes and make more inmates eligible for early release based on good behavior. Also, sentencing alternatives under consideration could*

---

[221] Dep't of Justice, U.S. Attorney's Office District of Columbia, *Former Correctional Officer Sentenced in Bribery Case*, News Release, http://www.justice.gov/usao/dc/news/2010/jul/10-171.pdf.

[222] Federal Bureau of Investigation, *Corrections Officer Arrested on Federal Bribery Charge*, Press Release, http://www.fbi.gov/washingtondc/press-releases/2014/corrections-officer-arrested-on-federal-bribery-charge; Keith L. Alexander, *Second guard at D.C. jail charged with bribery in smuggling contraband*, The Washington Post, Apr. 30, 2014, http://www.washingtonpost.com/local/crime/second-guard-at-dc-jail-charged-with-bribery-in-smuggling-contraband/2014/04/30/260e88e4-d0ad-11e3-9e25-188ebe1fa93b_story.html.

[223] Tim Hull, *Women Call Private Prison Guards Predators*, Courthouse News Service, Feb. 23, 2010, http://www.courthousenews.com/2010/02/23/24939.htm.

put some offenders on probation with electronic monitoring who would otherwise be incarcerated. Similarly, reductions in crime rates or resources dedicated to prevent and enforce crime could lead to reductions in arrests, convictions and sentences requiring incarceration at correctional facilities. Our policy prohibits us from engaging in lobbying or advocacy efforts that would influence enforcement efforts, parole standards, criminal laws, and sentencing policies.[224]

Except for the last sentence, the above statement, or one substantially similar to it, appears on every CCA annual SEC filing for the last ten years.  However, not until FY11 does the final sentence, setting forth CCA's position as to lobbying with regard to criminal justice policy, appear.

Consistent with this timing (perhaps coincidentally), in 2011 CCA ended its membership with the American Legislative Exchange Council (ALEC), of which CCA had been a corporate member for over twenty years.[225] ALEC, by its own description, is a nonprofit organization that "works to advance limited government, free markets and federalism at the state level" through the partnership of private entities, the general public, and state legislators.[226] While CCA was a member of ALEC, it served on ALEC's Criminal Justice task force (later called the Public Safety & Elections task force) that developed model legislation[227] for what has been called "some of the toughest sentencing laws on the books today[:] . . . mandatory minimums for non-violent drug offenders, 'three strikes' laws, and 'truth in sentencing' laws."[228]

The so-called "truth in sentencing" (TIS) laws refer to practices "designed to reduce the apparent disparity between court-imposed sentences and the time offenders actually serve in prison."[229]   Such policies are particularly relevant to D.C., where

---

[224] Corrections Corporation of America, *Annual Report (Form 10-K)*, 29, http://www.sec.gov/Archives/edgar/data/1070985/000119312514072723/d664216d10k.htm#tx664216_1a.

[225] Bog Ortega, *Arizona prison businesses are big political contributors*, Sept. 4, 2011, http://www.azcentral.com/news/articles/2011/09/04/20110904arizona-prison-business-politics.html.

[226] American Legislative Exchange Council, "About ALEC," http://www.alec.org/about-alec/.

[227] Additionally, through ALEC, the CCA was reportedly able to review and give its approval for draft legislation that would later become Arizona's controversial SB 1070.  The CCA's interest in such legislation would likely be heightened given that CCA "is the nation's largest detainer of immigrants."  *See* Harvey Silverglate and Kyle Smeallie, *Freedom watch: Jailhouse bloc*, The Phoenix, Dec. 9, 2008, http://thephoenix.com/Boston/News/73092-Freedom-watch-Jailhouse-bloc/?page=3.

[228] Mike Elk and Bob Sloan, *The Hidden History of ALEC and Prison Labor*, The Nation, Aug. 1, 2011, http://www.thenation.com/article/162478/hidden-history-alec-and-prison-labor#.

[229] Katherine J. Rosich and Kamala Mallik Kane, *Truth in Sentencing and State Sentencing Practices,* NIJ Journal No. 252, http://nij.gov/journals/252/Pages/sentencing.aspx.

statutes limit prisoners' use of good time credits and eligibility for parole. ALEC's Criminal Justice Task Force reportedly drafted a model TIS bill—CCA was a member of the task force at the time.[230] In 1994, Congress passed the Violent Crime Control and Law Enforcement Act which, among other things, offered federal grant money for states and the District of Columbia to "expand their prison capacity if they imposed TIS requirements on violent offenders." In order to qualify for this grant funding, states and the District of Columbia were required to "have or pass laws requiring serious violent offenders to serve at least 85 percent of their imposed sentences in prison."[231] That same year, the District of Columbia enacted the Omnibus Criminal Justice Reform Amendment Act of 1994, D.C. Law 10-151 which, among other things, prevented good time credits from reducing the minimum sentence of someone convicted of a crime of violence by more than 15%, and prevented persons convicted of violent offenses from being paroled prior to serving 85% of the minimum sentence imposed.[232]

Additionally, numerous reports have indicated that CCA has lobbied for policies affecting criminal statutes and sentencing. In 2008, The Phoenix reported that CCA "spent more than $2.7 million from 2006 through September 2008 on lobbying for stricter laws."[233] The Associated Press reported that in CCA spent about half a million dollars in the first half of 2010 "lobbying federal officials." Targets of CCA's lobbying efforts included Congress, the Department of Homeland Security, the U.S. Marshals Service and U.S. Immigration & Customs Enforcement.[234] The chart below details the amount of money CCA has spent on federal lobbying efforts each year from 1998 until 2014.

> In its self-published Political Activity Report, CCA reported that it and its consultant lobbyists spent approximately $2.7 million "in fees and other expenditures related to lobbying on behalf of CCA at the Federal, state and local levels."

---

[230] Karen Olsson, *Ghostwriting the Law,* Mother Jones, September/October 2002 Issue, http://www.motherjones.com/politics/2002/09/ghostwriting-law.

[231] Katherine J. Rosich and Kamala Mallik Kane, *Truth in Sentencing and State Sentencing Practices,* NIJ Journal No. 252, http://nij.gov/journals/252/Pages/sentencing.aspx.

[232] U.S. Dep't of Justice, National Institute of Corrections Information Center, *State Legislative Actions on Truth in Sentencing: A Review of Law and Legislation in the Context of the Violent Crime Control and Law Enforcement Act of 1994,* 34, http://static.nicic.gov/Library/012259.pdf.

[233] Harvey Silverglate and Kyle Smeallie, *Freedom watch: Jailhouse bloc,* The Phoenix, Dec. 9, 2008, http://thephoenix.com/Boston/News/73092-Freedom-watch-Jailhouse-bloc/?page=3.

[234] *Corrections Corp. spent $240,000 on 2Q lobbying,* Associated Press, Sept. 1, 2010, http://www.businessweek.com/ap/financialnews/D9HVBLM80.htm.



Source: "Client Profile: Summary, 2013," OpenSecrets.org,
https://www.opensecrets.org/lobby/clientsum.php?id=D000021940&year=2013.

However, as the above chart only involves expenditures on the federal level, it does not tell the whole story. Most of CCA's lobbying expenditures occur on the state and local level. In its self-published Political Activity Report, CCA reported that it and its consultant lobbyists spent approximately $2.7 million "in fees and other expenditures related to lobbying on behalf of CCA at the Federal, state and local levels." Of that sum, $1.1 million was attributable to lobbying on the federal level, and $1.6 million was attributable to state and local activities.[235]

> **CCA has spent over $7 million in its lobbying efforts to prevent private prisons from being subjected to the same public disclosure requirements as public prisons.**

CCA has invested significant resources in lobbying against several incarnations of the Private Prison Information Act (PPIA)—an act that has been introduced in Congress multiple times over the course of several years and which would essentially subject private prisons to the requirements of the Freedom of Information Act. CCA spent $1.84 million lobbying against the PPIA of 2007, $1.48 million lobbying against the PPIA of 2009, and $3.85 million lobbying against the PPIA of 2011.[236] Thus, since 2007, CCA has spent over $7 million in its lobbying efforts to prevent private prisons from being subjected to the same public disclosure requirements

---

[235] *See* Corrections Corporation of America, *CCA Political Activity and Lobbying Report 2013*, 6, http://ir.correctionscorp.com/phoenix.zhtml?c=117983&p=irol-politicalcontributions_pf.

[236] OpenSecrets, *Corrections Corporation of America, Bills Lobbied, 2007*, https://www.opensecrets.org/lobby/clientbills.php?id=D000021940&year=2007.

as public prisons. We note, however, that in recent years, CCA's lobbying disclosures have consistently included the following disclaimer:

> CCA DOES NOT LOBBY FOR OR AGAINST ANY POLICIES OR LEGISLATION THAT WOULD DETERMINE THE BASIS FOR AN INDIVIDUAL'S INCARCERATION OR DETENTION.[237]

It is not clear whether this statement is intended to cover lobbying efforts by any other organization to which CCA may provide financial support. For example, due to disclosure rules for certain entities, such as 501(c)(4) social welfare organizations, whether CCA supports other organizations that in turn have expressed views regarding legislation may not be publicly available information.

Over the years, CCA has also made substantial political contributions on both the federal and state levels. In 2013, CCA and its political action committee CCA PAC, contributed a total of $875,350—including contributions to (i) federal candidates, parties and committees; (ii) state/local candidates, parties, and committees; and (iii) 527 organizations ("political organizations" under 26 U.S.C. § 527).[238] With regard to District political elections, CCA has made contributions to the campaigns of several candidates running for City Council and Mayor, with such contributions occurring in 2002, 2006, 2008, and 2009, and totaling $4,500.[239] A CCA subsidiary, CCA of Tennessee, LLC, actually exceeded the CCA's contribution rate by contributing over $7,000 in District races in the last five years, [240] and another $5,000 to a mayoral inaugural committee.[241] None of these figures include direct contributions to candidates by the officers or employees of the CCA or a CCA subsidiary.

---

[237] *See, e.g.*, Corrections Corporation of America Lobbying Report 2013, Q2 (4/1-6/30), http://soprweb.senate.gov/index.cfm?event=getFilingDetails&filingID=1699C3FE-3358-4854-A8D5-BAE4143E294A&filingTypeID=60.

[238] *See* Corrections Corporation of America, *CCA Political Activity and Lobbying Report 2013*.

[239] District of Columbia Office of Campaign Finance, *Contribution & Expenditure Search*, http://www.ocf.dc.gov/dsearch/searchresulteon.asp?mf1=&ml1=&ms1=&mc1=corrections%20corp&mo1=N&xa=&sa=&ea=&ca=N&sc=&mf3=&ml3=&ms3=&mc3=&mf4=&ml4=&ms4=N&d1=0&m1=0&y1=0&d2=0&m2=0&y2=0&d3=0&m3=0&y3=0&m05=N&sc5=&sr=6&ob1=agyname&ob2=&ob3=&type=pcc&searchtype=org.

[240] District of Columbia Office of Campaign Finance, *Contribution & Expenditure Search*, http://www.ocf.dc.gov/dsearch/searchresulteon.asp?mf1=&ml1=&ms1=&mc1=cca%20of%20tennessee&mo1=N&xa=&sa=&ea=&ca=N&sc=&mf3=&ml3=&ms3=&mc3=&mf4=&ml4=&ms4=&mo4=N&d1=0&m1=0&y1=0&d2=0&m2=0&y2=0&d3=0&m3=0&y3=0&m05=N&sc5=&sr=6&ob1=agyname&ob2=&ob3=&type=pcc&searchtype=org.

[241] District of Columbia Office of Campaign Finance, *Contribution & Expenditure Search*, http://www.ocf.dc.gov/dsearch/searchresulteon.asp?mf1=&ml1=&ms1=&mc1=cca%20of%20tennessee&mo1=N&xa=&sa=&ea=&ca=N&sc=&mf3=&ml3=&ms3=&mc3=&mf4=&ml4=&ms4=&mo4=N&d1=0&m1=0&y1=0&d2=0&m2=0&y2=0&d3=0&m3=0&y3=0&m05=N&sc5=&sr=6&ob1=agyname&ob2=&ob3=&type=pcc&searchtype=org.

B.     Unity Health Care

Between July 19, 2006, and September 30, 2013, the District paid approximately $185 million for health care services for District prisoners, or about $26 million per year.[242]  The contract with Unity is based on a fixed-price model, in which the cost is not dependent upon the prisoner population or number of individuals treated.[243]

The prisoner population at the D.C. Jail and the CTF "is highly transient and exhibits a wide array of serious health problems, including tuberculosis, HIV/AIDS, sexually transmitted diseases, and mental illness."[244]  Prisoners are provided with medical care through a contract with Unity Health Care, Inc. (Unity).[245]

Unity has been providing medical care services to District prisoners since 2006.[246]  This arrangement represented a change for CTF prisoners.  Originally, the contract between the District and CCA contemplated that CCA would provide medical services to prisoners, and that CCA would be responsible for a range of both outpatient and inpatient costs.[247]  Six years into the contractual arrangement, in January 2003, the District and CCA modified their contract to begin transferring responsibility for the provision of medical care back to the District.  During the transition, the District initially agreed to pay CCA for the subcontracted services of the Center for Correctional Health and Policy Studies, Inc. while it negotiated its own contract with a medical provider without CCA as an intermediary.[248]  That same contract modification included a reduction in CCA's compensation "as full and final settlement of any and all claims the District may have against the Operator related to the Management Contract and Operator's alleged non-compliance."[249]  In April 2003, the District took over

---

[242] D.C. Contract, DCFL-2006-D-6001 & Modifications (Unity Health Care, Inc.).  Based on the contract documents, the annual cost did not consistently increase each year over the life of the contract; the contract cost for FY13 (Oct. 1, 2012, through Sept. 30, 2013) was $23.6 million.

[243] See D.C.-Unity Health Care, Inc. Contract, ¶ B.2 (2006); Letter from Mayor Vincent Gray to The Honorable Phil Mendelson, Chairman, Council of the District of Columbia (Sept. 24, 2013), http://dcclims1.dccouncil.us/images/00001/20130925162240.pdf.

[244] D.C.-Unity Health Care, Inc. Contract, ¶ C.2 (2006).

[245] DOC, FAQs, http://doc.dc.gov/page/doc-frequently-asked-questions

[246] Unity Health Care, Inc., About Unity Health Care / Our History, http://www.unityhealthcare.org/AboutHistory.html.

[247] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, ¶ 5.4.5.

[248] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, Modification 3, at 3.

[249] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, Modification 3, at 4.

responsibility for providing both medical services and all food services to CTF prisoners.[250]

The District has been developing a new contract model for health care services that moves away from a fixed price model to a mixed compensation model that would account for volume of services rendered.[251] Initially, then Mayor Gray transmitted a proposed contract for services with Corizon Health, Inc.[252] However, concerns were raised about the firm,[253] and Mayor Gray withdrew the contract from consideration by the Council.[254] Mayor Bowser asked the Council to revisit the proposal and, on April 14, 2015, the D.C. Council voted against awarding the contract to Corizon.[255] While the District continues procurement of a new long-term contract, it appears that Unity continues to provide health care pursuant to short-term extensions of its contract.

### C.   Halfway Houses

As noted, until recently, the DCDOC contracted with four separate, privately-owned and operated halfway houses in the District:   Efforts From Ex-Convicts; Extended House, Inc.; Fairview; and Hope Village.[256]   The District no longer contracts

---

[250] Operations and Management Agreement by and between The District of Columbia and Corrections Corporation of America, Modification 4.

[251] *See* Letter of Mayor Vincent Gray to The Honorable Phil Mendelson, Chairman, Council of the District of Columbia (Dec. 8, 2014), http://lims.dccouncil.us/Download/33020/CA20-0548-Introduction.pdf.

[252] *See id.* D.C. Office of Contracting and Procurement, *Determination and Findings for a Sole Source Extension of Contract* (Contract CW2669, Unity Health Care, Inc.) (unsigned), http://app.ocp.dc.gov/intent_award/D_F/DF_SS_UnityHealth_DOC_022515.pdf (proposing a payment of $5.9 million for services rendered during a three-month period between April 1, 2015, and June 30, 2015).

[253] *See, e.g.*, Human Rights Defense Center, Letter, *Contract with Corizon for Medical Care at D.C. Jail* (Dec. 13, 2014), https://www.prisonlegalnews.org/media/publications/Letter%20to%20DC%20councilmember s%202014%20Chairman.pdf.

[254] *See* Mike DeBonis, *Gray halts D.C. Council vote on controversial pick for jail contract*, Wash. Post (Dec. 16, 2014), http://www.washingtonpost.com/local/dc-politics/gray-halts-dc-council-vote-on-controversial-pick-for-jail-contract/2014/12/16/93e9057e-855c-11e4-9534-f79a23c40e6c_story.html.

[255] Abigail Hauslohner, *D.C. Council rejects Corizon Health contract after lobbying battle*, Wash. Post (Apr. 14, 2015), http://www.washingtonpost.com/local/dc-politics/dc-council-rejects-corizon-health-contract-after-lobbying-battle/2015/04/14/b784c8e2-e222-11e4-81ea-0649268f729e_story.html.

[256] D.C. Dep't of Corr., *FY 2013 Performance Accountability Report*, at 1 (Jan. 2014).

with Efforts From Ex-Convicts.[257]  Each of the other three halfway houses received a contract with a maximum value of $990,000 for a one-year period ending on August 13, 2015.[258]  The halfway houses serve as an alternative to incarceration for individuals awaiting trial and for sentenced misdemeanants.  The goal of halfway houses is to provide a number of important services designed to help residents with educational, professional, and interpersonal skills, as well as providing support for residents' mental and physical health and wellbeing.[259]

Unfortunately, reports of inadequate services and safety concerns point to a need for a review of the capabilities and performance of the District's contract facilities.  For example, an op ed by a Washington Post editor reported in 2013 that, of the approximately 2,000 offenders "return[ed] to the District each year after their release from incarceration, . . . half are re-arrested within three years," a statistic that casts doubt on whether the halfway houses are indeed "helping ex-offenders adjust" to life outside.[260]

# IV. Looking Forward

Based on our review of the conditions of confinement for District prisoners, we believe a number of steps are urgently needed to address deficiencies ranging from physical infrastructure to training, availability of programming, and oversight.  Due to the nature of the problems and the measures needed to resolve them, it is apparent that efforts to move forward should be carried forward by the Mayor and City Council.  We believe these proposed steps are consistent with the DCDOC's expressed "commit[ment] to improving operations and achieving the status of a benchmark correctional agency."[261]  For each of these following recommendations, we strongly encourage active, good-faith collaboration by all stakeholders.  Effective solutions will require input from advocates, lawyers, corrections and law enforcement personnel, and politicians.  The goal of this report is not to dictate specific solutions, but to continue the Washington Lawyers' Committee's efforts to address criminal justice issues writ large, and to begin a series of much needed conversations about the District's approaches to confinement.

---

[257] *See* D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, C-37, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_1_web.pdf.

[258] *See* D.C. Contracts CW 30866 (Extended House), CW 30868 (Hope Village), and CW30870 (Fairview - Reynolds & Associates); *see also* D.C. Office of Contracting & Procurement, *Contract Awards Notification Report*, http://app.ocp.dc.gov/RUI/information/award/search.asp.

[259] D.C. Dep't of Corr., *Correctional Facilities*, http://doc.dc.gov/page/correctional-facilities.

[260] Justin Moyer, *To some, D.C. halfway house is more like 'Hopeless Village'*, The Washington Post, Aug. 29, 2013, http://www.washingtonpost.com/opinions/2013/08/29/cd282a86-f4c1-11e2-9434-60440856fadf_story.html.

[261] DCDOC Response.

---

A.   **Recommendation 1:  Close the D.C. Jail and the CTF and construct a new, safer, more effective facility**

This report identifies serious recurring and structural problems at the D.C. Jail and the CTF.  The D.C. Jail is suffering from degraded infrastructure, as evidenced by recurring plumbing problems and holes in the walls, and insufficient protections for those under observation due to suicide risk.  Although we have less information about the condition of the CTF's physical infrastructure, problems associated with the juvenile unit, including space and difficulty providing in-person visitation, and with the Secure Residential Treatment Program, indicate that the CTF is not well-designed for the specialized populations it contains.

Rather than invest considerable resources in a significant overhaul of both the D.C. Jail and the CTF, the District should be proactive and design a new facility or facilities designed to meet modern correctional facility standards, with the flexibility to handle the District's prisoner populations, and which will be easier to maintain.

Additionally, the trends in the District's prisoner population, as well as changes to the District's drug policy, necessitate a reevaluation of the District's true correctional needs.  A new facility could be designed to address the prisoner population the District expects to have, and provide for the different prisoner populations, including men and women, those awaiting trial, those post-conviction awaiting transfer to the BOP, parole violators, juveniles of both sexes, individuals within each population who have special physical or mental health needs (including suicide monitoring), and individuals of all ages and gender who could benefit from substance abuse programming such as the SRTP.

B.   **Recommendation 2:  Expand the Secure Residential Treatment Program**

The SRTP should be expanded.  First, women should be able to participate.  In addition, CSOSA and the U.S. Parole Commission should ensure that more than thirty-two beds are dedicated to the SRTP and make the program available for individuals with a "high" ICS rating.

C.   **Recommendation 3:  Correct deficiencies in suicide prevention and youth confinement**

Significant work has already been undertaken by the DCDOC to assess the conditions of, and identify problems in the DCDOC's juvenile unit and mental health and suicide programs through the Hayes Report and Ridley Report.  Although the DCDOC takes the position that it has addressed the issues outlined in the Hayes Report, more work should still be done.  The DCDOC should invite independent third party assessment, such as a review by Hayes, as to whether the issues identified in the Hayes Report have been fully addressed, culminating in a published report.  The DCDOC also notes that it has "worked diligently to implement the Ridley recommendations,"

including by creating a "Juvenile Administrative Housing and Hearing policy," that has been in place since June 2013.[262] In order to address issues raised by the Ridley Report, the DCDOC should consider, among other things, reducing the use of isolation and segregation among youth prisoners, further increasing and improving youth programing, and expanding access to in-person visitation for all youths.

### D. Recommendation 4: Conduct a review of training

In both the Hayes Report and the Ridley Report, one of the common themes was inadequacy of training of correctional officers tasked with specialized functions related to mental health or the juvenile unit. The DCDOC maintains that the "review of training for correctional officers tasked with specialized functions such as juvenile custody and suicide prevention . . . has been addressed . . . and is ongoing."[263]

We recommend continuing to ensure that adequate training is provided, as described in both reports, but we also believe it would be useful to take a step back and evaluate training across the correctional system in a comprehensive fashion. We propose that the District retain an independent consultant with extensive experience in the corrections field to conduct a review of all training programs needed for correctional officers (and any others, including contract staff) who work at the D.C. Jail, the CTF, and the halfway houses, to ensure that the right people are receiving the right training, and that the training they receive is sufficiently thorough and reflects modern correctional practices.

### E. Recommendation 5: Revise current policies restricting "Good Time Credits"

As discussed above, DCDOC prisoners are eligible to earn "good time credits" and reduce their sentences for successfully completing academic, vocational, and rehabilitation programs and for performing duties of "outstanding importance" or reflecting "exceptionally meritorious service." Other DCDOC policies, however, arbitrarily restrict the earning of such credits with respect to drug or violent offenses. These restrictive policies should be carefully reviewed and revised so that the important penological tool of good time credits is available for the benefit of prisoners and the system alike to the maximum extent possible.

### F. Recommendation 6: Return management of the CTF to District control

When the District's contract with CCA expires, the District should return management of the CTF to District control. The benefits of continuing to contract with a private corrections corporation are doubtful, and there are a number of disadvantages.

---

[262] DCDOC Response.

[263] *Id.*

Private corrections companies such as CCA tout a number of purported benefits as rationales for contracting out correctional services, including taxpayer savings, rehabilitation and reentry services, quality of operations, flexibility, security, and economic benefits to the local community.[264]

However, prisoners' rights advocates have argued that these benefits are questionable and that the companies themselves have had numerous safety and quality issues. For example, a paper issued by The Sentencing Project pointed out the "promise of meaningful savings is . . . specious at best," citing reviews by the then General Accounting Office (GAO) and the Bureau of Justice Assistance.[265] Others have argued that the CCA has used cost-cutting measures such as "operating on routinely low and dangerous staff-to-prisoner ratios."[266] This concern was also raised by a ten-year veteran CCA employee who provided testimony at a City Council oversight hearing that "corners are being cut," and "the facility is being operated understaffed to avoid paying overtime to . . . employees."[267] The witness also testified that "the company has been grossly negligent in their management of time."[268] The witness recalled that, on Mother's Day (May 13, 2012), ten units were being manned by five officers, there was no emergency response team on site, the radios and telephones were faulty, and, as a result, they were "in a death trap."[269] The witness also listed various examples of understaffing.[270] Additionally, the witness noted that the prisoners had been notified by memo of a facility-wide shakedown, potentially allowing prisoners to dispose of

---

[264] Corrections Corporation of America, *Value and Benefits of Partnership Corrections*, http://www.cca.com/partner-with-cca/value-benefits; Corrections Corporation of America, *Value of Partnering with CCA*, http://www.cca.com/partner-with-cca/value-benefits/partnership-value; Corrections Corporation of America, *Answers for Our Communities*, http://www.cca.com/partner-with-cca/value-benefits/community-benefits.

[265] The Sentencing Project, *Prison Privatization and the Use of Incarceration*, http://www.sentencingproject.org/doc/publications/inc_prisonprivatization.pdf.

[266] Grassroots Leadership, *The Dirty Thirty: Nothing to Celebrate About 30 Years of Corrections Corporation of America*, 3, http://grassrootsleadership.org/sites/default/files/uploads/GRL_Dirty_Thirty_formatted_for_web.pdf.

[267] D.C. City Council, *Public Hearing, Committee on the Judiciary* (Sept. 20, 2012), http://dccarchive.oct.dc.gov/services/on_demand_video/on_demand_September_2012_week_3.shtm (video) (testimony of Ms. Dana Bushrod); *see also* D.C. City Council, Cmte. on the Judiciary, *Public Oversight Hearing on Corrections Corporation of America's Management of the District's Correctional Treatment Facility: Witness List*, http://dccouncil.us/files/user_uploads/event_testimony/sept20_judiciary_corrections_witnesslist.pdf.

[268] *Id.*

[269] *Id.*

[270] *Id.*

contraband and, according to the witness, potentially avoiding reporting of negative incidents.[271]

Additionally, in a recent hearing, witness testimony indicated that CCA may not be adequately informing prisoners at the CTF of the availability of good time credits.[272] If this is accurate, it is concerning in part because CCA would be paid more if an prisoner resided in the facility for a longer period of time.

There are also downsides to utilizing a private contractor, especially with respect to accountability. Unlike government agencies (including the D.C. Department of Corrections), private corporations are generally not subject to Freedom of Information Act (FOIA) laws. Consequently, it is difficult to obtain internal documentation that would allow for effective oversight of the District's corrections system without engaging in expensive civil litigation. The District-CCA contract provides that a limited set of reports and audits of CCA's operations ought to be in the possession of at least one of the District's departments and therefore subject to FOIA. But these documents can be difficult to obtain, particularly when department FOIA officials fail to comprehensively respond to requests and point the finger at other agencies, as the authors of this report experienced. Anecdotally, and notwithstanding difficulties in obtaining certain information from the Department of Corrections, the authors of this report found it easier to identify facts and data regarding the D.C. Jail than the CTF.

## G.  Recommendation 7:  Increase public access to records

One of the most challenging aspects of public oversight is unearthing the facts. Former Supreme Court Justice William O. Douglas once said, "sunlight is the best disinfectant," meaning that government and freedom of information laws service the public good because more information available to more people will lead to less waste, more justice, and better government. To that aim, under the District of Columbia Freedom of Information Act, public bodies of the D.C. government must disclose public records to any person upon request (unless the record is covered by a statutory exemption).[273] The "basic purpose" of this Act was "to open agency action to the light of public scrutiny."[274]

Unfortunately, in our efforts to gather information for this report, we encountered barriers that impede public access to corrections information. First, although the District has in place the Freedom of Information Act, its implementation is far from perfect. We submitted FOIA requests to four District agencies. All but one

---

[271] Id.

[272] See D.C. City Council, Cmte. on the Judiciary, *Agency Performance Oversight Hearings on Fiscal Year 2014-2015* (Feb. 19, 2015), http://dccouncil.us/events/committee-on-the-judiciary-poh1.

[273] See D.C. Code § 2-534.

[274] *District of Columbia v. Fraternal Order of Police*, 75 A.3d 259, 265 (D.C. 2013).

exceeded the fifteen-day statutorily mandated time limit on responding to requests. On one occasion, an agency seemed to wholly ignore our request, prompting us to appeal the request to the Mayor's Office. As a result of the appeal, and following further dialogue, the requested documents were released—more than four months after the statutory deadline. On another occasion, a public information officer asserted that we had contacted the wrong agency in our effort to obtain a report, despite the fact that D.C. law required that agency to conduct such reports. Many other requests did not result in any substantive response at all.

Although some of the individuals we spoke with during this process tried to be helpful, it is our impression that all public information officers could benefit from significant improvements in their ability to identify records within their agencies. Specifically, (i) public information officers should be made aware of the scope of work the agency performs as well as documents created by other agencies or persons that the agency is likely to possess; (ii) standard operating procedures for agencies responding to a FOIA request should require the agency to make reasonable efforts to identify records responsive to requests *before* asserting they do not exist (on more than one occasion, public information officers responding to our request denied possession or knowledge of reports we requested, even though a cursory internet search could have revealed that such reports were produced by the agency in the past); (iii) if an agency makes documents available on its website, it should identify where those documents are located with specificity; (iv) agencies should implement measures to increase agency accountability in their responses to FOIA requests and to ensure that public information officers have an accurate understanding of the scope of disclosure requirements and of the limitations on FOIA exemptions,[275] and (v) agency FOIA performance should be assessed for the purpose of determining whether individual agency FOIA units require additional staffing, training, or oversight. Public information officers should not be permitted to ignore requests, flout deadlines without explanation.

Second, notwithstanding our difficulties obtaining certain information from District agencies, it was even harder to identify anyone who would admit to possessing information regarding CCA's operation of the CTF. All of our efforts to obtain the reports and audits authorized by the DC-CCA Contract were unsuccessful. And, while the D.C. Department of Health provided us with its inspection reports of the D.C. Jail

---

[275] Agencies currently submit annual reports providing basic information regarding the number of requests received, the amount of time spent processing FOIA requests, and similar information. *See, e.g.*, D.C. Office of the Sec'y, *Annual Reports*, http://os.dc.gov/page/annual-reports. In general, it appears that FOIA oversight currently focuses on quantification of FOIA data; it is less clear that oversight adequately assesses whether FOIA requests are accurately processed. For example, an analysis of the 2012 FOIA reports found that one-third of FOIA requests were subject to delays and, when requesters chose to appeal agency determinations, agency actions were found incorrect "nearly half the time." *See* D.C. Open Government Coalition, *DC FOIA delays, denials, attorney fee awards jump in 2012*, http://www.dcogc.org/content/dc-foia-delays-denials-attorney-fee-awards-jump-2012 (last visited Feb. 10, 2015).

upon request, the agency specifically indicated that it was not authorized to inspect the CTF.[276]  This points to a larger issue associated with private operation of a large prison facility.  CCA itself has resisted efforts to be subjected to sunshine laws, spending millions of dollars over several years to opposed federal legislation alone.

In light of the problems facing those who seek public access to corrections information, we recommend a review of the District's freedom of information laws and practices, to ensure that the laws are functioning as they should, and that staff have the information and resources to respond accurately, helpfully, and promptly to all requests. The need for improvement is especially compelling where it involves the District's oversight of a private prison.

---

[276] We remain uncertain about the accuracy of this assertion.  A 2004 Report by the Government Accountability Office mentions "health and safety inspection reports for the Jail *and the CTF* that were prepared from January 2002 through April 2004 by the District's Department of Health."  *See* District of Columbia Jail: Management Challenges Exist in Improving Facility Conditions." GAO-04-742, http://www.gao.gov/assets/250/243835.html.

# Appendix A

# Demographics & Budget

Deficiencies in the conditions of confinement in the District disproportionately impact the District's Black men. We cannot fully understand and correct deficiencies in the correctional system without understanding these realities. Likewise, an understanding of the District's budget for corrections is important, because the high cost[1] of confinement should be a call to action for those unhappy with the status quo.

## I.  DEMOGRAPHICS

### A.  Racial Disparities

The District's prisoner population is disproportionately Black and male as compared to the District's total population. Slightly less than half (49.5%) of the District's total population, but 91% of the District's prisoner population, is Black. By contrast, 43.4% of the District's total population, but only a small fraction (3%) of the District's prisoner population, is White. And, while 92% of DCDOC prisoners are male, only 47% of District residents are male.[2]





---

[1] Although this Appendix primarily focuses on the monetary costs to the District (and taxpayers) of confining and providing health care to District prisoners, there are numerous other costs associated with confinement, such as the economic cost to individuals and to society of lost productivity both due to confinement and due to difficulty obtaining employment following release, and the economic and non-economic costs to the families of prisoners, to name a few.

[2] United States Census Bureau, *State & County QuickFacts*, http://quickfacts.census.gov/qfd/states/11000.html.

The significance of this disparity is highlighted when considering the history of vast racial disparities in arrest rates for marijuana possession in D.C. In 2010, the District had the highest overall marijuana possession arrest rate in the nation with 846 marijuana possession arrests per 100,000 residents.[3] Ninety-one percent of individuals arrested were Black, causing D.C. to also have one of the largest racial disparities in its arrest rates for marijuana possession.[4] Thus, District law enforcement officers arrested one White person for marijuana possession for every eight Black people they arrested for marijuana possession.[5] Between 2009 and 2011, more than eight out of ten adult residents arrested for marijuana possession were Black.[6] Marijuana use, however, is roughly equal among Blacks and Whites.[7] Although the District's legalization of possession of small amounts of marijuana for at-home use (discussed elsewhere in this Report) is sure to affect the arrest rates, racial disparities in arrest and conviction rates are certainly not unique to marijuana-related offenses.[8] We remain concerned that the existence of such a marked disparity in marijuana arrest rates, like the overrepresentation of Blacks in DCDOC custody, is a symptom of a larger problem with regard to the impact of the criminal justice system on minorities, and particularly Black men.

### B. Gender Disparities

DCDOC's prisoner population is also predominantly male; in FY14, men represented approximately 92% of those in DCDOC custody. All of the prisoners in the D.C. Jail are male (it only houses male prisoners), and 70% of CTF prisoners are male, as are 80% of those in halfway houses in the District.[9] This percentage is somewhat

---

[3] *See* American Civil Liberties Union, *The War on Marijuana in Black and White: Billions of Dollars Wasted on Racially Biased Arrests*, 18, https://www.aclu.org/files/assets/1114413-mj-report-rfs-rel1.pdf.

[4] *See id.* at 18.

[5] *See id.* at 18–19.

[6] *See* Washington Lawyers' Committee For Civil Rights and Urban Affairs, *Racial Disparities in Arrests in the District of Columbia, 2009-2011,* http://www.washlaw.org/pdf/wlc_report_racial_disparities.pdf.

[7] *See id.* at 21.

[8] *See* Washington Lawyers' Committee For Civil Rights and Urban Affairs, *Racial Disparities in Arrests in the District of Columbia, 2009-2011,* at 8, 20, 23, http://www.washlaw.org/pdf/wlc_report_racial_disparities.pdf (reporting that in 2011, black arrestees in D.C. accounted for nearly 70 percent of the Metropolitan Police Department's traffic arrests, 76 percent of the disorderly conduct arrests, and 87.5 percent of the simple assault arrests).

[9] *See* D.C. Dep't of Corr., "DC Department of Corrections Facts and Figures," http://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DC%20Departmen t%20of%20Corrections%20Facts%20and%20Figures%20October%202014.pdf.

higher than the percentage of the national average daily prison population that is male (86%).[10]

This gender disparity is even more drastic when it comes to youth. While youth incarcerated in the juvenile system are generally held in a DYRS or contract facility, youth tried as adults may be placed at the CTF. An assessment from 2013 reports that only one girl per year is processed through CTF, compared to seventy boys per year.[11] The prosecution of girls as adults is not only infrequent, but it also appears to be a fairly recent phenomenon.[12] When in 2006, a sixteen-year-old girl was accused of stabbing a man to death, the Washington Post reported that this was "the first time in recent memory in the District that a girl was charged as an adult with murder."[13] In contrast, in FY12, girls represented 12% of youth committed to DYRS.[14]

C.    Trends

1.    History of Disputes Regarding D.C. Jail Population Size.

Over the course of multiple decades, the District had been the subject of lawsuits alleging that the number of prisoners in the D.C. Jail was unsafe and that overcrowding

---

[10] U.S. Dep't of Justice, Bureau of Justice Statistics, *Jail Inmates at Midyear 2013 - Statistical Tables*, http://www.bjs.gov/content/pub/pdf/jim13st.pdf.

[11] The Ridley Group & Associates, LLC, *The District of Columbia Department of Corrections Correctional Treatment Facility Juvenile Unit Assessment*, http://doc.dc.gov/sites/default/files/dc/sites/doc/release_content/attachments/DOC%20CTF%20JUV%20ASSESSMENT%20REPORT.pdf. The Campaign for Youth Justice (CFYJ) cited different, but similarly dramatic figures: CFYJ reported that, between 2007 and 2012, 528 boys and 13 girls were processed through the CTF. Campaign for Youth Justice, *Capital City Correction: Reforming DC's Use of Adult Incarceration Against Youth*, 12 (May 2014), http://www.campaignforyouthjustice.org/images/pdf/Capital_City_Correction.pdf.

[12] It is unclear how much of this disparity is due to prosecutorial discretion as opposed to fewer female juveniles being arrested for higher level violent crimes. A juvenile who is charged with certain D.C. Code violations, like murder or burglary, will be eligible for "direct filing," meaning the prosecutor may try the juvenile as an adult from the start without having to seek permission from a court. *See* D.C. Code § 16-203(3). Nevertheless, prosecutors retain sole discretion in deciding whether to direct file an eligible juvenile. Prosecutors may also petition the court to "transfer" a juvenile's case from the D.C. Superior Court Family Division (i.e. juvenile court) to the criminal division (to be tried as an adult).

[13] Henri E. Cauvin, *Jail Options Few for Young Female Suspects*, The Washington Post, Sept. 14, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/09/13/AR2006091301937.html.

[14] Dep't of Youth Rehab. Servs., "Youth Population Snapshot," http://dyrs.dc.gov/page/youth-snapshot.

and other conditions there amounted to cruel and unusual punishment.[15]  In 1985, the United States District Court for the District of Columbia capped the population at 1,674. The District never fully complied with this order, nor with a consent decree issued after another prisoner suit, and the District successfully moved to lift this cap in March of 2002 after the enactment of the Prison Litigation Reform Act.  Soon thereafter, the D.C. Jail population reportedly skyrocketed and two prisoners were stabbed to death, while another prisoner was stabbed but survived, in unrelated incidents within the facility.[16] City Council member Kathy Patterson said she believed these incidents were related to jail overcrowding—at the time, the D.C. Jail population exceeded 2,400.[17]

The Jail Improvement Act of 2003 required the Mayor to establish a maximum number of prisoners at the D.C. Jail based on recommendations from an independent consultant.   A study commissioned by the Mayor determined that the D.C. Jail population should remain between 1,958 and 2,164 at any given time.  Nevertheless, the D.C. Jail's population often exceeded 2,164[18] and the District was sued again in June 2005.  In response, the District initially asserted that it should not be bound by these recommendations.  In 2007, D.C. Superior Court Judge Melvin Wright, who presided over the suit, disagreed, stating that the District "does not have the right to choose which laws it will obey" and considered a contempt finding against the Mayor.[19]  A week later, the District agreed to cap the number of D.C. Jail prisoners at 2,164 except in "exigent circumstances."[20]

---

[15] *See, e.g.*, *Beale v. District of Columbia*, No. 1:04-CV-0959 (D.D.C.); *Anderson v. Fenty*, No. 2005 CA 005030 B (D.C. Super. Ct.); *Morgan v. District of Columbia*, 824 F.2d 1049 (D.C. Cir. 1987).

[16] Michael Rigby, *Officials Agree To Cap Population at D.C. Jail*, Prison Legal News, Feb. 15, 2009, https://www.prisonlegalnews.org/news/2009/feb/15/officials-agree-to-cap-population-at-dc-jail/.

[17] *See Second D.C. inmate stabbed to death in jail*, The Washington Times, Dec. 17, 2002, http://www.washingtontimes.com/news/2002/dec/17/20021217-110323-2832r/.

[18] Serge F. Kovaleski, *D.C. Jail Conditions Unchanged Despite Law*, The Washington Post, Apr. 24, 2005, http://www.washingtonpost.com/wp-dyn/articles/A12259-2005Apr23.html?nav=rss_topnews.

[19] Robert E. Pierre, *D.C. Judge Pressures City on Jail Population*, The Washington Post, Oct. 6, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/10/05/AR2007100502268.html.

[20] David Nakamura, *D.C. Agrees to Abide by 2004 Limit On Inmates*, The Washington Post, Oct. 11, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/10/10/AR2007101001743.html; D.C. Dep't of Corr., *Correctional Facilities*, http://doc.dc.gov/page/correctional-facilities.

### 2.   From Highest in the Nation to Downward Trend

The District had a higher incarceration rate in 2007 than any state in the country.[21]  The District saw a 48% growth of its prisoner population from 1982 to 2007.[22]  In 2007, across the nation as a whole about 1 in every 100 adults was confined behind bars; in the District, the figure was 1 in 50.[23]  The Justice Policy Institute asserted that these high numbers were largely due to problems particularly affecting low income communities in the District:  A report studying the District's high incarceration rate identified a lack of affordable housing, high rates of homelessness, education deficiencies, lack of access to mental health and substance abuse treatment, and high unemployment as relevant factors.[24]

Whether or not these factors *cause* higher incarceration rates in the District,[25] there is no doubt that one or more of these factors impact many District prisoners.  Only about 30% of male DCDOC prisoners reported having a high school diploma, and 3.5% report having a college degree.  Additionally, census data show a disproportionate number of prisoners reside in the Southeast quadrant of the city.  As the Justice Policy Institute reports, the Southeast quadrant of the city primarily consists of Black residents who also "have the lowest median income of the city as well as the highest unemployment rates."  Meanwhile, as shown below, very few members of DCDOC's prisoner population come from the Northwest quadrant of the city.  By contrast, the Northwest quadrant is home to the two wards with "the highest median household income and lowest percentage of people of color in the entire District."[26]

---

[21] The PEW Center On the States, *One In 31: The Long Reach of American Corrections*, at 43, http://www.pewtrusts.org/~/media/Assets/2009/03/02/PSPP_1in31_report_FINAL_WEB_3_2609.pdf.

[22] *Id.*

[23] *Id.*

[24] Justice Policy Institute, *A Capitol Concern: The Disproportionate Impact of the Justice System on Low-Income Communities in D.C.*, http://www.justicepolicy.org/images/upload/10-07_EXS_CapitolConcern_AC-PS-RD-DC.pdf.

[25] This question is beyond the scope of this report.

[26] *Id.*



Source: D.C. Dep't of Corrs., "DC Department of Corrections Facts and Figures" (Oct. 8, 2014),
http://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DC%20Department%20of%
20Corrections%20Facts%20and%20Figures%20October%202014.pdf.

There has recently been a downward trend in the District's overall prisoner population—the average daily population for DCDOC facilities in 2009 was 3,089; in 2013, it was 2,289; it was 2,041 in 2014; and there has been a drop of over 700 prisoners from January 2011 through June 2014.[27] This trend is also reflected in decreasing intake numbers over the last five years: Intake was 17,903 in 2009, 17,047 in 2011, and 12,334 in 2013. And, whereas the number of intakes exceeded number of releases by seventy-six in 2009, releases exceeded intakes by 642 in 2013.[28] In contrast, however, the overall population of D.C. residents has increased from 572,059 residents in 2000 to

---

[27] *See* D.C. Dep't of Corr., *Demographics and Statistics*,
http://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/Demographics%20
and%20Statistics%20June%202014.pdf.

[28] *See* D.C. Dep't of Corr., *DC Department of Corrections Facts and Figures*,
http://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DC%20Departmen
t%20of%20Corrections%20Facts%20and%20Figures%20October%202014.pdf.

601,723 residents in 2010 to 646,449 residents in 2013 to an estimated 658,893 residents in 2014.[29]

Drug policy, such as the recent legislation legalization of use and possession of small amounts of marijuana, is also likely to impact prisoner population size. Legislation related to this initiative began in July 2014, when the District enacted the Marijuana Possession Decriminalization Amendment Act which decriminalized the possession of up to one ounce of marijuana. Thus, under D.C. law, possession or transfer without exchange of money of a small amount of marijuana became a civil violation (with a $25 fine) instead of an arrestable offense[30] and violators were not subject to jail time.[31] The effects of this change may already be apparent: The percent of men being held in the DCDOC system for drug offenses dropped from 2013, 8.4% in FY13 to 6.6% in FY14.

On February 26, the District passed a ballot initiative legalizing the possession of up to two ounces of marijuana, and permitting individuals to grow up to three marijuana plants in the home.[32] The ballot initiative garnered 70% of the vote.[33]

Efforts toward marijuana legalization in the District have not gone unchallenged. As noted, the District is subject to congressional control and, in late 2014, the U.S. Congress passed an omnibus spending bill that included a provision prohibiting the use of federal or local funds in the Act to "enact any law, rule, or regulation to legalize or otherwise reduce penalties associated with the possession, use, or distribution" of

---

[29] *See* United States Census Bureau, "State & County QuickFacts, District of Columbia," http://quickfacts.census.gov/qfd/states/11000.html.

[30] *See* D.C. Metropolitan Police, *Marijuana Possession Decriminalization Amendment Act of 2014*, Special Order Number SO-14-04, July 17, 2014, https://www.documentcloud.org/documents/1219510-metropolitan-police-department-special-order-on.html.

[31] *See* Mike DeBonis and Peter Hermann, *Decriminalization arrives, and D.C. police prepare for sea change in marijuana laws*, The Washington Post, July 17, 2014,http://www.washingtonpost.com/local/dc-politics/decriminalization-arrives-and-dc-police-prepare-for-sea-change-in-marijuana-laws/2014/07/16/0f21a2b8-0c82-11e4-b8e5-d0de80767fc2_story.html.

[32] Mike Coneen, *Recreational marijuana use, possession now legal in D.C.*, WJLA, Feb. 26, 2015, http://www.wjla.com/articles/2015/02/recreational-marijuana-now-legal-in-d-c--111817.html.

[33] Aaron Davis, *D.C. voters overwhelmingly support legalizing marijuana, joining Colo., Wash.*, Washington Post, Nov. 4, 2014, http://www.washingtonpost.com/local/dc-politics/dc-voters-titling-heavily-toward-legalizing-marijuana-likely-joining-colo-wash/2014/11/04/116e83f8-60fe-11e4-9f3a-7e28799e0549_story.html.

certain substances, including marijuana.[34]   Additionally, the day before the initiative went into effect, two Members of Congress wrote a letter to the Mayor of the District stating, in relevant part, that if the Mayor were to "decide to move forward . . . with the legalization of marijuana . . . [the Mayor would] be doing so in knowing and willful violation of the law."[35]   In an interview, one Congressman suggested that officials who continued with the legalization efforts would face prison time.[36]   Although District officials were not deterred from moving forward with legalization, it appears that they have (at least for the time being) refrained from pressing forward with efforts to legalize the sale of marijuana, notwithstanding prior discussions of passing legislation to create a "legitimate cannabis industry" in the District.[37]   However, the City Council has advanced a bill that, if enacted, would limit employers' ability to require job applicants to undergo drug testing as part of the hiring process.[38]

---

[34] Alex Rogers, *Congress Approves Trillion-Dollar Spending Bill,* Time, Dec. 14, 2014, http://time.com/3632125/congress-spending-bill/; Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235, 113th Cong. § 809 (2014).

[35] Jonathan Topaz, *Muriel Bowser: D.C. won't back down in Chaffetz pot showdown,* POLITICO, http://www.politico.com/story/2015/02/jason-chaffetz-and-dc-in-pot-showdown-115495.html; http://www.scribd.com/doc/256910143/Letter-to-d-c-Mayor-Muriel-Bowser-Regarding.

[36] Mike DeBonis, *Bowser: Legal pot possession to take effect at midnight in the District,* Washington Post, http://www.washingtonpost.com/local/dc-politics/house-republicans-warn-dc-mayor-not-to-legalize-pot/2015/02/25/2f784a10-bcb0-11e4-bdfa-b8e8f594e6ee_story.html.

[37] *See* Aaron Davis, *D.C. Council backs down on marijuana hearing after attorney general warning,* Washington Post, http://www.washingtonpost.com/local/dc-politics/dc-council-warned-not-to-move-forward-on-marijuana-legalization/2015/02/09/2c1593aa-b067-11e4-827f-93f454140e2b_story.html; Mike DeBonis, *Legal marijuana could be $130 million a year business in D.C., study finds,* The Washington Post, Oct. 30, 2014, http://www.washingtonpost.com/local/dc-politics/legal-marijuana-could-be-a-130-million-a-year-business-in-dc-officials-find/2014/10/30/d6f80a52-603d-11e4-9f3a-7e28799e0549_story.html?wprss=rss_local.

[38] Aaron Davis, *Bill to limit marijuana screening by D.C. employers advances in council,* The Washington Post, Mar. 4, 2015, http://www.washingtonpost.com/local/dc-politics/bill-to-limit-marijuana-screening-by-dc-employers-advancing-in-council/2015/03/04/72569e0c-c28e-11e4-9ec2-b418f57a4a99_story.html.

# II. THE DISTRICT'S BUDGET: COSTS OF CONFINEMENT

## A.  D.C. Department of Corrections Budget

Over the past decade, the DCDOC's budget has averaged $141.7 million, with peak funding[39] in FY08.  The Department's FY15 request for $151.6 million would bring the Department's budget within $2 million of the FY08 level.

When considering the District's budgeting and priorities, one should note that the District has less control over its budget than do states over their budgets.  The District of Columbia Self-Government and Governmental Reorganization Act of 1973 (also known as the "Home Rule" Act) is a federal law that devolves certain decision making responsibilities to the District, including a degree of authority to help determine the District's budget.[40]  To simplify, once the City Council adopts the Mayor's budget, which is effectively a request to Congress for approval of local budget priorities as well as any federal funding, the Mayor sends the budget to the President, who transmits it to the House and the Senate for review.[41]  Congress is not required to follow the District's budget when it approves the District's use of its own revenue or when it appropriates funding in the bill it sends to the President for signature.  As a consequence, District funding remains subject to the oversight of a political body that is not accountable to residents of the District, an arrangement that can and has led to disputes over funding and puts the District at risk when Congress cannot pass legislation, such as those discussed previously relating to legislation regarding possession of marijuana.[42]

The District's annual budget figures are divided into "actual," "approved," and "requested" figures.  Actual figures are dollars actually spent, as determined by an audit; "approved" figures are amounts approved to be spent; and requested amounts denote spending that the District has proposed, but which has not yet been approved.[43]

---

[39] This report considers budgets for FY05 through the FY15 request.

[40] *See* District of Columbia Self-Government and Governmental Reorganization Act of 1973, Pub. L. 93-198, 87 Stat. 777 (Dec. 24, 1973); *see also* D.C. Code §§ 1-201.1, *et seq.*

[41] *See* D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, 1-16 - 1-17, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_1_web.pdf.

[42] *See, e.g.*, Erik Wasson, *DC cannot declare budget freedom from Congress, GAO says*, The Hill, Jan. 30, 2014, http://thehill.com/policy/finance/197019-dc-cannot-declare-budget-freedom-from-congress-gao-says.

[43] *See* DC Fiscal Policy Institute, *A Citizen's Guide to the DC Budget*, 8-9, http://www.dcfpi.org/wp-content/uploads/2013/03/3-26-13-Citizens-Budget-Guide.pdf.

The DCDOC's approved budget for FY14 was $140.3 million.[44] The FY14 approved budget represented an increase of 7% over the FY13 actual budget ($131.1 million).[45] For FY15, the Department has proposed a budget of $151.6 million, which represents an increase of approximately 8% over FY14 approved levels.[46]

Figure 1[47] indicates the Department's budget for fiscal years 2005 through 2015.[48] As the data indicate, during the covered period (FY05-FY15), the Department

---

[44] D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, C-37, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_2_web.pdf.

[45] D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, C-37, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_2_web.pdf.

[46] D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, C-37, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_2_web.pdf.

[47] Figure 1 was calculated using information made available by the Office of the Chief Financial Officer. *See* D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_2_web.pdf; D.C. Chief Financial Officer, *FY 2014 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_2_Final.pdf; D.C. Chief Financial Officer, Seizing Our Future: *FY 2013 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_fy2013_volume_2_chapters_part_1.pdf; D.C. Chief Financial Officer, *One City Rising to the Challenge: FY 2012 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_volume_2_agency_chapters_part_i_web.pdf; D.C. Chief Financial Officer, *Maximizing Efficiency: FY 2011 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/2011_Volume_1-Executive_Summary_Web.pdf; D.C. Chief Financial Officer, *Meeting the Challenge: FY 2010 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_volume_2_agency_chapters_part_i_web_1.pdf; D.C. Chief Financial Officer, *FY 2009 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_agency_budget_chapters_part_1_of_2.pdf; D.C. Chief Financial Officer, *Moving Forward: FY 2008 Proposed Budget and Financial Plan*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_volume_2a_web2.pdf; D.C. Chief Financial Officer, *FY 2007 Proposed Budget and Financial Plan: Public Safety and Justice 2007 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_dc_budget_v (continued...)

received peak funding in FY08 ($153.4 million).  The FY12 budget was the lowest the Department had seen since FY05.

**Figure 1**



olume_3d.pdf; D.C. Chief Financial Officer, *FY 2008 Proposed Budget and Financial Plan: Public Safety and Justice 2008 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_volume_3_web.pdf; D.C. Chief Financial Officer, *FY 2009 Proposed Budget and Financial Plan: Public Safety and Justice 2009 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_operating_appendices_part_2_of_4.pdf; D.C. Chief Financial Officer, *FY 2010 Proposed Budget and Financial Plan: Public Safety and Justice 2010 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/volume_4_-_operating_appendices_-_part_i_web.pdf; D.C. Chief Financial Officer, *FY 2011 Proposed Budget and Financial Plan: Public Safety and Justice 2011 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/2011_Volume_4-Operating_Appendices-Part_I_Web.pdf; D.C. Chief Financial Officer, *FY 2012 Proposed Budget and Financial Plan: Public Safety and Justice 2012 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_volume_4_operating_appendices_part_i_web_r.pdf; D.C. Chief Financial Officer, *FY 2013 Proposed Budget and Financial Plan: Public Safety and Justice 2013 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_fy2013_volume_4_appendices_part_1_0.pdf; D.C. Chief Financial Officer, *FY 2014 Proposed Budget and Financial Plan: Public Safety and Justice 2014 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_4_Final.pdf; D.C. Chief Financial Officer, *FY 2015 Proposed Budget and Financial Plan: Public Safety and Justice 2015 Operational Appendices*, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume_5_web.pdf.

[48] Figures for FY05 through FY13 are actual budget figures, while FY14 is the approved budget and FY15 is the Department's request.

The DCDOC's budget can be further divided to into "Personal Services," (PS) (Figure 2[49]) which is essentially labor expenses, and "Nonpersonal Services," (NPS) (Figure 3[50]) which is a catch-all category for other expenses, generally including operational costs including supplies, equipment, and contractual services.

**Figure 2**                                                    **Figure 3**





A review of notices of intent to award sole source contracts issued by the Office of Contracting and Procurement[51] provide some insight into the cost of various contractual services:[52]

- Inmate Telephone, Inc. provides prisoner telephone services for the DCDOC, including labor, equipment, and materials. A proposed extension of a contract for services provided through September 30, 2015, indicates that services would be provided at no cost to the District. Presumably, the company pays for these costs through revenue generated by system use.[53]

---

[49] *See supra* n.47.

[50] *See supra* n.47.

[51] *See* D.C. Office of Contracting and Procurement, *Notice of Intent to Award Sole Source Contracts*, http://app.ocp.dc.gov/intent_award/intent_award_opic.asp.

[52] It is not clear precisely which budget category encompasses these expenditures, though it is not unreasonable to expect that they would be categorized as contractual services.

[53] D.C. Office of Contracting and Procurement, *Determinations and Findings for Sole Source Extension of Contract* (Contract CW12929, Inmate Telephone Inc.) (unsigned), http://app.ocp.dc.gov/intent_award/D_F/DF_Sole_Source_Inmate_Telephone.pdf.

- Centric GRP LLC/Keefe Supply Company provides commissary services. A proposed extension of a contract for services would pay the company about $631,000 for the seven-month period from January 1, 2015, through July 31, 2015.[54]

- Virginia Correctional Enterprises provides off-site laundry services for the D.C. Jail. A proposed extension of a contract for services would pay the company $200,000 for the nine-month period from January 1, 2015, through September 30, 2015.[55]

- Johnson Control provides maintenance services for the D.C. Jail air, heat, power, and ventilation systems. A proposed extension of a contract for services would pay the company about $70,000 from the date of the award through September 30, 2015.[56]

- URS Federal Technical Services, Inc./EG&G Technical Services, Inc. provide warehouse management and logistics services, including management of supply operations at the D.C. Jail. A proposed contract for services would pay URS about $694,000 for services between October 1, 2014, and September 30, 2015.[57]

B.   Private Contracts: CCA, Unity Health Care, Halfway Houses

One NPS component, "Contractual Services - Other" (Figure 4[58]) accounted for between 75% and 86% of all NPS expenses for FY05 through FY15, and for between 36% and 48% of the entire budget. The contractual services component appears to include the Department's contracts with CCA, with the private halfway houses, and for prisoner medical services.

Because the "Contractual Services - Other" category accounts for such a significant percentage of the total NPS budget, it is useful to examine the NPS budget

---

[54] D.C. Office of Contracting and Procurement, *Determination and Findings for Sole Source Extension of Contract* (Contract CW18182, Centric GRP/Keefe Supply Company) (unsigned), http://app.ocp.dc.gov/intent_award/D_F/DF_CW18182_R1.pdf.

[55] D.C. Office of Contracting and Procurement, *Determination and Findings for Sole Source Extension of Contract* (Contract CW17235, Virginia Correctional Enterprises) (unsigned), http://app.ocp.dc.gov/intent_award/D_F/DF_CW17235_R1.pdf.

[56] D.C. Office of Contracting and Procurement, *Determination and Findings for Sole Source Extension of Contract* (Johnsons Control) (unsigned), http://app.ocp.dc.gov/intent_award/D_F/DF_Johnson_Control_R1.pdf.

[57] D.C. Office of Contracting and Procurement, *Determination and Findings for Sole Source Extension of Contract* (Contract CW12688, URS) (unsigned), http://app.ocp.dc.gov/intent_award/D_F/DF_CW12688%208_26_14R.pdf.

[58] *See supra* n.47.

without the contractual services category (Figure 5[59]).  As Figure 5 demonstrates, the NPS budget sans the "Contractual Services - Other" category has been subject to a fair degree of year-to-year fluctuation.   The figures also reveal comparatively higher expenses in FY10 and FY11.  In both fiscal years—and only those fiscal years—the second largest expense category after contractual services was "Expense Not Budgeted Others," which accounted for $10.6 million in expenses in FY10 and $8.6 million in FY11.  It is not clear precisely what accounts for the variations in this budget category.  For FY15, this budget category includes $6.5 million for supplies and materials, such as books, writing materials, and other goods purchased for prisoner use and consumption; $2.7 million for equipment; $60,000 for telecommunications.[60]   For FY15, this budget category also includes $2.8 million for land and building rental, which may represent the District's lease payment to CCA for the CTF facility, as discussed below.[61]

**Figure 4**                                                  **Figure 5**





A significant percentage of the Department of Corrections' budget is devoted to paying for contracts with private entities, including CCA and private halfway houses.

---

[59] *See supra* n.47.

[60] *See* D.C. Chief Financial Officer, *Keeping the Promises: FY 2015 Proposed Budget and Financial Plan*, C-37 to C-39, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_Volume _2_web.pdf.

[61] *See id.*

# Appendix B



GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

## D.C. Department of Corrections Response
## to
## Washington Lawyers' Committee White Paper

The Washington Lawyers' Committee commissioned Covington and Burling to prepare a white paper regarding conditions of confinement at the D.C. Jail and CTF to include physical infrastructure, mental health, suicide prevention, drug treatment practices, juvenile unit, demographics, budget/costs and contracting. The Department of Corrections provides the following comments in response to this report.

## CDF and CTF Facilities

- DOC is committed to performing preventative and day to day maintenance of the CDF and CTF facilities in order to provide a clean and safe environment for staff and inmates.
- DOH noted in its exit interview with DOC staff on March 16, 2015 that there had been noticeable improvements in the facility, and areas that were in need of repair and in poor condition during the initial inspection have improved significantly.
- In the most recent March 2015 DOH inspection, 87% of the identified items have already been abated to date; the remaining items are either currently being corrected or, due to the age and deterioration of the physical structure, are outside of DOC's control.

## Juvenile Programs

- Since the issuance of the Ridley Report, DCDOC has significantly expanded the juvenile program.
  - The after school program has been expanded and now runs from Monday-Friday. This program focuses on reinforcing the day's lessons, teaching good citizenship and pro-social development.
  - There is a daily barbering program for the male juveniles.
  - There is a comprehensive Victim Impact Training program that combines intensive recovery support, mentoring and anger management services, and workforce development skills.
  - Other weekly programs include: Life Skills workshops, Free Minds Book Club, Adjusting Our Attitudes and substance abuse education.
- The Juvenile Unit program manager is currently in the process of negotiating a career and technical training for weekend programming.
- As of September 2014, all correctional officer recruits are trained in Positive Youth Development (PYD), as well as the operational and disciplinary procedures of the

2000 14th Street, NW, 7th Floor, Washington, DC 20009     Phone (202) 671-2042

Juvenile Unit. This training is being phased into the annual in-service training for all correctional staff.
- PYD emphasizes building skills and assets in youth in addition to preventing negative outcomes.

## Juvenile Administrative Segregation

.

The DOC does not use excessive isolation and segregation with the juvenile population. The number of juveniles segregated (either awaiting a disciplinary hearing or placed in administrative segregation) over the past year are as follows with the average stay in segregation being approximately two (2) days:

| Month | Number of juveniles |
|---|---|
| May 2014 | Six (6) |
| June 2014 | Zero (0) |
| July 2014 | Three (3) |
| August 2014 | Three (3) |
| September 2014 | Two (2) |
| October 2014 | Six (6) |
| November 2014 | Two (2) |
| December 2014 | Zero (0) |
| January 2015 | Zero (0) |
| February 2015 | Zero (0) |
| March 2015 | Five (5) |
| April 2015 | Two (2) |
| May 2015 | Zero (0) |

- The DOC has had Juvenile Administrative Housing and Hearing Procedures in place since June 2013.
- Any juvenile placed in administrative segregation is housed in a separate cell on the lower tier within the juvenile unit.
  - These juveniles attend school through DCPS and have access to legal services, programming, counseling services, and meaningful contact with the other juvenile inmates.
- If a juvenile is placed in administrative segregation, the following occurs:
  - Officers are required to do a visual security check of the juvenile every fifteen (15) minutes.
  - The juvenile receives individual recreation for two (2) hours per day.
  - Juveniles will not be placed in segregation for longer than five (5) days unless extenuating circumstances exist.

## Visitation for Juveniles

- In addition to video visitation, juveniles who have reached the Gold Tier in the Juvenile Unit are given contact visitation with their parent or guardian once per month. Eligibility for the Gold Tier is based on several factors such as behavior, program participation and educational factors.
- There are currently eight (8) juveniles on the Gold Tier with two (2) more expected by May 7.
- Juvenile inmates are given contact visits during the holiday season in December.

2

**Suicide Prevention**

The DOC, through a proactive initiative, requested that consultant Lindsay Hayes independently assess current practices and provide any appropriate recommendations relating to suicide prevention policies and procedures within DOC. His recommendations have been implemented.

- As of October 2014, all 40 designated cells have been completed and retrofitted as follows: to decrease ligature points, handles have been removed from toilets and desks, vents are covered with anti-ligature grade mesh, pick-proof, penal-grade caulking has been used in the cells, and doors have been replaced to allow for 2 clear panels that provide enhanced vision into and out of the cells.
- In response to the Hayes Report recommendations relating to suicide precautions, the DOC provides suicide-resistant smocks and blankets; more time out of cells and the provision of more family visits and telephone access is under review.
- "Behavior Management" status was immediately discontinued upon receipt of the Hayes Report. There are now two categories of observation: Suicide Watch for inmates thought to be actively suicidal and Suicide Precaution for inmates who are at risk of suicide, but less acutely compared to inmates on Suicide Watch. Inmates on Suicide Watch are placed in a safe cell on 3rd floor medical and are provided one-to-one constant monitoring by a healthcare professional. Inmates on Suicide Precaution are monitored by officers every fifteen (15) minutes in staggered intervals.
- Suicide Prevention training has been significantly enhanced. All correctional officers, other DOC staff and healthcare vendor staff must undergo four (4) hours annually of Suicide Prevention training. Additionally, DOC brought in national expert Dr. Dean Aufderheide to conduct a full day of training on self-injurious behavior issues which involved inmates with mental health issues as well as those exhibiting "bad behavior." Correctional officers on the mental health and segregation units, as well as mental health staff participated in this training.
- DOC is in the process of developing a Mental Health Step Down Unit, which seeks to transition stabilized inmates on the Crisis Intervention Unit to a different wing of the same area which would involve enhanced programming, as well as double-bunking as a way to help them fully transition to general population as their functionality improves.

**Substance Abuse Treatment Programs**

- The Secure Residential Treatment Program (SRTP) is a joint program of CSOSA and the US Parole Commission that is located in the CTF. Eligibility requirements and the content of the program are controlled by those agencies.
- The DOC offers a Residential Substance Abuse Treatment (RSAT) program to both male and female inmates. The RSAT curriculum is licensed by Addiction Prevention and Recovery Administration (APRA), the regulating body for policy for substance abuse prevention, treatment, and recovery services.
  - RSAT is a 30-120 day program that includes services such as: relapse prevention, parenting classes, and life skills.
  - The program is open to volunteers and also accepts referrals and self-reports.
  - Inmates who have violated the terms of their probation and otherwise meet the requirements of the program may also enroll.

**Good Time Credits**

- The DOC amended the good time credits law in 2010 in order to expand the application of good time credits to allow pretrial detainees, in addition to sentenced misdemeanants, to earn credits for good behavior and for successful participation in an expanded list of programs including rehabilitative programs, work details, and special projects, with or without completion of the program.
- The District's good time credit laws only apply to pretrial and subsequently sentenced misdemeanants. In accordance with the National Capital Revitalization and Self-Government Improvement Act of 1997 (Pub. L. No. 15-33, 11 Stat.712) and D.C. Code § 24-101, inmates charged with felonies and sentenced to more than one (1) year of incarceration are Federal Bureau of Prisons inmates and can only earn good time credits in accordance with federal law and FBOP policies.

**WLC Recommendations**

As explained above, the DOC has already taken action on several of the Recommendations contained in the WLC Report. In regard to suicide prevention practices mentioned in Recommendation #3, the DOC brought in on its own initiative an independent consultant, Lindsay Hayes, made the report public, and has implemented the recommendations from his report.  Inasmuch as Recommendation #3 relates to juvenile confinement, the DOC similarly commissioned the Ridley report and publicized it, and has worked diligently to implement the Ridley recommendations, including a comprehensive Juvenile Administrative Housing and Hearing policy that is currently in place. The review of training for correctional officers tasked with specialized functions such as juvenile custody and suicide prevention contained in Recommendation #4 has been addressed as explained above, and is ongoing.  While much progress has been made, the DOC remains committed to improving operations and achieving the status of a benchmark correctional agency.

# EXHIBIT 2

**DECLARATION OF DR. MARC STERN, MD MPH IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION**

On this 29th day of March, 2020, I hereby declare:

1.      My name is Marc Stern. I am a board certified internist specializing in correctional health care. I have managed health care operations and practiced health care in multiple correctional settings. Most recently, I served as the Assistant Secretary of Health Care for the Washington State Department of Corrections. In terms of educational background, I received a Bachelor of Science degree from State University of New York (Albany) in 1975, a medical degree from State University of New York (Buffalo) in 1982, and a Master of Public Health from Indiana University in 1992. I am an Affiliate Assistant Professor at the University of Washington School of Public Health.

2.      On a regular basis, I investigate, evaluate, and monitor the adequacy of health care delivery systems in correctional institutions on behalf of a variety of parties including federal courts. My prior experience includes working with the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security; the Special Litigation Section of the Civil Rights Division of the U.S. Department of Justice; and state departments of corrections and county jails.

3.      Through 2013, I taught the National Commission on Correctional Health Care's (NCCHC) correctional health care standards semi-annually to correctional health care administrators at NCCHC's national conferences. I authored a week-long curriculum commissioned by the National Institute of Corrections of the U.S. Department of Justice to train jail and prison wardens and health care administrators in the principles and practice of operating safe and effective correctional health care operations, and served as the principal instructor for this course.

4.      In the past four years alone, I have been qualified as an expert in several

1

jurisdictions on correctional health care systems and conditions of confinement. My full *curriculum vitae* is attached hereto as Exhibit A.

5.      I am not receiving payment in exchange for providing this affidavit to the D.C. Public Defender Services regarding appropriate correctional healthcare measures during the COVID-19 pandemic. In light of the emergency conditions occurring in jails and prisons across the country, I am providing my services *pro bono*.

6.      Due to the recent COVID-19 pandemic affecting the nation and world, I have familiarized myself with the virus from a clinical perspective, including its causes and conditions, its transmission – especially in crowded and unsanitary conditions – and its ability to quickly spread through correctional facilities.

7.      In the context of a pandemic like the one we currently face, public health and public safety interests are closely intertwined. When and if correctional staffing challenges arise due to the need for staff to quarantine, seek treatment, or care for dependents, managing internal safety in carceral settings becomes even more challenging. Understaffing in the correctional setting is dangerous for staff as well as incarcerated people, and the stress and fear of the current crisis only serve to increase those risks.

8.      I have reviewed the March 25, 2020, letter sent from the union to the D.C. DOC, spelling out in the public health dangers at the D.C. DOC. If accurate, such conditions heighten the urgency of addressing these problems.

9.      For example, if true, the grievance's allegations that correctional officers responsible for receiving and overseeing inmates do not any, or sufficient, personal protective equipment (PPE) for use when indicated,[1] and that officers are not required to participate in social distancing during shift changes, raise serious concerns that those officers may contract and transmit COVID-19 to their co-workers, families, and inmates in the facility. Accordingly, reducing the number of inmates with whom those

---

[1] Grievance at 3.

correctional officers must interact will reduce the risk that those correctional officers will contract COVID-19 or transmit it to others in the community.

10.     I have also reviewed the declarations of four inmates detained in DOC facilities. As with the union's grievance letter, the inmates' allegations, if true, heighten the urgency of taking immediate and aggressive action. For example, the housing of multiple inmates within a single cell and lack of adequate cleaning supplies increases the probability that COVID-19 is already spreading throughout the facilities. Accordingly, housing only one inmate per cell and either providing sufficient cleaning supplies or reducing the amount of space requiring thorough cleaning will decrease the virus's ability to spread within DOC facilities.

11.     In light of the conditions described in the documents that I have reviewed, the four confirmed cases of COVID-19 inside of DOC facilities, and the apparent resource-shortages facing the DOC, I am even more firmly convinced that downsizing the inmate population as much as possible will reduce the risk of contraction and transmission of COVID-19—and the attendant risks of serious harm and death—within DOC facilities and the communities around them.

12.     Thoughtful downsizing should be implemented in tandem with aggressive, responsive prevention measures that are developed and  guided by public health and medical experts.

13.     Institutional settings such as jails, prisons, shelters, and inpatient treatment  programs are congregate environments where people live, eat, and sleep closely together. In these  environments, infections like COVID-19 can spread more rapidly.  Downsizing jail populations  serves two critical public health aims: (1) targeting residents who are at elevated risk of suffering  from severe symptoms of COVID-19; and (2) allowing those who remain incarcerated to better  maintain social distancing and avoid other risks associated with forced communal living.  Because  vulnerable populations are at the highest risk of severe complications from COVID-19, and  because when they develop severe complications they will be transported to community hospitals—thereby  using  scarce  community

resources (ER beds, general hospital beds, ICU beds)—avoiding disease in this population is a critical contribution to public health overall.

14.     Downsizing jail populations by releasing high risk individuals and others the court system deems eligible for release will help to "flatten the curve" overall—both within the jail setting and without. Early reporting on the impacts of COVID-19, based in part on preliminary data emerging from China, seemed to indicate that the virus' impact would remain relatively mild for younger people. Recent data released by the CDC suggests that this initial narrative is incorrect, and that adults aged 20-44 also face a risk of experiencing severe health outcomes as a result of contracting the disease. The CDC released data based on the reported cases in the United States between February 12 and March 16, 2020. This data showed the thirty-eight percent (38%) of the hospitalizations from coronavirus occurred in patients under 55 years old.[2] French health officials have released statements saying that half of intensive care admission in that country involve individuals under 65. In the Netherlands, half of intensive care admissions were for people under the age of 50.[3]

15.     While the highest risk of death remains among the elderly, it is becoming clear that younger individuals are not protected from severe complications requiring hospitalization and placement in intensive care, using valuable community resources that are expected to become more scarce.

16.     At the same time criminal justice authorities work to downsize jail populations, it is critical that the D.C. Department of Corrections, the D.C. Department of Behavioral Health, and any other public agency responsible for maintaining congregate living conditions of detained individuals in the D.C. system immediately undertake the following prevention and planning measures:

---

[2] *Severe Outcomes Among Patients with Coronavirus Disease* 2019 (COVID-19) — United States, February 12–March 16, 2020, *available at*
https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w
[3] https://www.washingtonpost.com/health/2020/03/19/younger-adults-are-large-percentage-coronavirus-hospitalizations-united-states-according-new-cdc-data/

a. **Immediate testing**. Patients who require testing, based on public health recommendations and the opinion of a qualified medical professional, should be tested for COVID-19.

b. **Immediate Screening**. Correctional authorities must be required to screen each employee or other person entering the facility *every day* to according to current CDC or local health department guidelines A record should be made of each screening.

c. **Quarantine.** The jail must establish non-punitive quarantine for all individuals believed to have been exposed to COVID-19, but are not yet symptomatic, and non-punitive isolation for those believed to be infected with COVID-19 and potentially infectious. Any individual who must interact with those potentially or likely infected with COVID-19 must utilize protective equipment as directed by public health authorities. In short, every possible effort must be made to separate infected or potentially infected individuals from the rest of the incarcerated population. Individuals requiring continued quarantine, isolation, or health care after release from incarceration should be transferred from the institution to the appropriate outside venue.

d. **Institutional Hygiene.** The jail must be required to provide adequate sanitation of high use/high touch areas and cells in accordance with CDC or local health authority guidelines.

   i. This includes a prompt way to dispose of tissues used by incarcerated individuals as well as staff.

e. **Personal Hygiene.** The jail must be required to provide hand soap, disposable paper towels, and access to water to allow residents to wash their hands on a regular basis, **_free of charge_** and ensure replacement products are available as needed. Correctional staff should be allowed to carry hand sanitizer with alcohol on their person, and residents should be allowed to use hand sanitizer with alcohol when they

5

are in locations or activities where hand washing is not available.

   i.  Inmates should be permitted access to cleaning supplies so they may clean their individual cells. This will both keep cells cleaner, and also stem panic amongst the incarcerated population.

  f.  **Access to treatment.** It is critical that inmates have rapid access to responsive medical treatment. Those with a cough should be provided masks as soon as they inform staff of this symptom or staff notice this symptom.

17.   The measures I propose above are baseline steps to help slow the spread of COVID-19 in all facilities. However, each correctional facility has its own unique combination of physical structure and layout, operations, policies, logistics, inmate characteristics, and staffing factors that determine what additional measures may be necessary to minimize the spread of COVID-19. Only a public health expert who is able to review a particular facility firsthand can account for all of those factors and provide a meaningful and facility-specific opinion about what additional measures are necessary to reduce the risk of transmission.

18.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 29, 2020.

_____
Marc Stern, MD MPH

# EXHIBIT 3

coronavirus.dc.gov
Read Mayor Bowser's Presentation on DC's COVID-19 Situational Update: May 29.
Mayor Bowser Lifts Stay at Home Order, Urges Safety as Phase One of Reopening Begins
Friday, May 29

Office of the Mayor



**Connect With Us**
John A. Wilson Building
1350 Pennsylvania Avenue, NW, Washington, DC 20004
Phone: (202) 727-2643
TTY: 711

Email: eom@dc.gov

    

Ask the Mayor



Muriel Bowser
Mayor

# DC Department of Health Confirms First Coronavirus Case

Saturday, March 7, 2020
Risk for community spread in the District remains low

(Washington, DC)–Today, the DC Department of Health (DC Health) announced the District's first presumptive positive case of coronavirus disease 2019 (COVID-19). The person has no prior history of travel outside the United States. DC Health is coordinating closely with the health team where this person is currently being treated and all infection control protocols are being followed. While this is the first case in the

District, there is still no widespread community transmission and the general level of risk for residents is low.

Because human coronaviruses most commonly spread through respiratory droplets, DC residents are reminded to take the same measures that are recommend annually to prevent the spread of the flu and other viruses.

- Get your flu shot, and make sure the people around you do the same.
- Wash hands with soap and water for at least 20 seconds multiple times a day. If soap and water are not available, use alcohol-based hand sanitizer.
- Cough or sneeze into your elbow or upper sleeve. Cover your coughs and sneezes to prevent others from getting sick.
- Avoid touching your eyes, nose, or mouth. Germs spread this way.
- Keep surfaces (especially bedside tables, surfaces in the bathroom, and toys for children) clean by wiping them down with a household disinfectant.

DC Health does not recommend that healthy individuals wear a facemask to protect themselves from respiratory illnesses, including COVID-19. Residents should only wear a mask if recommended by a healthcare professional. A facemask should be used by people who have COVID-19 and are showing symptoms. This is to protect others from the risk of getting infected.

For more information on coronavirus, visit:

- https://coronavirus.dc.gov
- https://www.cdc.gov/coronavirus/2019-ncov/index.html

**Attachment(s):**
- Amharic (አማርኛ)
- Chinese (中文)
- Korean (한국어)
- Vietnamese (Tiếng Việt)
- French (Français)
- Spanish (Español)

ACCESSIBILITY

PRIVACY AND SECURITY

ABOUT DC.GOV

TERMS AND CONDITIONS

# EXHIBIT 4



Ann-Kathryn So <akso@hannonlawgroup.com>

---

## Fwd: Log book/ health concerns in SE2
1 message

---

**Johnson, Jannease (DOC)** <jannease.johnson@dc.gov>      Tue, Mar 31, 2020 at 11:37 PM
To: "J. Michael Hannon" <jhannon@hannonlawgroup.com>, Ann Kathryn So <akso@hannonlawgroup.com>

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** "Elias-Cueto, Sonia (DOC)" <sonia.elias-cueto@dc.gov>
> **Date:** March 31, 2020 at 11:35:17 PM EDT
> **To:** "Johnson, Jannease (DOC)" <jannease.johnson@dc.gov>
> **Subject: Fwd: Log book/ health concerns in SE2**

Fyi

Get Outlook for iOS

---

**From:** Elias-Cueto, Sonia (DOC)
**Sent:** Monday, March 2, 2020 6:27:16 PM
**To:** Carrington, Capucine (DOC) <Capucine.Carrington@dc.gov>
**Subject:** Log book/ health concerns in SE2

Upon leaving this evening I could not locate the sign in/sign out log also, the entrance was busy with visitors. In addition, I am not sure if you was made aware or not but there are at least ten or more sick inmates on SE2. Testing and some classes had been canceled last week Friday and today. Do I need to notify you or Mr Edson? I cannot afford to track infections back home to my son and mother who both have delicate health conditions.
Thank you

Get Outlook for iOS

For the latest information on the District Government's response to COVID-19 (Coronavirus), please visit coronavirus.dc.gov.

# EXHIBIT 5



Ann-Kathryn So <akso@hannonlawgroup.com>

## Fw:

1 message

**Johnson, Jannease (DOC)** <jannease.johnson@dc.gov>      Tue, Mar 31, 2020 at 1:12 PM
To: Ann-Kathryn So <akso@hannonlawgroup.com>, "J. Michael Hannon" <jhannon@hannonlawgroup.com>
Cc: "Hudson, Arnold E. (DOC)" <Arnold.Hudson@dc.gov>

This email is still housed in Northwest Two (2) General Population.  He was the cell mate of Inmate ███████████ who tested positive for Covid-19.

*Sergeant Janneasse J. Johnson*
*Adjustment Board Chairman*
*Executive Secretary*
*FOP/DOC Labor Committee*
*DC Department of Corrections*
*Office : 202-523-7043*
*Cell : 202-230-9635*
*Email : Janneasse.Johnson@dc.gov*

"If your actions inspire others to dream more, learn more, do more and become more, you are a leader." ~ John Quincy Adams

Company

**From:** Walker, Angela (DOC) <Angela.Walker3@dc.gov>
**Sent:** Tuesday, March 31, 2020 1:09 PM
**To:** Johnson, Janneasse (DOC) <jannease.johnson@dc.gov>
**Subject:**

*Corporal Angela Walker*
*Adjustment Board Officer*
*D.C. Department of Corrections*
*Central Detention Facility*
*1901 D St SE*

*Washington, DC 20003*
*Office: 202-523-7040*

For the latest information on the District Government's response to COVID-19 (Coronavirus), please visit coronavirus.dc.gov.



PNG

# EXHIBIT 6



Ann-Kathryn So <akso@hannonlawgroup.com>

# Fw:
1 message

**Johnson, Jannease (DOC)** <jannease.johnson@dc.gov>     Tue, Mar 31, 2020 at 1:07 PM
To: Ann-Kathryn So <akso@hannonlawgroup.com>, "J. Michael Hannon" <jhannon@hannonlawgroup.com>

Greetings,

The above inmates were sent to the Infirmary Safe Cell and then transferred to SMU B for testing positive.  However there cell mates are still housed in NW-2 housing units.

*Sergeant Jannease J. Johnson*
*Adjustment Board Chairman*
*Executive Secretary*
*FOP/DOC Labor Committee*
*DC Department of Corrections*
*Office : 202-523-7043*
*Cell : 202-230-9635*
*Email : Jannease.Johnson@dc.gov*

"If your actions inspire others to dream more, learn more, do more and become more, you are a leader." - John Quincy Adams

Company

**From:** Walker, Angela (DOC) <Angela.Walker3@dc.gov>
**Sent:** Tuesday, March 31, 2020 1:05 PM
**To:** Johnson, Jannease (DOC) <jannease.johnson@dc.gov>
**Subject:**

***Corporal Angela Walker***
***Adjustment Board Officer***
***D.C. Department of Corrections***
***Central Detention Facility***

1901 D St SE

Washington, DC 20003

Office: 202-**523-7040**

For the latest information on the District Government's response to COVID-19 (Coronavirus), please visit coronavirus.dc.gov.



# EXHIBIT 7

Hannon Law Group Mail - Covid-19 positive Inmates from NW-2



Ann-Kathryn So <akso@hannonlawgroup.com>

## Covid-19 Positive Inmates from NW-2

1 message

---

**Johnson, Jannease (DOC)** <jannease.johnson@dc.gov>       Tue, Mar 31, 2020 at 12:37 PM
To: "J. Michael Hannon" <jhannon@hannonlawgroup.com>, Ann-Kathryn So <akso@hannonlawgroup.com>, "Hudson, Arnold E. (DOC)" <Arnold.Hudson@dc.gov>

FYI

There are two inmates that were originally housed in Southwest One (1) the Quarantine unit. They were then released to General Population Northwest Two (2). Thereafter they became ill and was then placed in the Infirmary Safe Cell. On Saturday, March 28, 2020 both of those inmates were transferred to SMU (B) where they remained due to them testing positive for Covid-19. The information sent out on the email clearly states that all of these inmates are from the D- Building at CTF which is not true.

*Sergeant Jannease J. Johnson*
*Adjustment Board Chairman*
*Executive Secretary*
*FOP/DOC Labor Committee*
*DC Department of Corrections*
*Office: 202-523-7043*
*Cell: 202-230-9635*
*Email: Jannease.Johnson@dc.gov*

"If your actions inspire others to dream more, learn more, do more and become more, you are a leader." - John Quincy Adams

Company

For the latest information on the District Government's response to COVID-19 (Coronavirus), please visit coronavirus.dc.gov.

# EXHIBIT 8



J. Michael Hannon <jhannon@hannonlawgroup.com>

# Fwd: Request for Information on Potentially Dangerous Conditions at the DOC Facilities
1 message

**Ann-Kathryn So** <akso@hannonlawgroup.com>                    Mon, Mar 23, 2020 at 3:53 PM
To: "J. Michael Hannon" <jhannon@hannonlawgroup.com>

Here is his response to my first email.  I have heard nothing about the second.

---------- Forwarded message ----------
From: **Glover, Eric (DOC)** <eric.glover@dc.gov>
Date: Fri, Mar 20, 2020 at 11:16 AM
Subject: RE: Request for Information on Potentially Dangerous Conditions at the DOC Facilities
To: Ann-Kathryn So <akso@hannonlawgroup.com>, Johnson, Paulette (DOC) <paulette.johnson@dc.gov>
Cc: Olubasusi, Benjamin R. (DOC) <benjamin.olubasusi@dc.gov>


Ms. So:


Thank you for contacting the District of Columbia Department of Corrections. DOC is preparing a response to your inquires and will contact you as soon as possible.


Regards,


Eric S. Glover

General Counsel

District of Columbia

Department of Corrections

2000 14th Street, N.W.

Seventh Floor

Washington, D.C. 20009

Phone: (202) 671-0088

Office Cell: (202) 286-8736

Fax: (202) 671-2514



**Confidentiality Notice:** This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential, or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by email and delete all copies of the message.

**Metadata:** This email transmission and any accompanying material may contain embedded metadata. Any included metadata is confidential or privileged information and is not intended to be viewed by a non-client recipient.

--------

**From:** Ann-Kathryn So [mailto:akso@hannonlawgroup.com]
**Sent:** Thursday, March 19, 2020 11:00 AM
**To:** Glover, Eric (DOC) <eric.glover@dc.gov>; Johnson, Paulette (DOC) <paulette.johnson@dc.gov>
**Cc:** Olubasusi, Benjamin R. (DOC) <benjamin.olubasusi@dc.gov>
**Subject:** Request for Information on Potentially Dangerous Conditions at the DOC Facilities

CAUTION: This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

Good morning,

In light of the ever-changing landscape with respect to the pandemic, we would like to ensure that the Agency is doing everything it can to keep the staff, residents, and visitors as safe as possible from COVID-19.  Swift effective action is critical as the numbers of suspected and confirmed cases rise exponentially.  This is especially true for DOC staff members, who have regular contact with the inmate population.   They must be protected!

The DOC has publicized a number of measures it has or will be taking.  Please confirm the following DOC efforts:

- Have all in-person visits, programming and volunteer activities at all Agency facilities in fact been suspended?

- Have DOC officials established Incident Command Team?  Who is on that team?  Are any members of the Union on that team?

- Is the Medical Staff meeting with each housing unit and officer roll call?  Please provide details as to time, place and frequency of the meetings that the Medical Staff is holding.

- What is the Agency's strategic communications plan with regard to COVID-19, and how has it been communicated to the staff?  Is it updated and communicated regularly as this situation evolves?  The last update on the DOC web page is dated March 14, 2020.

- What does "enhanced cleaning efforts" mean?  Have those "enhanced cleaning efforts" been implemented, especially within common areas?  How often is this level of cleaning being done?

- The Agency promised to order additional cleaning and sanitation supplies, including protective gloves, masks and clothing for staff.  No information was provided about dispensing these items.  Have these items been received and distributed?  Are there any supplies you need that you do not have?  Have sanitizing wipes been provided by the Agency?  Is the staff permitted to bring personal sanitation material, other than wipes?  Are inmates being provided safety materials that the staff is not?

- Was there a two-hour cleaning of the entire facility?  How many times has this happened?  Is this occurring daily/regularly?

- Please describe the Agency's efforts in partnering and/or sharing information with criminal justice partners?

•   Are daily updates continuing to be sent via emails to the staff regarding COVID-19?  Can you please make those available?

Most notable in the Agency's public response to COVID-19 is that there is nothing that addresses the procedures for the screening, quarantine and/or treatment of staff, inmates and/or anyone who comes into contact with either or both.  Can you provide detailed information as to what those procedures are?  Specifically:

•   **Have the DOC employees (officers and medical staff) been provided appropriate protective devices/material/training?  Are staff members knowledgeable on and adequately equipped to prevent transmission, minimize spread and protect themselves and the inmate population from contacting COVID-19?**

•   **Is the DOC working in close connection with the DC Department of Health? What medical support does the Agency have specifically for the virus?**

•   Are all incoming inmates, staff and other individuals with access to the DOC facilities questioned as to their level of risk?

•   What is the procedure for processing all new inmates to the facilities?

•   What is the procedure for assessing the risk to existing inmates?

•   What testing is being offered to confirm a diagnosis of COVID-19?

•   What procedures are in place if an inmate is symptomatic?

•   What procedures are in place if an inmate tests positive?

•   What procedures are in place for quarantines?

•   Are there any of the following:

•   Asymptomatic inmates currently housed at any of the facilities who are at high-risk for contracting COVID-19?

•   Symptomatic inmates currently housed at any of the facilities?  If so, what actions are being taken with regard to those individuals?

•   Inmates currently housed at any of the facilities who have tested positive for COVID-19?

•   What is being done to track any inmates, visitors, staff, or other individuals with access to any of the facilities who have been at any DOC facility within the