# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANNEASE JOHNSON,           :
                                  :

      Plaintiff,                 :       Civil Action No.:      20-2944 (RC)
                                  :

      v.                          :       Re Document No.:    6, 10, 11
                                  :

DISTRICT OF COLUMBIA, *et al.*,      :
                                  :

      Defendants.              :

## MEMORANDUM OPINION

**DENYING DEFENDANTS' PARTIAL MOTION TO DISMISS AS MOOT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

This case concerns Plaintiff Jannease Johnson's allegations against Defendants the District of Columbia, Director of the D.C. Department of Corrections ("DOC") Quincy Booth, and Deputy Director of Operations of the DOC Wanda Patten, that she was demoted, re-assigned, and fired from positions in the DOC due to disclosures and speech of hers concerning DOC's handling of the COVID-19 pandemic. Plaintiff alleges that she was retaliated against in violation of the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51 *et seq.* ("DCWPA"), and the First Amendment under 42 U.S.C. § 1983. For the reasons set forth below, the Court denies as moot Defendants' Partial Motion to Dismiss, grants in part and denies in part Defendants' Motion to Dismiss, and denies Plaintiff's Motion for Partial Summary Judgment.

## II. BACKGROUND

Plaintiff alleges that until the events that are the subject of this action, she was a Sergeant with DOC and the Executive Secretary of the Labor Committee of her union, the Fraternal Order of Police for D.C. Jail employees ("FOP"). Am. Compl. ¶ 1, ECF No. 7. The pandemic caused

by COVID-19 began during her employment at DOC, with the first confirmed case of COVID-19 in the United States on January 21, 2020, the first COVID-19 death in the United States on February 29, 2020,[1] and the first confirmed case of COVID-19 in D.C. on March 7, 2020.  *Id.* ¶¶ 16, 18, 20.

Plaintiff alleges that she, the FOP, and the FOP's lawyers at Hannon Law Group ("Hannon") took many steps to try and address what she felt were inadequate COVID-19 safety precautions in the D.C. Jail.  Starting March 13, 2020, the FOP Labor Committee—including Plaintiff—began meeting daily with Hannon to "review DOC's response to the [COVID-19] emergency" and form a plan to protect the union members, which included sharing information about "D.C. Jail operations" with Hannon "to assess the danger of COVID-19 to Unit Members, inmates and the public."  *Id.* ¶¶ 23–24.  Plaintiff alleges that DOC leadership and Mayor Bowser were trying to keep DOC personnel "uninformed of the dangers associated with exposure to COVID-19 in the Jail so as not to impair operations of the Jail."  *Id.* ¶¶ 25–27.  On March 20, 2020, the Labor Committee held a vote of no confidence in Director of DOC Quincy Booth and Deputy Director of DOC Wanda Patten.  *Id.* ¶ 28.

On March 25, 2020, Hannon sent a letter to Booth "outlining conditions at the Jail and listing those actions urgently requested by the FOP," which included information provided by Plaintiff.  *Id.* ¶ 33.  The letter cited problems such as lack of communication between DOC leaders and the Labor Committee, lack of COVID-19 screening for incoming inmates, and lack of personal protective equipment for correctional officers having "direct contact" with inmates.  *Id.*  Also on March 25, Plaintiff told Hannon that "at least two inmates had tested positive for COVID-19."  *Id.* ¶ 35.  Plaintiff alleges that having received no response by March 28, "the

---

[1] The Amended Complaint states February 28, but the cited source states February 29.

Labor Committee established Protocols for its membership based on CDC Guidance, and delivered them to DOC," and "urged members to refuse to comply with an order that violated these Protocols." *Id.* ¶ 36. Plaintiff alleges that as of March 29 there were five inmates known to have tested positive for COVID-19. *Id.* ¶ 37.

Upon learning that the Public Defender Service for the District of Columbia ("PDS") and the ACLU were filing suit regarding DOC's failure to protect inmates from COVID-19, the Labor Committee allegedly issued a press release in agreement, stating that DOC was not following Centers for Disease Control and Prevention guidance. *Id.* ¶¶ 41–42. The Labor Committee also held a "live-streamed" press conference on April 1, 2020, outside the D.C. Jail to announce that they had authorized Hannon to file an *amicus* brief in the PDS/ACLU suit (*Banks v. Booth*, No. 1:20-cv-849 (D.D.C. filed Mar. 30, 2020)). *Id.* ¶¶ 44–45, 49. Among the speakers at this press conference were J. Michael Hannon of the eponymous law firm, Plaintiff, and other FOP members. *Id.* ¶ 49. Plaintiff allegedly "spoke passionately about the failure of DOC to respond to COVID-19 in the Jail," including lack of testing, contact tracing, and reporting the number of employees testing positive. *Id.* She also criticized Booth for not visiting the Jail. *Id.* By April 8, the Jail's "official" count of positive-testing inmates was allegedly thirty-seven. *Id.* ¶ 50.

Plaintiff alleges that the Labor Committee, including Plaintiff, and Hannon lawyers spoke on April 11 with court-appointed *amici* in the PDS/ACLU suit, sharing information and documents about DOC's handling of COVID-19. *Id.* ¶ 52. On April 14, Hannon filed a class action lawsuit on behalf of the Labor Committee and its Chairman, Corporal Benjamin Olubasusi, in the Superior Court of the District of Columbia alleging that DOC failed to protect DOC personnel from COVID-19. *Id.* ¶ 54. Plaintiff provided a declaration in support of this suit

based on "her personal experiences in the Jail, and from the experiences of other Unit Members who, because she was a Union Officer, turned to her to report their concerns." *Id.* ¶ 55. Three FOP members newly tested positive for COVID-19 on April 22. *Id.* ¶ 57.

Plaintiff alleges that on the evening of April 22, 2020, "inmates rioted" in the Jail after not being allowed recreation time or showers for four days. *Id.* The next day, "an email reporting the incident was sent through the DOC Incident Notification Mailing List under the title 'Planned Use of Force.'" *Id.* ¶ 58. Plaintiff alleges that "[t]he email contained no medical information and was not marked confidential." *Id.* She forwarded this email to Hannon lawyers "as part of her ongoing work with the Labor Committee to collect information" about DOC's COVID-19 response. *Id.* ¶ 59. J. Michael Hannon provided the email to a reporter to "raise public awareness of the state of the Jail." *Id.* ¶ 60. The reporter then contacted a DOC official and referenced the Planned Use of Force email. *Id.* ¶ 61. Plaintiff subsequently gave an interview to the reporter on April 27 "to raise public awareness of the danger at the Jail," noting "that an FOP member had now died due to COVID-19," and the reporter published an article including a testimonial from Plaintiff on May 1. *Id.* ¶¶ 64, 67. The Labor Committee, including Plaintiff, and Hannon lawyers met again with the *Banks amici* on May 9 and shared additional documentation, including the Planned Use of Force email. *Id.* ¶ 69. During a bargaining session between FOP and DOC on May 12, a DOC Deputy Director allegedly asked, "how can we move forward when we have people going to the media." *Id.* ¶ 70. On May 22, Hannon filed the FOP's *amicus* brief in *Banks*, which allegedly relied in part on information provided by Plaintiff. *Id.* ¶ 72.

After the reporter referenced the Planned Use of Force email to the DOC official, DOC allegedly began an investigation into Plaintiff's "conduct in emailing to Mr. Hannon." *Id.* ¶ 61.

Plaintiff alleges that she notified DOC of her April 27 interview in advance and that "[i]mmediately thereafter" she was reassigned and "demot[ed]" because of her "effectiveness at raising public concern." *Id.* ¶¶ 64–65. The stated reason for reassignment was that there was "a pending investigation into misconduct by [Plaintiff] wherein [she] allegedly released privileged information." *Id.* ¶ 65. On May 14, the DOC Office of Investigative Services allegedly completed the investigation into Plaintiff's alleged misconduct. *Id.* ¶ 71. The report stated that Plaintiff's transmission of emails to Hannon violated DOC policies and procedures, including the Health Insurance Portability and Accountability Act ("HIPAA"). *Id.*

On May 29, Deputy Director Patten allegedly proposed that Plaintiff be terminated from her position because Plaintiff forwarded certain emails to Hannon. *Id.* ¶ 73. Plaintiff alleges that in this proposal,

> Patten intentionally failed to note that the offending emails were NOT marked confidential, under DOC policy or federal HIPAA regulations. Nor did she note that federal HIPAA regulations permit a Unit Member to forward otherwise confidential documents to an attorney under whistleblower law. Director Patten's distortion of the facts represents a reckless disregard for the rights of SGT. JOHNSON and the law.

*Id.* A hearing officer was appointed to review the proposed termination in accordance with the FOP's collective bargaining agreement. *Id.* ¶ 74. On June 30, the hearing officer recommended against disciplining Plaintiff in part because Plaintiff's disclosures to Hannon were protected by D.C. whistleblower law. *Id.* ¶ 75.

Booth responded in writing on July 20, allegedly including "new legal arguments not present in DOC's original submission." *Id.* ¶ 76. Booth allegedly focused on Plaintiff's supposed violation of HIPAA and "intentionally withheld" the fact that the emails were not "marked confidential under DOC polices or HIPAA regulations . . . in reckless disregard for the rights of [Plaintiff] and the law." *Id.* Booth allegedly then "remanded" the case for the hearing

officer's reconsideration. *Id.* On August 4, the hearing officer submitted new findings allegedly "adopt[ing] almost in its entirety Director Booth's updated arguments." *Id.* ¶ 79. The hearing officer concluded that even though Plaintiff's "disclosure of DOC email to" Hannon was permitted under 45 C.F.R. § 164.502(j), a whistleblower exception to HIPAA, Plaintiff's "forwarding the email through her attorneys to the media was not protected under the Whistleblower Protection Act," and Plaintiff was "bound by the actions of the attorneys." *Id.*

Plaintiff received notice of her dismissal on August 13, in a letter dated August 12, from Booth adopting the hearing officer's updated recommendation. *Id.* ¶ 80. Her employment with DOC ended on August 21. *Id.* ¶ 81.

On September 3, 2020, Plaintiff filed a complaint in the Superior Court of the District of Columbia alleging that Defendants violated the DCWPA and the First Amendment under 42 U.S.C. § 1983, and that Defendants did so as a civil conspiracy. Complaint, *Johnson v. District of Columbia*, Civil Action No. 2020 CA 003889 B (D.C. Super. Ct. 2020), ECF No. 1-2 at 6–33. Defendants removed this action to this Court on October 14, and Plaintiff filed an amended complaint on November 18. Notice of Removal, ECF No. 1; Am. Compl. Plaintiff's Amended Complaint retains only the claims brought pursuant to the DCWPA and First Amendment under 42 U.S.C. § 1983.

Defendants moved to partially dismiss Plaintiff's original Complaint and Plaintiff responded. Defs.' Partial Mot., ECF No. 6; Pl.'s Opp'n Partial Mot., ECF No. 8. Defendants moved to dismiss Plaintiff's Amended Complaint for failing to state claims upon which relief can be granted for both the DCWPA and First Amendment claims. Defs.' Mot., ECF No. 10; Pl.'s Opp'n, ECF No. 20; Defs.' Reply, ECF No. 21. Plaintiff moved for partial summary

judgment of several elements of her DCWPA claim (Count I).  Pl.'s Mot., ECF No. 11; Defs.'

Opp'n, ECF No. 19; Pl.'s Reply, ECF No. 22.

### III.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain

statement of the claim" to give the defendant fair notice of the claim and the grounds upon which

it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that

standard; it asks whether the plaintiff has properly stated a claim.  *Browning v. Clinton*, 292 F.3d

235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief

above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements," are

therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not

accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of

legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

However, a court considering a motion to dismiss presumes that the complaint's factual

allegations are true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States*

*v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Rule 56 of the Federal Rules of Civil Procedure requires a court to grant summary

judgment "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. ANALYSIS

### A. Defendants' Partial Motion to Dismiss (ECF No. 6)

Defendants moved to dismiss Plaintiff's initial complaint on November 4, 2020. Defs.' Partial Mot. Plaintiff subsequently filed an amended complaint and Defendants moved to dismiss that amended complaint. Am. Compl.; Defs.' Partial Mot. Therefore, Defendants' first motion to dismiss is denied as moot.

### B. Defendants' Motion to Dismiss (ECF No. 10)

Defendants move to dismiss both of Plaintiff's claims for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, Defendants' motion to dismiss is granted in part regarding Plaintiff's DCWPA claim and otherwise denied.[2]

---

[2] Defendants also argue that Count III should be dismissed because it "does not assert a cause of action, and instead merely asserts a prayer for the award of injunctive relief." Defs.' Mot. at 14. Plaintiff "takes no position on whether Count Three should stand alone or be construed as part of the prayer for relief." Pl.'s Opp'n at 18 n.2. The Court dismisses Count III and will construe its content as part of Plaintiff's prayer for relief. *Cf. Elec. Priv. Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 38 (D.D.C. 2019) (dismissing Declaratory Judgment Act count and construing as part of prayer for relief), *aff'd*, No. 19-5238, 2021 WL 1703626 (D.C. Cir. Apr. 30, 2021).

1. D.C. Whistleblower Protection Act (Count I)

Defendants argue that Plaintiff's claim under the DCWPA fails for two reasons. First, Defendants argue that Plaintiff did not plead that she made a protected disclosure. Second, Defendants argue that Plaintiff did not adequately plead causation. The Court holds that Defendants have only demonstrated that Plaintiff failed to state a claim under the DCWPA with respect to her alleged protected disclosures through participation in an unfair labor practice complaint and sixteen group grievances. Only Plaintiff's claims based on those alleged protected disclosures are therefore dismissed.

The DCWPA states "that the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C. Code § 1-615.51. "A plaintiff asserting a claim under the DCWPA must establish a prima facie case that (1) he made a 'protected disclosure'; (2) his supervisor took or threatened to take a 'prohibited personnel action' against him; and (3) the protected disclosure was a 'contributing factor' to the prohibited personnel action." *Bowyer v. District of Columbia*, 793 F.3d 49, 52 (D.C. Cir. 2015) (citing D.C. Code §§ 1-615.53(a), 1-615.54(b)).

*a. Protected Disclosure*

Defendants argue that Plaintiff failed to adequately plead a protected disclosure for three reasons. First, Defendants argue that some of Plaintiff's disclosures were not made directly "to a supervisor or a public body," as required by the DCWPA. Second, Defendants argue that one of Plaintiff's disclosures concerned information already widely known, and that protected disclosures cannot have been already widely known. Third, Defendants argue that Plaintiff did not plead sufficient facts regarding certain disclosures. As discussed below, the Court only

agrees with the third argument, which concerns alleged disclosures through Plaintiff's participation in an unfair labor practice complaint and sixteen group grievances.

"A supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure." D.C. Code § 1-615.53. "Protected disclosure" is defined as

> any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences [certain categories of mismanagement, abuse, danger, etc.].

*Id.* § 1-615.52(a)(6). "Prohibited personnel action" is defined to include at least

> recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or take other favorable personnel action; or retaliating in any other manner against an employee because that employee makes a protected disclosure or refuses to comply with an illegal order, as those terms are defined in this section.

*Id.* § 1-615.52(a)(5)(A).

The definition of "protected disclosure" was amended in 2010 to replace "by statute" with "by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties." Whistleblower Protection Amendment Act of 2009 § 2(a)(2), 2010 D.C. Law 18-117, 57 D.C. Reg. 896 (Mar. 11, 2020), https://code.dccouncil.us/ dc/council/laws/docs/18-117.pdf ("Whistleblower Protection Amendment Act of 2009").

Defendants' first argument is that Plaintiff's disclosures to Hannon were not protected disclosures because Hannon is not a supervisor or public body. *See* Defs.' Mot. at 5; Defs.' Reply at 2–4. This argument requires interpreting the DCWPA, a D.C. statute. "In answering questions involving the proper interpretation of D.C. statutes, [we rely] on the construction of

these laws by the D.C. Court of Appeals." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 947 (D.C. Cir. 2017) (alteration in original) (quoting *Poole v. Kelly*, 954 F.2d 760, 761 (D.C. Cir. 1992) (per curiam)). This rule does not extend to the D.C. Court of Appeals' dicta. *United States v. Wade*, 152 F.3d 969, 973 (D.C. Cir. 1998); *see also id.* (collecting cases). But even such dicta should be carefully considered because when the interpretation of a D.C. statute is not conclusively determined by a D.C. Court of Appeals decision, federal courts must predict how the D.C. Court of Appeals would rule on the issue. *See Coleman v. District of Columbia*, 794 F.3d 49, 58 (D.C. Cir. 2015) ("In reviewing a claim under the Whistleblower Act, this court applies the substantive law of the District of Columbia and "[o]ur duty . . . is to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered the case." (alteration in original)).

The D.C. Court of Appeals' "primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *1215 CT, LLC v. D.C. Alcoholic Beverage Control Bd.*, 213 A.3d 605, 609 (D.C. 2019) (quoting *Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61, 64–65 (D.C. 1980) (en banc)). "[T]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Id.* (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)). "However, 'there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination.'" *Id.* (quoting *Harrison v. N. Tr. Co.*, 317 U.S. 476, 479 (1943)). "Thus, 'even where the words of a statute have a superficial clarity, we may turn to legislative history to ensure that our interpretation is consistent with legislative intent." *Id.* (citation omitted; quoting

*Peoples Drug Stores*, 470 A.2d at 754, and *Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015)).

Defendants argue that disclosures are only considered "protected disclosures" when they are made "to a supervisor or a public body." Defs.' Mot. at 5. They contend that the pre-amendment DCWPA required disclosure "to a supervisor or a public body" and the 2010 amendment did not alter this requirement. They claim that "statutory language, caselaw, [and] legislative intent" support their interpretation. Defs.' Reply at 3. Regarding statutory language, Defendants argue that because the words "to any person" appear as part of the clause "without restriction to . . . prior disclosure made to any person by an employee or applicant," the "any person" language refers to the recipients of prior disclosures, as opposed to the overall recipient of a protected disclosure. *Id.* They cite *Baumann v. District of Columbia* as supporting their view because the D.C. Circuit in that case held that certain disclosures were not protected disclosures because they were made to a union committee, which was not a supervisor or public body. *Id.* at 2–3; 795 F.3d 209, 219–20 (D.C. Cir. 2015). Defendants point to a D.C. legislative report on the 2010 amendment which indicates that the "to any person" language was added as part of an effort to provide protection to duplicative disclosures. *See* Defs.' Reply at 3 (citing D.C. Council, Report on Bill 18-233, the "Whistleblower Protection Amendment Act of 2009" at 4 (Nov. 19, 2009), ECF No. 19-4).

Plaintiff argues that protected disclosures post-amendment can be made to "any person." Pl.'s Opp'n at 9. They point to the "plain language meaning of the statute." Pl.'s Reply at 2.[3]

---

[3] This same statutory interpretation question was argued in the briefing for Plaintiff's Motion for Partial Summary Judgment, in addition to the briefing for Defendants' Motion to Dismiss. The Court considers arguments on this issue from both sets of briefs to answer the same question of law for both motions.

Regarding case law, Plaintiff accurately notes that *Baumann*—cited for support by Defendants—concerned the pre-amendment DCWPA. *See* 795 F.3d at 220 ("[E]ven assuming [the post-amendment] statute encompasses Baumann's disclosure, that amendment does not apply retroactively." (citation omitted)); *see also id.* at 219 ("any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body" (quoting D.C. Code § 1-615.52(a)(6))). Moreover, Plaintiff cites both a D.C. Court of Appeals decision and a decision of this Court that suggest in dicta that protected disclosures may be made to "any person." *See Freeman v. District of Columbia*, 60 A.3d 1131, 1141 & n.16 (D.C. 2012) ("The FOX–5 broadcast two days later did not constitute a protected disclosure because it was not made to a 'supervisor or a public body' as the DCWPA then required. . . . We note that the Whistleblower Protection Amendment Act of 2009 relaxed this requirement." (citation omitted)); *Hawkins v. Boone*, 786 F. Supp. 2d 328, 333 n.2 (D.D.C. 2011) ("Under the pre–2010 WPA, statements to a newspaper would not be covered because *The Washington Post* was neither a 'supervisor' nor a 'public body' as required under § 1-615.52(a)(6). Under the current incarnation of the WPA, a disclosure may be made 'to any person.'"). Regarding legislative history, Plaintiff points generally to the "overarching legislative intent of the act." Pl.'s Reply at 4.

The Court believes Defendants' interpretation is the one more likely to be adopted by the D.C. Court of Appeals, and therefore interprets "protected disclosure" to only cover disclosures "to a supervisor or a public body." The plain language favors Defendants' interpretation. The Court finds the statutory language as codified to be ambiguous. It does not clearly limit "any person" to the prior-disclosure provision, nor clearly remove the previously universal "supervisor or a public body" limitation. One point weighing against Plaintiff's interpretation is that under

Plaintiff's interpretation, protected disclosures can generally be made to any person, but "disclosure[s] made in the ordinary course of an employee's duties" presumably can only be protected disclosures if they are made to a "supervisor or a public body," if the "supervisor or a public body" language is to have any effect. The Court does not see why only disclosures made in the ordinary course of an employee's duties would need to be made to a supervisor or public body when all others could be made to any person. Furthermore, if as Plaintiff argues, the "supervisor or a public body" restriction applies only to disclosures made in the ordinary course of an employee's duties, the same logic seems to require the subsequent limitation—that the employee reasonably believes the disclosed information to evidence certain categories of mismanagement, abuse, danger, etc.—to apply only to "duties" disclosures as well. The Court sees no indication from the statutory text that the D.C. Council intended to generally broaden whistleblower protections to "any disclosure of information, not specifically prohibited by statute, . . . made to any person by an employee," Pl.'s Mot. at 30, yet restrict "duties" disclosures to those made "to a supervisor or a public body" and for which "the employee reasonably believes" the disclosures evidence certain categories of information.[4]

The legislative history also favors Defendants' interpretation because it indicates that the amendment to the definition of "protected disclosure" was not intended to broaden the category

---

[4] The Court notes that a comma appears to have been lost during codification of the 2010 amendment. The pre-amendment statute defined "protected disclosure" to include "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or public body." D.C. Code Ann. § 1-615.52(a)(6) (West, effective until Mar. 10, 2020 amendment). The bill amending the DCWPA instructed that "by statute" be replaced with "by statute, . . . including a disclosure made in the ordinary course of an employee's duties." Whistleblower Protection Amendment Act of 2009 § 2(a)(2). Followed literally, the amended statute should have a comma directly after "duties" because the pre-amendment statute had a comma directly after "by statute." Yet the as-codified, post-amendment version has no comma after "duties." *See* D.C. Code § 1-615.52(a)(6). That extra comma would indicate more clearly that "to a supervisor or public body" applied universally.

of potential recipients, but rather to address other issues. *See* Defs.' Reply at 3 (citing D.C. Council, Report on Bill 18-233, the "Whistleblower Protection Amendment Act of 2009" at 4 (Nov. 19, 2009), ECF No. 19-4). Although not every significant statutory change is included in every relevant legislative report, this omission is another data point urging caution against Plaintiff's interpretation.

Although some cases suggest that the D.C. Court of Appeals may have previously believed that protected disclosures could be made to "any person," none of those cases squarely address the issue. *Freeman* states in dicta that the requirement that a protected disclosure be made to a supervisor or public body was "then required" by the DCWPA and had subsequently been "relaxed." *Freeman*, 60 A.3d at 1141 & n.16. The D.C. Court of Appeals indicated the same understanding in dicta in a recent case where it stated in part that "'protected disclosure' is defined to include (as pertinent here) 'any disclosure of information . . . to any person by an employee.'" *Ukwuani v. District of Columbia*, 241 A.3d 529, 551 (D.C. 2020). But there are also some cases supportive of the Court's and Defendants' view. *See, e.g.*, *Clayton v. District of Columbia*, 374 F. Supp. 3d 119, 138 (D.D.C. 2019) (regarding amended DCWPA, stating in dicta and without analysis that protected disclosures must be made to supervisor or public body); *District of Columbia v. Poindexter*, 104 A.3d 848, 853 (D.C. 2014) (regarding amended DCWPA, recounting jury instruction implying that protected disclosures must be made to supervisor or public body). Overall, this Court believes that in a future case with the issue squarely presented, the D.C. Court of Appeals would hold that protected disclosures must be made "to a supervisor or a public body."

Defendants further argue that protected disclosures must be made *directly* to a supervisor or public body. *See* Defs.' Reply at 4–5 (arguing that Plaintiff's provision of information to

attorneys for use in *amicus* brief was not disclosure made to public body because such information was not "directly" provided to court).  But the Court is not convinced that the DCWPA requires direct disclosures.  Defendants cite no authority supporting their view that disclosures to a supervisor or public body must be made directly by the whistleblower to the supervisor or public body.  Plaintiff also cites no authority on this issue, but the Court notes at least some persuasive case law indicating that indirect disclosures may be acceptable.  *See Freeman*, 60 A.3d at 1143 (holding that letter written by union attorney "on behalf of" plaintiff was not plaintiff's protected disclosure because at time of writing plaintiff was unaware of potential illegality forming subject of letter, without mentioning indirect nature of disclosure); *Adams v. District of Columbia*, No. 2009 CA 006419 B, 2011 WL 1991991, at *8–9 (D.C. Super. Mar. 30, 2011) ("To the Court's knowledge, neither the District of Columbia Court of Appeals nor the D.C. Circuit has addressed whether the DC WPA's 'supervisor or [] public body' requirement limits protected disclosures to those made directly by the disclosor to the disclosee—the supervisor or public body. . . .  For this Court to hold that Detective Adams cannot maintain an action under the DC WPA because he made a disclosure, which would have otherwise been protected under the DC WPA, to the wrong person would be contrary to the stated purpose of the DC WPA and public policy generally." (first alteration in original)); *cf. Deneau v. Manor Care, Inc.*, 219 F. Supp. 2d 855, 864 (E.D. Mich. 2002) (holding that Michigan whistleblower statute requiring reporting to "public body" may encompass indirect reports if there is "a question of fact as to whether Plaintiff reported a suspected violation of law to a public body").  At this time, the Court is not prepared to hold that disclosures must be made directly to a supervisor or a public body.

Under this interpretation of the DCWPA, the Court holds that Defendants have not demonstrated that their motion to dismiss should be granted regarding disclosure to a supervisor or a public body for two reasons. First, Defendants did not argue that Plaintiff's disclosures failed to qualify as *indirect* disclosures to a supervisor or a public body; they only argued that indirect disclosures were not protected by the DCWPA. *E.g.*, Defs.' Reply at 4–5 ("Although Plaintiff alleges 'participation' in the *Banks v. Booth* class action, she did not *directly* provide testimony or disclose information to the Court; rather, at best, she provided information to attorneys, who then filed a brief as *amicus curiae* and a declaration by Plaintiff's attorney." (emphasis added)). In fact, Defendants seem to acknowledge that at least some of Plaintiff's disclosures could count as indirect disclosures. For example, Defendants argue that one of Plaintiff's disclosures does not qualify "because *she* did not make *any* disclosures to the court" and because an amicus brief and declaration filed in court by Hannon "cannot reasonably be construed as Plaintiff's own disclosures under the plain language of the DCWPA." Defs.' Mot. at 5–6. Because Defendants did not argue that Plaintiff's disclosures failed to qualify as either direct or indirect protected disclosures, their motion cannot be granted on that ground.

Second, Plaintiff has pleaded sufficient facts alleging that her disclosures to Hannon were indirect disclosures to public bodies. "Public body" is defined to include, among other entities, any federal or D.C. judiciary, including any member thereof. D.C. Code § 1-615.52(a)(7)(B). As Defendants acknowledge, Plaintiff "allege[d] that Plaintiff engaged in 'protected disclosures to attorneys for the FOP Labor Committee *for the purpose of bringing litigation*.'" Defs.' Mot. at 5 (emphasis added) (quoting Am. Compl. ¶ 84). Plaintiff alleges that after she forwarded the Planned Use of Force email to Hannon, it was at least provided to court-appointed *amici* in *Banks v. Booth* during a meeting between the Labor Committee—including Hannon—and court-

appointed *amici*, and the *amici* later submitted a report to the appointing judge. Compl. ¶ 69. Plaintiff has therefore sufficiently alleged at this stage that sharing the Planned Use of Force email with Hannon was an indirect disclosure to a public body. The amicus brief and declaration filed by Hannon in *Banks v. Booth* are similarly alleged to be indirect disclosures to a federal court. The Court therefore declines to grant Defendants' motion to dismiss premised on failure to have made disclosures to a supervisor or a public body.

Defendants' second argument is that "Plaintiff's participation as a plaintiff in the class action lawsuit *Olubasusi v. District of Columbia*, Case No. 2020 CA 002256 B, in the D.C. Superior Court, is not protected because the allegations in that complaint were already widely known at the time of the case's filing." Defs.' Mot. at 6. Defendants cite *Johnson v. District of Columbia* for support, which suggests that "a true disclosure" under the DCWPA cannot concern information that is "commonly known," "a matter of public record," or "already known" to the recipients or "other supervisory persons." 225 A.3d 1269, 1278–79 (D.C. 2020) (quoting *Wilburn v. District of Columbia*, 957 A.2d 921, 925–26 (D.C. 2008)).

Taking the Plaintiff's allegations as true, Defendants have not shown as a matter of law that Plaintiff's participation in *Olubasusi* raised only issues that were publicly known. Defendants only make two specific factual arguments. They say that "Plaintiff concedes that information related [to] DOC's handling of COVID-19 was already the subject of a lawsuit filed by the Public Defender Service and the ACLU," Defs.' Reply at 5 (citing Am. Compl. ¶ 41), and that "Plaintiff also admits that the Labor Committee had given a press conference on that same subject on April 1, 2020," *id.* (citing Am. Compl. ¶ 49). But these are at a very high level of generality. Plaintiff alleged that the content of the declaration she provided in *Olubasusi* "was drawn from her personal experiences in the Jail, and from the experiences of other Unit Members

who, because she was a Union Officer, turned to her to report their concerns." Am. Compl. ¶ 55. This is also fairly high-level, but sufficient to survive a motion to dismiss. Although Plaintiff did not explicitly plead that she provided information unknown to the general public, the Court finds this to be a reasonable inference from the fact that she drew "from her personal experiences in the Jail" and from first-hand accounts of the personal experiences of her colleagues. Defendants may raise this issue again at the summary judgment stage with the benefit of discovery.

Defendants' third argument is that Plaintiff failed to plead sufficient facts regarding alleged protected disclosures through Plaintiff's "participation in [an] unfair labor practice complaint" and "participation in sixteen separate, group grievances." Defs.' Mot. at 6; Am. Compl. ¶¶ 87–88. Defendants are correct. Plaintiff first mentions these two purported protected disclosures in her claim for relief for Count I—with no mention of them in her extensive "Factual Allegations" section—and says essentially no more than recited here other than that these disclosures "serve the public interest." These are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, and are therefore dismissed.

### b. Causation

In addition to challenging whether Plaintiff satisfied the protected-disclosure prong of a DCWPA claim, Defendants also argue that Plaintiff did not adequately plead facts to support causation. The causation element of a prima facie DCWPA claim requires establishing that "the protected disclosure was a 'contributing factor' to the prohibited personnel action." *Bowyer*, 793 F.3d at 52 (citing D.C. Code § 1-615.54(b)).

Defendants initially argue that "Plaintiff's DCWPA claim . . . fails for lack of causation" because her "termination stemmed from the findings of the investigation into Plaintiff's use of

her District government email account to external sources, not any protected disclosure." Defs.'
Mot. at 7–8. But this appears to again be an argument that Plaintiff's disclosures to Hannon
were not protected disclosures because they were not made to a supervisor or public body.
Plaintiff correctly explains that *Hawkins*, the case relied upon by Defendants, is inapposite. In
that case, the plaintiff's complaint "ma[de] clear that the adverse action occurred because of
[plaintiff's] *Washington Post* interview," yet that plaintiff did not allege that this interview was a
protected disclosure. 786 F. Supp. 2d at 333; *see also* Pl.'s Opp'n at 11. Defendants seem to
accept all of this in their reply, in which they state that "[t]he District does not dispute that
Plaintiff has sufficiently alleged causation in connection with the Planned Use of Force
Email . . . . But as to any other possible disclosure[,] . . . Plaintiff has pleaded no facts to support
an inference that these actions resulted in her termination."[5] Defs.' Reply at 4.

The Court would be justified in denying this ground of Defendants' motion because new
arguments cannot ordinarily be raised in reply. *See Baloch v. Norton*, 517 F. Supp. 2d 345, 348
n.2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-
movant's opposition, the court [may] either ignore those arguments . . . or provide the non-
movant an opportunity to respond."), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C.
Cir. 2008). Plaintiff was not afforded a fair opportunity to respond to this issue because of
Defendants' shifting causation argument.

Regardless, the Court holds that Plaintiff has sufficiently pleaded causation for
disclosures other than the Planned Use of Force email. The strongest argument that Plaintiff did
not sufficiently plead causation for alleged disclosures other than the Planned Use of Force email

---

[5] Defendants presumably intended to refer to "the Defendants" instead of "[t]he District"
because Count I is alleged against all Defendants.

are several statements suggesting that Plaintiff herself alleges that she was fired for sharing the Planned Use of Force email with Hannon. *See, e.g.*, Pl.'s Opp'n at 11 ("[Plaintiff] was fired for providing the Planned Use of Force email to Mr. Hannon as the Hearing officer Specifically found on remand."). However, these statements are not sufficiently unambiguous to be considered disclaimers. For example, the preceding sentence of the quote above is: "SGT. JOHNSON was not fired for participating in an interview with Nathan Baca." *Id.* It is plausible that Plaintiff was imperfectly stating a comparison with *Hawkins*, where the plaintiff alleged that he was fired for giving an interview. Plaintiff can be forgiven for poor wording when Defendants seek to use it against them in a new argument in reply after initially focusing Plaintiff's attention on a different argument.

Plaintiff also alleges sufficient facts regarding causation of disclosures other than sharing the Planned Use of Force email with Hannon to survive a motion to dismiss. For example, Plaintiff alleges that on April 1, 2020, she spoke at a press conference outside the D.C. Jail at which it was announced that the Labor Committee intended "to submit an authorized Amicus Brief supporting the PDS/ACLU lawsuit." Am. Compl. ¶ 49. DOC had allegedly been notified of the press release in advance, *id.* ¶ 46, but even if they had not been, it can be inferred that DOC personnel would become aware of the content of a press conference staged outside the Jail by DOC employees and their union's lawyers. Similarly, Plaintiff alleges that Hannon filed a class action suit against DOC on April 14 which included a declaration from Plaintiff. *Id.* ¶ 54. Because both of these occurred before the date of Plaintiff's dismissal notice of August 12, and because these disclosures allegedly criticized DOC's handling of COVID-19, the facts as alleged regarding causation are "enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted).

## 2. Section 1983—First Amendment (Count II)

In addition to her claim brought pursuant to the DCWPA, Plaintiff brings a First Amendment claim under 42 U.S.C. § 1983, which Defendants have also moved to dismiss.[6] Defendants argue that Plaintiff's First Amendment claim under Section 1983 fails for three reasons. First, Defendants argue that Plaintiff's sharing of emails was not protected speech. Second, Defendants argue that Plaintiff did not plead adequate facts connecting talking to the press with retaliatory action. Third, Defendants argue that, even if Plaintiff has pleaded a plausible claim under the First Amendment, Booth and Patten are entitled to qualified immunity from such a claim. For the reasons set forth below, the Court holds that Defendants have not shown that Plaintiff failed to sufficiently plead a First Amendment violation. Defendants' motion is therefore denied with respect to Plaintiff's First Amendment claim.

In the D.C. Circuit, courts apply a four-prong test in evaluating a government employee's First Amendment retaliation claim:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that [his] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

---

[6] References to "Defendants" in this subsection refer only to Booth and Patten in their personal capacities in line with Count II as pleaded. *See* Am. Compl. ¶¶ 92–97.

*Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (alteration in original) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)).  In balancing the governmental interest against the employee's interest for the second prong—performing the *Pickering* balancing, *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)—courts consider several factors including "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).  This "balancing test calls for a fact-intensive inquiry." *Thompson v. District of Columbia*, 428 F.3d 283, 286 (D.C. Cir. 2005).  "The first two factors . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." *Wilburn*, 480 F.3d at 1149 (alteration in original).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  For a right to be "clearly established" at the time of the official's conduct, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft*, 563 U.S. at 741).  The legal principle to be applied must be "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority'" that "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 589–90 (quoting *Ashcroft*, 563 U.S. at 741–42).  "Qualified immunity balances two

important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

Trial courts have discretion to decide which prong of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236; *see Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) ("[L]ower federal courts have the discretion to decide only the more narrow 'clearly established' issue 'in light of the circumstances of the particular case at hand.'" (quoting *Pearson*, 555 U.S. at 236)). On the "clearly established" prong, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Abbasi*, 137 S. Ct. at 1866 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)); *see also id.* at 1867 ("[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

## a. Protected Speech

Defendants move to dismiss Plaintiff's First Amendment claim for failure to state a claim, arguing that Plaintiff did not engage in protected speech based on the second prong of the *Pickering* test: "whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." *Bowie*, 642 F.3d at 1133 (quoting *Wilburn*, 480 F.3d at 1149). Defendants argue that "even if Plaintiff engaged in speech as a private citizen by forwarding internal DOC emails to outside parties, the government's interests in safeguarding

pre-investigatory information and medical records of inmates outweighs any possible interest Plaintiff had in making that speech," and that "Defendants' interest in promoting the efficiency and security of the operations at DOC significantly outweighs Plaintiff's interest in releasing the pre-investigatory and inmate medical information." Defs.' Mot. at 9–10. Citing HIPAA regulations and "D.C.'s Freedom of Information Statute," Defendants state that "[t]he government has a substantial interest in safeguarding pre-investigatory information as well as inmate medical information from public disclosure." *Id.* at 10 (citing 45 C.F.R. § 160.101 *et seq.* and § 164.102 *et seq.*; D.C. Code § 2-531 *et seq.*). Defendants claim that "Plaintiff's speech interfered with DOC's obligation to comply with medical privacy laws and the standard operations of the agency." *Id.* Defendants criticize Plaintiff for failing to articulate why "this speech in particular was protected," even if "Plaintiff had an interest in speaking out about DOC's COVID-19 response generally." Defs.' Reply at 7.

It is Defendants' burden as movants to demonstrate why Plaintiff's allegations, taken as true, fail as a matter of law to state a claim that would pass the *Pickering* balancing test. As explained below, based on the current record the Court cannot say as a matter of law that Plaintiff has failed to plead an interest that outweighs the government's interest in the *Pickering* balancing test.

Defendants do not sufficiently articulate how the Court could conclude at this pre-discovery stage that Plaintiff's "statement[s] impair[ed] discipline by superiors or harmony among co-workers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise," *LeFande*, 841 F.3d at 494 (quoting *Rankin*, 483 U.S. at 388), or why such effects could have been predicted. The closest

Defendants come to addressing the specific "governmental interest in promoting the efficiency of the public services it performs through its employees," *Bowie*, 642 F.3d at 1133 (quoting *Wilburn*, 480 F.3d at 1149), is stating, without support, that "Plaintiff's speech interfered with DOC's obligation to comply with medical privacy laws and the standard operations of the agency," Defs. Mot. at 10. But they say nothing specific about what type or degree of harm, if any, resulted or could have resulted from Plaintiff's disclosure, nor the importance generally of ensuring strict compliance "with medical privacy laws and the standard operations of the agency." *See Rankin*, 483 U.S. at 388–89 (concluding that petitioners "fail to demonstrate a state interest that outweighs" employee's First Amendment rights in part because "there is no evidence that it interfered with the efficient functioning of the office"). Compliance with medical privacy laws such as HIPAA is surely important. But even assuming Plaintiff's speech violated HIPAA, Defendants say nothing about the actual or potential harm from disclosure of the type of information at issue here. Furthermore, Defendants do not make clear what "standard operations of the agency" they refer to, nor what kind of investigation the disclosed "pre-investigatory information" could jeopardize, nor how this particular disclosure would jeopardize that investigation. Without the benefit of discovery to conduct this "fact-intensive inquiry," *Thompson*, 428 F.3d at 286, and taking Plaintiff's factual allegations as true, the Court is not convinced that Defendants have identified a weighty interest on their side of the balancing test. *See id.* at 286–87 (reversing judgment on the pleadings for defendants on plaintiff's First Amendment retaliation claim because, viewing the complaint's allegations in the light most favorable to plaintiff, with the record "[c]onsisting only of the complaint, the record contains no evidence regarding the extent of [plaintiff's] alleged disruptiveness," and defendants "cannot

prevail in a balancing test with no record evidence on [their] side of the scale").[7]  In fact, taking

Plaintiff's allegations as true that she was fired "*in retaliation* for her first amendment protected

disclosures," Am. Compl. ¶¶ 94–95 (emphasis added), rather than because she violated HIPAA

or DOC policies, suggests little to no interest on Defendants' side because, as alleged,

Defendants did not fire Plaintiff *for those violations*.

     In contrast, Plaintiff sufficiently alleges a weighty First Amendment interest.  Taking

Plaintiff's factual allegations as true, she sought "to bring public scrutiny on the deplorable and

dangerously poor response to COVID-19 by DOC."  Am. Compl. ¶ 94.  The alleged spread of a

contagious disease among DOC personnel and inmates due to DOC mismanagement is a matter

of public concern.  Additionally, given Plaintiff's unique position to be informed about these

matters of public concern, her interest in commenting about them to the public is high.  *See*

*Baumann v. District of Columbia*, 987 F. Supp. 2d 68, 77 (D.D.C. 2013) ("As a government

employee, and specifically a police officer, the Plaintiff and the public have a strong interest in

the Plaintiff's ability to comment on matters of public concern."), *aff'd*, 795 F.3d 209 (D.C. Cir.

2015).  These allegations are more than sufficient to plausibly allege an interest that outweighs

the government's interest when viewed in the light most favorable to Plaintiff, and therefore

survive a motion to dismiss.  Although the Court would not characterize Defendants' argument

as "embrac[ing] pointless secrecy," Pl.'s Opp'n at 14, Defendants have not provided sufficient

---

[7] Defendants cite a case in which a court held at the motion to dismiss stage "that the governmental interests far outweighs any conceivable countervailing interests."  *Pearson v. District of Columbia*, 644 F. Supp. 2d 23, 44 (D.D.C. 2009), *aff'd*, 377 F. App'x 34 (D.C. Cir. 2010).  But that conclusion came after the court acknowledged that, "[w]here an employee is simply performing his or her job duties, as the Court has concluded is the case here, the Court need not—and should not—proceed to balance the competing interests."  *Id.* at 42.  The balancing analysis was therefore dicta.

support on this pre-discovery record to allow the Court to conclude that, taking Plaintiff's

allegations as true, the government's interest outweighs Plaintiff's interest.

### b. Causation for Press Disclosures

Defendants briefly argue that "the Amended Complaint establishes that Plaintiff's

termination was the result of her unauthorized disclosures of sensitive information to attorneys at

Hannon Law Group," and therefore Plaintiff has not pleaded sufficient allegations of retaliation

"for her participation in press conferences or interviews." Defs.' Mot. at 11; *see also* Defs.'

Reply at 6 n.3. But the Amended Complaint also states that "[i]n the instant case the speech was

both the sharing of emails with Union attorneys and sharing her experiences and beliefs with the

press regarding the COVID-19 pandemic in the Jail," and that Defendants Booth and Patten

retaliated against her for this allegedly protected speech. Am. Compl. ¶¶ 94–96. Plaintiff

alleged that she participated in press conferences and interviews criticizing DOC's handling of

COVID-19. *See, e.g.*, Am. Compl. ¶¶ 49, 64, 67. She also alleged facts from which it can be

plausibly inferred that Booth and Patten became aware of such disclosures before her

reassignment or dismissal, including advance notice provided to DOC about the April 1 press

conference and an article being published on May 1 with a testimonial from Plaintiff. *Id.* ¶¶ 44–

47, 67. Given that Plaintiff is essentially alleging that Booth and Patten provided a pretextual

reason for their actions and there has not yet been any discovery, Plaintiff cannot be expected to

provide much more to show causation at this time. *See* Fed. R. Civ. P. 9(b) ("Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."); *Jones v.

Quintana*, 831 F. Supp. 2d 75, 87 (D.D.C. 2011) (holding that at the "early stage" of a motion to

dismiss, plaintiff sufficiently alleged that her protected speech was "a substantial or motivating

factor" of the adverse employment actions in part because such allegations are "implicit" when

plaintiff alleged defendant's conduct "was an 'intentional' effort to 'prevent [plaintiff] from exercising her First Amendment rights'").

Furthermore, the temporal proximity between Plaintiff's alleged participation in press conferences and interviews and the alleged retaliation strengthens the plausibility of causation. Plaintiff alleges that she participated in a press conference outside the Jail on April 1, 2020, Am. Compl. ¶ 49, and gave an interview to a reporter on April 27, 2020, which resulted in a published article on May 1, 2020, *id.* ¶¶ 64, 67. Plaintiff also alleges that she was removed from her post "[i]mmediately []after" giving the interview, *id.* ¶ 65, that on May 12, 2020, "during a bargaining session between the FOP Union and DOC, . . . DOC Deputy Director Gitanna Stewart-Ponder stated 'how can we move forward when we have people going to the media,'" *id.* ¶ 70, that on May 14, 2020, DOC "completed a report on SGT. JOHNSON's supposed misconduct," *id.* ¶ 71, and that on May 29, 2020, "SGT. JOHNSON was proposed by Defendant Wanda Patten for removal from her position," *id.* ¶ 73. The close temporal proximity between Plaintiff's alleged press conferences and interviews and Defendants' subsequent alleged steps taken concerning Plaintiff's employment supports finding plausible causation. The allegation that DOC personnel found "people going to the media" to be disruptive further supports this plausibility by alleging that DOC had knowledge of "people going to the media" and that DOC perceived this negatively. For these reasons, Defendants have not shown that Plaintiff failed to sufficiently plead causation related to her alleged participation in press conferences and interviews.

### c. Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's First Amendment claim. As stated above, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official

29

violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court explained above why Defendants have not shown that Plaintiff failed to sufficiently plead protected speech or causation. Therefore, Defendants' motion to dismiss based on qualified immunity can succeed only if the "clearly established" prong of the qualified immunity test is met. *See* Defs. Mot. at 11 ("Even if Plaintiff states a First Amendment retaliation claim, Booth and Patten are entitled to qualified immunity.").

It is first necessary to define what constitutional right must have been clearly established. Defendants argue that

> the relevant question is not whether Plaintiff's conduct *actually* violated DOC policies or HIPAA, but merely whether, at the time Patten recommended Plaintiff's termination and Booth gave Plaintiff her final notice, that the individual defendants *reasonably believed* Plaintiff's conduct violated DOC Policies and HIPAA's Privacy Rules and that she could be terminated on that basis.

Defs.' Mot. at 13 (citing *Mpoy v. Rhee*, 758 F.3d 285, 295 (D.C. Cir. 2014)). But Plaintiff's factual allegations must be taken as true for purposes of a motion to dismiss. Therefore, the question is not whether it was clearly established that Defendants could not fire Plaintiff for violating DOC policies or HIPAA. The question is whether it was clearly established that Defendants could not pretextually claim that they were firing Plaintiff for violating DOC policies or HIPAA while actually firing her for "sharing of emails with Union attorneys and sharing her experiences and beliefs with the press regarding the COVID-19 pandemic in the Jail . . . to bring public scrutiny on the deplorable and dangerously poor response to COVID-19 by DOC." Am. Compl. ¶ 94. The phrase "and that she could be terminated on that basis" in Defendants' brief obscures Plaintiff's allegation—taken as true at this stage—that "that basis" was pretextual.

Defendants put forth limited argument and cite no controlling authority about whether or not the facts alleged indicate that Defendants violated clearly established law by firing Plaintiff for the content of her speech. Defendants cite only an out-of-circuit district court case for the proposition that "courts have consistently upheld terminations challenged by employees fired for what their employer honestly and reasonably believed to be a violation of HIPAA." Defs.' Mot. at 13; *see Kopko v. Lehigh Valley Health Network*, No. CV 14-1290, 2016 WL 6442062 (E.D. Pa. Oct. 31, 2016), *aff'd*, 776 F. App'x 768 (3d Cir. 2019). The Court does not doubt that employees could in some circumstances be legally fired for violating HIPAA. But, as explained above, for purposes of this motion it is irrelevant whether Defendants could fire Plaintiff for reasons other than those alleged. *See Jones*, 831 F. Supp. 2d at 87 ("While that may or may not turn out to be true after the parties have had the opportunity to engage in discovery, the simple and unavoidable fact is that Jones has alleged otherwise."). Plaintiff has alleged that Defendants retaliated against her for "rais[ing] her public-safety concerns" and "[t]his account is more than adequately supported by the full panoply of factual allegations in the . . . Amended Complaint." *Id.*; *see, e.g.*, Pl.'s Opp'n at 16–17 (recounting Plaintiff's allegations that Defendants intentionally declined to alert hearing officer to relevant facts and that Defendants "could not have reasonably believed SGT. JOHNSON's forwarding of emails violated HIPAA," which if true would belie Defendants' stated justification for Plaintiff's dismissal); Am. Compl. ¶¶ 94–95 (alleging that Plaintiff's protected speech was made "to bring public scrutiny on the deplorable and dangerously poor response to COVID-19 by DOC," and that she was fired "in retaliation for her first amendment protected disclosures").[8]

---

[8] To the extent that Plaintiff argues that Defendants are not entitled to qualified immunity because it was clearly established that Plaintiff did not violate HIPAA or "Agency Policies," *see* Pl.'s Opp'n at 16–18, Plaintiff also misunderstands the proper inquiry, as noted for Defendants

The question is therefore not whether Defendants had a "good faith belief that [Plaintiff] committed a job-related violation of agency rules"; it is whether at the time "the general principles governing First Amendment retaliation claims had been so fully articulated and repeatedly applied to analogous employment disputes" such that it was "beyond debate" that terminating Plaintiff's employment for "rais[ing] her public-safety concerns" was unconstitutional. *Jones*, 831 F. Supp. 2d at 88 (quoting *Al-Kidd*, 563 U.S. at 741). "The Supreme Court has cautioned us not to define the right at too high a level of generality; instead, we must examine the right in its 'particularized' context." *Aref v. Lynch*, 833 F.3d 242, 267 (D.C. Cir. 2016) (citing *Reichle v. Howards*, 566 U.S. 658, 665 (2012)). But taking Plaintiff's allegations as true that she was pretextually reassigned and dismissed for her criticism of DOC's handling of COVID-19, and in light of this Court's conclusion that Plaintiff has more than sufficiently pleaded the elements of her Section 1983 action challenged by Defendants in their motion, this is the most particularized the right needs to be defined in determining whether the right was clearly established for purposes of this motion. *See Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))).

In general, there can be "difficulty of finding clearly established law under *Pickering*" because it requires a balancing of interests. *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998); *see also id.* (collecting cases). But even though "reasonable officials might not always be able to predict the outcome of a balancing test such as that used in *Pickering* cases," in some

above. But to the extent Plaintiff alleges that Defendants "could not have reasonably believed" Plaintiff violated HIPAA or agency policies," *id.* at 17, to support her argument that Defendants' stated reasons for dismissing her were pretextual, these allegations are relevant.

cases "the illegality of the [defendants'] conduct is sufficiently clear that they can fairly be said to have been on notice of the impropriety of their actions." *Kinney v. Weaver*, 367 F.3d 337, 371–72 (5th Cir. 2004); *see Sanders v. District of Columbia*, 522 F. Supp. 2d 83, 90 (D.D.C. 2007) (rejecting defendants' argument that "because the law requires a balancing of competing interests . . . the outcome in this particular instance would be difficult to predict" in part because when "viewing the facts in the light most favorable to [plaintiff], a reasonable MPD official surely would have known that retaliating against [plaintiff] for his public speech violated a clearly established right"). In those cases, when "taking the plaintiff['s] side of [factual] disputes, th[e] case does not require any real balancing at all, for the [defendants] do not have any relevant, legitimate interests to put on their side of the *Pickering* scales." *Kinney*, 367 F.3d at 372.

In light of the *Pickering* balancing above and the allegation—taken as true—that Defendants' contemporaneous justifications were pretextual, Defendants have not demonstrated that it was not clearly established at the time that Defendants' alleged actions violated the First Amendment. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted). A judge of this Court has stated that at least as early as 2008, "any reasonable government official would have been on notice that" it was "clearly unlawful" to "knowingly and intentionally" take adverse employment actions against a government employee "because [the employee] had attempted to raise her public-safety concerns about [Defendants'] own policies with the District of Columbia Council, [the then-Mayor], and the media." *Jones*, 831 F. Supp. 2d at 88 (internal quotation marks omitted). Regarding the *Pickering* balancing test specifically—which itself is clearly

established—it would necessarily have been clear to any reasonable official that if there were no legitimate interests on the government's side of the balancing in a given case, the plaintiff's interest must prevail. *See Thompson*, 428 F.3d at 287 ("The [government] cannot prevail in a balancing test with no record evidence on its side of the scale."); *Yniguez v. Arizonans for Off. Eng.*, 69 F.3d 920, 943 (9th Cir. 1995) (explaining that the government "would lose by default" in a *Pickering* balancing if there were "nothing on the non-free speech side of the scale"), *vacated sub nom. Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43 (1997); *see also Mihos v. Swift*, 358 F.3d 91, 108 (1st Cir. 2004) (holding that that "when considering only the complaint, as we are bound to do, we find a void on [defendant's] side of the scale and the *Pickering* scale tips decisively in favor of [plaintiff]" because plaintiff alleged that his termination was motivated by "political interference and intimidation"); *Edwards v. City of Goldsboro*, 178 F.3d 231, 248 (4th Cir. 1999) (denying government's motion for judgment on the pleadings in part because "at this early pleading stage[] we cannot discern any legitimate interest of the Defendants" on their side of the *Pickering* balancing test).

The D.C. Circuit has affirmed the denial of a motion to dismiss based on qualified immunity when the defendants relied on support similar to that relied upon by Defendants here. In *Navab-Safavi v. Glassman*, the plaintiff, a contractor for a unit of Voice of America, alleged that her contract was terminated for appearing in a music video critical of the United States. 637 F.3d 311, 313 (D.C. Cir. 2011). The district court denied the defendants' motion to dismiss based on qualified immunity, and the defendants filed an interlocutory appeal. *Id.* at 314. The D.C. Circuit panel acknowledged that "the government has presented a weighty interest in support of its authority to take action" against the plaintiff, but went on to affirm the denial. *Id.* at 316–17. The court explained that when the plaintiff's allegations were taken to be true and

construed in the light most favorable to her, the plaintiff's interests were "weighed against little government interest," even though "this same view" might not "prevail after full discovery." *Id.* at 317. The court reasoned that "without further resolution of the factual questions underlying the determination of the *Pickering* balance[,] . . . it is not possible to determine at this stage as a matter of law that [plaintiff] has not alleged a violation of clearly established law." *Id.* That was because when "all we have of record is the [government's] assertion that its interest in performing its governmental functions and carrying out its statutory mandates was sufficiently implicated by plaintiff's conduct to warrant the protection of qualified immunity," that is insufficient because "qualified immunity cannot be based on a 'simple assertion by [appellants] without supporting evidence' of the adverse effect of the speech on [the governmental function]." *Id.* at 318 (quoting *Shockency v. Ramsey Cty.*, 493 F.3d 941, 949–50 (8th Cir. 2007)). The court concluded that denial was proper because it was "unable to determine without an evidentiary record whether any act [the government] committed in defense of those functions constituted a violation of clearly established rights, or even in general terms, where the *Pickering* balancing tips." *Id.*

Here, Plaintiff alleges that she was fired "in retaliation for her first amendment protected disclosures" that "w[ere] undertaken as part of her personal responsibilities as Executive Secretary for the Union Labor Committee in their efforts to bring public scrutiny on the deplorable and dangerously poor response to COVID-19 by DOC." Am. Compl. ¶¶ 94–95. As discussed above, at this stage of the litigation the government has essentially nothing on its side of the balancing test because the Court must rely on Plaintiff's well-pleaded complaint, construed liberally, and Plaintiff alleges that she was fired in retaliation for her speech, rather than due to any potential or actual disruption to the government's operations. "The *Pickering*

balance understandably favors the plaintiff when the test is based solely on the allegations in the complaint." *Hafley v. Lohman*, 90 F.3d 264, 267 (8th Cir. 1996). Like in *Navab-Safavi*, where the D.C. Circuit affirmed denial of a motion to dismiss based on qualified immunity because "all [the court] ha[d] of record" for the government's interest was the government's "assertion that its interest in performing its governmental functions and carrying out its statutory mandates was sufficiently implicated by plaintiff's conduct to warrant the protection of qualified immunity," 637 F.3d at 318, here, all Defendants have at this stage are their assertions that "the government's interests in safeguarding pre-investigatory information and medical records" and "in promoting the efficiency and security of the operations at DOC" outweigh Plaintiff's interests, Defs.' Mot. at 9–10. Because that is all Defendants have at this stage, and because "qualified immunity cannot be based on a 'simple assertion by [defendants] without supporting evidence' of the adverse effect of the speech on [the governmental function]," *Navab-Safavi*, 637 F.3d at 318 (second alteration in original) (quoting *Shockency*, 493 F.3d at 949–50), Defendants' motion to dismiss based on qualified immunity must be similarly denied. For the same reason, no reasonable official could have believed at the time that the *Pickering* balance would come out in the government's favor when taking Plaintiff's allegations as true and construed in her favor because Defendants then have nothing on their side of the scale.

With further development of the factual record there may potentially appear additional contours to the relevant right such that it would not have been clearly established at the time. For example, the right at issue would be defined differently if it was shown that Defendants legitimately held separate, innocent justifications for the actions taken against Plaintiff, such as the potential or actual detrimental effect on "the efficiency of the public services" from violations of HIPAA or agency rules. But as elaborated elsewhere in this opinion, no such facts

are currently accepted when taking Plaintiff's allegations as true and construing them liberally in Plaintiff's favor, as the Court must on a motion to dismiss. Therefore, "resolution of the question of whether [Defendants' are] entitled to qualified immunity must await further development of the factual record." *Jones*, 831 F. Supp. 2d at 83; *see also Devlin v. Kalm*, 531 F. App'x 697, 707 (6th Cir. 2013) ("[W]hile officers will often be entitled to qualified immunity under *Pickering*, this will only be evident after an opportunity for discovery so that the court can know 'what is being balanced against what.'" (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223 (6th Cir. 2005) (Sutton, J., concurring))).

### C. Plaintiff's Motion for Partial Summary Judgment (ECF No. 11)

Plaintiff moves for partial summary judgment on certain elements of her DCWPA claim, arguing that she is entitled to summary judgment because she made a protected disclosure, Defendants took prohibited personnel actions against her, her protected disclosure was a contributing factor to the prohibited personnel actions, and the prohibited personnel actions would not have been taken without her protected disclosure. "A plaintiff asserting a claim under the DCWPA must establish a prima facie case that (1) he made a 'protected disclosure'; (2) his supervisor took or threatened to take a 'prohibited personnel action' against him; and (3) the protected disclosure was a 'contributing factor' to the prohibited personnel action." *Bowyer*, 793 F.3d at 52 (citing D.C. Code §§ 1-615.53(a), 1-615.54(b)). For the reasons given below, Plaintiff's motion is denied.

#### 1. Protected Disclosure

Plaintiff moves for summary judgment that her disclosures to Hannon were protected disclosures. Pl.'s Mot. at 29–31. But Plaintiff has not demonstrated everything needed to prove that she made protected disclosures beyond any genuine dispute of material fact, at least because

she has not established that she disclosed to a supervisor or a public body, held the required belief, or made disclosures "not specifically prohibited by statute." "Protected disclosure" is defined as

> any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> > (A) Gross mismanagement;
> >
> > (B) Gross misuse or waste of public resources or funds;
> >
> > (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
> >
> > (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
> >
> > (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6).

Plaintiff does not make it perfectly clear which disclosures are the focus of this motion. She refers to her "disclosures to [Hannon]" in plural, but then states that she "need only address the single email upon which Director Quincy Booth relied, the April 23 Use of Force email." Pl.'s Mot. at 29. The following paragraph of her motion refers to "this email," even though the subsequent paragraph refers to "all of SGT. JOHNSON's disclosures." *Id.* at 30. Plaintiff does not reference any other disclosures with specificity in her argument. Given the lack of analysis dedicated to disclosures beyond the Planned Use of Force email and the relative focus of her

argument on that email, the Court construes the motion to be requesting summary judgment for that email alone.[9]

First, the parties again debate whether the current DCWPA requires disclosures to have been made to a supervisor or a public body to be considered protected disclosures. *See, e.g.*, Defs.' Opp'n at 4–6. For the reasons given above in Section IV.B.1.a, the Court holds that the D.C. Court of Appeals would rule that protected disclosures must be made "to a supervisor or a public body," but that such disclosures may be made indirectly. Although Plaintiff has sufficiently alleged that her disclosure of the Planned Use of Force email to Hannon was an indirect disclosure to a public body for purposes of avoiding dismissal, Plaintiff has not provided sufficient evidence for the Court to hold the same as a matter of law at this time. Plaintiff did not advance any argument on this point in her opening memorandum, likely because she argued that disclosures need only be made "*to any person*." Pl.'s Mot. at 29 (quoting D.C. Code § 1-615.52(a)(6)). In reply, Plaintiff states that "there is no dispute that SGT. JOHNSON made her disclosure to attorneys at HANNON LAW GROUP for them to present the information to both the Superior Court and to the District Court." Pl.'s Reply at 4. But Plaintiff presents no evidence in support, such as a citation to Defendants' response to Plaintiff's Statement of Material Facts, to show a lack of dispute. This is therefore one reason to deny summary judgment as to whether this disclosure was a protected disclosure.

---

[9] If the Court instead construed Plaintiff's motion to be requesting summary judgment on "all of SGT. JOHNSON's disclosures," Pl.'s Mot. at 29, her motion would similarly fail at least because her Argument does not describe with any specificity which acts constitute "all of SGT. JOHNSON's disclosures." The Court will not on its own attempt to divine arguments not actually made by Plaintiff. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[I]t is not the obligation of this Court to research and construct the legal arguments available to the parties. To the contrary, perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." (internal quotation marks and citations omitted)).

Second, Plaintiff has not provided sufficient undisputed evidence that she believed her disclosure of this email evidenced at least one of the five statutory categories. Plaintiff argues that due to "DOC's deplorable response to the COVID-19 pandemic[,] . . . SGT. JOHNSON could more than 'reasonably believe' that her disclosures were evidence of gross mismanagement, violation of federal, state, or local law, rule or regulation, and/or substantial danger to public health and safety." Pl.'s Mot. at 29. In her Amended Complaint she alleges that she forwarded the Planned Use of Force email to Hannon because she was "still genuinely concerned about the health and safety of the inmates, Unit Members." Am. Compl. ¶ 59. She also alleged that her "disclosures evidence [the five statutory categories]." *Id.* ¶ 89. But none of these affirmatively state that Plaintiff believed at the time of each disclosure that the information in the disclosure evidenced at least one of those categories of information, even though the gravamen of the Amended Complaint and this motion imply that that is her position and Defendants do not specifically dispute this fact. *See Freeman*, 60 A.3d at 1143 ("[A]n employee must have had such a belief *at the time the whistle was blown* in order to state a claim under the DCWPA."). Regardless, Plaintiff has not cited in her motion any evidence, such as an affidavit from herself, from which a reasonable jury could conclude that she held such a belief at the time of disclosure. Additionally, Defendants are largely unable to dispute this fact because they have not had the opportunity to conduct discovery on this fact-specific question of belief. *See Coleman v. Allstate Ins. Co.*, 80 F. Supp. 3d 5, 8 (D.D.C. 2015) ("Summary judgment is particularly inappropriate here where the parties have not yet engaged in discovery.").

Third, Plaintiff has not shown that it is undisputed that her disclosure was "not specifically prohibited by statute." The only potential prohibitions on disclosing the email discussed in the briefs are HIPAA and DOC confidentiality policies. For the reasons below,

Plaintiff has not shown a lack of genuine disputes of material fact such that she would be entitled to judgment as a matter of law that her disclosure of the Planned Use of Force email was "not specifically prohibited by statute."

Regarding HIPAA, Defendants dispute Plaintiff's assertion that the Planned Use of Force email contained no medical information, presumably referring to "protected health information," the disclosure of which HIPAA forbids. Defs.' Resp. Statement Material Facts ¶ 11, ECF No. 19-1. But neither party sufficiently analyzes the email's contents and HIPAA case law to persuade the court one way or the other. This would therefore be a disputed fact preventing summary judgment if the dispute was material. But Plaintiff counters that even if the email contained medical information protected from disclosure by HIPAA, there is a whistleblower exception in HIPAA covering Plaintiff's disclosure:

> (a) Standard. A covered entity or business associate may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this subchapter.
>
> . . . .
>
> (j)(1) Disclosures by whistleblowers. A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses protected health information, provided that:
>
>> (i) The workforce member or business associate *believes in good faith that the covered entity has engaged in conduct that is unlawful or otherwise violates professional or clinical standards, or that the care, services, or conditions provided by the covered entity potentially endangers one or more patients, workers, or the public*; and
>>
>> (ii) The disclosure is to:
>>
>>> (A) A health oversight agency or public health authority authorized by law to investigate or otherwise oversee the relevant conduct or conditions of the covered entity or to an appropriate health care accreditation organization for the purpose of reporting the allegation of failure to meet professional standards or misconduct by the covered entity; or

> (B) *An attorney retained by or on behalf of the workforce member or business associate for the purpose of determining the legal options of the workforce member or business associate with regard to the conduct described in paragraph (j)(1)(i) of this section.*

45 C.F.R § 164.502;[10] *see* Pl.'s Reply at 6–7 n.1.  The application of this exception depends on at least one question of material fact that Plaintiff has not sufficiently established—good-faith belief that the disclosed information evidenced at least one of the above categories.  The issue of Plaintiff's beliefs is discussed in more detail above, but the same infirmities there apply to Plaintiff's motion concerning the potential application of this HIPAA exception to Plaintiff's disclosure of the Planned Use of Force email.  Plaintiff has therefore not established as a matter of law that her disclosure met the above exception.

Regarding Defendants' second argument that Plaintiff's disclosure was "specifically prohibited by statute"—that it was in violation of DOC confidentiality policies—Plaintiff argues that "DOC Policy is not statute," and that therefore DOC confidentiality policies are irrelevant.  Pl.'s Reply at 6.  But Plaintiff cites no authority that agency policies or regulations promulgated pursuant to statutory authority can never meet the "specifically prohibited by statute" standard.  The Court is not prepared to adopt such a restrictive interpretation at this time based on this skeletal argument.  Therefore, because "Defendants contend that the information in the email was confidential and that they terminated Plaintiff for her unauthorized release of confidential information," Defs.' Opp'n at 7, and because Plaintiff contends that "under no theory or DOC policy is this email confidential," Pl.'s Mot. at 30, there is a disputed issue of material fact.

---

[10] Regarding the attorney-disclosure provision, a response to a comment in the Final Rule states that "[w]orkforce members or business associates may not understand their legal options or their legal exposure when they come into possession of information about unlawful or other inappropriate or dangerous conduct.  Permitting potential whistleblowers to consult an attorney provides them with a better understanding of their legal options."  Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82637 (Dec. 28, 2000).

## 2. Prohibited Personnel Action

Plaintiff also moves for summary judgment that Defendants took a prohibited personnel action against her. As noted above, the DCWPA states that "[a] supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure." D.C. Code § 1-615.53. "'Prohibited personnel action' includes but is not limited to: recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; . . . or retaliating in any other manner against an employee because that employee makes a protected disclosure or refuses to comply with an illegal order . . . ." *Id.* § 1-615.52(a)(5)(A).

Plaintiff argues that because she was demoted, involuntarily transferred, and terminated from her positions at DOC, she is entitled to summary judgment that Defendants took prohibited personnel actions against her. Pl.'s Mot. at 31. Defendants do not dispute that Plaintiff was "reassigned" and "dismiss[ed]" from her positions at DOC, Defs.' Resp. Statement Material Facts ¶¶ 14, 21, and do not specifically address this aspect of Plaintiff's motion. Defendants' only argument against granting summary judgment on this issue is a general objection that summary judgment is currently premature. *See* Defs.' Opp'n at 6–8.

The Court declines to grant summary judgment on this issue for two reasons. First, Plaintiff did not address whether she must prove that a prohibited personnel action was taken "because that employee makes a protected disclosure." D.C. Code § 1-615.52(a)(5)(A). Second, given that the underlying facts are not in dispute, the Court sees little benefit in granting summary judgment on such a small segment of Plaintiff's claim at this early stage of litigation.

3. Causation

Finally, Plaintiff moves for summary judgment on the causation elements of her DCWPA claim. "A supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure." D.C. Code § 1-615.53. The DCWPA employs a burden-shifting framework for litigating causation:

> [O]nce it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the defendant to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.

D.C. Code § 1-615.54. "'Contributing factor' means any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* § 1-615.52(a)(2). The issue of causation is "[e]ssentially . . . measured under a 'but for' analysis." *Johnson v. District of Columbia*, 935 A.2d 1113, 1119 (D.C. 2007).

Plaintiff argues that she is entitled to summary judgment that "her protected disclosures were a contributing cause of the prohibited personnel action" and that "there is no evidence that the prohibited personnel action would have been taken absent her protected disclosures." Pl.'s Mot. at 31–32. She argues that because DOC listed her disclosures to Hannon as the justification for her termination, and because she contends that those disclosures were protected disclosures, that she is entitled to judgment as a matter of law that she would not have suffered the prohibited personnel actions absent those protected disclosures. *Id.* Defendants agree "that they terminated Plaintiff for her unauthorized release of confidential information," but even crediting Defendants' statement, it is not clear which disclosures they argue formed the basis of Plaintiff's dismissal. *See* Defs.' Opp'n at 7 (citing letter from Patten to Plaintiff, Defs.' Opp'n Ex. 1, ECF No. 19-2, which notes violations from forwarding the Planned Use of Force email to Hannon, *id.*

at 2, as well as "various instances" of providing information to "external source(s)," *id.* at 4–5); Defs.' Resp. Statement Material Facts ¶ 16 (not disputing that "[t]he stated basis for the proposal was SGT. JOHNSON's forwarding certain *email(s)* to attorneys for the Union" (emphasis added)). This ambiguity justifies denial of this segment of Plaintiff's motion.

Additionally, even if Plaintiff and Defendants agreed that the alleged prohibited personnel actions were caused by Plaintiff's forwarding of the Planned Use of Force email, that would not fully resolve the causation issue because the parties would be in disagreement about whether the resulting violation of HIPAA or other agency rules caused the alleged prohibited personnel actions, as Defendants contend, or whether other aspects of the forwarding of the email, such as criticism of Defendants, caused the alleged prohibited personnel actions, as Plaintiff contends. Because Plaintiff has not established as a matter of law based on undisputed material facts that "her protected disclosures were a contributing cause of the prohibited personnel action" or that "there is no evidence that the prohibited personnel action would have been taken absent her protected disclosures," Pl.'s Mot. at 31–32, Plaintiff's motion for summary judgment is denied regarding causation.

## V. CONCLUSION

For the foregoing reasons, Defendants' Partial Motion to Dismiss (ECF No. 6) is **DENIED** as moot, Defendants' Motion to Dismiss (ECF No. 10) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motion for Partial Summary Judgment (ECF No. 11) is **DENIED**. As explained above, only Plaintiff's DCWPA claim (Count I) is dismissed in part, and only to the extent that this claim is based on alleged protected disclosures through Plaintiff's participation in an unfair labor practice complaint and sixteen group grievances. *See* Am.

Compl. ¶¶ 87–88.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  July 16, 2021                                   RUDOLPH CONTRERAS
                                                                        United States District Judge