**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JANNEASE JOHNSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-2944 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 44, 45, 46 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S MOTION FOR LEAVE TO FILE UNDER SEAL; GRANTING
DEFENDANTS' CONSENT MOTION TO FILE EXHIBITS UNDER SEAL

## I. INTRODUCTION

In March and April of 2020, Sergeant Jannease Johnson worked for the D.C. Department

of Corrections ("DOC") and was a regular and vocal critic of DOC's early response to the

COVID-19 pandemic. She alleges that, because of her criticism, Defendants the District of

Columbia, DOC Director Quincy Booth, and DOC Deputy Director of Operations Wanda Patten

demoted, reassigned, and ultimately fired her. Johnson alleges that Defendants' actions were

retaliatory, and that they violated both the D.C. Whistleblower Protection Act ("DCWPA"), D.C.

Code §§ 1-615.51 *et seq.*, and the First Amendment. The parties have cross-moved for summary

judgment on Johnson's claims. *See* Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 44-2; Defs.'

Mot. Summ. J. ("Defs.' MSJ"), ECF No. 46. For the reasons set forth below, the Court denies

Johnson's motion for summary judgment and grants in part and denies in part Defendants'

motion for summary judgment.

## II.  BACKGROUND

### A.  Factual Background

Johnson's career at DOC began in 1992, when DOC hired her as a correctional officer. Pl.'s Statement Undisputed Material Facts ("Pl.'s SUMF") ¶ 1, ECF No. 44-2.  In 2006, DOC promoted her to sergeant, and she served as a Lead Correctional Officer from 2006 until 2020. *Id.* ¶ 2.  In 2020, Johnson also held a position as the "Adjustment Board Chairman"—a role in which she "oversaw the disciplinary process for inmates who possessed contraband or assaulted other inmates or staff."  *Id.* ¶ 4.  Separately, Johnson was an active participant in the Fraternal Order of Police Department of Corrections Labor Committee (the "Union").  Pl.'s MSJ at 2.  In either 2017 or 2018, "Johnson was elected Executive Secretary" of the Union.  *See* Pl.'s SUMF ¶ 5; Defs.' Response Pl.'s SUMF ¶ 5, ECF No. 52-1.

Although Johnson's career at DOC spanned decades, the facts relevant to resolving the parties' motions occurred over just a few months in 2020.  In March of that year, "Johnson and other members of the Union's Executive Board began meeting regularly with the Union's attorneys to address concerns about COVID-19 in the D.C. Jail."  Pl.'s SUMF ¶ 10.  Among other things, Johnson and others were concerned by "DOC's lack of response" to the COVID crisis, insufficient measures to track and quarantine potentially-infected inmates, a shortage of personal protective equipment ("PPE") for staff, and "DOC's failure to communicate and implement COVID policies."  *See id.* ¶¶ 13, 17.

On April 1, Union leadership held a press conference "outside the D.C. Jail [to] express[] their ongoing concerns about the DOC's response to COVID-19."  *Id.* ¶ 20.  During the press conference, Johnson stated that the conditions in the Jail were "the absolute worst conditions [she had] ever experienced" and expressed her belief that DOC had failed to implement a "true

quarantine" for inmates.  *Id.* ¶ 22.  Johnson also stated that DOC was not accurately reporting the number of cases.  *Id.*  She further announced that "DOC was not conducting contact tracing for staff exposed to positive inmates, that staff did not receive PPE, and that only the administrative areas of the Jail were regularly disinfected."  *Id.* ¶ 23.  Finally, Johnson "criticized DOC management, including Deputy Director Patten and Director Booth, for not visiting the Jail and '[leaving] the staff and inmates to become infected, sick, and, or die.'"  *Id.* ¶ 24.

The next day, the Union filed an *amicus* brief in *Banks v. Booth*.  *Id.* ¶ 25; *see also* Fraternal Ord. of Police for the D.C. Dep't of Corrs. Lab. Comm.'s Mem. P. & A. as *Amicus Curiae* in Support of Pls., *Banks v. Booth*, No. 20-cv-849 (D.D.C. Apr. 2, 2020), ECF No. 23-2. In that case, inmates sued Defendant Booth, in his official capacity as Director of DOC, for constitutional violations relating to the conditions of their confinement during the COVID pandemic.  *See Banks v. Booth*, 459 F. Supp. 3d 143, 147 (D.D.C. 2020).  The *amicus* brief attached as an exhibit a declaration sworn to by J. Michael Hannon, one of the Union's lawyers. *See* Pl.'s Ex. 9, ECF No. 44-8.  The declaration included statements—provided by Johnson, *see* Pl.'s Ex. 10, ECF No. 44-8—in which Johnson described her personal observations of the conditions at the D.C. Jail, *see* Pl.'s Ex. 9 ¶¶ 26–33.  For instance, the declaration described that Johnson had "witnessed cleaning crews in the [DOC's Central Detention Facility] that only clean the administrative side of the DOC facilities" and who "use the same rag to wipe down everything they are instructed to wipe down with bleach."  Pl.'s Ex. 9 ¶ 29.  The declaration also stated that Johnson had learned from other correctional officers that a deputy warden had instructed correctional officers "not to take the cleaning crew to the infirmary," and that other correctional officers had described the Jail's "unsanitary conditions, complete lack of ventilation," and the need to "fight with management to get [PPE]."  *Id.* ¶¶ 30–31.  Moreover,

the declaration reported that Johnson had "witnessed inmates, as recently as April 1, 2020, travelling within the facilities and during their assigned recreation periods without practicing any social distancing." *Id.* ¶ 32.  Finally, the declaration stated that Johnson had heard that there were "at least ten" inmates displaying COVID-19 symptoms in one section of the Jail, and that correctional officers assigned to that section lacked PPE and had been given "no guidance from DOC medical staff." *Id.* ¶ 33.

The Union remained very active over the following days and weeks.  On April 6, "the Union filed an Unfair Labor Practices Complaint with the Public Employee Relations Board." Pl.'s SUMF ¶ 29.  The complaint alleged that "DOC refused to bargain with the Union regarding the unsafe and hazardous conditions at the Jail, . . . unilaterally imposed 12-hour shifts, and intentionally deprived the Union of protection against COVID-19." *Id.*  On April 23, the Union supplemented its complaint to include additional information, some of which was provided by Johnson.  *Id.* ¶ 30.  Specifically, the Union attached emails that Johnson had forwarded which showed that "masks were only provided to inmates, that officers were left on posts for more than 16 hours, and that cleaning crews were only cleaning the administrative side of the building." *Id.* ¶ 31.  Then, on May 5, the Union filed a motion to amend its Unfair Labor Practices Complaint. *Id.* ¶ 32.  The amended complaint attached more than twenty emails sent or forwarded by Johnson.  *Id.* ¶ 33.  The emails "detailed the poor conditions in the Jail and DOC's lack of communication with staff members."  *Id.*  The emails also showed that "officers were left on duty when exposed to positive inmates," that officers had "confusion regarding leave procedures," that DOC was not accurately reporting positive COVID-19 cases, and that "staff members [were] being threatened with [repercussions] if they left the facility when they were not well."  *Id.*  In addition to the Unfair Labor Practices Complaint, between April 6 and June 11, the

Union filed "16 separate grievances with Director Booth alleging violations of the Collective Bargaining Agreement" with respect to DOC's COVID-related response and policies.  *Id.* ¶ 34.

Around the same time, the Union filed a class action lawsuit in D.C. Superior Court.  *Id.* ¶ 36; *see Olubasusi v. District of Columbia*, No. 2020-CA-2256-B (D.C. Super. Ct. Apr. 15, 2020).  The lawsuit alleged that "DOC violated D.C.'s OSHA statute by failing to protect Union members from COVID-19."  Pl.'s SUMF ¶ 36.  In support of the lawsuit, Johnson submitted a sworn declaration that "described DOC's lack of testing for staff members, confusion among staff when exposed to positive inmates, lack of contact tracing among inmates, the absence of quarantine for positive inmates, and officers' concerns about spreading the virus to their families."  *Id.* ¶ 39; *see also* Pl.'s Ex. 11, ECF No. 44-8.

On April 22, inmates in the D.C. Jail "protested the inhumane conditions . . . by refusing food and placing their hands over the food slots on their cell doors."  Pl.'s SUMF ¶ 44.  The next day, an email describing the incident was distributed over the "DOC Incident Notification Mailing List."  *Id.* ¶ 46.  The subject line of the email was "Planned use of force."  Pl.'s Ex. 34, ECF No. 44-9.  Johnson was one of the recipients of the email, and she forwarded it to the Union's attorneys shortly after receiving it.  Pl.'s SUMF ¶ 48; *see also* Pl.'s Ex. 34.  Later that day, the Union's attorneys forwarded the email to a reporter at a local television network.[1]  Pl.'s SUMF ¶ 49.  The reporter, in turn, sent the email to "DOC's Director of Strategic Communications, Keena Blackmon, with a request for comment."  *Id.* ¶ 50.  Blackmon then relayed the email to Deputy Director Patten, who replied to Blackmon with a list of ways in which Johnson had violated DOC policy by sharing the initial email.  *Id.* ¶ 51; *see also* Pl.'s Ex.

---

[1] On May 7, the Union's attorneys sent a copy of the same email to court-appointed *amici* in the *Banks* case.  *See* Pl.'s Ex. 12, ECF No. 44-8.

36, ECF No. 44-9.  Patten also notified Kevin Hammond, the Chief of Investigative Services, of the suspected violations.  Pl.'s SUMF ¶ 52; *see also* Pl.'s Ex. 37, ECF No. 44-9.

The fallout that followed was swift.  On April 24, DOC Deputy Director of Programs Gitana Stewart-Ponder asked the Technology Office to "launch an investigation" into Johnson's email usage from March 1 through the then-present.  Pl.'s SUMF ¶ 54.  Stewart-Ponder was particularly interested in whether there had been any "additional incidents" in which Johnson had sent "confidential incident notifications to external parties."  Pl.'s Ex. 40, ECF No. 44-9.  Three days later, Johnson was informed that, "[e]ffective immediately," DOC was removing her from her post as Adjustment Board Chairman.  Pl.'s Ex. 44, ECF No. 44-9.  DOC explained that it was doing so because of the "pending investigation into misconduct"—that is, Johnson's "alleged[] release[] [of] privileged information."  *Id.*

Johnson's reassignment did not deter her from continuing to speak out.  To the contrary, on April 28, a Union attorney sent an email to Blackmon notifying her that Johnson planned to be interviewed on a local news network.  Pl.'s SUMF ¶ 58.  Blackmon forwarded the notification to Patten, Stewart-Ponder, and DOC General Counsel Eric Glover.  Pl.'s Ex. 43, ECF No. 44-9.  On May 1, the local station published an article critical of DOC's response to the growing pandemic and which included excerpts from Johnson's interview.  *See* Pl.'s SUMF ¶ 60.

DOC completed its investigation into Johnson's email usage on May 14.  *Id.* ¶ 64.  The investigation concluded that twenty-two of the emails Johnson had sent to the Union's attorneys "violated DOC policies and the Health Insurance Portability and Accountability Act ("HIPAA")."  *Id.* ¶ 65; *see also* Pl.'s Ex. 46, ECF No. 44-11.  On May 29, Patten issued Johnson

a formal notice of proposed removal.[2]  Pl.'s SUMF ¶ 66; *see also* Pl.'s Ex. 47, ECF No. 44-10.

The notice charged Johnson of violating three provisions of the District of Columbia Municipal

Regulations ("DCMR"), various DOC policies and procedures, the collective bargaining

agreement, and a confidentiality agreement Johnson had signed in November of 2015.  *See* Pl.'s

Ex. 47.  It also described the ways in which Johnson's forwarding of the "planned use of force"

email violated a subset of those regulations, policies, and agreements.  *See id.* at 1–3.

       Following DOC's announcement of Johnson's proposed termination, DOC submitted the

proposal to a hearing officer for review.  Pl.'s SUMF ¶ 70.  On June 30, the hearing officer

recommended that DOC "reprimand or suspend" Johnson, but not fire her.  *Id.* ¶ 71.  The hearing

officer specifically recommended that DOC consider Johnson's actions "in light of" the COVID-

19 health crisis and the DCWPA which, among other things, "protects the disclosure of

information . . . when an employee believes there is gross mismanagement . . . or a substantial

and specific risk to public health."  *See* Pl.'s Ex. 49 at 8, ECF No. 44-10.  Displeased with the

hearing officer's recommendation, Defendant Booth "remanded the case" to the hearing officer,

asking that she "reevaluate the materials presented" and "conclude" that "Johnson violated the

rules and regulations of the DOC, by sending confidential and protected health information

without the required authorization in violation of [HIPAA]."  *See* Pl.'s Ex. 50 at 1, ECF No. 44-

10.  On remand, the hearing officer disagreed with DOC's assertions that Johnson had violated

HIPAA, but she agreed that Johnson had violated DOC's "rules, regulations, written procedures,

or proper supervisory instructions" by forwarding emails containing protected health information

to the media.  *See* Pl.'s Ex. 52 at 2–3, ECF No. 44-10.  Accordingly, she concluded that DOC's

---

[2] Defendants claim that Patten received an "initial draft of Plaintiff's removal paperwork" on May 5, but they explain that Johnson's "proposed termination was under review until May 29."  *See* Defs.' Statement Undisputed Material Facts ¶¶ 63–64, ECF No. 46-1.

decision to terminate Johnson was both "supported" and "reasonable." *Id.* at 4.  DOC did not

delay in acting on the hearing officer's revised conclusions.  On August 12, DOC "issued a final

decision to remove . . . Johnson from her position with DOC," effective August 21.  Pl.'s SUMF

¶¶ 76–77.

## B.  Procedural Background

On September 3, 2020, Johnson filed a complaint in D.C. Superior Court alleging that

Defendants violated the DCWPA and the First Amendment under 42 U.S.C. § 1983, and that

Defendants did so as a civil conspiracy.  Compl., *Johnson v. District of Columbia*, Civil Action

No. 2020-CA-003889-B (D.C. Super. Ct. 2020), ECF No. 1-2.  Defendants removed the action to

this Court on October 14, and Johnson filed an amended complaint on November 18.  *See* Notice

of Removal, ECF No. 1; Am. Compl., ECF No. 7.  Johnson's amended complaint retained only

the claims brought pursuant to the DCWPA and First Amendment under 42 U.S.C. § 1983.

Defendants moved to dismiss the amended complaint on the ground that Johnson had

failed to state a claim upon which relief could be granted.  *See* Defs.' Mot. Dismiss, ECF No. 10.

In addition to opposing Defendants' motion, *see* Pl.'s Opp'n Defs.' Mot. Dismiss, ECF No. 20,

Johnson filed her own motion seeking partial summary judgment, *see* Pl.'s Mot. Partial Summ.

J., ECF No. 11.  Upon consideration of the competing motions, the Court granted in part and

denied in part Defendants' motion to dismiss, and denied Johnson's motion for partial summary

judgment. *Johnson v. District of Columbia*, No. 20-cv-2944, 2021 WL 3021458, at *19 (D.D.C.

July 16, 2021).

Following the close of discovery, the parties cross-moved for summary judgment.  *See*

Pl.'s MSJ; Defs.' MSJ.  The cross-motions are ripe for review.  *See* Pl.'s Opp'n Defs.' Mot.

Summ. J. ("Pl.'s Opp'n"), ECF No. 51; Defs.' Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n"), ECF

No. 52; Pl.'s Reply Defs.' Opp'n Pl.'s Mot. Summ. J. ("Pl.'s Reply"), ECF No. 54; Defs.' Reply

Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 55.

### III.  LEGAL STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the

litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if

sufficient evidence exists such that a reasonable factfinder could return a verdict for the

nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of

factually unsupported claims or defenses and determining whether there is a genuine need for

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party bears the initial

responsibility of identifying those portions of the record which demonstrate the absence of any

genuine issue of material fact.  *Id.* at 323; Fed. R. Civ. P. 56(c)(1)(A) (noting that the movant

may cite to "depositions, documents, electronically stored information, affidavits or declarations,

. . . admissions, interrogatory answers, or other materials").  In response, the non-moving party

must similarly designate specific facts in the record that reveal a genuine issue that is suitable for

trial.  *Celotex*, 477 U.S. at 324.  On a motion for summary judgment, the court must "eschew

making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360,

363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most

favorable to the non-moving party, *Anderson*, 477 U.S. at 255.  Nevertheless, conclusory

assertions offered without any evidentiary support do not establish a genuine issue for trial.

*Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

Johnson's amended complaint alleges that Defendants retaliated against her in violation of the DCWPA (Count I) and the First Amendment (Count II).  The parties cross-move for summary judgment on both counts.

### A.  D.C. Whistleblower Protection Act

The DCWPA prohibits employers from "tak[ing], or threaten[ing] to take, a prohibited personnel action or otherwise retaliat[ing] against an employee because of the employee's protected disclosure."  D.C. Code § 1-615.53.  Like similar claims brought under Title VII, retaliation claims under the DCWPA "are subject to analysis under 'the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).'" *McCormick v. District of Columbia*, 752 F.3d 980, 984–85 (D.C. Cir. 2014) (quoting *Payne v. D.C. Gov't*, 722 F.3d 345, 353 (D.C. Cir. 2013)).  Under that framework, a plaintiff must first establish the three elements of a *prima facie* case; that is, she must establish by a preponderance of the evidence "that (1) [s]he made a 'protected disclosure'; (2) [her] supervisor took or threatened to take a 'prohibited personnel action' against [her]; and (3) the protected disclosure was a 'contributing factor' to the prohibited personnel action."  *Bowyer v. District of Columbia*, 793 F.3d 49, 52 (D.C. Cir. 2015) (quoting D.C. Code §§ 1-615.53(a), 1-615.54(b)).  Once a plaintiff establishes these three elements, "the burden shifts to the employer to 'prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.'" *Coleman v. District of Columbia*, 794 F.3d 49, 54 (D.C. Cir. 2015) (quoting D.C. Code § 1-615.54(b)).  If the employer makes that showing, the plaintiff must then "come forward with credible evidence showing that the legitimate, independent reason the defendant offered was pretext for an actual,

discriminatory motive or did not actually motivate the challenged personnel action."  *Bowyer*,
793 F.3d at 52.

### 1.  Plaintiff's *Prima Facie* Case

Johnson argues that she made seven protected disclosures, and that these disclosures
contributed to DOC's decision to demote, reassign, and fire her.  *See* Pl.'s MSJ at 13–15.
Defendants do not dispute that Johnson's demotion, reassignment, or termination constitute
"prohibited personnel actions," and, accordingly, there is no dispute that Johnson has established
the second element of her *prima facie* case.  *See* D.C. Code § 1-615.52(a)(5)(A) (defining
"[p]rohibited personnel action" to include "recommended, threatened, or actual termination [or]
demotion" as well as "involuntary transfer, reassignment, or detail").  They do, however, contest
Johnson's ability to show that she made *any* protected disclosures or that such disclosures
contributed to her demotion, reassignment, or termination.  The Court will address those
arguments below.

### a.  Protected Disclosures

Johnson argues that she made seven disclosures that qualify as protected disclosures
under the DCWPA.  *See* Pl.'s MSJ at 14–15.  Specifically, she points to (1) her "[p]articipation
in an April 1, 2020 press conference where she spoke about the conditions of the D.C. Jail," (2)
her "April 2, 2020 declaration in support of the Union's *amicus* brief in *Banks v. Booth*," (3) an
"Unfair Labor Practice Complaint filed with the Public Employees Relations Board on April 6,
2020 and subsequent filings on April 23 and May 5, 2020," (4) "[c]lass and group grievances
submitted to Director Booth between April 6, 2020 and June 11, 2020," (5) an "April 6, 2020
meeting with D.C. Councilmember Trayon White at the D.C. Jail [during which] she shared her
experiences at the Jail," (6) her "April 17, 2020 sworn declaration in support of [the Union's]

class action lawsuit in *Olubasusi v. [District of Columbia]*," and (7) the "April 23, 2020 email

regarding the DOC's planned use of force provided to *Banks v. Booth amici*."  *Id.*

The DCWPA defines a "protected disclosure" to include "any disclosure of

information . . . by an employee to a supervisor or a public body that the employee reasonably

believes evidences:

> (A) Gross mismanagement;

> (B) Gross misuse or waste of public resources or funds;

> (C) Abuse of authority in connection with the administration of a public program
> or the execution of a public contract;

> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of
> a contract between the District government and a District government contractor
> which is not of a merely technical or minimal nature; or

> (E) A substantial and specific danger to the public health and safety."

D.C. Code § 1-615.52(a)(6); *see also Stewart v. District of Columbia*, 290 A.3d 937, 943 & n.6

(D.C. 2023).  Whether a disclosure is protected hinges upon whether the plaintiff "reasonably

believed" the conduct at issue constituted gross mismanagement, a violation of law, or a

significant and specific threat to public health and safety.  *See Harris v. D.C. Water & Sewer

Auth.*, 172 F. Supp. 3d 253, 261 (D.D.C. 2016) (quoting *Freeman v. District of Columbia*, 60

A.3d 1131, 1141 (D.C. 2012)).  It is not enough for a plaintiff to harbor a "subjective belief that

the information set forth evidenced official misconduct."  *Stewart*, 290 A.3d at 943 (quoting

*Freeman*, 60 A.3d at 1151).  Rather, the plaintiff must demonstrate the "objective

reasonableness" of her belief "at the time the disclosure was made."  *Id.* (quoting *Freeman*, 60

A.3d at 1151).  "An employee's 'reasonable belief turns on whether a disinterested observer with

knowledge of the essential facts known to and readily ascertainable by the employee could

reasonably conclude that the actions of the government evidence illegality, gross abuse, etc.'"

*Harris*, 172 F. Supp. 3d at 261 (quoting *Saint-Jean v. District of Columbia*, 846 F. Supp. 2d 247, 260 (D.D.C. 2012)).

That said, not all disclosures which an employee reasonably believes show gross mismanagement, a breach of law, or a substantial threat to public health qualify for protection under the DCWPA. That is because the Act only covers disclosures that are made "to a supervisor or a public body." D.C. Code § 1-615.52(a)(6); *see Johnson*, 2021 WL 3021458, at *5–7. The DCWPA defines "supervisor" by cross-reference to D.C. Code § 1-617.01(d), *see* D.C. Code § 1-615.52(a)(8), which clarifies that a "supervisor" is "an employee having authority . . . to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, . . . or effectively to recommend such action, if . . . the exercise of [such] authority . . . requires the use of independent judgment," D.C. Code § 1-617.01(d). The DCWPA's definition of "public body" includes, "among other entities, any federal or D.C. judiciary, including any member thereof." *Johnson*, 2021 WL 3021458, at *8; *see* D.C. Code § 1-615.52(a)(7) (listing the covered entities and individuals).

As mentioned above, Johnson asserts that she made seven disclosures regarding "what she reasonably believed to be substantial and specific dangers to public safety, gross mismanagement by the DOC, violations of law, and contract violations." Pl.'s MSJ at 14–15. The Court will address each purportedly protected disclosure in turn.

*1. April 1 Press Conference.* Johnson first contends that she made a protected disclosure when she spoke about the conditions at the D.C. Jail during a press conference held on April 1. *Id.* at 14. She argues that statements she made during the press conference demonstrated her reasonable belief that DOC's actions—or lack thereof—constituted a substantial and specific threat to public health and safety. *Id.* at 15; *see* D.C. Code § 1-615.52(a)(6)(E). She also

contends that her statements evinced an objectively reasonable belief that DOC's response to the pandemic constituted gross mismanagement.  Pl.'s MSJ at 17; *see* D.C. Code § 1-615.52(a)(6)(A).  In support of these arguments, Johnson cites record evidence showing that, at the press conference, she expressed her belief that the conditions at the Jail were "the absolute worst conditions [she had] ever experienced" and that there was "no true quarantine" for inmates.  Pl.'s SUMF ¶ 22.  She made statements attesting to the fact that "DOC was not conducting contact tracing for staff exposed to positive inmates," that Jail staff were not "receiv[ing] PPE," and that janitorial staff were only "regularly disinfect[ing]" the "administrative areas of the Jail."  *Id.* ¶ 23.

For their part, Defendants do not seem to contest the fact that a reasonable jury could find that Johnson's statements disclosed information which Johnson reasonably believed demonstrated gross mismanagement on the part of DOC officials or a substantial and specific threat to public health and safety.  *See* Defs.' Opp'n at 8.  Instead, Defendants argue that Johnson's participation in the press conference does not constitute a protected disclosure for purposes of the DCWPA because her disclosures were not made to a "supervisor" or "public body" as defined by the statute.  *Id.* (quoting D.C. Code § 1-615.52(a)(6)).  To that end, they argue that the record does not contain evidence from which a reasonable jury could conclude that Johnson's supervisors were even aware of the fact that Johnson spoke at the press conference. *See id.*; *see also* Defs.' MSJ at 3 ("Neither Booth nor Patten attended or viewed the press conference, nor were they aware Plaintiff spoke individually at this event.").

As discussed above, for a disclosure to be entitled to protection under the DCWPA, it must be made to either a "supervisor" or "public body."  D.C. Code § 1-615.52(a)(6).  Johnson does not contend that her press conference statements constituted statements made to a "public

body" as defined by the Act. *See id.* § 1-615.52(a)(7). But she argues that "several DOC supervisors monitored the conference," and thus her statements satisfy the DCWPA's requirement that a disclosure be made to a "supervisor." *See* Pl.'s Reply at 2; *see also* Pl.'s MSJ at 15 (asserting that "DOC management monitored the press conference"). To be sure, there is at least some evidence in the record to support Johnson's assertion that DOC leadership was "aware of the press conference." *See* Pl.'s Reply at 3. For instance, there is evidence that, on March 31, the Union notified DOC leadership of its plans to hold the press conference. *See* Pl.'s Exs. 13, 14, ECF No. 44-8. And there is also evidence that Defendants Booth and Patten knew that the press conference had been held. *See* Pl.'s Ex. 66-B at 16:12–17:4, ECF No. 51-2.

The problem, however, is that aside from this general evidence that DOC leadership was "aware" that the Union was holding—or had held—a press conference, there is *no* evidence that suggests that any DOC supervisors were aware of *Johnson's* participation in the event. Nor is there any evidence to suggest that DOC leadership later learned of the substance of Johnson's statements. Defendant Patten testified that she had not watched any recordings of the press conference, nor had she "read any reporting of it in the media." *See* Pl.'s Ex. 66-A at 38:18–39:4, ECF No. 51-2; *see also* Defs.' Ex. 5 ¶ 30, ECF No. 46-2 ("I am not aware of which members of the [U]nion spoke at any press conference . . . , and I only learned that Sergeant Johnson spoke at the conference through this litigation."). Defendant Booth testified similarly. *See* Pl.'s Ex. 66-B at 17:8–10 (testifying that he had never viewed the video of the press conference). All that being so—and assuming that Johnson's press conference statements could constitute *indirect* disclosures to supervisors, *see Johnson*, 2021 WL 3021458, at *7–8—the record is devoid of evidence from which a reasonable jury could conclude that Johnson's statements on April 1 were made "to a supervisor or a public body" as required under the

DCWPA.[3]  *See* D.C. Code § 1-615.52(a)(6).  Accordingly, Defendants are entitled to summary

judgment on this aspect of Johnson's claim.

    2.  *Declaration in Banks v. Booth.*  Second, Johnson argues that she made a protected

disclosure when, on April 2, the Union filed an *amicus* brief on behalf of the plaintiffs in *Banks*

*v. Booth*, No. 20-cv-849 (D.D.C. Mar. 30, 2020).  The Union's brief attached a declaration in

which Johnson attested to multiple health and safety issues at the Jail.[4]  *See* Pl.'s Ex. 9 ¶¶ 26–33;

*see also id.* ¶¶ 52, 56–58, 60–62, 64, 66.  For instance, Johnson stated that the facility was not

being adequately disinfected and cleaned, that there were severe shortages of PPE, that there was

a "complete lack of ventilation" in the facility, and that social distancing procedures were being

ignored.  *See id.* ¶¶ 29–32, 60–61.  Johnson further reported that there were "at least ten" inmates

displaying COVID symptoms in one section of the Jail, and that correctional officers assigned to

that wing lacked sufficient PPE and had received "no guidance" from medical staff.  *See id.* ¶ 33.

Moreover, Johnson observed that DOC staff were not adequately screening visitors to the Jail for

COVID-19, *see id.* ¶ 52, and that DOC leadership had not met with the Union to discuss

implementing better "preventive measures" or the staff's "working conditions," *see id.* ¶ 58.

    Defendants do not meaningfully dispute that Johnson reasonably believed that these

disclosures revealed substantial and specific threats to public safety or gross mismanagement on

---

    [3] For similar reasons, this means that Johnson would also be unable to demonstrate a
causal nexus between her press conference statements and her demotion or termination.  *See*
*Kolowski v. District of Columbia*, 244 A.3d 1008, 1013 (D.C. 2020) ("[F]or a protected
disclosure to be a contributing factor to [an] adverse employment action, the employer must be
aware of it.").

    [4] Defendants argue that the statements in the declaration which are attributed to Johnson
do not constitute a protected disclosure *made by Johnson* because they were included as part of a
larger declaration submitted by one of the Union's lawyers.  *See* Defs.' Opp'n at 9.  Defendants
argument is unconvincing, especially in light of the fact that the Union's lawyer attested that
Johnson had "provided" the relevant section of the declaration and had "affirmed that the
declaration[] [was] true and correct on April 2, 2020."  Pl.'s Ex. 10.

the part of DOC officials.  *See Davis v. District of Columbia*, 258 A.3d 847, 855 (D.C. 2021) (explaining that "'gross mismanagement' is 'a management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission'" (quoting *Johnson v. District of Columbia*, 225 A.3d 1269, 1275–76 (D.C. 2020)); *see also* Defs.' Opp'n at 9 (arguing only that the declaration does not constitute a protected disclosure because it was not made by Johnson).  Nor do they dispute that the disclosures were made to a "public body"—specifically, the U.S. District Court for the District of Columbia.  *See* D.C. Code § 1-615.52(a)(7)(B) (defining "public body" to include the federal judiciary and any of its members and employees).  Instead, Defendants argue that Johnson has failed to show that her declaration was a contributing factor in her termination because there is no evidence that Defendants or any other DOC decisionmakers were aware that Johnson had, in fact, made the declaration.  *See* Defs.' Opp'n at 9 ("The undisputed record evidence establishes that neither Booth nor Patten read this filing . . . ."); *see also* Defs.' MSJ at 12 ("[T]he record is undisputed that neither Booth nor Patten was aware of the Union's filings in *Banks v. Booth* and knew nothing about Plaintiff's role in those filings when they took adverse personnel action against Plaintiff.").

Having reviewed the evidence cited by Johnson, the Court concludes that a reasonable juror could find that Johnson's April 2 declaration constituted a protected disclosure under the DCWPA.  The Court will address below Defendants' argument that the declaration did not contribute to Johnson's termination.

*3. Unfair Labor Practice Complaint.*  Next, Johnson argues that she made protected disclosures in connection with the Unfair Labor Practices Complaint that the Union filed with the Public Employees Relations Board on April 6, 2020.  Pl.'s MSJ at 14.  More specifically, she asserts that the emails she forwarded to the Union's attorneys—and which those attorneys

subsequently attached to filings related to the Unfair Labor Practices Complaint—constituted protected disclosures under the DCWPA because they demonstrated both DOC's gross mismanagement and that DOC was allegedly violating the collective bargaining agreement and federal and state laws. *See id.* at 17 (arguing that she "raised concerns about DOC's mismanagement of the pandemic . . . in emails to the Union's attorneys that were utilized for litigation in an unfair labor complaint"); *id.* at 18–19 ("The [Union's] unfair labor complaint and Sgt. Johnson's emails and information provided to the Union's attorneys show that she believed that Defendants[] were violating both D.C. law and the [collective bargaining agreement] by enacting a twelve hour shift change, eliminating official union time, and creating hazardous working conditions."); *see also* Pl.'s SUMF ¶¶ 31, 33.

The primary issue with Johnson's reliance on these emails is that the Court previously dismissed Johnson's DCWPA claim to the extent it purported to rest on the "alleged[ly] protected disclosures" Johnson made in connection with the Union's Unfair Labor Practice Complaint. *Johnson*, 2021 WL 3021458, at *9, *19 ("Plaintiff's DCWPA claim (Count I) is dismissed . . . to the extent that this claim is based on alleged protected disclosures through Plaintiff's participation in an unfair labor practice complaint."). In ruling on Defendants' motion to dismiss, the Court agreed with Defendants that Johnson had "failed to plead sufficient facts" to show that she had made any protected disclosures related to the Unfair Labor Practice Complaint. *Id.* at *9. Given the Court's previous dismissal of this factual predicate for Johnson's DCWPA claim, Johnson may not unilaterally revive this theory through her motion for summary judgment.[5]

---

[5] In light of this holding, the Court need not and does not consider Defendants' argument that the Comprehensive Merit Personnel Act, D.C. Code §§ 1–601.01 *et seq.*, somehow operates to bar Johnson's claims. *See* Defs.' Opp'n at 10–11.

*4. Class and Group Grievances Submitted to Director Booth.*  Johnson next contends that she made protected disclosures in connection with the "[c]lass and group grievances" that the Union "submitted to Director Booth between April 6, 2020 and June 11, 2020."  Pl.'s MSJ at 15; *see also* Pl.'s SUMF ¶ 34; Pl.'s Ex. 56, ECF No. 44-10 (collecting 18 grievances filed between April 6, 2020 and June 11, 2020).  Johnson's summary judgment papers cursorily assert that she provided information "to the Union's attorneys" and that that information "formed the basis for the grievances."  Pl.'s MSJ at 6.  Other than that, she does not meaningfully explain whether the Union's submission of the grievances themselves, the information she provided in support of those grievances, or a combination of both constitutes a protected disclosure under the DCWPA.  *Cf. Coleman*, 794 F.3d at 65 ("[B]ecause the court's duty at summary judgment is to afford the [non-movant] all reasonable inferences from the record, it is not and should not be enough merely to mention a possible argument in the most skeletal way . . . and then leave the court . . . to do counsel's work." (cleaned up)).

Even more fundamentally, Johnson's reliance on the class and group grievances is misplaced for the same reason that her reliance on the Union's Unfair Labor Practices Complaint is flawed.  That is, the Court has already held that Johnson failed to state a DCWPA claim on the basis of any "alleged[ly] protected disclosures" made in connection with her participation in the various grievances.  *See Johnson*, 2021 WL 3021458, at *9, *19 ("Plaintiff's DCWPA claim (Count I) is dismissed . . . to the extent that this claim is based on alleged protected disclosures through Plaintiff's participation in . . . sixteen group grievances.").  Thus, these disclosures cannot form a basis for Johnson's DCWPA claim.

*5. April 6 Meeting with D.C. Councilmember White.*  Fifth, Johnson argues that she made a protected disclosure when "she shared her experiences at the Jail" with D.C. Councilmember

White.  Pl.'s MSJ at 15.  The record supports Johnson's claim that she met White at the Jail on April 6.  *See* Pl.'s Ex. 11 ¶ 18.  Defendants are correct, however, that—aside from Johnson's general allegation that she described to the Councilmember "the actual conditions [of] the DOC facilities," *id.*—the record does not disclose the substance of what Johnson and the Councilmember discussed with any reasonable degree of specificity.  *See* Defs.' Opp'n at 13–14.  While a reasonable juror could perhaps speculate as to the scope of the conversation based on Johnson's testimony regarding the conditions of the Jail at the time, *see* Pl.'s Ex. 1 at 141:12–143:19 (explaining that around the same time as the Councilmember's visit, the "[J]ail was . . . a disaster," inmates were throwing "feces" and "urine" at officers, inmates were spitting at officers, and "nobody had any plan in place" to keep inmates, staff, or visitors safe), that is not enough for Johnson to demonstrate a triable issue of fact, *see Payne v. District of Columbia*, 741 F. Supp. 2d 196, 220 (D.D.C. 2010) ("Mere speculation fails to create a genuine issue of material fact to avoid summary judgment." (quoting *Atanus v. Sebelius*, 652 F. Supp. 2d 4, 13 (D.D.C. 2009))).

And even if it were sufficient, the record is devoid of evidence from which a reasonable jury could conclude that DOC decisionmakers were aware of the substance of Johnson's conversation with the Councilmember.  At most, the record supports the inference that Defendant Booth was aware of the fact that Johnson met with White.  *See* Pl.'s Ex. 1 at 142:8–143:2; *see also* Pl.'s Ex. 68 ¶ 8, ECF No. 51-2.  But there is nothing in the record that suggests that Booth was present when Johnson discussed the Jail's conditions with White.  In fact, the record suggests the opposite—that Johnson's meeting with White occurred *after* Booth had already met with him and that Booth was not involved in any part of their conversation.  *See* Pl.'s SUMF ¶ 18 ("Johnson alerted [White] to the actual conditions at DOC facilities *after* he was

only shown certain areas of the facility by DOC management." (emphasis added)); Pl.'s Ex. 68 ¶

8 (Johnson declaring that her meeting with White occurred "after his visit [to Jail]" and that

Booth only "observed [the two] interacting" while "in the parking lot").  Thus, even if Johnson

made protected disclosures to White, there is no evidence from which a jury could conclude that

those disclosures contributed to her demotion or termination.  *See Coleman*, 794 F.3d at 64

(explaining that plaintiff failed to state a *prima facie* case of retaliation where plaintiff had no

evidence that decisionmaker had "actual knowledge" of protected disclosure (citation omitted)).

   *6.  Declaration in Olubasusi v. District of Columbia.*  Johnson also argues that the sworn

declaration she submitted in support of the Union's class action lawsuit in *Olubasusi v. District*

*of Columbia*, No. 2020-CA-2256-B (D.C. Super. Ct. Apr. 15, 2020), constitutes a protected

disclosure.  Pl.'s MSJ at 15.  Johnson's declaration was comprehensive in scope.  *See* Pl.'s Ex.

11.  Like the declaration she submitted in *Banks*, the declaration detailed multiple issues

regarding the lack of adequate cleaning measures in the Jail, inmates' failure to follow social-

distancing policies, and severe shortages of PPE.  *See id.* ¶¶ 4–7, 10, 23, 34–35.  The declaration

also described specific instances in which DOC leadership had been unresponsive to staff

concerns regarding their potential exposure to COVID or the fact that inmates displaying

symptoms were returned to the general population less than two weeks after being quarantined.

*See id.* ¶¶ 8–9.  She also reported multiple instances in which Jail employees were exposed to

inmates who had tested positive for the virus or were exhibiting symptoms.  *See id.* ¶¶ 12, 20, 25.

And finally, she described breakdowns in communication which resulted in COVID-positive

inmates being permitted to interact with other inmates and staff, *see id.* ¶ 20, instances in which

infected inmates were quarantined for far less than fourteen days, *see id.* ¶ 21, and examples of

times when officers were forced to interact with sick inmates despite lacking adequate protective gear, *see id.* ¶¶ 26, 34–35.

Defendants do not appear to contest that Johnson's declaration qualifies as a protected disclosure. *See* Defs.' Opp'n at 14. They do not contest that Johnson reasonably believed that her declaration revealed fundamental threats to public health and safety or gross mismanagement by DOC, *see* D.C. Code § 1-615.52(a)(6)(A), (E), or that Johnson made the disclosure to a "public body," *see id.* § 1-615.52(a)(7)(B) (defining "public body" to include the District of Columbia judiciary and any of its members and employees). Instead, they argue that Johnson has failed to show that her declaration was a contributing factor in her termination. *See* Defs.' Opp'n at 14. In support, they argue that "neither Booth nor Patten was aware of the [Union's] lawsuit until May 5, 2020"—by which point they assert that DOC had already "removed [Johnson] from her post and decided to terminate her." *Id.* They further contend that Booth and Patten "never read" Johnson's declaration. *Id.* They also argue that the record lacks evidence showing that any "other [DOC] decisionmaker . . . was aware of [Johnson's] role in the Union class action before the decision to proceed with her termination was made." *Id.* at 15.

As with Johnson's declaration in *Banks*, the Court has reviewed the record evidence and concludes that a reasonable juror could find that Johnson's *Olubasusi* declaration constitutes a protected disclosure. The Court will address below Defendants' argument that the declaration did not factor into DOC's decision to fire Johnson.

*7. "Planned Use of Force" Email.* Finally, Johnson argues that she made a protected disclosure when she forwarded the "planned use of force" email to the Union's attorneys who, in

turn, provided the email to the court-appointed *amici* in *Banks*.[6]  Pl.'s MSJ at 15.  As discussed

above, the "planned use of force" email described an April 22 incident during which inmates had

prevented officers from delivering meals as a way of protesting the denial of recreation time,

their inability to shower, and restrictions on their telephone usage.  *See* Pl.'s Ex. 34.  When

inmates continued to resist officers' efforts, Jail staff used force "to gain their compliance."  *Id.*

Johnson testified that she forwarded the "planned use of force" email to the Union's attorneys

because the attorneys had asked her to "advise" or "notify" them "of any incidents that [arose]"

at the Jail that "related to the mishandling of COVID-19."  Pl.'s Ex. 1 at 96:6–11, ECF No. 44-4.

The Union, then, provided the email to the *amici* in *Banks*.  Pl.'s SUMF ¶ 42.

Johnson contends that the "planned use of force" email constitutes a protected disclosure

because it revealed her reasonable belief that DOC leadership was "gross[ly] mismanag[ing] . . .

the pandemic," Pl.'s MSJ at 17, and because the disclosure was made to a "public body" in the

form of "court-appointed *amici*," *see* Pl.'s Reply at 4–5.  The Court agrees that there is sufficient

evidence from which a jury could find that Johnson shared the "planned use of force" email

because she reasonably believed that it demonstrated DOC's gross mismanagement of the

pandemic.  Moreover, a reasonable jury could find that Johnson's forwarding of the email

constituted an indirect disclosure to a public body.  In its earlier opinion, the Court noted that

"persuasive case law indicat[es] that indirect disclosures may be acceptable" to satisfy the

DCWPA's requirement that a disclosure be made to a "public body."  *See Johnson*, 2021 WL

---

[6] Johnson received the "planned use of force email" on April 23, and she forwarded it to the Union's lawyers that same day.  Pl.'s SUMF ¶¶ 46, 48.  On May 7, the Union's attorneys provided the email to the *amici* in *Banks*.  *Id.* ¶ 41.  Johnson's papers tend to refer to the email as the "April 23 'planned use of force email,'" *see, e.g.*, Pl.'s MSJ at 22, whereas Defendants sometimes refer to the same email in connection with the May 7 transmission, *see, e.g.*, Defs.' Opp'n at 9.  The difference is immaterial, and the Court only notes this distinction to alleviate potential confusion.

3021458, at *7.  Although the Court ultimately left open the question of whether an indirect

disclosure may suffice, *see id.*, Defendants make no attempt to re-raise the issue here.

Instead, Defendants counter that there is insufficient evidence to establish that the email

was *actually* provided to the *Banks amici*.  *See* Defs.' Opp'n at 10.  This argument is unavailing.

The record contains evidence showing that, on May 7, the Union's attorneys sent an email to the

*amici* that attached a detailed chronology of recent events at the Jail.  *See* Pl.'s Ex. 12.  The

chronology listed the "planned use of force email" and explained that the "[e]mail indicat[ed]

that inmates were actually protesting because the situation [at the Jail] had become so bad."  *Id.*

It further explained that the inmates cited "lack of shower for four days, lack of telephone calls,

and lack of recreation" as reasons for their protest.  *Id.*  Finally, the chronology states that the

email itself was available as an exhibit.  *Id.*  Such evidence is sufficient to allow a reasonable

juror to conclude that Union attorneys provided the email to *amici*.

### b.  Causation

Because Johnson has shown that a reasonable jury could find that she made protected

disclosures under the DCWPA, the Court next considers whether those disclosures were a

"contributing factor" to the prohibited personnel actions taken against her.  *See Holbrook v.

District of Columbia*, 259 A.3d 78, 92 (D.C. 2021).  The DCWPA defines a "contributing factor"

as "any factor which, alone or in connection with other factors, tends to affect in any way the

outcome of the decision."  D.C. Code § 1-615.52(a)(2); *see McCormick v. District of Columbia*,

899 F. Supp. 2d 59, 70 (D.D.C. 2012).  This requires a plaintiff to show that her protected

disclosure was "essentially" a "'but for' cause" of a prohibited personnel action.  *Coleman*, 794

F.3d at 60 (quoting *Johnson v. District of Columbia*, 935 A.2d 1113, 1119 (D.C. 2007)).  A

plaintiff need not offer "direct evidence" of a causal link; "circumstantial" evidence may suffice. *Payne*, 722 F.3d at 354.

    *1. Johnson's Declarations.*  Johnson largely relies on temporal proximity to demonstrate a causal connection between her declarations in *Banks* and *Olubasusi* and her demotion and termination.  *See* Pl.'s MSJ at 20–21 ("[T]emporal proximity alone is sufficient to establish that Sgt. Johnson's protected disclosures were a contributing factor to her demotion and termination.").  To that end, Johnson notes that only a few weeks separated her decision to submit declarations in *Banks* (on April 2) and in *Olubasusi* (on April 15) from DOC's decision (on April 27) to remove her from the Adjustment Board Chairman position.  *See id.* at 20.  And she further notes that only four months separated the declarations and her termination.  *See id.*

    It is true that, in certain circumstances, close temporal proximity "can provide circumstantial evidence of causation."  *See Payne*, 722 F.3d at 354; *Freeman*, 60 A.3d at 1144–45 ("[T]he temporal proximity of an adverse personnel action to a protected disclosure may lend support to an inference of a causal relationship.").  But it is also true that, in order for a plaintiff to rely on temporal proximity to show causation, she must be able to show that her employer was "aware of" the protected disclosure in the first place.  *Kolowski v. District of Columbia*, 244 A.3d 1008, 1013 (D.C. 2020); *see also Mentzer v. Lanier*, 677 F. Supp. 2d 242, 255 (D.D.C. 2010) ("Temporal proximity between a protected activity and an adverse action can establish a prima facie case of retaliation if the employer had knowledge of the protected activity."); *Bowyer v. District of Columbia*, 910 F. Supp. 2d 173, 198 (D.D.C. 2012) (same); *Tingling-Clemmons v. District of Columbia*, 133 A.3d 241, 247 (D.C. 2016) ("As with other retaliation claims, the requisite 'causal connection may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after

25

that activity.'" (cleaned up) (quoting *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 368

(D.C. 1993))).  That is because "an employer's awareness of its employee's engagement in

protected activity is 'essential to making out a prima facie case for retaliation.'"  *Holbrook*, 259

A.3d at 93 (quoting *McFarland v. George Washington Univ.*, 935 A.2d 337, 356 (D.C. 2007)).

This requires the plaintiff to show that "the decision-maker[s] responsible for the adverse action

had actual knowledge of the protected [disclosure]."  *Coleman*, 794 F.3d at 64 (quoting

*McFarland*, 935 A.2d at 357); *see also Kolowski*, 244 A.3d at 1014.

     Here, Defendants argue that the record demonstrates the contrary; that is, that none of the

decisionmakers responsible for Johnson's demotion or termination had knowledge of the

declarations that she submitted in either *Banks* or *Olubasusi*.  *See* Defs.' Opp'n at 9, 14–15;

Defs.' MSJ at 12, 16.  In support, they argue that neither Defendants Booth, Patten, nor any other

decisionmaker involved in either the decision to remove her from her position as Adjustment

Board Chairman or the decision to fire her knew anything about Johnson's participation in the

*Banks* case or the fact that she had submitted a declaration.  *See* Defs.' Opp'n at 9; Defs.' MSJ at

12.  Record evidence supports Defendants' assertions.  *See* Defs.' Ex. 4 ¶ 7, ECF No. 46-2

(Booth declaring he "was not aware that the Union submitted any filings in *Banks v. Booth*" and

that he has "never read those filings"); Defs.' Ex. 5 ¶¶ 35–37 (Patten declaring that she "did not

and ha[s] not read any filings in the *Banks v. Booth* class action litigation" including "any papers

submitted by the Union in that case").

     As for Johnson's declaration in *Olubasusi*, Defendants concede that Booth and Patten

were aware of the lawsuit generally.  *See* Defs.' Opp'n at 14; Defs.' MSJ at 16.  However, Booth

and Patten both state—and the record contains evidence showing—that neither of them was

aware of Johnson's declarations.  *See* Defs.' Opp'n at 14.  Booth stated that he "did not review

any exhibits or declarations submitted by other DOC employees in [*Olubasusi*] and did not have

any knowledge that Sergeant Johnson submitted a declaration in the matter until this litigation."

Defs.' Ex. 4 ¶ 24.  Similarly, Patten declared that she "did not receive or review any exhibits or

declarations filed in that case" and had no "knowledge that Sergeant Johnson submitted a

declaration in the matter until this litigation."  Defs.' Ex. 5 ¶ 41.  And there is no evidence

showing that other DOC decisionmakers knew about Johnson's declarations.  *See* Defs.' Opp'n

at 14–15; Defs.' MSJ at 16.

　　In response, Johnson emphasizes that Defendant Booth was the "named defendant" in

*Banks*, Pl.'s Reply at 6, and that both Booth and Patten admitted that they were generally aware

of the Union's lawsuit in *Olubasusi*, *see* Defs.' Ex. 4 ¶ 22; Defs.' Ex. 5 ¶ 40.  But those facts

alone are insufficient to demonstrate that Defendants had "actual knowledge" of the statements

Johnson made in those cases.  *See Kolowski*, 244 A.3d at 1014 (quoting *McFarland*, 935 A.2d at

357); *see also Furline v. Morrison*, 953 A.2d 344, 355 (D.C. 2008) ("Constructive knowledge is

not enough; the employee must show that the decision-makers responsible for the adverse action

had actual knowledge of the protected activity." (internal quotation marks omitted)).  Put another

way, those facts are insufficient to rebut Booth's and Patten's sworn statements that they lacked

awareness of Johnson's declarations.  *See Walker v. Children's Nat'l Med. Ctr.*, 236 F. Supp. 3d

136, 146 (D.D.C. 2017) (granting summary judgment where the plaintiff failed to provide

evidence to rebut the employer's affidavit, which claimed a lack of knowledge of the plaintiff's

protected activity); *cf. Kolowski*, 244 A.3d at 1014 (affirming grant of summary judgment to

defendant where decisionmaker expressly disclaimed knowledge of protected disclosure and

where no evidence suggested decisionmaker's professed lack of knowledge was untruthful).  At

most, the facts to which Johnson points may provide evidence from which a reasonable juror

could speculate that DOC decisionmakers were aware of Johnson's statements.  But it is well-established that a plaintiff cannot demonstrate a causal link between a protected disclosure and a prohibited personnel action by "'offering only evidence from which a reasonable jury would have to speculate' regarding the employer's knowledge" of the disclosure.  *See Brisbon v. Tischner*, 639 F. Supp. 3d 164, 185 (D.D.C. 2022) (cleaned up) (quoting *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011)).  Consequently, Johnson has failed to make out a *prima facie* case of retaliation based on her declarations in *Banks* or *Olubasusi*.

  *2. "Planned Use of Force" Email.*  On the other hand, there is no question that Johnson's decision to forward the "planned use of email" to the Union's attorneys was a "contributing factor" in her demotion and termination.  Indeed, Defendants explicitly cite Johnson's forwarding of that email as the reason that she was demoted and later terminated.  *See* Defs.' MSJ at 16; *see also Smith v. Cnty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015).

  In sum, Johnson has failed to establish a *prima facie* case with regard to six of her seven purportedly protected disclosures.  The only disclosure for which Johnson has established a *prima facie* case of retaliation relates to her decision to forward the "planned use of force" email to the Union's attorneys.

## 2.  Legitimate, Independent Reasons and Pretext

  Because a reasonable jury could find that Johnson has made out a *prima facie* case of retaliation under the DCWPA in connection with her forwarding the "planned use of force" email, the burden shifts to Defendants to "prove by clear and convincing evidence" that they would have demoted and fired her for "'legitimate, independent reasons even if [she] had not' made the protected disclosure."  *Bowyer*, 793 F.3d at 52 (quoting D.C. Code § 1–615.54(b)).  Said another way, because Johnson has "made out a prima facie case of retaliatory motive, the

question [becomes] whether that animus was in fact the cause of" the prohibited personnel actions taken against her, "or whether for independent lawful reasons [Defendants] would have taken the same action[s] without respect to retaliatory motive." *McCormick*, 752 F.3d at 986. This requires Defendants to prove their "*actual* non-retaliatory justification for [their] employment decision." *Coleman*, 794 F.3d at 61. The D.C. Circuit has described the DCWPA's evidentiary standard as "stringent," "exacting," and "exceptional"—emphasizing that, in contrast to federal employment laws, the DCWPA entails a burden of persuasion rather than production. *Id.* at 61–62, 66.

If Defendants show "that there is no genuine issue of disputed fact as to [their] asserted legitimate, independent reason, the plaintiff must counter the defense evidence by proffering contrary, admissible evidence that a jury might credit." *Bowyer*, 793 F.3d at 52 (cleaned up); *see also Johnson*, 935 A.2d at 1118 n.2 (explaining that "countering the defense evidence does not mean totally disproving it"). Such evidence must show "that the legitimate, independent reason the defendant offered was pretext for an actual, discriminatory motive or did not actually motivate the challenged personnel action." *Bowyer*, 793 F.3d at 52.

Here, Defendants argue that they demoted and fired Johnson not because she was blowing the whistle on their mishandling of the pandemic, but rather because, by sending the "planned use of force" email, Johnson released "pre-investigatory records and inmate health information . . . without authorization." Defs.' MSJ at 16. Put differently, they explain that, by sending the email, Johnson "disclosed . . . sensitive, confidential, pre-investigatory information, including inmate names, identifiers, and a description of an incident that required an investigation." *Id.* They contend that Johnson's disclosure of such information was a "clear violation of DOC policy" and an "extraordinary breach of the public trust she held as a DOC

sergeant." *Id.* at 17.  In support, Defendants also rely on the fact that the "planned use of force" email originated from the "DOC Incident Notification List"—a listserv that distributes "preliminary notifications of serious, notable, or extraordinary incidents within the facilities that could necessitate medical treatment of inmates and staff and prosecution or discipline of the involved individuals."  Defs.' Statement Undisputed Material Facts ("Defs.' SUMF") ¶ 41, ECF No. 46-1.

There is evidence in the record suggesting that Johnson did in fact violate DCMR regulations, DOC policies, the collective bargaining agreement, and the confidentiality agreement she signed in 2015.  For instance, the notices announcing Johnson's proposed and, later, final termination both cited 6-B DCMR § 1607.2(a)(10), which states that an employee's "[u]nauthorized disclosure or use of (or failure to safeguard) information protected by statute or regulation or other official, sensitive or confidential information" is punishable by anything from "[c]ounseling to [r]emoval."  *See* Pl.'s Exs. 47, 53, Pl.'s MSJ, ECF No. 44-10.  The notice of proposed removal (but not the final notice of removal) also cited a provision of the collective bargaining agreement between the Union and DOC that "prohibit[s] [employees] from releasing undisclosed agency-related information to the public."  *See* Pl.'s Ex. 47 at 2; *see also* Defs.' Ex. 8 at 6, ECF No. 46-2.  And by signing the confidentiality agreement, Johnson "agree[d] not to directly or indirectly make known, divulge, publish, or communicate . . . confidential information" including "personal information regarding inmates."  *See* Defs.' Ex. 25, ECF No. 46-2.

Johnson does not meaningfully contest that the evidence described above could demonstrate an independent, legitimate reason for Defendants' decision to fire her.  She simply states, without citation, that "Defendants' proffered reasons have no factual basis in the record."

Pl.'s Opp'n at 13.  As just illustrated, that argument is baseless—there is record evidence that supports Defendants' stated rationale.  Instead, Johnson contends that—even if Defendants had an independent, legitimate reason for terminating her—the record also contains sufficient evidence from which a reasonable jury could infer that Defendants' stated reasons were pretextual.  *See id.*; *see also* Pl.'s MSJ at 21–23.

To demonstrate pretext, Johnson first points to the fact the hearing officer assigned to assess her proposed termination explicitly stated her "belie[f] that the proposal for [Johnson's] removal is retaliatory in nature."  *See* Pl.'s Ex. 49 at 7.  The hearing officer initially concluded that, although Johnson had disclosed "sensitive and confidential" information, "removal does not seem like a reasonable punishment" given Johnson's nearly three decades of service and no record of "prior disciplines."  *Id.*  The hearing officer instead recommended that Defendants "reprimand" or "suspen[d]" Johnson, not fire her.  *Id.*  That initial recommendation—coupled with the fact that such penalties would have also accorded with the prescribed sanctions for first-time offenders described in the regulations Johnson was charged with violating, *see* 6-B DCMR § 1607.2(a)(10) (authorizing as little as "[c]ounseling")—provides evidence from which a jury could infer retaliatory animus.  *Cf. Anderson v. Brennan*, 911 F.3d 1, 9, 12 (1st Cir. 2018) (affirming district court's finding that "'evidence that removal was a disproportionate level of discipline,' supported an inference of retaliatory motive").

Additionally, Johnson points to evidence tending to undermine Defendants' pronounced interest in shielding "pre-investigatory information" from disclosure.  To that end, she cites her own testimony explaining that not all of the incidents reported on the DOC Incident Notification List engender an investigation.  *See* Pl.'s Ex. 1 at 75:14–78:11.  On its own, that may not be enough to cast sufficient doubt on Defendants' stated rationale.  But Johnson also points out that

there is no evidence that the incident reported in the April 23 "planned use of force" email was, in fact, subject to further investigation. *See* Pl.'s Opp'n at 18. And as for the confidentiality of the email, there is evidence that DOC did not follow its own policies in designating the email or its contents as confidential. *See id.* at 13–14; *see also* Pl.'s MSJ at 21. While DOC's failure to follow its own policies is certainly not dispositive in and of itself, it is still a relevant factor. *Cf. Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020) (explaining that although "an employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual, . . . such a failure is certainly not irrelevant" (cleaned up)). And, here, that factor is one of a combination of factors that could lead a reasonable jury to doubt that Defendants were motivated purely by a desire to protect pre-investigatory or confidential information from disclosure.

In the end, it is plausible that Defendants have the better argument and that a jury would find that they did not retaliate against Johnson for making a protected disclosure. But to be entitled to summary judgment, Defendants must prove that there is no genuine dispute of material fact as to the legitimacy of Johnson's termination. *See Coleman*, 794 F.3d at 62 ("[T]he burden of persuasion *remains* on the defendant even once a legitimate and independent rationale for an action has been articulated."). They have failed to carry their burden with respect to Johnson's disclosure of the "planned use of force" email. Thus, to the extent they seek summary judgment on Johnson's disclosure of that email, their motion is denied. Defendants have, however, demonstrated that no reasonable jury could find that they violated the DCWPA with respect to Johnson's six other allegedly protected disclosures. The Court grants Defendants summary judgment on those disclosures.

## B.  First Amendment Retaliation

The parties also cross-move for summary judgment on Johnson's Section 1983 claim. That claim alleges that Defendants Booth and Patten retaliated against her for exercising her First Amendment rights.[7]

It is well-established "that individuals do not 'relinquish the First Amendment rights they would otherwise enjoy as citizens' when they accept employment with the government." *Navab-Safavi v. Glassman*, 637 F.3d 311, 315 (D.C. Cir. 2011) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  At the same time, however, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* (quoting *Pickering*, 391 U.S. at 568).  "To balance these competing interests in First Amendment retaliation claims by government employees," courts in this circuit apply a four-factor test:

> First, the public employee must have spoken as a citizen on a matter of public concern.  Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern.  Third, the employee must show that [her] speech was a substantial or motivating factor in prompting the retaliatory or punitive act.  Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)).  The first two prongs of this analysis "involve questions of law" for the court to decide, whereas "the second two implicate questions of fact" for the jury.

---

[7] Further references to "Defendants" in this section refer only to Booth and Patten in their personal capacities in line with Count II as pleaded in Johnson's amended complaint.  *See* Am. Compl. ¶¶ 92–97.

*LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016); *see Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994).

Defendants do not dispute that Johnson has satisfied the first element of the *Bowie* test. *See* Defs.' Opp'n at 17. The parties agree that Johnson spoke as both a private citizen and in her capacity as a member of the Union's Executive Board, and that her speech addressed matters of public concern. *See Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 224 (D.D.C. 2010) ("Courts have recognized that when a public employee is acting in [her] capacity as a union leader, [her] speech is protected by the First Amendment."); *see also Johnson*, 2021 WL 3021458, at *12 ("The alleged spread of a contagious disease among DOC personnel and inmates due to DOC mismanagement is a matter of public concern."). But Defendants contest Johnson's ability to satisfy the other three elements of the test, Defs.' Opp'n at 17–20, and, accordingly, contend that they are entitled to summary judgment on Count II, *see* Defs.' MSJ at 18–23. Alternatively, Defendants argue that the doctrine of qualified immunity shields them from liability for any violation of Johnson's First Amendment rights. *See* Defs. MSJ at 23–25.

### 1. Merits of Retaliation Claim

Johnson expressed her views on DOC's handling of the COVID pandemic in multiple ways and venues throughout April and May of 2020. Thus, although there is no dispute that Johnson spoke as a citizen on matters of public concern during this period, it is useful to briefly describe the specific instances of speech on which Johnson's First Amendment claim rests. Johnson's amended complaint alleged that the protected speech that formed the basis of this claim was (1) her "sharing of emails with Union attorneys" and (2) her "sharing [of] her experiences and beliefs with the press." *See* Am. Compl. ¶ 94. Her summary judgment motion mirrors that framework: it argues that Defendants retaliated against her (1) for

34

"forwarding . . . emails to Union attorneys" and (2) based on the "statements [she made] to the media." *See* Pl.'s MSJ at 24.  The following discussion will focus on those specific instances of Johnson's speech.

### a. Whether DOC's Interests Outweigh Johnson's Interests

The Court starts with the second-prong of the *Bowie* test.  For a government employee to prevail on a First Amendment retaliation claim, she must demonstrate that her interest "as a citizen, in commenting upon matters of public concern" outweighs the government's interest in "promoting the efficiency of the public services it performs through its employees."[8]  *Pickering*, 391 U.S. at 568; *see also LeFande*, 841 F.3d at 494.  To assess these competing interests, courts consider factors such as "whether the [employee's] statement[s] impair[] discipline by superiors or harmony among co-workers, ha[ve] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[] the performance of the speaker's duties or interfere[] with the regular operation of the enterprise."  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *see also LeFande*, 841 F.3d at 494.  "[T]he manner, time, and place of the employee's expression" are also relevant considerations.  *Rankin*, 483 U.S. at 388; *see also Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021).  "The government bears the burden of justifying its adverse employment action."  *Baumann v. District of Columbia*, 795 F.3d 209, 216 (D.C. Cir. 2015) (internal alterations omitted) (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995)).

Johnson contends that she had a weighty interest "in speaking out about the conditions in the Jail" and DOC leadership's alleged "lack of response" to those conditions.  Pl.'s MSJ at 26;

---

[8] This balancing test is often referred to as the *Pickering* test, and the Court will occasionally refer to it as such throughout this opinion.

*see also* Pl.'s Reply at 14 ("Johnson's interest was in speaking out about the horrible COVID-19 conditions and DOC's failure to manage the pandemic within its facilities . . . .").  The Court agrees that Johnson had a significant interest in publicly detailing the "rapid and dangerous spread of COVID-19 among DOC inmates[,] staff and their families," as well as insufficient "contact tracing," DOC's allegedly "inaccurate reporting of positive cases," and DOC's alleged mismanagement of the COVID crisis.  *See* Pl.'s Opp'n at 18–19.  Moreover, the public had an interest in hearing what Johnson had to say.  *See Breiterman*, 15 F.4th at 1177 (weighing "the public's interest in obtaining information").  And given Johnson's thirty-year career at DOC and her leadership role in the Union, Johnson's perspective on these issues was especially beneficial and well-informed.  *See id.* (explaining that "[w]hen a government employee is a 'member of a community most likely to have informed and definite opinions' about an issue, the public has an interest in not being 'deprived of informed opinions'" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 419–420 (2006))).

Defendants counter that whatever interests Johnson had in speaking out about conditions in the Jail are outweighed by their interest in safeguarding confidential information from disclosure.  *See* Defs.' MSJ at 19–20.  They more specifically argue that they have an interest in maintaining the privacy of "pre-investigatory" information and inmate medical data.  *Id.*  The Court will address these categories of information separately and in turn.

First, the Court is not persuaded that—in the specific context of this case—Defendants have demonstrated a particularly significant interest in protecting "pre-investigatory" information.  In support of this stated interest, Defendants emphasize that the "planned use of force" email shared by Johnson originated from the DOC Incident Notification List.  *See* Defs.' MSJ at 20–21.  They further explain that, when similar notifications are distributed, "the

underlying facts have not yet been investigated and [DOC] has not yet determined the appropriate next steps, which may include inmate or staff discipline or referral for criminal charges." *Id.* at 21.  The Court does not gainsay the importance of keeping such information confidential, especially to the extent that disclosing the information would have a detrimental impact on inmates' or staff members' due process rights or the integrity of an investigation. *See id.*; *see also* Defs.' Ex. 3 at 43:12–44:9.  Here, however, there is no evidence that suggests that DOC conducted any investigation into the incident described in the "planned use of force" email. While Defendants may have a *general* interest in keeping "pre-investigatory" information confidential, they have not adequately explained—and the record does not otherwise reveal— how that interest applied here, where no investigation actually occurred.  *See Johnson*, 2021 WL 3021458, at *12 (faulting Defendants for failing to "make clear . . . how *this particular disclosure* would jeopardize [a specific] investigation" (emphasis added)).  Moreover, the record makes clear that, upon learning Johnson had leaked the "planned use of force" email, Defendant Patten "took immediate steps" to revoke Johnson's access to the DOC Incident Notification List. *See* Defs.' SUMF ¶ 52.  Patten's prompt action significantly minimized the risk that Johnson would continue to share emails containing "pre-investigatory" information in the future.

Defendants' second asserted interest—maintaining the privacy of other confidential, sensitive information, such as inmates' medical data, *see* Defs.' MSJ at 19–20—is somewhat stronger.  On this front, Defendants point to specific policies DOC has enacted to maintain the confidentiality of such information.  They cite, for example, DOC's Health Information Privacy policy, which states that DOC seeks to both "safeguard the confidentiality . . . of all protected health information that DOC creates, receives, maintains, or transmits" and to "protect against any reasonably anticipated . . . disclosures of [health] information that are not permitted or

required under the HIPAA."  Defs.' Ex. 21, ECF No. 46-2.  They also cite a policy prohibiting

the release of "[i]nmate [r]ecords" except under specific conditions.  *See* Defs.' Ex. 19, ECF No.

46-2.  And they further reference training materials used to "remind" staff of their obligations to

keep inmates' health information secret.  *See* Defs.' MSJ at 20; Defs.' Ex. 23, ECF No. 46-2.  To

the extent Johnson violated DOC policies meant to protect such information from disclosure,

Johnson's violations of those policies is a factor that strengthens Defendants' asserted interests.

*See Breiterman*, 15 F.4th at 1177 (finding that plaintiff's violation of employer's policy

"regarding confidentiality" and the protection of "sensitive information" factored in favor of

employer's "strong interest in disciplining" plaintiff for leaking information to media); *see also*

*Connick v. Myers*, 461 U.S. 138, 153 & n.14 (1983) (explaining that the government's interests

strengthen when an employee violates an announced official policy).

That said, consideration of DOC's asserted interest in maintaining the privacy of health

information must also be considered in light of the "time" and "context" in which Johnson was

disclosing such information.  *Breiterman*, 15 F.4th at 1176 (quoting *Rankin*, 483 U.S. at 388).

Here, the context was a rapidly evolving pandemic—one in which Johnson believed DOC was

failing to protect the health of both inmates and Jail staff.  In that vein, to the extent the emails

Johnson forwarded contained health information, that information overwhelmingly related to

inmates and staff members who had contracted or been exposed to COVID.  *See* Defs.' Ex. 4B,

ECF No. 45-3.  Given all of that, the Court concludes that Defendants have not demonstrated

that their broad interest in protecting against the "unauthorized disclosure" of "medical

information" was particularly weighty in the specific context in which Johnson's speech arose.

Finally, the Court notes that Defendants' asserted interest in shielding the release of

confidential information only addresses a subset of Johnson's protected speech.  That is, this

interest is only relevant to Johnson's decision to forward emails to the Union's attorneys.  But as discussed above, Johnson expressed her dissatisfaction with DOC's response to COVID in other ways that have nothing to do with the forwarding of such emails, including the April 1 press conference and Johnson's late-April interview with a local news station.  Thus, in balancing their asserted interests against Johnson's, Defendants take an overly narrow view of Johnson's protected speech.  If Johnson's First Amendment claim were based solely on her disclosure of emails containing inmate and staff health information, Defendants *may* have a stronger argument that their interests in confidentiality outweigh Johnson's interests in disclosure.  But that is not the case here.  *See Baumann*, 744 F. Supp. 2d at 224 (finding that plaintiff's interests outweighed defendants' interests in part because defendants' view of the protected speech at issue was "overly narrow").  All that being so, the Court concludes that, as a matter of law, Johnson's interests in speaking outweighed DOC's interests in penalizing her for such speech.

### b. Substantial or Motivating Factor

Johnson must next show that her public statements or her emails to the Union's attorneys were "a substantial or motivating factor in prompting [Defendants'] retaliatory or punitive act[s]"—that is, their decision to demote or fire her.[9]  *See Bowie*, 642 F.3d at 1133 (quoting *Wilburn*, 480 F.3d at 1149).  This causation requirement is "much greater than the showing required to establish a *prima facie* case of retaliation under the DCWPA."  *Payne*, 741 F. Supp.

---

[9] Defendants do not contend that their decision to remove Johnson from her post as Adjustment Board Chairman or their later decision to fire her would fail to qualify as retaliatory acts.  *See* Defs.' Opp'n at 19–20.  That is wise, given that "the First Amendment protects government employees from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee when intended to punish her for exercising her free speech rights.'" *Tao*, 27 F.3d at 639 (internal alterations omitted) (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8 (1990)); *see also Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 137 (D.D.C. 2013)).

2d at 219.  Although causation is normally a question of fact to be decided by the jury, a plaintiff opposing summary judgment must show that there is "evidence (either of a direct or indirect nature) from which a reasonable jury could find the required causal link between the protected disclosures . . . and the allegedly retaliatory actions." *Williams v. Johnson*, 701 F. Supp. 2d 1, 17 (D.D.C. 2010); *see also Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 534 (D.D.C. 2015).

Here, and as previously discussed, Johnson has failed to proffer any evidence that Defendants were aware of the comments she made during the April 1 press conference or even of the fact that she spoke at the press conference in the first place.  *See supra* Part IV.A.1.a.  That being so, the Court agrees with Defendants that a reasonable jury could not find a causal nexus between Johnson's April 1 statements and either her demotion or termination.  *See, e.g.*, *Williams*, 701 F. Supp. 2d at 17 (granting summary judgment to defendants where defendants lacked awareness of protected speech).

Next, Johnson argues that the interview she gave in late April to local news station WUSA9—excerpts of which were included in a story published on May 1—was a substantial or motivating factor in prompting Defendants' decision to demote and fire her.  *See* Pl.'s MSJ at 27. Defendants first counter that there is no evidence that Defendant Booth knew about the interview or the article.  Defs.' Opp'n at 19.  And second, although they concede that Defendant Patten was aware that Johnson would be participating in the interview, they argue that that awareness was attained only *after* "the decision to remove Plaintiff from her post and [to] initiate her termination [had] already [been] made."  *See id.*; *see also* Defs.' MSJ at 22.

Taking Defendants' arguments in turn, there is no record evidence that rebuts Defendant Booth's sworn statements that he "did not receive any notification of Sergeant Johnson's interview with WUSA 9," that he "ha[d] no knowledge of what, if any, interviews or statements

she gave," that he "never [saw] footage of this interview," and that he "ha[d] no knowledge of whether it took place, what statements Sergeant Johnson made, or when, if ever, it was published." Defs.' Ex. 4 ¶¶ 19–20. That being so, a reasonable jury could not find that Booth took retaliatory actions against Johnson because of her interview or WUSA9's subsequent publication of some of Johnson's statements. *See, e.g.*, *Williams*, 701 F. Supp. 2d at 17.

As for Defendant Patten, the record shows that DOC removed Johnson from her post as Adjustment Board Chairman on April 27. *See* Pl.'s Ex. 44. The Union did not notify Patten that Johnson would be interviewed until April 28. *See* Pl.'s Ex. 43. There is thus no evidence of a causal nexus between Johnson's interview and DOC's decision to remove her from the Adjustment Board. *See, e.g.*, *Coleman*, 794 F.3d at 64 (explaining in analogous context that causation cannot exist where adverse employment action predates protected speech); *Wang v. Washington Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 83 (D.D.C. 2016) (similar).

The same cannot be said of the link between Johnson's interview and DOC's decision to terminate her. Patten's argument on this front rests entirely on the premise that she—and others at DOC—had decided to terminate Johnson at some point between April 23 and April 27. *See* Defs.' Opp'n at 19; Defs.' Ex. 5 ¶ 19. The exact timing of when Patten decided to terminate Johnson is important because "an adverse employment action that was already *contemplated* before a plaintiff engaged in protected activity cannot be evidence of retaliation." *Wang*, 206 F. Supp. 3d at 83 (emphasis added) (quoting *Terveer v. Billington*, 34 F. Supp. 3d 100, 119 (D.D.C. 2014)); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). The only record evidence suggesting that

DOC had decided to fire Johnson on or before April 27 is Patten's sworn statement that she was "in agreement with the decision that DOC would seek to terminate [Johnson's] employment because of her breach." *See* Defs.' Ex. 5 ¶ 19.  It is not clear who made the "decision" to which Patten refers.  And there is other evidence from which a reasonable jury could find that the decision to terminate Johnson was made later: Patten received a "draft" of Johnson's "removal paperwork" on May 5,[10] *see id.* ¶ 20, Patten did not notify Johnson of her proposed removal until May 29, *see* Pl.'s Ex. 47, and DOC did not finalize her termination until August, *see* Pl.'s SUMF ¶¶ 76–77.  All that being so, the Court concludes that a reasonable jury could find that Johnson's WUSA9 interview was a motivating factor in Patten's decision to fire her.

A reasonable jury could also find that Johnson's forwarding of emails to Union attorneys was a substantial or motivating factor in her termination.  Indeed, Defendants do not disclaim the fact that her forwarding of such emails was a significant factor in their decision to demote and fire her.[11]  Johnson's final notice of termination explained that she was being terminated based on the "details . . . stated in the [proposed] notice" of termination issued on May 29.  Pl.'s Ex. 53 at 1.  The proposed notice, in turn, relied heavily on Johnson's forwarding of emails as a rationale for firing her.  *See* Pl.'s Ex. 47.  Such evidence would allow a reasonable jury to conclude that Johnson's emails were a significant factor in Defendants' decision to fire her.  *See Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 143 (D.D.C. 2013) (granting plaintiff

---

[10] If a jury were to find that Patten had informally decided to fire Johnson on or around May 5, the jury could also find the close temporal proximity between Johnson's interview and that informal decision to be indicative of causation.  *See Sanders*, 85 F. Supp. 3d at 535–36 (denying defendants summary judgment where "close temporal proximity between [plaintiff's] protected speech" and defendants' informal, not-yet-announced decision to deny request to rescind resignation provided enough "circumstantial support" to show causation).

[11] Defendants retort that they fired Johnson not for the act of forwarding the emails *per se*, but rather because the forwarded emails contained sensitive, confidential information.  That explanation is more appropriately directed to the next prong of the analysis.

summary judgment on causation where employer expressly referred to plaintiff's protected speech as a basis for adverse action).

### c. Refuting Defendants' Explanation for Decision

Once a plaintiff has met her initial burden of showing that she engaged in constitutionally protected speech, and that this speech was a "substantial" or "motivating" factor in prompting the defendants' actions, the burden shifts to the defendants to show, by a preponderance of the evidence, that they would have taken the same actions "even in the absence of the protected conduct." *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Sanders*, 85 F. Supp. 3d at 537. If the defendant does so, the plaintiff "must refute the [defendant's] showing . . . that it would have reached the same decision in the absence of the protected speech." *Bowie*, 642 F.3d at 1133 (quoting *Wilburn*, 480 F.3d at 1149).

The Court has already discussed in detail the evidence that supports Defendants' explanation that they would have demoted and fired Johnson even absent her protected speech. As explained, although there is sufficient evidence from which a reasonable jury could conclude that Defendants would have fired Johnson because she disclosed confidential information in violation of DOC policies and signed agreements, there is also evidence from which a jury could conclude that Defendants' stated reasons were, at least in part, pretextual. *See supra* Part IV.A.2. The latter finding is enough to "refute [Defendants'] showing that [they] would have reached the same decision in the absence of the protected speech." *See Martin v. District of Columbia*, 78 F. Supp. 3d 279, 327 n.74 (D.D.C. 2015) (cleaned up) (quoting *Bowie*, 642 F.3d at 1133); *see also LeFande v. District of Columbia*, No. 09-cv-217, 2014 WL 12684473, at *6 (declining to grant summary judgment where evidence could support finding that employer's stated motives were

pretextual); *Bowyer*, 910 F. Supp. 2d at 204 (granting summary judgment to defendant only where there was a "complete absence of evidence" to refute employers' showing that they would have acted differently regardless of plaintiff's protected speech).  All that being so, the Court concludes that there are genuine disputes of material fact that a reasonable jury could resolve in either Johnson's or Defendants' favor.

### 2.  Qualified Immunity

Because the Court concludes that there are triable issues of fact on Johnson's First Amendment claim, the Court must consider Defendants' alternative argument that they are entitled to qualified immunity from such a claim.  The Court concludes that they are not so entitled.

Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks omitted).  It accomplishes this by shielding federal and state officials from money damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In other words, the immunity protects public officials from civil consequences for their official acts unless the contours of the constitutional right that they are accused of violating are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Navab-Safavi*, 637 F.3d at 317 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The plaintiff bears the burden of showing "that the particular right in question—narrowly described to fit the factual pattern confronting the [officials]—was clearly established." *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citation omitted).

Trial courts have discretion to decide which prong of the two-prong qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) ("[L]ower federal courts have the discretion to decide only the more narrow 'clearly established' issue 'in light of the circumstances of the particular case at hand.'" (quoting *Pearson*, 555 U.S. at 236)).  Here, however, the Court has already concluded that a reasonable jury could find that Defendants violated Johnson's First Amendment rights. The issue of Defendants' qualified immunity thus hinges on whether Johnson's First Amendment rights—particularly and "narrowly described to fit the factual pattern confronting [Defendants]—[were] clearly established." *Dukore*, 799 F.3d at 1145 (citation omitted).

For a right to be "clearly established" at the time of the official's conduct, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft*, 563 U.S. at 741).  Said another way, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).  "[C]onduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (cleaned up) (quoting *Anderson*, 483 U.S. at 640).

Moving from the general to the more specific, the Supreme Court has explained that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse

consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman*, 547 U.S. at 256). But as the D.C. Circuit has observed, the "Supreme Court has cautioned [courts] not to define the right at too high a level of generality," *Aref v. Lynch*, 833 F.3d 242, 267 (D.C. Cir. 2016), and thus the right at issue here cannot be understood as the "general right to be free from retaliation for one's speech," *Reichle v. Howards*, 566 U.S. 658, 665 (2012); *see also Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 729 (9th Cir. 2022). Moreover, as discussed above, a government employee's freedom of speech rights are not absolute—rather, the employee's right to speak depends on whether the employee spoke "as a citizen on a matter of public concern" and whether the "governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon" such matters. *Bowie*, 642 F.3d at 1133 (quoting *Wilburn*, 480 F.3d at 1149).

Here, Defendants assert that they "reasonably believed that they could terminate Plaintiff for her unauthorized release of confidential agency records that included pre-investigatory and inmate medical information." Defs.' MSJ at 24. Johnson replies that Defendants "cannot show that they had a good faith reasonable belief to terminate" her for these reasons, and that "no reasonable official would have thought it was reasonable to terminate . . . Johnson for these alleged justifications." Pl.'s Opp'n at 22. She further argues that "no reasonable official would believe" that the *Pickering* balancing test could come out in favor of DOC's asserted interests in protecting confidential information. *Id.*

As this Court and others have explained, it can be "difficult[]" to find "clearly established law" when the question of whether a government employee's speech is protected rests on "a balancing of interests" under *Pickering*. *See Johnson*, 2021 WL 3021458, at *14 (quoting

*Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998)).  One court recently stated that, because "the *Pickering* analysis requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will rarely, if ever, be sufficiently clearly established to preclude qualified immunity."  *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 784 (9th Cir. 2022) (internal quotation marks omitted).  But, in some cases, "the illegality of the [defendants'] conduct is sufficiently clear that they can fairly be said to have been on notice of the impropriety of their actions," despite the fact that they may not be able to "predict" the exact "outcome" of the balancing test.  *See Johnson*, 2021 WL 3021458, at *14 (quoting *Kinney v. Weaver*, 367 F.3d 337, 371–72 (5th Cir. 2004)); *see also Dodge*, 56 F.4th at 784 (explaining that there are "rare occasions where the *Pickering* balancing test so clearly cuts in [the plaintiff's] favor that the violation of his First Amendment rights was clearly established").  In those rare instances, "th[e] case does not require any real balancing at all, for the [defendants] do not have any relevant, legitimate interests to put on their side of the *Pickering* scales."  *See Johnson*, 2021 WL 3021458, at *14 (quoting *Kinney*, 367 F.3d at 372).  And the D.C. Circuit has affirmed denials of qualified immunity in cases where the government's asserted interests "weighed . . . little" against the plaintiff's own interests.  *See Navab-Safavi*, 637 F.3d at 317.

   With the benefit of discovery, it is now apparent that this is *not* a case in which Defendants "do not have *any* relevant, legitimate interests to put on their side of the *Pickering* scales."  *See Johnson*, 2021 WL 3021458, at *14 (emphasis added) (quoting *Kinney*, 367 F.3d at 372).  That said, the Court's earlier analysis illustrates the relative insubstantiality of Defendants' asserted interests.  *See supra* Part IV.B.1.a.  This is particularly true to the extent Defendants purport to assert an interest in preventing the release of "pre-investigatory" information.  As

explained above, Defendants point to no evidence showing that an investigation ensued after Johnson forwarded the "planned use of force" email.  Further—and perhaps more importantly— the "immediate steps" Defendants took to revoke Johnson's access to similar emails meant that, by the time they terminated her, there was almost no risk that she would disclose similar emails or information in the future.  *See* Defs.' SUMF ¶ 52.  A reasonable official in Defendants' position therefore could not have believed that preventing the further release of "pre-investigatory" information would come close to outweighing Johnson's own, significant interest in disclosing the worsening conditions at the D.C. Jail and the health threats to inmates and staff resulting from DOC leadership's failure to mitigate the situation.

That being so, from the perspective of a reasonable official at the time, the only appreciable interest on Defendants' side of the *Pickering* scales was Defendants' interest in protecting the release of inmate and staff health information.  On this front, the fact that DOC had enacted policies to prevent the release of such information—policies which Johnson violated—gives weight to Defendants' interest in protecting such information from disclosure. At the same time, the Court previously explained (1) that the health information that Johnson *actually* released was almost entirely cabined to information relating to individuals' COVID exposure or infection and (2) that DOC had a lesser interest in shielding the release of such information given evidence revealing DOC's struggles to mitigate the early effects of the pandemic amongst the inmate population and staff.  The Court is not alone in reaching these conclusions.  On the contrary, the hearing officer who initially assessed Johnson's proposed termination acknowledged that Johnson had disclosed emails containing confidential health information but emphasized that "the information in the emails was directly related to the COVID-19 public health crisis."  *See* Pl.'s Ex. 49 at 6.  The hearing officer also found it

significant that Johnson was motivated to send the emails to the Union's attorneys because the emails demonstrated that "correctional officers were afraid for their health and the health of the inmates." *See id.* at 7.

In light of the above, the Court concludes that what little interest Defendants had in protecting the release of confidential medical information was so heavily outweighed by Johnson's countervailing interest in shedding light on the deplorable conditions in the D.C. Jail and the ongoing threat to inmate and staff safety that no reasonable official in Defendants' position could have concluded that the *Pickering* scales would tip in DOC's favor. This conclusion is buttressed by the fact that Defendants were, in fact, put on notice that the balance weighed against them: the hearing officer initially concluded—after balancing many of the factors discussed above and accounting for Johnson's "twenty-nine years" of service and history of "no prior disciplines"—that terminating Johnson was not "reasonable punishment." *Id.* Indeed, the hearing officer added that Johnson's termination appeared to be "retaliatory in nature" and instead suggested that DOC "reprimand" or "suspen[d]" Johnson. *Id.* Defendants' decision to continue to insist on Johnson's termination in the face of the hearing officer's initial findings suggests that they "knowingly and intentionally . . . terminated [Johnson's] employment because [she] had attempted to raise her public-safety concerns" regarding the conditions at the Jail—something that "any reasonable government official would have" known was "clearly unlawful" to do.[12] *See Jones v. Quintana*, 831 F. Supp. 2d 75, 88 (D.D.C. 2011) (citation

---

[12] The record also contains evidence suggesting that Defendants' decision to seek reconsideration of the hearing officer's initial decision was itself irregular. *See* Pl.'s Ex. 51 at 2, ECF No. 44-10. Specifically, Johnson attaches an email in which the Union's attorney averred that DOC had not "remand[ed]" a hearing officer's decision since 2011. *Id.* Such evidence further undermines Defendants' claim that they are entitled to qualified immunity. *Cf. Dist. Council 20, Am. Fed'n of State, Cnty. & Mun. Emps., AFL CIO v. District of Columbia*, 150 F. Supp. 2d 136, 146 (D.D.C. 2001) (denying defendant qualified immunity in part because

omitted).  Accordingly, Defendants are not entitled to qualified immunity from Johnson's First

Amendment charge.

### C.  Sealed Filings

Finally, the Court must address Johnson's motion for leave to file the vast majority of her

summary judgment papers and supporting exhibits under seal.[13]  *See* Pl.'s Mot. Leave File Under

Seal ("Pl.'s Mot. Seal"), ECF No. 44.  Specifically, Johnson seeks leave to file her motion for

summary judgment, her statement of undisputed material facts, and all supporting exhibits under

seal.  *Id.* at 1.  Johnson asserts that her motion accords with the Protective Order entered in this

case, *see* Protective Order, ECF No. 33, because it seeks to place under seal documents that

Defendants have designated as "confidential," Pl.'s Mot. Seal at 1.  She further explains that

Defendants designated as "confidential" documents "such as the DOC's report on its

investigation, the emails Sgt. Johnson sent about the conditions at the [J]ail, the memorandum of

remand to the Hearing Officer, and the final notice of termination."  *Id.*  And she states that,

"[a]lthough [she] does not believe any harm would come from the public disclosure of the

documents, paragraph 13 of the [P]rotective [O]rder prohibits her from publicly filing her

memorandum, supporting exhibits, or statement of undisputed facts.  Instead, she is required to

seek leave to file the documents under seal."  *Id.* at 2; *see also* Protective Order ¶ 13 ("Any party

or third party who seeks to file with the Court any transcript, deposition, exhibit, answer to

interrogatories, and other information previously designated CONFIDENTIAL pursuant to this

Protective Order, or any pleading, memorandum, or other submission to the Court purporting to

---

defendant "departed from his usual practice by not following the recommendations of the
supervisors to whom he delegated evaluation responsibility" and explaining that such a departure
gave rise to an inference of retaliatory animus).

[13] Defendants also move to file certain exhibits under seal.  *See* Defs.' Mot. File Exhibits
Under Seal, ECF No. 45.  Johnson does not oppose Defendants' motion, and the Court grants it.

discuss, reproduce, summarize, or paraphrase any such CONFIDENTIAL INFORMATION,

shall seek leave to file the protected material under seal in accordance with D.D.C. LCvR 5(h).").

Defendants partially oppose Johnson's motion to seal. *See* Defs.' Partial Opp'n Pl.'s

Mot. Leave File Under Seal ("Defs.' Opp'n Pl.'s Mot. Seal"), ECF No. 47. They do not oppose

Johnson's motion to the extent it seeks to seal "Plaintiff's Exhibits 17, 21–26, 29–32, 34–35, 46,

and 62–63." *Id.* at 1. They oppose sealing the rest of Johnson's filings, given that the documents

at issue "were not marked confidential subject to the Court's protective order and do not contain

confidential information." *Id.*

The "right of public access to judicial records 'is a fundamental element of the rule of

law, important to maintaining the integrity and legitimacy of an independent Judicial Branch.'"

*In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1127

(D.C. Cir. 2020) (quoting *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 663

(D.C. Cir. 2017)). There is thus a "'strong presumption in favor of public access to judicial

proceedings,' including judicial records." *Id.* (quoting *United States v. Hubbard*, 650 F.2d 293,

317 (D.C. Cir. 1980)). Courts in this Circuit apply "a six-factor balancing test [to] determin[e]

whether documents should be sealed." *Friedman v. Sebelius*, 672 F. Supp. 2d 54, 57 (D.D.C.

2009). Those factors are:

> (1) the need for public access to the documents at issue; (2) the extent of previous
> public access to the documents; (3) the fact that someone has objected to
> disclosure, and the identity of that person; (4) the strength of any property and
> privacy interests asserted; (5) the possibility of prejudice to those opposing
> disclosure; and (6) the purposes for which the documents were introduced during
> the judicial proceedings.

*Metlife, Inc.*, 865 F.3d at 665 (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409

(D.C. Cir. 1996)).

Here, Defendants argue that three of the exhibits Johnson seeks to file under seal—Plaintiff's Exhibits 37, 40, and 41—do not need to be filed under seal despite the fact that they were marked as "Confidential Subject to Protective Order."  Defs.' Opp'n Pl.'s Mot. Seal at 3.  Defendants acknowledge that they themselves designated these documents as confidential, but now state that they did so "out of an abundance of caution."  *Id.*  They further explain that the documents do not actually contain confidential information.  *Id.*  Given that it was *Defendants* who marked these documents "confidential" yet now disavow the confidentiality of these specific documents, the Court sees no need to maintain Plaintiff's Exhibits 37, 40, and 41 under seal.  The Court therefore denies Johnson's motion for leave to file these documents under seal.

Second, Defendants contend that the remainder of Johnson's filings—her motion for summary judgment, her statement of material facts, and Plaintiff's Exhibits 1–16, 18–20, 27–28, 33, 36, 38–39, 44–45, 47–61, and 64—should not be sealed either because (1) they were not marked as "confidential" in the first place or (2) they do not reveal confidential information.  *Id.* at 3–4.  They also argue that some of the exhibits—specifically, Plaintiff's Exhibits 1, 3, 9–11, 15–16, 55, and 57—"have been filed on the public docket in other matters."  *Id.* at 4; *see Friedman*, 672 F. Supp. 2d at 58 ("The fact that a document was accessible to the public prior to being sealed 'may weigh in favor of subsequent access.'" (quoting *Hubbard*, 650 F.2d at 318)).  For her part—and despite moving to seal the filings and exhibits described in this paragraph—Johnson seems to agree that the documents do not need to be sealed.  She states in her motion that no "harm would come from the public disclosure of the documents."  Pl.'s Mot. Seal at 2.  In light of Johnson's statement and the "strong presumption in favor of public access to . . . judicial records," *In re Leopold*, 964 F.3d at 1127 (citation omitted), the Court denies Johnson's motion

for leave to seal to the extent it seeks to seal her motion for summary judgment, her statement of material facts, and Plaintiff's Exhibits 1–16, 18–20, 27–28, 33, 36, 38–39, 44–45, 47–61, and 64.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 44-2) is **DENIED**; Defendants' motion for summary judgment (ECF No. 46) is **GRANTED IN PART AND DENIED IN PART**;  Plaintiff's motion for leave to file under seal (ECF No. 44) is **GRANTED** to the extent it seeks leave to file Plaintiff's Exhibits 17, 21–26, 29–32, 34–35, 46, and 62–63 under seal, and **DENIED** in all other respects; and Defendants' motion to file exhibits under seal (ECF No. 45) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 28, 2024                                         RUDOLPH CONTRERAS
                                                                      United States District Judge